UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHAZZ CLEVINGER,                                    Civil Action No. 23-cv-1159

1515 15th Street NW, Unit 416
Washington, DC 20005

       Plaintiff,

     v.

ADVOCACY HOLDINGS, INC., d/b/a
OneClickPolitics,

1 North Wacker Drive, Suite 3601
Chicago, IL 60606

      and

JOHN KOEPKE,

519 Wisner Street
Park Ridge, IL 60068

       Defendants.

## **COMPLAINT**

    Plaintiff Chazz Clevinger files this Complaint against Defendants Advocacy Holdings, Inc. and John Koepke for damages and other related relief. In support, Plaintiff states as follows.

### PARTIES

    1.    Plaintiff is a natural person and resident of the District of Columbia since 2019 who currently resides at 1515 15th Street NW, Unit 416, Washington, DC 20005.

    2.    Defendant Advocacy Holdings, Inc. d/b/a OneClickPolitics ("OCP") is a Delaware corporation with a principal address of 1 North Wacker Drive, Suite 3601, Chicago, Illinois 60606.

3.    Defendant Koepke is a natural person and resident of Illinois who resides at 519 Wisner Street, Park Ridge, Illinois 60068.

## JURISDICTION AND VENUE

4.    There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the District of Columbia and Defendants are citizens of Delaware and Illinois.

5.    Defendant OCP is a citizen of Delaware, the state of its incorporation, and Illinois, the state of its principal office.

6.    Defendant Koepke is a citizen of Illinois.

7.    The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

8.    This action properly lies in the District of Columbia pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred within this District.

9.    During the timeframe most relevant to this action, OCP's principal office was located in the District of Columbia.

10.    As of today, OCP still maintains an office physically located in the District of Columbia, reflecting a street address of 1717 Pennsylvania Avenue NW, Suite 1025, Washington, DC 20006 and a telephone number of (202) 800-8877. https://oneclickpolitics.com/who-we-are/ (visited April 26, 2023).

11.    Venue is appropriate in this court.

12.    This Court has personal jurisdiction over both Defendants as both Defendants have continuously transacted business in the District of Columbia for several years, contracted to supply

services in the District of Columbia for several years, supplied services in the District of Columbia for many years, caused tortious injury against Plaintiff in the District of Columbia, regularly solicited business in the District of Columbia for multiple years, engaged in a persistent and systematic course of conduct in the District of Columbia for several years, maintained employees in the District of Columbia for several years, provided products and rendered services in the District of Columbia for many years, paid taxes in the District of Columbia for several years, entertained and serviced clients in the District of Columbia for several years and derived millions of dollars of revenue in the District of Columbia over several years.

13.    Venue is appropriate in this court.

### FACTS COMMON TO ALL ALLEGATIONS

14.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set out herein.

15.    As of three months ago, Plaintiff was the CEO of OCP and Koepke was the chairman of OCP. However, in retaliation for Plaintiff's refusal to unlawfully discriminate based on race, gender and sexual orientation as directed by Defendant Koepke, Defendant Koepke engaged in a pattern of abuse and misconduct culminating in a physical assault and a threat to strike Plaintiff with a baseball bat. Plaintiff's working conditions became intolerable and Plaintiff was constructively terminated and forced to resign due to a hostile work environment.

16.    Criminal charges have been filed against Koepke in Illinois.

17.    Koepke has a violent temper and he is psychologically unstable.

18.    Koepke has been held in contempt of court. Ex. A is a true and accurate copy of an appellate opinion describing Koepke's violent behavior and lack of candor.

19.    After Koepke was held in contempt of court, the appellate court affirmed the trial court's finding that Koepke is "not particularly truthful or credible."

20.    The appellate court also affirmed the trial court's finding that Koepke's conduct was "evasive and combative."

21.    Prior to the 2019 order whereby the Appellate Court of Illinois affirmed the circuit court's contempt finding against Koepke, Koepke was previously arrested for violating a protective order (Cook County, IL case no. 02200561201). In a separate incident, Koepke was charged with aggravated assault and assault with intent to commit a felony (Duval County, FL case no. 8735200).

22.    Koepke has systematically made numerous unlawful statements and expressions of his discriminatory intent and practices.

23.    Koepke has stated that he does not want to hire racial minorities, women, or homosexuals.

24.    Koepke has made specific remarks demonstrating his animus against homosexuals and his discriminatory practices.

25.    Despite having to work with this vile person Koepke, though thankfully from afar given that Koepke rarely engaged in substantive work, Plaintiff was able to advance the interests of OCP substantially during his tenure from 2017 through 2023.

26.    Plaintiff joined OCP as a vice president in November 2016. He worked his way up to CEO in November 2017.

27.    The main OCP office has been in the District of Columbia at all relevant times.

28.    Plaintiff has resided in Washington, DC since December 15, 2019 and Plaintiff's addresses and dates of residency are as follows:

| Start Date | End Date | Residence |
|---|---|---|
| 6/1/2017 | 2/3/2019 | 9030 Timberwolf Court, Vienna, VA 22182 |
| 1/1/2019 | 12/31/2019 | 1300 Lyons Street, Great Falls, VA 22066 |
| 12/15/2019 | 6/30/2020 | 1527 Church Street NW, #PH, Washington, DC 20005 |
| 7/1/2020 | 8/31/2020 | 1204 G Street NE Washington, DC 20002 |
| 9/1/2020 | 4/10/2023 | 1515 15th Street NW, Unit 416, Washington, DC 20005 |

29.    As OCP's CEO, Plaintiff oversaw OCP's sales and marketing operations, which included recruiting, training, and business development.  Plaintiff also managed client service and technology domains.

30.    Plaintiff managed all aspects of OCP's Google AdWords lead generation activity including keywords, budgets, and bidding strategies. Plaintiff also distributed leads to the sales team and reached out to potential customers to sell OCP products and services.

31.    Plaintiff also regularly attended conferences as the face of OCP.

32.    At all relevant times, Plaintiff reported directly to OCP's founder/chairman Koepke, as well as the other founder/president Raymond Zenkich.

**Koepke's Unlawful Harassment**

33.    During Plaintiff's time as CEO, Plaintiff was constantly subjected to yelling, profanity, emails in "all caps" and other inappropriate and erratic behavior on the part of Koepke.

34.    The volume of improper activity by Koepke is enormous. The examples set forth herein are not the full extent of the misconduct that Koepke perpetrated.

35.    On December 8, 2020, Koepke told Plaintiff he had "gained weight, better lay off the burgers and pizza."

36.    Koepke would make frequent negative comments about Plaintiff's appearance.

37.    Koepke would also make negative comments about Plaintiff's marital status as a single man.

38.    For example, on March 11, 2021, Koepke told Plaintiff that Plaintiff "does not understand" things because of his marital status. (Koepke was held in contempt of court for violating court orders pursuant to his divorce).

39.    In June of 2021, Koepke aggressively questioned Plaintiff about who he was dating, subjecting Plaintiff to this treatment because of his marital status.

40.    On multiple occasions for several years, Koepke verbally abused Plaintiff when Plaintiff hired employees of diverse backgrounds, sexual orientations, and ethnicities.

41.    On June 24, 2021, during a phone call with Plaintiff, Koepke raised his voice and shouted at Plaintiff as follows, "don't be fucking stupid. Don't send me stuff like this over the internet," because Plaintiff sent Koepke a link to DC's new employment law: DC ACT 23-563.

42.    Koepke specifically told Plaintiff that he should not hire employees who fit in protected classes, such as racial minorities, women, and homosexuals because it would inevitably "lead to lawsuits."

43.    Plaintiff was forced to endure the unlawful and discriminatory policies foisted on him by Koepke. But Plaintiff disregarded Koepke's discriminatory policies and directives.

44.    Plaintiff was given a Hobson's Choice where he either had to follow Koepke's orders and violate the law by discriminating against new hires based on race, gender and sexual orientation, or Plaintiff had to disregard Koepke's orders and run the risk of enduring more of Koepke's wrath. Plaintiff chose the latter.

45.     As Plaintiff disregarded Koepke's orders to unlawfully discriminate, Koepke raised his scrutiny and mistreatment of Plaintiff.  Koepke retaliated against Plaintiff because Plaintiff would not carry out Koepke's discriminatory and unlawful employment policies.

46.     In 2021, Plaintiff suggested to Koepke that OCP should be mindful of new employment laws in DC. In response, Koepke told Plaintiff "go stuff your face with a pizza, I don't have time for this" and abruptly hung up the phone.

47.     On July 12, 2021, on a business phone call with Plaintiff, Koepke raised his voice and used profanity toward Plaintiff, telling him "I don't give a fuck about acquisition or consulting." Later in the call, Koepke aggressively hung up on Plaintiff.

48.     On October 11, 2022, as a result of Plaintiff's decision to not follow Koepke's orders to unlawfully discriminate and after Koepke had harassed Plaintiff based on his appearance and marital status, during a work Zoom call, Koepke indicated that he may reduce Plaintiff's pay.

49.     In response, Plaintiff mentioned that Plaintiff recently personally wrote checks of $20,000 to fund the business when it couldn't make payroll. Koepke cut Plaintiff short and told Plaintiff, "Shut the fuck up, Chazz."

50.     Plaintiff respectfully asked Koepke to have a productive conversation. Showing his combative and violent temper, in response, Koepke became irate and screamed, "Chazz, fuck you!" Koepke then abruptly terminated the call.

51.     Later that evening during a Zoom call among Plaintiff, Koepke and Zenkich regarding the financial status of OCP, Plaintiff made suggestions to pay down certain debt obligations. Koepke remained angry and he derisively rejected Plaintiff's suggestions. Plaintiff essentially told Koepke that OCP's inability to pay its debts was causing irreconcilable damage to

not only Plaintiff's personal reputation but also OCP's reputation. In response, Defendant Koepke became increasingly antagonistic toward Plaintiff.

52.    Because Koepke was not paying the company's bills, Plaintiff was placed in the position of having to explain Koepke's nonpayment to vendors and business partners. It was another Hobson's Choice that Koepke had foisted on Plaintiff.

53.    Koepke's increasingly unprofessional and violent behavior created a hostile work environment for Plaintiff. Because of Koepke's verbal abuse, unlawful discrimination and unhinged conduct, Koepke created a hostile work environment even before Koepke's ensuing criminal assault.

### Koepke Assaults Plaintiff and Threatens to Beat Him with a Baseball Bat

54.    Koepke's violent and uncontrolled conduct reached a crescendo on January 17, 2023 when Koepke assaulted Plaintiff and threatened to beat him with a baseball bat.

55.    On January 17, 2023, in person, Koepke chided Plaintiff, "it looks like you have been gaining weight and puffing up, what's wrong with you, Chazz?"

56.    Koepke made those derogatory comments with the intent to make Plaintiff feel uncomfortable in the workplace, which is unlawful.

57.    In the evening of January 17, 2023, Koepke derided Plaintiff for being single and for what Koepke described as Plaintiff's "eating habits."

58.    That evening, Koepke made more derogatory comments about Plaintiff not having kids.

59.    Later in the evening of January 17, 2023, Plaintiff, Koepke and Zenkich were in OCP's office in Chicago to discuss, among other things, the state of the business. Koepke had been verbally abusive toward Plaintiff throughout the day. During the meeting, Koepke stated, "today

we are going to beat up on Chazz." This was not a funny joke, if it was a joke at all, and Plaintiff felt uncomfortable.

60.     Koepke then stated, with reference to "beating up" Plaintiff, "we may as well use a baseball bat on him." At this time, Koepke made a physically threatening gesture toward Plaintiff.

61.     Because of Koepke's combative nature, temper, anger issues, use of profanity, lawlessness and past derogatory comments, Plaintiff reasonably did not interpret these actions as a joke.

62.     Koepke's threat to "beat up" Plaintiff, which included the threat to use a "baseball bat," coupled with a physically threatening gesture was an aggravated assault.

63.     Koepke's relationship with Plaintiff is not of a jovial or amicable nature. Koepke knew that his statements and actions would have the intended effect, which they did, of placing Plaintiff in imminent apprehension of being "beat up" with a "baseball bat."

64.     Koepke's reference to "using a baseball bat" to "beat up" Plaintiff in the workplace was unacceptable.

65.     Koepke had been consistently abusive and inappropriate in his conduct throughout the years and his conduct was becoming worse. At this point in January 2023, the workplace was more than hostile, it was physically dangerous.

66.     Plaintiff believed that Koepke could have had a baseball bat on the premises on January 17, 2023 and Plaintiff was placed in imminent apprehension and fear by Koepke that Koepke would commit a violent act against him either that evening or at some point in the near future. Plaintiff was aware of Koepke's past misconduct.

67.    After Koepke crossed this firewall in January 2023, Plaintiff became reasonably convinced that it was a "when" and not an "if" regarding Koepke's next abusive violent threat or act.

68.    Plaintiff believed that if he had returned the negative sentiment to Koepke that evening, or at any point in the future, a physical altercation would likely ensue in the workplace.

## Koepke Engages in More Unlawful Behavior and Threatens to Fire Plaintiff

69.    Six days after threatening to "beat up" Plaintiff with a "baseball bat," on January 23, 2023 at 11:40 am, Plaintiff had an eight-minute phone call with Koepke where Plaintiff addressed an email that Koepke sent to an employee. Koepke quickly began yelling and using profanity in a tirade at Plaintiff. Standing up for himself, Plaintiff tried to interrupt Koepke and asked Koepke to stop yelling and cursing at him.

70.    In response, Koepke called Plaintiff "stupid" and said Plaintiff was the reason the business was failing. Plaintiff asked Koepke to stop being so hostile and in response, Koepke threatened to fire Plaintiff.

71.    Plaintiff told Koepke that he couldn't do that [fire Plaintiff] and suggested that Koepke talk to Zenkich. Koepke replied, "Fuck you, go talk to your lawyer then."

72.    On January 28, 2023, Zenkich called Plaintiff to thank him for "enduring such a long, difficult day" after Plaintiff was subjected to Koepke's ongoing abuse. Zenkich was unable to stop Koepke's abuse, and Zenkich's only recommendation at that time was, "Chazz, you should talk to John and tell him you don't like what he's saying."

73.    Plaintiff had already talked to Koepke about that many times. The result was more abuse, more yelling, more screaming, cursing, physical threats and adverse employment actions.

74.    Because of Koepke, Plaintiff's working conditions became so intolerable that any reasonable person would be forced to resign.

75.    Working with and for the abusive Koepke, a racist, violent, chauvinist, homophobic person, became detrimental to Plaintiff's mental health and psychological well-being.

76.    Because of the systematic and continuous verbal abuse perpetrated by Koepke, and the hostile work environment he caused, Plaintiff was constructively terminated from OCP on February 1, 2023.

77.    The constructive termination was manifested in Plaintiff's tendering of his resignation on February 1, 2023 and Plaintiff's tendering of his 10% class B ownership shares to OCP.

78.    Plaintiff filed a claim with the District of Columbia Office of Human Rights and a charge of discrimination is pending. Plaintiff intends to amend the Complaint to add discrimination claims under District of Columbia law.

79.    Plaintiff retained counsel and agreed to pay its counsel's reasonable attorneys' fees.

## COUNT ONE – ASSAULT
### (Against Defendant Koepke)

80.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 as if fully set out herein.

81.    Intending to cause harmful or offensive contact, or an imminent apprehension of harmful or offensive contact, Defendant Koepke assaulted Plaintiff on January 17, 2023 by threatening to beat up Plaintiff and threatening to use a baseball bat to beat up Plaintiff. Defendant Koepke also made contemporaneous aggressive and threatening physical gestures toward Plaintiff.

82.    As a result of Defendant Koepke's intentional conduct toward Plaintiff on January 17, 2023, including but not limited to Koepke's repeated verbal threats and reference to the use of

a baseball bat on Plaintiff, Plaintiff was put in reasonable apprehension that such harmful and offensive contact was imminent.

83.    Defendant Koepke's actions were not merely negligent or reckless. Defendant Koepke has a history of combative, aggressive and violent behavior, including without limitation when the Illinois court held Koepke in contempt for interfering with the parental rights of his ex-wife and as the court determined that Koepke is combative and not credible.

84.    Defendant Koepke's assault against Plaintiff was intentional. Koepke's behavior was, is, and continues to be erratic, threatening, and offensive to the average, like-minded individual.

85.    As a result of Koepke's assault, Plaintiff has suffered damages.

## COUNT TWO – WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Against both Defendants)

86.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 as if fully set out herein.

87.    Defendant Koepke's actions, including but not limited to the aforementioned assault, threats, and other unlawful conduct, caused Plaintiff to be wrongfully and constructively terminated from his position as the CEO of OCP.

88.    Defendant Koepke wrongfully retaliated against Plaintiff when Plaintiff pressed Koepke and OCP to not violate employment laws, such as DC ACT 23-563, and when Plaintiff refused to discriminate against the people OCP hires based on their backgrounds, sexual orientations, and ethnicities.

89.    Acting on behalf of OCP, Defendant Koepke deliberately made working conditions at OCP so intolerable that he drove Plaintiff to involuntarily resign.

90.    Any reasonable person would find that working the conditions that Plaintiff endured were intolerable.

91.    Defendants' conduct was harmful to the public's interests.

92.    Plaintiff has suffered damages due to the wrongful termination in violation of public policy.

### COUNT THREE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (Against Defendant Koepke)

93.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 as if fully set out herein.

94.    Defendant Koepke intentionally, or at the very minimum recklessly, engaged in extreme and outrageous conduct which caused Plaintiff severe emotional distress.

95.    As described herein, Defendant Koepke's course of behavior was intentional, reckless, and so extreme that it caused Plaintiff to suffer from severe anxiety.

96.    Not only did Defendant Koepke's conduct cause Plaintiff to be constructively terminated from his employment, but as a result of Koepke's conduct, Plaintiff suffered severe depression, stress, unhealthy eating habits, weight gain and an inability to take care of himself, as well as sleep deprivation.

97.    Defendant Koepke's assault, unlawful and violent conduct and verbal threat to beat up Plaintiff with a baseball bat, coupled with his contemporaneous physical gestures, Koepke's repeated use of profanity, his repeated ridicule of Plaintiff regarding his weight, eating habits, and marital status, Koepke's violations of the law by discriminating in hiring practices, and Koepke's consistently unprofessional conduct was so outrageous in character and so extreme in degree that it was beyond all possible bounds of decency.

98.     Defendant Koepke's conduct was extreme and outrageous and Defendant Koepke intended or recklessly caused Plaintiff to sustain severe emotional distress.

99.     As a result of Defendant Koepke's intentional infliction of emotional distress, Plaintiff suffered damages.

### COUNT FOUR – DECLARATORY JUDGMENT TO HOLD ANY
### NON-COMPETE AGREEMENT UNENFORCEABLE AGAINST PLAINTIFF
### (Against Defendant Advocacy Holdings, Inc.)

100.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 as if fully set out herein.

101.     After Plaintiff was wrongfully terminated, Defendants further retaliated and threatened to enforce an unlawful, unreasonable, and unenforceable non-compete agreement against Plaintiff to preclude him from earning a living in his lawfully chosen profession.

102.     Plaintiff incorporates by reference the purported non-compete agreement.

103.     The restraints on trade in the non-compete agreement are patently unreasonable, particularly in duration, geographic scope, in subject matter and under the circumstances of Plaintiff's wrongful termination.

104.     The restraints on trade in the non-compete agreement are drastically larger and more extensive than what is required to protect Defendant's business interests.

105.     Enforcing a non-compete agreement against Plaintiff and in favor of Defendant under the facts set forth above would contravene public policy.

106.     Moreover, Defendants failed to comply with D.C. law regarding the noncompete and it is unenforceable as a matter of law.

107.    There is an actual controversy between the parties as to the interpretation and enforceability of the non-compete agreement and the D.C. Non-Compete Clarification Amendment Act of 2022.

108.    This is a genuine dispute that needs to be resolved, rather than a hypothetical or speculative disagreement.

109.    The controversy involves legal rights and duties that are in question or uncertain.

110.    The controversy is ripe for resolution. The dispute is sufficiently developed and ready for a court to make a decision.

111.    Plaintiff has a sufficient stake in the controversy and will be directly affected by the outcome.

112.    Plaintiff has no other adequate remedy is it pertains to the enforceability of any non-compete agreement and the application of the D.C. Non-Compete Clarification Amendment Act of 2022.

113.    Public policy precludes Defendants' enforcement of the non-compete agreement.

114.    Plaintiff requests a declaratory judgment stating, among other things, the following:

A.    Any non-compete agreement sought to be enforced by Defendants against Plaintiff is unenforceable against Plaintiff and is void under public policy and the D.C. Non-Compete Clarification Amendment Act of 2022.

B.    Defendants failed to provide Plaintiff with the requisite notices as required by the D.C. Non-Compete Clarification Amendment Act of 2022.

    C.     Plaintiff did not voluntarily resign from his employment with Defendant and instead was constructively terminated.

    D.     The non-compete is unreasonable and unenforceable on its terms.

    E.     Because Plaintiff was constructively terminated, OCP is estopped from enforcing any non-compete agreement.

## COUNT FIVE – MALICIOUS PROSECUTION
### (Against Defendant Advocacy Holdings, Inc.)

115.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 as if fully set out herein.

116.    Defendant OCP maliciously prosecuted a lawsuit against Plaintiff with no probable cause. The lawsuit was dismissed in Plaintiff's favor and Plaintiff suffered damages as a result.

117.    Dating back to November 24, 2019, Plaintiff informed Defendants that Plaintiff resides in the District of Columbia.

118.    At all relevant times since November 24, 2019, Defendants have known that Plaintiff resides in the District of Columbia.

119.    On November 24, 2019, Plaintiff informed Defendants in writing of his move to "1527 Church Street NW, #PH, Washington, DC 20005" so that Plaintiff would be an "8 minute walk" from the DC office of OCP.

120.    On April 1, 2021, Plaintiff informed Defendants that Plaintiff's address is "1515 15th Street NW, #416, Washington, DC 20005."

121.    Dating back to 2020, Defendants issued W-2s with Plaintiff's DC's address.

122.    On June 2, 2022, October 31, 2022, December 30, 2022, and January 31, 2023, Defendants signed paychecks reflecting Plaintiff's DC residential address and Defendants mailed those paychecks to Plaintiff's DC residential address.

123.    On August 30, 2021, July 29, 2022 and October 31, 2022, Defendants sent FedEx packages to Plaintiff at Plaintiff's home address in the District of Columbia.

124.    On March 30, 2023, approximately two months after Plaintiff was constructively terminated on February 1, 2023, Defendant OCP maliciously filed a "Verified Complaint" riddled with perjury in the United States District Court for the Eastern District of Virginia, styled *Advocacy Holdings, Inc. v. Chazz Clevinger*, 1:23-cv-00419-CMH-IDD (the "Underlying Suit").

125.    Defendant Koepke, who is "not particularly truthful or credible" according to the Appellate Court of Illinois, was the sole affiant of the Verified Complaint.

126.    In the Verified Complaint in the Underlying Suit, Defendant Koepke lied under oath.

127.    On behalf of OCP, Defendant Koepke falsely represented to the United States District Court for the Eastern District of Virginia under oath that, "Clevinger is an individual who currently resides at 9030 Timberwolf Court in Vienna, Virginia… He has been a resident and domiciliary of Virginia since 2011… Clevinger is a citizen of the Commonwealth of Virginia for diversity jurisdiction purposes." Underlying Suit, ECF No. 1, ¶ 6.

128.    On behalf of OCP, Defendant Koepke further swore that Plaintiff "has been domiciled in the Commonwealth of Virginia at all relevant times and for at least six months preceding the initiation of this lawsuit." *Id*., ¶ 8.

129.    While Defendant Koepke falsely swore under oath on March 30, 2023 that Plaintiff was a resident of Virginia, Defendant Koepke and Defendant OCP were fully aware at that time that Plaintiff was a resident of the District of Columbia and *not* Virginia.

130.    On March 30, 2023, Defendant OCP filed a "Motion for Temporary Restraining Order," and in that motion, Defendant OCP's attorney falsely represented to the tribunal that he

satisfied the Fed. R. Civ. P. 65(b)(1) requirement that "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Underlying Suit, ECF No. 8-9.

131.    Despite the false certification regarding notice, Defendant OCP's attorney failed to provide any notice to Plaintiff's attorney in advance of the March 31, 2023 ex parte hearing on a temporary restraining order.

132.    The certification was false, as Plaintiff and Plaintiff's counsel had not heard from Defendants' attorney since February 13, 2023.

133.    Defendant Koepke's false statements under oath and Defendants' counsel's false certification regarding notice, as well as false representations at the ex parte hearing, caused the United States District Court for the Eastern District of Virginia to issue an ex parte temporary restraining order, which resulted in a special injury to Plaintiff.

134.    In moving to dismiss the Underlying Suit for the lack of personal jurisdiction over Plaintiff in Virginia, Plaintiff produced five affidavits and 12 exhibits confirming his residency in the District of Columbia dating back to 2019.

135.    In response to this evidence, Defendants failed to explain why Defendant Koepke falsely represented to the court that Plaintiff was a resident of Virginia when Koepke knew that Plaintiff had resided in the District of Columbia since 2019.

136.    On April 24, 2023, the United States District Court for the Eastern District of Virginia confirmed that the TRO is discharged, the court held that there is no personal jurisdiction over Plaintiff in Virginia, and the court granted Plaintiff's motion to dismiss.

137.    Thus, the Underlying Suit was terminated in Plaintiff's favor.

138.     The prosecution of the Underlying Suit by Defendants was undertaken with malice. The Underlying Suit was predicated on Defendant Koepke's false statements under oath and Defendants were aware of the falsity of their representations when made.

139.     Defendants' malice is shown through Defendants' willful, wanton, reckless, and oppressive disregard for the rights of Plaintiff.

140.     Defendants lacked probable cause to have filed the Underlying Suit, which was based on perjury.

141.     The facts and circumstances, including Defendants' knowledge of Plaintiff's DC address coupled with the false attestation as to a Virginia address, would warrant a cautious man to believe that the action and the means taken in prosecuting it are not legally just and proper.

142.     Plaintiff sustained a special injury as a result of Defendants' misconduct.

143.     After Defendants wrongfully obtained an ex parte temporary restraining order, based on perjury and a false certification regarding notice, Defendants used the TRO to inhibit and prevent Plaintiff from conducting his business and from engaging in lawful commerce.

144.     As a result of Defendants' wrongful acts, Plaintiff was required to cancel appearances at conferences and other client events. Plaintiff was also forced to abstain from and deterred from engaging in other commercial enterprises.

145.     As a result of the special injury, Plaintiff lost a substantial amount of business and opportunities to develop business.

146.     The special injury to Plaintiff is beyond that which would normally be incurred in regular litigation. Plaintiff's rights were flagrantly violated and Defendants' actions were predicated on perjury and a false certification regarding notice. The Court should not tolerate this abuse of process.

147.    After the falsity of Defendants' statements was shown through five affidavits and 12 exhibits, Defendants insisted on perpetuating their misconduct as Defendants argued for, and obtained, a renewal of the improperly obtained ex parte TRO.

148.    These actions exacerbated the special damages to Plaintiff.

149.    Plaintiff was damaged beyond the normal expenses of litigation as a result of Defendants' wrongful conduct.

150.    Plaintiff is entitled to recover his reasonable costs and attorneys' fees incurred in the Underlying Suit.

151.    Plaintiff is also entitled to damages for the lost business sustained as a result of Defendants' false statements and fraud on the court.

### COUNT SIX – ABUSE OF PROCESS
### (Against Defendant Advocacy Holdings, Inc.)

152.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-79 and 115-151 as if fully set out herein.

153.    As set forth pursuant to the facts herein, Defendant used and misused a legal proceeding, the Underlying Suit, and process related thereto solely for improper and ulterior motives, which caused special damages to Plaintiff.

154.    By intentionally committing perjury regarding Plaintiff's address, Defendant was not acting in good faith.

155.    By falsely certifying that the notice requirements of Rule 65 were satisfied, despite the absence of notice, Defendant was not acting in good faith.

156.    Defendant had an ulterior motive for initiating and pursuing its unlawful and knowingly frivolous claims which were based on the false sworn representation by Koepke that Plaintiff resided in Vienna, Virginia.

157.    Defendant's ulterior motives included a desire to unlawfully obstruct Plaintiff's lawful pursuit of his chosen profession.

158.    Defendant's ulterior motives also included the desire to tarnish Plaintiff's reputation, to ridicule Plaintiff publicly, to intimidate Plaintiff, and to extort Plaintiff into a settlement with Defendant.

159.    As of February 2023, Defendant was aware of Plaintiff's pending claims with the D.C. Office of Human Rights.

160.    When Defendant became aware that Plaintiff does not live in Virginia, Defendant concealed this fact from the tribunal.

161.    Instead, Defendant doubled down and argued for an extension of the ex parte TRO.

162.    On April 17, 2023, Defendant was undisputedly aware that Plaintiff lives in the District of Columbia and Defendant dispatched Defendant's agent to serve Plaintiff at his DC residence pursuant to the Underlying Suit.

163.    On April 17, 2023, Defendant's agent approached Plaintiff's building manager in the District of Columbia and Defendant's process falsely represented to Plaintiff's building manager that he is an "FBI agent."

164.    To be sure, on April 17, 2023, Defendant's agent impersonated a law enforcement officer by showing Plaintiff's building manager a fake FBI badge while falsely stating that Defendant's process server was an "FBI agent."

165.    A composite of still photographs attached as Ex. B depict Defendant's agent's unlawful impersonation of an FBI agent together with his display of a fake FBI badge.

166.    These wrongful acts are attributable to Defendants and these actions are outrageous and abusive.

167.    Defendant used a wrongfully obtained ex parte TRO to prevent Plaintiff from engaging in his lawfully chosen profession, causing a special injury to Plaintiff.

168.    As a result of the special injury, Plaintiff lost a substantial amount of business and opportunities to develop business.

169.    Plaintiff is entitled to recover his reasonable costs and attorneys' fees incurred in the Underlying Suit.

170.    Plaintiff is also entitled to damages for the lost business sustained as a result of Defendants' false statements to the court, Defendants' fraud on the court, and Defendant's agent's unlawful impersonation of an FBI agent.

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor and against Defendants as follows:

A.      Damages in excess of $500,000 in an amount to be determined at trial;

B.      A declaratory judgment stating that:

- Any non-compete agreement sought to be enforced by Defendants against Plaintiff is unenforceable against Plaintiff and is void under public policy and the D.C. Non-Compete Clarification Amendment Act of 2022.
- Defendants failed to provide Plaintiff with the requisite notices as required by the D.C. Non-Compete Clarification Amendment Act of 2022.
- Plaintiff did not voluntarily resign from his employment with Defendant and instead was constructively terminated.
- The non-compete is unreasonable and unenforceable on its terms.
- Because Plaintiff was constructively terminated, OCP is estopped from enforcing any non-compete.

C.      Costs and attorneys' fees; and,

D.      Such other and further relief as this Court deems just and proper in these circumstances.

22

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:    */s/ Kenneth E. Chase*
      Kenneth E. Chase
      D.C. Bar No. 985629
      Chase Law & Associates, P.A.
      1141 71st Street
      Miami Beach, FL 33141
      Tel: (305) 402-9800
      Fax: (305) 402-2725
      Email: kchase@chaselaw.com

      *Attorneys for Plaintiff Chazz Clevinger*

# EXHIBIT A

2019 IL App (1st) 180779-U

THIRD DIVISION
September 30, 2019

No. 1-18-0779

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| JOHN KOEPKE, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | 11 D 9851 |
| and | ) | |
| | ) | Honorable |
| TAMARA KOEPKE, | ) | Raul Vega, |
| | ) | Judge Presiding |
| Respondent-Appellee. | ) | |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

### ORDER

¶ 1    *Held*: Affirmed. Court did not err by allowing certain testimony into evidence. Finding appellant in indirect civil contempt was not against manifest weight of evidence. Contempt order contained appropriate purge provision.

¶ 2    As part of their divorce, petitioner John Koepke got primary custody of the couples' children, while respondent Tamara Koepke was allowed visitation rights. Tamara filed a rule to show cause claiming that John was interfering with those rights. The court found John in indirect civil contempt. John appeals. We find no error and affirm.

No. 1-18-0779

¶ 3                                   BACKGROUND

¶ 4        In 2016, after a protracted proceeding, John and Tamara agreed to custody and visitation

for their minor children—Jack (17), Jillian (13), and Peter (12). They also have an adult child,

Greta (19).The parental allocation judgment provides Tamara with initial supervised visitation,

additional summer visitation, and limited unsupervised overnight visitations. In order to qualify

for unsupervised overnight visitation, Tamara was required to provide proof of compliance with

certain psychiatric treatment obligations. Initially, Tamara's treating physician refused to provide

adequate proof of compliance. So in May 2017, the circuit court modified the allocation

judgment and eased Tamara's obligations to prove compliance.

¶ 5        Shortly after the modification, in late June or early July 2017—the record is unclear on

this point—Tamara became eligible for unsupervised overnight visitation. Almost immediately,

Tamara filed a petition for rule to show cause. The petition alleged that John was interfering with

her right to summer and overnight visitation. The petition requested "[t]hat upon finding [John]

guilty of indirect civil contempt," the court should allow Tamara "adequate make-up parenting

time." John denied the allegations.

¶ 6        In August, the circuit court found "a *prima facie* case of indirect civil contempt" and

issued a rule "to show cause why [John] should not be held in contempt of Court for failure to

comply with the parenting time Schedule(s) set forth in the Allocation Judgment." The court

conducted an evidentiary hearing, which took place over three months. At the hearing, John,

Tamara, and the supervisor Kate Wilson testified.

¶ 7        John and Tamara have not communicated since 2011. They live about half a mile from

each other, but the kids do not typically go directly to Tamara's house for visitation. Instead,

they meet at the library, as provided by the allocation judgment. Almost always, one of the older

No. 1-18-0779

children will drive the other children to the library for visitation. From the library, Wilson drives the kids to Tamara's house. When visitation ends, Wilson and Tamara typically drive the kids back to the library. There was some testimony that occasionally, the older children will take the younger ones directly to and from visitation.

¶ 8    The allocation judgment entitled Tamara to parenting time on Wednesdays from 4:00 to 6:00 p.m. She is also scheduled for regular visitation on Saturdays from 10:00 a.m. to 5 p.m., with alternating Saturdays being extended overnight to 1:00 p.m. on Sunday. Finally, she gets additional visitation during the summer—two weekdays from 9:00 a.m. to 5:00 p.m., while John is at work. The Wednesday visitations, Saturday visitations, and summer visitations are all supervised by Wilson. Tamara's only unsupervised parenting time is from 10 p.m. Saturday to 1 p.m. Sunday during overnight visitations.

¶ 9    Tamara was receiving her Wednesday visitation. All three witnesses agreed that, save a few exceptions, the Saturday visitations—including dates which were supposed to be overnight—only last from 10:00 a.m. to approximately 3:00 p.m. Saturday. That is, not only is the *regular* Saturday visitation cut short by two hours but, for the most part, she has not received her *unsupervised* overnight visitation. There was no dispute as to these facts; it was the reason *why* Tamara did not receive all of this visitation time that was hotly contested.

¶ 10    Wilson expressly and unequivocally testified that John controlled when visitation began and ended, that Tamara has never set the schedule. Until recently, John texted with Wilson about the visitation schedule. However, after the hearing began, John stopped discussing visitation times because Tamara "knew the schedule." John testified that he stopped discussing times because he was frustrated that it was being used against him. As for the visitations ending early, Wilson said, "[i]t's done because the children say that they have to leave." On cross-

- 3 -

No. 1-18-0779

examination, Wilson admitted that, besides leaving for a hockey game, the kids do not say why they have to leave early. She has also never been present with John and the kids and does not know what he says to them. Likewise, she has never seen John call the kids and has not seen any texts between them.

¶ 11    John emphatically denied that he was interfering with Tamara's parenting time. His testimony centered around one basic tenet—that what the kids do after they leave his care is between them and Tamara. He denied sending text messages to either Wilson or the kids telling them that they must end the visitations early.

¶ 12    Tamara's testimony primarily focused on the fact that she never wanted her parenting time to end early. She acknowledged that she willingly allowed the kids to leave early when they had other social obligations. Although she agreed to allow them to leave early, "they don't ask me. They tell me" they are leaving early. She agrees they can leave because "[t]hey've received a text from their father." She doesn't object at that point "[s]o that there isn't any punishment *** [t]o the children." But like Wilson, there is no indication that she has seen these text messages.

¶ 13    No text messages between any of the witnesses were entered into evidence. Nor were the specific contents of any text message discussed during the hearing.

¶ 14    As for summer time, John testified that, through their lawyers, the parties agreed on Mondays but were unable to come to an agreement on the second day. On the other hand, Tamara testified that the parties initially agreed to Mondays and Fridays, but Fridays were changed to Wednesdays later in the summer. Regarding the Monday visitation, John testified that Tamara got "just about every Monday throughout the summer." Tamara disagreed, testifying that she only got "some Mondays" even though she wanted all of them; for those other Mondays, "[t]he children weren't brought to the library" (where the handoff usually took place).

- 4 -

No. 1-18-0779

¶ 15     After the hearing, the court issued a written order finding John "in indirect civil contempt for failing to comply with the Allocation Judgment entered November 15, 2016 in that he has failed to provide and allow Tammy all of her parenting time pursuant to the Judgment." In its findings, the court specifically "did not find John to be particularly truthful or credible." On the other hand, "[t]he testimony of Kate Wilson crystallized John's refusal to abide by the parenting schedule as required by the Allocation Judgment. Th[e] Court found Ms. Wilson to be impartial, and not biased, and truthful."

¶ 16     The court ordered that "John shall purge himself of the indirect civil contempt by allowing Tammy make-up parenting time beginning upon entry of this order; the make-up parenting time shall be completed by August 31, 2018."

¶ 17     John timely appealed.

¶ 18                              ANALYSIS

¶ 19     John makes three arguments on appeal: that the finding of contempt was against the manifest weight of the evidence, that the court erred by allowing in hearsay testimony, and that the purge provision of the contempt order was improper.

¶ 20                         I. Evidentiary Errors

¶ 21     Because it will aid in our later discussion, we begin with John's second argument, that the circuit court erred by allowing two hearsay statements into evidence. Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion—that is, unless the ruling is so arbitrary or irrational that "no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 22     Hearsay is an out-of-court statement offered for the truth of the matter asserted. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1064 (2001). As defined by the rules, "[a]

No. 1-18-0779

'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a) (eff. Oct. 15, 2015).

¶ 23    John complains of two statements that he claims were inadmissible hearsay. First, Wilson testified that visitation gets terminated early because "the children say that they have to leave." Second, Tamara testified that she agrees that the kids can leave visitation early because "[t]hey've received a text from their father."

¶ 24    Taking them in that order, we agree with the trial court that Wilson's testimony that visitation gets terminated early because "the children say that they have to leave" was hearsay. Wilson was testifying about the children's out-of-court statement, and it was offered to prove the truth of that statement—that the children were required to leave visitation early, as opposed to leaving of their own accord. Tamara's theory, of course, was that it was *John* who was directing them to leave early, and Wilson's testimony was offered to support that theory.

¶ 25    Properly finding this testimony as eliciting hearsay, the trial court initially sustained John's objection. But Tamara's counsel argued that the statement was reliable and thus admissible under controlling case law. The trial court ultimately allowed Wilson's hearsay testimony because the court found it to be "reliable."

¶ 26    Before the adoption of the Illinois Rules of Evidence, hearsay regarding the declarant's state of mind was admissible "when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case." *Caffey*, 205 Ill. 2d at 91.

¶ 27    But the Illinois Rules of Evidence eliminated the requirements of witness unavailability and reasonable probability of truthfulness. See Ill. R. Evid. 803(c) Committee Commentary ("Rule 803(3) eliminates the requirements currently existing in Illinois law, that do not exist in

No. 1-18-0779

any other jurisdiction, with respect to statements of then existing mental, emotional, or physical

condition, that the statement be made by a declarant found unavailable to testify, and that the

trial court find that there is a 'reasonable probability' that the statement is truthful."). Instead,

under the Illinois Rules of Evidence, "[a] statement of the declarant's then existing state of mind,

emotion, sensation, or physical condition (such as intent, plant, motive, design, mental feeling,

pain, and bodily health)" is not excluded by the hearsay rule, regardless of witness availability or

the reliability of the out-of-court statement. Ill. R. Evid. 803(3) (eff. Apr. 26, 2012).

¶ 28    So the court's finding that the statement was "reliable," and John's argument on appeal to

contrary, are beside the point. Still, we may uphold a trial court's evidentiary ruling on any

ground in the record, even if we disagree with the trial court's stated basis. *Kimble v. Earle M.

Jorgenson Co.*, 358 Ill. App. 3d 400, 408 (2005). So the question is whether the challenged

statement was properly admitted under Illinois Rule of Evidence 803(3) (eff. Apr. 26, 2012) as a

state-of-mind exception to the hearsay prohibition.

¶ 29    We find no abuse of discretion in admitting this testimony. The children's statement that

"they have to leave" could reasonably be construed as an explanation of their current state of

mind, their "motivation[] at the time of the utterance." *People v. Munoz*, 398 Ill. App. 3d 455,

479 (2010). The children weren't leaving because they were bored or unhappy or because of

some voluntary decision, but because they believed that they "had" to. We cannot say that no

reasonable person would agree with the admission of this testimony under the state-of-mind

exception to the hearsay rule, and thus no abuse of discretion occurred.

¶ 30    The other testimony that John cites as inadmissible hearsay took place during the

examination of Tamara:

    MR. ROSENFELD [Tamara's attorney]: Tammy, why do you agree that they can leave?

- 7 -

No. 1-18-0779

      TAMARA: They've received a text from their father.

      MR. KAFOGLIS [John's attorney]: Objection. Hearsay.

¶ 31    The court overruled the objection because "[s]he hasn't testified about what's in it, the content."

¶ 32    We agree with the trial court and Tamara that this testimony did not elicit hearsay in the first instance. Tamara did not testify to any out-of-court "statement," any "oral or written assertion." Ill. R. Evid. 801(a) (eff. Oct. 15, 2015) (defining "hearsay"). She merely testified to a sequence of events that happened routinely during visitation—the children receive a text from their father, so she lets them leave. Was there an inference there, as John argues, that the text message contained some direction to the children to leave? Certainly. But that doesn't make it hearsay. No oral or written assertion was introduced for the purpose of proving the truth of that assertion. No hearsay was elicited.

¶ 33    John also argues that Tamara couldn't have known that the text came from John unless she had relied on the children's hearsay statement telling her so (presumably something along the lines of "I just got a text from Dad"). Again, that may be true, but it doesn't convert anything Tamara said into hearsay. If anything, that would speak to the foundation for Tamara's testimony—how it was that she knew the text messages came from John. But John did not object on foundational grounds in the trial court. He only objected that it was hearsay. And it was not, because no out-of-court statement was elicited.

¶ 34    We find no error in either evidentiary ruling.

¶ 35                          II. Sufficiency of Evidence

¶ 36    John challenges the trial court's finding of indirect civil contempt. Generally, a party commits indirect civil contempt when he or she violates a court order through conduct outside

No. 1-18-0779

the court's presence. *In re Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494, ¶ 50. The

burden initially falls on the petitioner to show, by a preponderance of the evidence, that the

alleged contemnor has violated the court order. *Id*. If so established, the burden shifts to the

contemnor to show that the violation was not willful. *Id*. Ultimately, a finding of " 'willful

disobedience of a court order' " is necessary to a finding of indirect civil contempt. *Id*. (quoting

*In re Marriage of McCormick,* 2013 IL App (2d) 120100, ¶ 17).

¶ 37     John argues that the court's finding of contempt is against the manifest weight of the

evidence. Whether a party is guilty of contempt is a question of fact for the trial court, and we

will not disturb the trial court's determination "unless it is against the manifest weight of the

evidence or the record reflects an abuse of discretion." *Marriage of McCormick*, 2013 IL App

(2d) 120100, ¶ 17. A decision is against the manifest weight of the evidence if "the opposite

conclusion is clearly evident" or the court's findings are "unreasonable, arbitrary, and not based

on any of the evidence." *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43.

¶ 38     The trial court made two findings critical to its decision to find John in indirect civil

contempt: John terminated parenting time early, and John failed to allow Tamara her summer

parenting time. Specifically:

> "John has violated the parties' Allocation Judgment that was entered on November 15,
>
> 2016 in that he failed and by his actions refused to allow Tammy her regular and summer
>
> parenting time since June 2017 to date of hearing with the exception of two overnights,
>
> and even during her regular parenting time failed to allow her to have the complete time
>
> required by the Judgment."

No. 1-18-0779

¶ 39    Either of these findings, alone, is sufficient to support a contempt finding, as either would constitute a violation of the allocation judgment alleged in Tamara's petition for a rule to show cause.

¶ 40    We first note that John does not make any argument with respect to the court's finding that he denied Tamara summer visitation time. As such, any claimed error on this finding of fact is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised on appeal are deemed forfeited). In any event, the trial court's finding on this issue was not against the manifest weight of the evidence. At a minimum, the parties agreed that Monday was supposed to be a summer visitation day. John said she got the children on Mondays; she said she got "some Mondays" but not the bulk of them. The trial court believed Tamara. That finding, alone, would be sufficient to support the trial court's finding of indirect civil contempt.

¶ 41    John does, however, challenge the first finding—that he controlled the start and end times for the visitation. He begins by arguing that "there was no evidence or testimony as to the specific dates and times that the visitation was cut short, nor was there any evidence or testimony as to the number of hours it was shortened."

¶ 42    True, no one testified to every single date, every precise hour. But the evidence showed that nearly every Saturday visitation—regular or overnight—was terminated at 3 p.m. There was some testimony about specific dates. For example, Tamara testified that on certain dates, she did allow the kids to leave early. While not exactly precise, every witness testified that Saturday visitations ended at around 3 p.m. We believe that sufficient evidence was introduced about those dates and times when visitation was cut short.

¶ 43    In his brief, John says his "argument can be summed up in one concept: John cannot be held in contempt of court for the actions or inactions, of Tamara or the children." John's problem

No. 1-18-0779

is the trial court found that the children left early because John controlled when visitation ended, not because of Tamara or the children's actions.  Both parties acknowledge that a custodial parent cannot deny the other their visitation rights "merely because his or her children do not desire to visit the noncustodial parent." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 111 (2006). "Where a dissolution judgment places the ultimate responsibility for compliance with the visitation provisions upon the custodial parent, the custodial parent cannot escape his or her duty to comply with the visitation provisions by 'attempting to shift this burden to the discretion of [his or] her children.' " *Id*. at 111-12 (quoting *Doggett v. Doggett*, 51 Ill. App. 3d 868, 872 (1977)).

¶ 44      John attempts to distinguish *Charous* because here, the allocation judgment did not specifically place the ultimate responsibility for compliance on him. In *Charous*, the allocation judgment required the mother "to have the 'children prepared [for visitation] with the appropriate clothing and times the children will need to take with them' and to have the children 'ready to leave promptly at the scheduled time.' " *Id*. at 112. The court found the mother failed to meet those obligations. *Id*. In contrast, here, John notes, the allocation judgment does not contain these specific obligations.

¶ 45      But we do not find this holding in *Charous* particularly pertinent to this case. There was conflicting testimony about whether John properly prepared the children for visitation, but that was *not* the basis of the court's ruling. Instead, the court premised its finding on the fact that "[p]arenting time terminates because the children say they have to leave. They say they have to leave because John dictates the end time for parenting time with Tammy."

¶ 46      This finding of fact is entitled to great deference under our standard of review. *Hoxha v. LaSalle Nat. Bank*, 365 Ill. App. 3d 80, 84 (2006). We must be "mindful that '[a] reviewing court

- 11 -

No. 1-18-0779

may not overturn a judgment merely because the reviewing court might disagree with the judgment, or, had the reviewing court been the trier of fact, might have come to a different conclusion.' " *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007) (quoting *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005)).

¶ 47    While we wouldn't say that the evidence supporting the trial court's finding was overwhelming, there is no question that there was sufficient evidence to support the court's finding. Most of it came from Wilson, who had supervised the visits for over five years and whom the trial court found to be "to be impartial and not biased, and truthful." Wilson clearly testified that John, not Tamara (or Wilson herself), was in control of the visitation schedule:

> "MR. ROSENFELD: Okay. Now, Kate, are you aware of the schedule in which the children are supposed to be with their mother?
>
> KATE WILSON: Yes.
>
> Q: And has that schedule been followed?
>
> A: No.
>
> Q: Kate, who sets up the dates for the times that the children come and go?
>
> A: John.
>
> Q: John Koepke?
>
> A: Yes.
>
> Q: And he sets them up with you how?
>
> A: Through text messages.
>
> Q: Any other way?
>
> A: No.

- 12 -

No. 1-18-0779

***

MR. ROSENFELD: Now, Kate, has Tammy ever set the schedule for the children?

KATE WILSON: No.

Q: Have you seen the children come for visitation time with their mom and parenting time and leave early?

A: Yes.

Q: Is that because Tammy wants them to leave early?

A: No."

¶ 48    We couple that, of course, with the testimony we discussed above, which John challenged on hearsay grounds but which we found was properly admitted. Wilson said that the children would simply announce that they had to leave, and Tamara testified that they left when they received text messages from their father, and she let them go so John wouldn't punish them.

¶ 49    And while John claimed that he had nothing to do with his children leaving visitations early, the trial court did not believe him. The court found John "evasive and combative" and not "particularly truthful or credible." We must defer to these credibility findings by the trial court, which is in a far superior position to make such determinations. *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1035 (1993). Between Wilson's and Tamara's testimony, the court was left with the distinct impression that John dictated the visitation schedule, that John was responsible for the children cutting their visitations short, and thus that John willfully violated the allocation judgment. The evidence supported that determination.

¶ 50    The principal point of contention on appeal is those text messages that John supposedly sent to his children, instructing them to cut visitation short. Neither Wilson nor Tamara claimed to have read those text messages. And the court and the parties, at least initially, were strongly

No. 1-18-0779

opposed to hauling in the children to testify on this question. (Later, John's counsel seemed to change his tune on that point, after the challenged hearsay testimony was admitted.)

¶ 51     So it is true, as John points out, that we don't have definitive proof as to what those text messages said. But does the absence of that evidence fall on the trial court's shoulders or on John's? After all, as we noted above and as even John acknowledges, once the court found that Tamara had proven a violation of the court order by a preponderance of the evidence and issued a rule to show cause against John, it was *John's* burden to prove that he did not willfully violate the court's order. See *Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494, ¶ 50; *Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17.

¶ 52     Yes, John's counsel did broach the subject of bringing in the children to testify, which the court strongly opposed for the children's sake. But John could have introduced his *own* text messages as part of his case-in-chief or even in rebuttal; he could have disclosed any and all text communications with his children on the relevant dates. Or in lieu of calling the children to testify, he could have produced his *children's* text messages. One would think that if a party were accused of sending text messages that directed his children to violate a visitation schedule, the easiest way in the world to disprove that assertion would be to show those text messages (or prove the lack thereof) to the court. John did not do that.

¶ 53     We thus have no basis to overturn the trial court's finding of a willful violation of the court's allocation judgment. We can't say that the "the opposite conclusion is clearly evident" or that the court's finding on this point was "unreasonable, arbitrary, and not based on any of the evidence." *Demaret*, 2012 IL App (1st) 111916, ¶ 43.

- 14 -

No. 1-18-0779

¶ 54                              III. Purge Provision

¶ 55    John's final argument is that the order contains an improper purge provision. "Because [civil contempt] is intended to compel the contemnor to comply with the underlying court order in the future, the contemnor must be able to avoid or purge himself by complying with the terms of the underlying order." *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 29. John likens this case to *Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494. There, the trial court held the non-custodial parent in contempt for failure to allow visitation and required "the parties [to] immediately determine a make-up parenting time schedule" for the missed parenting time. *Id*. ¶ 40.

¶ 56    On appeal, this court found the purge provision improper, as it required the ex-husband's participation in order for the ex-wife to purge contempt. *Id*. ¶ 58. Because the other party could single-handedly prevent purging contempt, the court found that the purge was not proper because it did not give the contemnor "the keys to [her] cell." *Id*.; see *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 44 (requiring third party to make recommendation appeared to "take the keys out of the defendants' hands and give them to the receiver, for even if defendants cooperate with the receiver, the contempt will not be purged until the receiver determines that his investigation is complete and makes a report and recommendation to the court").

¶ 57    The order in this case does not suffer from the same defect. Here, the order simply provides: "John shall purge himself of the indirect civil contempt by allowing Tammy make-up parenting time beginning upon the entry of this order; the make-up parenting time shall be completed by August 31, 2018." All John has to do is provide make-up time by August 31, 2018. But according to John, Tamara's "participation is a necessary prerequisite to establishing a

No. 1-18-0779

make-up parenting time schedule." We do not agree and, in fact, this brings us to the distinction between this case and *Knoll*.

¶ 58    In *Knoll*, 2016 IL App (1st) 152494, ¶ 57, the purge provision left it entirely up to the parties—both the contemnor and her ex-husband—to work out a schedule for make-up parenting time, placing the ex-husband in a position to frustrate the contemnor's attempt to purge. Here, in contrast, the contempt order provides that "this matter is set for status of the make-up parenting time schedule on a future date agreed by all parties by separate order." So it is not solely up to the parties here to figure out the make-up schedule. The court gave them the *first* opportunity to figure out a schedule, which strikes us as a perfectly sensible initial step; John and Tamara are in a far better position than the trial court to work out a schedule that the court would then approve. But the obvious point of the status hearing is to ensure that a schedule has been put in place and, if it has not—if the parties can't agree on a schedule—the trial court would have to intervene to set the schedule.

¶ 59    And once that schedule is in place, John truly will hold the keys to his cell. He will simply be required to comply with a court-approved visitation schedule. *Knoll* is thus distinguishable and does not compel a different result. We find nothing improper in this purge provision.

¶ 60                                  CONCLUSION

¶ 61    For the reasons stated, we affirm the circuit court's judgment.

¶ 62    Affirmed.

- 16 -

# EXHIBIT B









