UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAZZ CLEVINGER, | Case No. 1:23-cv-1159-JMC |
| Plaintiff, | |
| v. | |
| ADVOCACY HOLDINGS, INC., and RED CHALK GROUP, LLC, and JOHN KOEPKE, and RAYMOND ZENKICH, | |
| Defendants. | |
| ADVOCACY HOLDINGS, INC., | |
| Counter-Plaintiff, | |
| v. | |
| CHAZZ CLEVINGER, et al., | |
| Counter-Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff Chazz Clevinger files this First Amended Complaint against Defendants Advocacy Holdings, Inc., Red Chalk Group, LLC, John Koepke, and Raymond Zenkich for damages and other related relief. In support, Plaintiff states as follows.

**PARTIES**

1. Plaintiff is a natural person and resident of the District of Columbia since 2019 who currently resides at 1515 15th Street NW, Unit 416, Washington, DC 20005.

2.     Defendant Advocacy Holdings, Inc. d/b/a OneClickPolitics ("Advocacy Holdings") is a Delaware corporation with a principal address of 1 North Wacker Drive, Suite 3601, Chicago, IL 60606. Advocacy Holdings purports to "conduct business" as "OneClickPolitics" or "OCP."

3.     Defendant Red Chalk Group, LLC ("Red Chalk") is an Illinois limited liability company with a principal address of 1 North Wacker Drive, Suite 3601, Chicago, IL 60606. Red Chalk has two members, Defendants Koepke and Zenkich, both of whom are citizens of Illinois. Red Chalk purports or purported to "conduct business" as "OneClickPolitics" or "OCP."

4.     Defendant Koepke is a natural person and resident of Illinois who resides at 519 Wisner Street, Park Ridge, Illinois 60068.

5.     Defendant Zenkich is a natural person and resident of Illinois who resides at 1215 Croft Lane, Evanston, IL 60202.

## JURISDICTION AND VENUE

6.     There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the District of Columbia and Defendants are citizens of Delaware and Illinois.

7.     Defendant Advocacy Holdings is a citizen of Delaware, the state of its incorporation, and Illinois, the state of its principal office.

8.     Defendant Koepke is a citizen of Illinois.

9.     Defendant Red Chalk is a citizen of Illinois, the state of its principal office and the state in which all its members are citizens. Red Chalk Group's members are Defendants Koepke and Zenkich.

10.     Defendant Zenkich is a citizen of Illinois.

2

11.     The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

12.     This action properly lies in the District of Columbia pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred within this District.

13.     During the timeframe most relevant to this action, Defendant Advocacy Holdings' principal office was located in the District of Columbia.

14.     As of today, Defendant Advocacy Holdings still maintains an office physically located in the District of Columbia, reflecting a street address of 1717 Pennsylvania Avenue NW, Suite 1025, Washington, DC 20006 and a telephone number of (202) 800-8877. https://oneclickpolitics.com/who-we-are/ (visited June 23, 2023).

15.     Venue is appropriate in this court.

16.     This Court has personal jurisdiction over all Defendants as all Defendants have continuously transacted business in the District of Columbia for several years, contracted to supply services in the District of Columbia for several years, supplied services in the District of Columbia for many years, caused tortious injury against Plaintiff in the District of Columbia, regularly solicited business in the District of Columbia for multiple years, engaged in a persistent and systematic course of conduct in the District of Columbia for several years, maintained employees in the District of Columbia for several years, provided products and rendered services in the District of Columbia for many years, paid taxes in the District of Columbia for several years, entertained and serviced clients in the District of Columbia for several years and derived millions of dollars of revenue in the District of Columbia over several years.

17.     Venue is appropriate in this court.

## FACTS COMMON TO ALL ALLEGATIONS

18.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set out herein.

19.     Plaintiff is an experienced professional in the advocacy technology space.

20.     As of 2016, Plaintiff had over a decade of experience in the advocacy technology and software industry, including experience with the technology providers Phone2Action and CQ Roll Call.

21.     Defendants Koepke and Zenkich are members of Defendant Red Chalk, a consulting company formed in 2006 with its sole office in Chicago. Red Chalk purports to provide consulting services on blockchain matters, investment due diligence, and disruptive technologies. The firm, which contains no attorneys, also proclaims to provide litigation support.

22.     In early October 2016, Zenkich, also on behalf of Red Chalk, cold-called Plaintiff on Plaintiff's cell phone. On the initial October 2016 telephone call, Zenkich personally recruited Plaintiff to join the Red Chalk organization for purposes of leading Red Chalk's fledgling involvement in digital advocacy.

23.     Digital advocacy involves the use of technology to create, promote, or develop causes, issues, or campaigns. Digital advocacy allows for effective, quick, and targeted messaging to recipients in the public space.

24.     As of 2016, Red Chalk was engaged in a small side-business in the digital advocacy space through the unregistered trade name "OneClickPolitics," or "OCP."

25.     The digital advocacy industry, in which Washington, DC is the hub, is heavily competitive and well-saturated.

26.     As of 2016, few clients were involved with Red Chalk's virtually unknown trade name "OneClickPolitics" or "OCP," as the annual revenue related to OCP was less than $90,000.

27.     On October 12, 2016, having accepted Defendants' invitation to discuss an opportunity, Plaintiff met in person with Zenkich and Koepke in the Red Chalk office at 1 North Wacker Drive, Suite 3601, Chicago, IL 60606.

28.     During the October 12, 2016 meeting, Zenkich and Koepke discussed the proposed compensation structure, which was to include a base salary, commissions, and equity.

29.     During the October 12, 2016 Chicago meeting, Zenkich and Koepke both made the following representation to Plaintiff regarding equity: "You will be entitled to up to a quarter of equity in the business if you build this thing up."

30.     Neither Koepke nor Zenkich, nor Red Chalk, mentioned any differentiated share classes during the October 12, 2016 meeting, and no company other than Red Chalk existed at this time as it relates to OCP. Regarding distribution of the equity, Zenkich and Koepke represented that it "will be distributed on a vesting schedule."

31.     Koepke, Zenkich and Red Chalk's October 12, 2016 representations to Plaintiff regarding their intent to convey equity to Plaintiff were false statements of material fact, which the speakers knew to be false when made.

32.     Particularly in the specific context such as this one, when Zenkich had unilaterally reached out to Plaintiff to recruit him to join the organization, the promise of equity in the organization would induce a reasonable person to manifest intent and Koepke, Zenkich and Red Chalk knew that the false statements regarding equity were likely to induce Plaintiff to consent to join the Red Chalk organization.

33.     Koepke, Zenich and Red Chalk intended to deceive and intended to induce Plaintiff into reliance.

34.     Plaintiff relied on Koepke, Zenich and Red Chalk's representations regarding the equity program and the parties came to terms on Plaintiff's employment by Red Chalk.

35.     On November 9, 2016, Plaintiff's employment began with Red Chalk.

36.     Plaintiff's initial title was vice president and head of sales.

37.     In his first year, Plaintiff successfully grew the annual revenue associated with Red Chalk's OCP. from under $90,000 in 2016 to approximately $500,000 in 2017.

38.     In November 2017, Plaintiff was promoted to "CEO" of the Red Chalk enterprise, OCP.

39.     In his role as CEO, Plaintiff oversaw sales, marketing, recruiting, training, and business development. Plaintiff also managed client service and technology aspects of the business and Plaintiff regularly attended conferences as the face of Red Chalk's OCP.

40.     While Plaintiff, Koepke and Zenich were in regular contact regarding revenue receipts and projections, Koepke, Zenich and Red Chalk failed to provide Plaintiff with the company records, including its organizational documents, bank statements, tax returns, balance sheets, income statements and records of capital contributions and distributions.

41.     2018 was another year of substantial expansion under Plaintiff's leadership and strong sales performance as the revenue received in 2018 was approximately $1,300,000, which was a substantial increase from approximately $500,000 in 2017 and $90,000 in 2016.

42.     In 2017 and 2018, Plaintiff followed up multiple times on the equity that Koepke, Zenkich and Red Chalk had promised at the outset of their relationship. Virtually every time Plaintiff broached the subject of his equity, however, Defendants changed the subject or otherwise avoided the conversation.

43.     On August 19, 2018, Koepke and Plaintiff met in person at approximately 6:00 pm at Gibson's Bar & Steakhouse at 1028 N. Rushton Street, Chicago, IL 60611. At this in-person dinner meeting, Koepke and Plaintiff discussed equity. During this conversation, Koepke and Red Chalk reiterated their intent to convey equity to Plaintiff as Koepke and Red Chalk stated that they "intend" to make Plaintiff "an owner, director and officer of the company."

44.     At the August 19, 2018 meeting, Koepke and Red Chalk represented and confirmed that Plaintiff would receive "founders shares" that "could not be diluted."

45.     At the August 19, 2018 meeting, Koepke and Red Chalk further stated, "Ray [Zenkich] and I will be fine giving you founders shares if you continue to build up the business. You got us from nothing to 1.3 million in business, so of course, we want to reward you."

46.     In the same way that Koepke, Zenkich and Red Chalk's October 12, 2016 representations were false statements of material fact when made, with the intent to deceive, on which Plaintiff relied to his detriment,  Koepke and Red Chalk's October 12, 2016 representations to Plaintiff regarding their intent to convey equity to Plaintiff were likewise false statements of material fact, which the speakers knew to be false when made.

47.     In Plaintiff had known in 2016, 2017, and 2018 that Defendants representations regarding equity were false, and known to be false when made, Plaintiff would not have accepted the position or continued with his employment.

48.     Months went by, however, following Defendants' subsequent promises to convey equity per the August 19, 2018 meeting.  By December 20, 2018, as Plaintiff completed his second full year, Defendants still had not tendered any equity despite having promised to do so.

49.     On December 20, 2018, Plaintiff, Koepke, and Zenkich conducted an in-person meeting between 9:00 am. and 2:00 pm at the Red Chalk office at 1 N. Wacker Drive, Suite 3601, Chicago, IL, 60606.

50.     At the December 20, 2018 in-person meeting in Chicago, Koepke, Zenkich, and Red Chalk specifically reiterated their promise to Plaintiff to convey "founders shares" of equity of at least 10% and up to 25% of the "whole company."

51.     At the December 20, 2018 in-person meeting in Chicago, Koepke, Zenkich, and Red Chalk represented to Plaintiff that he would be made an "officer and director" of the company.

52.     At the December 20, 2018 in-person meeting in Chicago, Koepke, Zenkich, and Red Chalk represented as follows to Plaintiff, "We already made you the CEO, so of course I have no problem making you an officer and director of the new company."

53.     In referring to a "new company," Koepke, Zenkich, and Red Chalk were referring to a corporate form, other than Red Chalk, in which Plaintiff would receive equity and hold the title of officer.

54.     At the December 20, 2018 in-person meeting in Chicago, Koepke and Red Chalk further stated, "Ray [Zenkich] and I just need to transfer all of OCP's assets from Red Chalk to the new entity."

55.     When Koepke, Zenkich, and Red Chalk made the multiple false December 20, 2018 statements, Koepke, Zenkich, and Red Chalk did not intend to convey "founders shares" of between 10% and 25% of the company to Plaintiff, they did not intend to make Plaintiff an officer

8

or director of the company, and they did not intend to "transfer all of OCP's assets from Red Chalk to the new entity."

56.     Koepke, Zenich, and Red Chalk knew their false statements were intended to deceive and that the false statements would be likely to induce reliance on the part of Plaintiff. Koepke, Zenich, and Red Chalk's false statements induced reliance on the part of Plaintiff and Plaintiff remained with the organization in reliance on the continuing promises of "founders shares" of equity of at least 10% and up to 25% of the "whole company."

57.     2019 was another year of significant expansion under Plaintiff's leadership and strong sales performance as the revenue received in 2019 was approximately $2,200,000, which was a substantial increase from approximately $1,300,000 in 2018, and that was a substantial increase from approximately $500,000 in 2017 and $90,000 in 2016.

58.     On January 10, 2019, Koepke emailed Plaintiff, copied to Zenich, and Koepke stated that "we need to find a quality CTO as soon as reasonably possible *without taking on excessive employment risk*." (Emphasis added).  The CTO who had just been fired was a member of a protected class. Koepke and Red Chalk were expressly dictating to Plaintiff that the organization's policy is to avoid hiring members of protected classes, including race and gender.

59.     Koepke and Red Chalk would frequently made comments about protected classes "feeling entitled," and Koepke and Red Chalk actively discouraged Plaintiff from hiring racial minorities and females. Plaintiff disregarded the discriminatory policies of Koepke and Red Chalk.

60.     On June 24, 2019, from 6:45 pm to 7:15 pm, Plaintiff spoke to Koepke by telephone. On this call, Plaintiff and Koepke discussed the successful sales month which had recently occurred, which was the largest in the organization's history and Plaintiff raised the issue of Koepke and Red Chalk's repeated past promises of equity which had been broken.

61.     On the June 24, 2019 call, Koepke and Red Chalk responded by saying, "easy bud, we have to create the new company first and get this money out of Red Chalk, but as soon as Ray [Zenkich] and I have it set up, we'll make good on your founders shares and we'll make you an officer and director of the company."

62.     On the June 24, 2019 call, Koepke and Red Chalk also stated as follows, "you're killing it, so you'll definitely get your 10% piece of the company, but I could see you getting much more, maybe 20%, if you continue to double year-over-year revenue for OCP."

63.     These statements, like the others, were false and known to be false when made.

64.     On July 11, 2019, beginning at 3:48 pm, Plaintiff spoke with Koepke and Zenkich on a telephone call. On this call, Plaintiff expressed his frustration that he still had not received the equity that was promised. The parties discussed a working capital loan to hire better engineers and more salespeople. Plaintiff stated, "let's try to raise a Series A, get a loan against receivables, or pursue revenue-based financing in order to create some working capital to hire better engineers and more salespeople." Koepke replied that "raising money is a tricky business, Chazz. However, it may be a good idea." Plaintiff responded that "it is critical that we create the new company prior to raising money, so that my 10-25% in founders shares will be in place and unable to be diluted prior to a capital raise." Koepke replied, "that seems fair and reasonable, Chazz, we just have to spin this thing out first."

65.     Defendants' representations were knowingly false.

66.     On November 24, 2019, Plaintiff emailed Koepke, stating that "[a]s of December 15 [2019], I will have a new physical mailing address as follows: Chazz Clevinger 1527 Church Street NW, #PH, Washington, DC 20005."

67.     On December 16, 2019, beginning at approximately 7:30 pm, Plaintiff spoke with Koepke via telephone. On this call, the two were initially discussing hiring employees, the agenda for an upcoming December 23rd meeting in-person in Chicago, and the lease on the office building in DC at 1824 Jefferson Place NW, Washington, DC 20005. Plaintiff had recently hired two African American employees and Koepke said "be careful with protected classes. Once we hire these people, we can never let them go." Plaintiff disregarded Koepke and Red Chalk's express policy to discriminate against members of protected classes.

68.     On the December 16, 2019 call beginning at approximately 7:30 pm, Plaintiff and Koepke discussed other matters of business and concluded with a conversation about Plaintiff's equity. This time, Koepke avoided the subject altogether and stated that they would "talk more about that in Chicago."

69.     On the December 16, 2019 call, Plaintiff requested access to the company bank records and other financial information.  In response Koepke refused and stated, "You're the CEO of OCP not the Red Chalk Group. You have no right to request financial records."

70.     On the same December 16, 2019 call, beginning at approximately 7:30 pm, Plaintiff replied back "John, OCP and Red Chalk are one in the same. I need you and Raymond [Zenkich] to either make me a full partner in Red Chalk or create the new company and give me my equity. I've been misclassified for three years as a contractor when we both know I'm the company's only executive." Koepke responded, "I'm not giving you equity in Red Chalk Group. Just wait for Ray and I to spin out the new company and then you'll get your fucking 15% of the company." Plaintiff said, "good, it's about time." And then Koepke hung up.

71.     On December 21, 2019, Koepke sent an email reflecting that revenue received from January through November 2019 was $2,107,025.

72.     On December 23, 2019, an in-person meeting took place between 9:00 am to 3:00 pm at the Red Chalk office at 1 N. Wacker Drive, Suite 3601, Chicago, IL, 60606, among Plaintiff, Koepke, and Zenkich. In this meeting, the parties discussed the state of the business and Plaintiff's compensation. Koepke again represented to Plaintiff that Plaintiff would be made an officer and director of the "company" once the new company was formed. Koepke and Zenkich then stated that they could not agree to make Plaintiff a full partner of Red Chalk but would instead have Plaintiff as an owner, officer and director of the new company.

73.     At the December 23, 2019 meeting, Plaintiff expressed his dissatisfaction that he still was not an equity owner in the company. Plaintiff stated that he was "three years into the company and still haven't received the 25% equity I was promised. You guys (Raymond and John) promised to give me a quarter of the whole company. Why can't we get this done? I'm tired of hearing excuses about it being the fault of the lawyers. I need the equity or I'm leaving."

74.     At the December 23, 2019 meeting Koepke replied by saying "I know that we promised 25% of the company, but realistically we might only be able to give you 10-15%. Ray [Zenkich] and I will have to talk."

75.     During phone conversations on June 24, 2019, July 11, 2019, December 16, 2019, and an in-person meeting on December 23, 2019, when asked when the conveyance of the equity would occur, Koepke would try to change the subject or take the issue of equity off the table.

76.     On the June 24, 2019, July 11, 2019, December 16, 2019 phone calls and at the December 23, 2019 in-person meeting, Koepke and Zenkich had blamed their lawyer for the delays in providing the equity.

77.     In January 2020, Plaintiff followed up with Koepke regarding the status of the equity tender and his elevation to officer and director, and Koepke stated, "Yeah, [the lawyer] told me to just list Ray [Zenkich] and I since Red Chalk is transferring all of OCP's assets to Advocacy Holdings, and you aren't an officer of Red Chalk, but don't worry, that will all change next year. I'll add you as an officer and director next December when I complete the next Delaware corporate filing."

78.     Koepke and Red Chalk's statements were false and known to be false.

79.     On April 4, 2020, Red Chalk obtained a $376,000 Paycheck Protection Program loan, which was fully forgiven on January 20, 2021.

80.     On April 21, 2020, Red Chalk registered a trademark for OneClickPolitics.

81.     On June 4, 2020, Koepke sent an email stating that 31% of large customers left and 58% of small customers left, year on year without renewing, which indicates that clients "simply did not like our product."

82.     On June 25, 2020, Plaintiff emailed Koepke and stated "Ray told me that the new entity is going to be called Advocacy Holdings, Inc. and that it will be based in Delaware. I'm assuming we will maintain our 'doing business as' designation as One Click Politics?" Koepke replied, "Yes Advocacy Holdings, Inc."

83.     On June 27, 2020, Zenkich emailed Plaintiff from Zenkich's rzenkich@redchalk.com email address, copied to Koepke's jkoepke@redchalk.com email address an attachment entitled 2020 Stock Incentive Plan_30441222_3 (the "Stock Incentive Plan").

84.     The Stock Incentive Plan, effective July 1, 2020, identified the "Company" as "Advocacy Holdings, Inc. d/b/a One Click Politics, a Delaware corporation."

85.     In presenting Plaintiff with the Stock Incentive Plan, nearly four years after promising the equity, on June 27, 2020, Koepke finally presented Plaintiff with paperwork that is necessary but not sufficient to convey equity.

86.     On July 7, 2020, ten days after providing the 2020 Stock Incentive Plan on June 27, 2020, Koepke emailed Plaintiff a noncompete agreement and required Plaintiff to sign the noncompete in order to receive his equity subscription.

87.     The noncompete agreement contains an extremely broad geographic scope. The scope is not limited to the Washington, D.C., Illinois or Delaware regions and instead purports to extend throughout *the entire United States.*

88.     Moreover, the vast majority of Advocacy Holdings' clients are in northern Virginia or the D.C. area.

89.     The July 1, 2020 effective date of the noncompete agreement matched the July 1, 2020 effective date of the 2020 Stock Incentive Plan.

90.     The noncompete agreement identified "Advocacy Holdings, Inc.," an entity that did not own the "OCP" trademark as the "Company."

91.     On July 13, 2020 at 11:53 pm, Koepke made a racist comment by email, as he was on a call with a person of Asian heritage, and Koepke stated, "Finishing a call with the Japanese. 45 minutes." Likewise, that same day, Koepke text messaged Plaintiff stating that he was "[f]inishing up a call with Japan."

92.     On July 23, 2020, Plaintiff followed up with Koepke regarding consummation of the equity tender, stating as follows, "I am prepared to sign the stock plan once the strike price is finalized. I believe you were waiting to hear back from the attorney."

93.     Koepke failed to respond.

94.     On July 28, 2020, Plaintiff followed up and stated, "Just following up on my email from last week. I am ready to sign the stock plan whenever you settle on a strike price."

95.     On July 29, 2020, Koepke replied and stated, "Waiting on Ray and lawyers…. each iteration takes forever…."

96.     Koepke's representation was false because the Stock Incentive Plan was already drafted and tendered.

97.     On September 9, 2020, Plaintiff emailed Koepke and stated that better engineers have to be hired because it is difficult to build a company and scale a sales team "with a floundering product." Plaintiff further noted, "we can't keep customers if people keep buying accounts for a year and leaving because our product is second rate."

98.     On December 3, 2020 at 9:07 pm, Koepke made a racist comment by email, as he identified available times the following day for a call, noting that he has a "call with Japan" at 6:00. Koepke referred to the "call with Japan" as a reference to a call with a person of Asian descent.

99.     On December 4, 2020, Koepke recorded a Certificate of Amendment providing that 500,000 Class B shares are outstanding.

100.    Five months *after* Defendants forced Plaintiff to sign the onerous noncompete agreement under false pretenses and false promises of equity and after fraudulently inducing Plaintiff to sign the noncompete agreement under the belief that he would receive 25% in founders share equity, Koepke revealed to Plaintiff that Plaintiff was only eligible to receive Class B non-voting shares.

101.    On December 7, 2020, Plaintiff became aware it was Class B shares that Advocacy Holdings was providing him, not the Class A shares Plaintiff was promised. During a meeting, Koepke wrote on the whiteboard, trying to explain that Plaintiff would be receiving Class B shares. Plaintiff, very upset, stated: "You promised me 10% of the whole company, my shares were supposed to be Class A."  Koepke said "take it or leave it.'

102.    On December 7, 2020, Koepke told Plaintiff that he should be "grateful" because he was getting 55,000 shares, "which is 10% of the Class B shares."

103.    On December 7, 2023, when Plaintiff stated that this wasn't the parties' agreement from four years ago, as that agreement was for 25% equity, Koepke said "well it doesn't matter what I promised, our lawyer said only Ray and I can have Class A shares as founders. You will get Class B shares."

104.    On December 8, 2020, Koepke told Plaintiff he had "gained weight, better lay off the burgers and pizza."

105.    On December 11, 2020, Plaintiff received equity of worthless Class B shares in Advocacy Holdings in exchange for a $11,000 capital contribution.

106.    Thus, after four years at the company, including three years as the CEO, and numerous promises to receive meaningful equity up to 25%, Plaintiff was only offered the option to purchase 55,000 Class B non-voting shares for $11,000.

107.    To mitigate his damages, Plaintiff paid Advocacy Holdings $11,000 on December 11, 2020 by check.

108.    On December 12, 2020, Koepke sent a text message to Plaintiff stating that Koepke was "sitting on my couch watching Periscope of the Proud Boys in DC going after Antifa."

109.    On February 25, 2021, as a second tranche of the forgivable loan, Red Chalk received $376,000 which was fully forgiven.

110.    On March 11, 2021, Koepke told Plaintiff that Plaintiff "does not understand" things because of his marital status.

111.    On April 1, 2021, Plaintiff emailed Koepke stating, "John, I have a change of address. Please update your records as appropriate. Chazz Clevenger 1515 15th Street NW, Unit 416, Washington, DC 20005."

112.    In June of 2021, Koepke aggressively questioned Plaintiff about who he was dating, subjecting Plaintiff to this treatment because of his marital status.

113.    In June of 2021, Plaintiff suggested to Koepke that Advocacy Holdings should be mindful of new employment laws in DC. In response, Koepke told Plaintiff "go stuff your face with a pizza, I don't have time for this" and abruptly hung up the phone.

114.    On June 24, 2021, during a phone call with Plaintiff, Koepke raised his voice and shouted at Plaintiff as follows, "don't be fucking stupid. Don't send me stuff like this over the internet," because Plaintiff sent Koepke a link to DC's new employment law: DC ACT 23-563.

115.    On July 3, 2021, Plaintiff asked Zenkich for the 409a valuation of Advocacy Holdings for tax purposes. Zenkich gave Plaintiff the run-around and refused to provide the information.

116.    On July 12, 2021, on a business phone call with Plaintiff, Koepke raised his voice and used profanity toward Plaintiff, telling him "I don't give a fuck about acquisition or consulting." Later in the call, Koepke aggressively hung up on Plaintiff.

117.    On October 28, 2021, Plaintiff emailed Koepke and asked him to inform Plaintiff regarding when payroll will be processed and invoices will be paid. Koepke responded stating, "Those that are PAID when I process payroll will be included in October. Those that are not will be in November. Am I missing something? Is their [sic] something that is pending? Is there something that is an issue? I don't understand?"

118.    Throughout 2021, customers would often complain that they would not receive timely responses to their problems, technical concerns or emails. This would result in Advocacy Holdings losing the customers and causing the customers to not renew.

119.    Plaintiff would be left to deal with not only driving the sales of the company but also responding to customers complaining about technical issues because Advocacy Holdings could not perform core functions.

120.    Throughout November 2021, Plaintiff repeatedly voiced these concerns to Koepke and Zenkich, but the problems continued.

121.    On November 4, 2021, a customer emailed Plaintiff and stated, "Gents. It's one thing to have an occasional glitch, but your service is VERY unreliable right now, and I'm not happy. We are getting a LOT of emails from supporters who cannot fill in a letter because it doesn't load. The messages tells them the server is too busy, etc. (This is not the Safari CORS issue). I need to know that I'm paying for something reliable OR that you're at least making it clear you KNOW that it's not doing what it should, and that you're doing something about it. Please give me some assurance that the current instabilities are known to you and are being dealt with as a matter of first importance. ACL can't keep failing our supporters like that." Plaintiff forwarded the email to Koepke and Zenkich and indicated that emails of this nature are a frequent occurrence, "at least 3-4 times per week."

122.   On November 9, 2021, Plaintiff emailed Koepke and Zenich as follows, "You, John, and I need to decide what type of business we are in, because we do not have the capital or resources at the present time to operate a true software business -- unless perhaps we make some changes in order to redirect capital toward engineering talent. I can't scale sales with the product in its current state with two reps or twenty reps. Right now, we are a Frankenstein of software, acquisition, and a whole lot of digital duck tape…. we won't succeed in getting the delivery issues or widgets fixed by the end of the year, and as a result, we will experience major revenue loss and churn. It is deeply distressing for both Darren and I to receive these types of emails from customers on a daily basis demanding that we provide them with a functioning product. I am refusing refunds on a weekly basis, which may save our bank account, but is devastating to our credibility. Former customers are out there bad-mouthing us, and the scuttlebutt comes back to me through my network. I think John is under the mistaken impression that we have a basic, core product that works that we can sell if we have a big enough sales team. We do not. We have a deeply flawed product that my sales team has daily qualms about selling in its current state."

123.   On November 30, 2021, Koepke confirmed by email that employees earn 80 hours of vacation time per year.

124.   On December 23, 2021, Koepke emailed Plaintiff and Zenich, stating, "Note that as of this morning, we have only received $164,000 month-to-date. Unless we get a few more wires in next Monday/Tuesday/Wednesday, we may be a bit short……. [sic] I am also holding payment to eSpace and we need to pay G12 about $10k and WhatIf about $50k……. [sic]"

125.   The financial problems continued throughout 2022.

126.   On January 7, 2022, Plaintiff, Koepke, and Zenich joined a conference call to discuss Advocacy Holdings' financial prospects for 2022.

127.     During the January 7, 2022 call, Koepke stated, "I don't know how else to sort of say it. I mean, independent of other, the three of us. [W]e have failed at this and I'm not being ... We haven't got it. You know, it's been, you know, I don't, you know, we have one, you know, we have you as a sales person right now..."

128.     During the January 7, 2022 call, Zenkich stated, "[N]one of us are happy with the business going sideways."

129.     During the January 7, 2022 call, Koepke stated, "Yeah, that's what I'm saying. Right. I mean, you, you take Bill track 50 and you just duplicate exactly their fucking interface and everything else and you know ..."

130.     During the January 7, 2022 call, Koepke stated, "I'm not what I'm saying is I'm, I'm, I'm commenting on the you know, look, there's a realization of what we can do if that's true, but there's also a way, you know, look, we've created this thing, right? We need to know when it's, when we're, we need to be smart enough to get the fuck out of the way when we need to get the fuck out of the way. Now, we may not find a guy that we need to get the fuck out of the way for, right? I mean, that may not be viable yet. But you know, I mean, at some point, we gotta sort of realize, hey, we gotta get the fuck out of the way and let the professionals run this business, you know, I mean, in a sense, right? So, I mean, I'm thinking, I, I mean, in an agreement with you that, you know, I mean, if, if everything's gonna depend on you teaching somebody something we're fucked, we're never gonna get anywhere."

131.     On January 18, 2022, Plaintiff received yet another email from an upset customer which stated in relevant part:

OCP, while apparently testing in our NB database, has not only removed data, but

- has replaced correct legislator emails with incorrect emails (so we had a bounce back today – please check your lists against the official list in MD. . . .[)]

- in trying to stop alert recipients from being unsubscribed in our NB database, OCP wrote code that subscribes all recipients. But we had two legislators (friends) who had personally opted out. OCP overwrote their records, opting them in without permission.

- removed data from multiple records, including prefixes and some party affiliations.

- did not and has not communicated properly, while also damaging the integrity of our data - I'm curious about what safeguards your tech team has taken to repair the damage they have caused. We have been actively using the database and don't know how or when your team has messed it up so we can't roll it back.

- every time someone sends an alert, the sender's action goes to NB so the account is tagged as having taken an action. Now, not only are senders' accounts tagged, but recipients (legislators in our NB database) are being tagged as having received an email. Why? Why is OCP touching recipients at all?

OCP has been working (testing?) inside our database (normally you use a test site not live data) and doing so without communication with us. I had been talking with my colleague about prefixes on some records and by luck thought I'd just check legislator prefixes before sending an email. That's how we found the most recent problems.

You have violated the integrity of our data. We contracted with you to integrate action alert sends. Only. I can't express enough how serious this is.
. . .
Also, Dominique told me the problem should be resolved by the end of 2021, but we were never told.

It's good customer service to alert customers to major issues that come up that will affect our workflow.

NB sends alerts re disruptions. Are we not on a list or do you all not inform customers of issues like this?

**Our trust in OCP is very low** - to the point we re-signed a contract with our former vendor to ensure we had a functioning action alert system this winter. That is a major cost resulting from the failure of OCP.

132.   On January 28, 2022, Koepke emailed Plaintiff and stated that the "We were $50,000 short [for payroll]… we also currently have $125,000 of payables… Note that we only collected $190,000 in January …. much less than last year."

133.    On February 22, 2022, Koepke emailed Plaintiff and Zenkich and stated, "Raymond and Chazz, I suggest we plan on putting an additional $50k into OCP. I realize that we have a longer term problem, however, I believe that IF we make payroll, we will just barely make it – and then be short for rent and other required payments (e.g., G12, Perky Pixel, marketing, etc… ) that are also due at month end (invoices from the previous month). If possible, send a check to the office: Red Chalk 1 N Wacker Drive Suite 3601 Chicago, IL 60606 Happy to discuss later today if needed. John."

134.    On March 24, 2022, Koepke emailed Plaintiff and Zenkich and stated, "Attached is a report on SOFTWARE invoice amounts by INVOICE month. (Note that we started the invoice process in July of 2020). **I did not calculate the renewal rate as we know it is extremely poor.** Just thought I would forward……."

135.    On March 28, 2022, Koepke emailed Plaintiff and Zenkich and stated, "Raymond and Chazz, as of close of business today, we have approximately $85k in the bank (you may recall that our all in monthly payroll is $145k). Per Chazz' email last week, we are still expecting another ~ $98k. Hopefully we will receive a large portion of this in the next several days as payday is Thursday 3/31. Note that the all in costs of $145k include federal and state taxes (~$50k). As Federal/state taxes are due on the following Wednesday, we need approximately $100k by Wednesday close of business."

136.    During a call on March 30, 2022, Koepke and Plaintiff had essentially the following exchange:

> **Koepke**: Thanks for calling. Listen, you need to stop trying to hire all these people with personal problems who can't come into the office. The pandemic is over. It's not an excuse not to be in the office.
>
> **Plaintiff**: What do you mean? The pandemic is very real. Lots of our employees still aren't comfortable working in an office setting.

**Koepke**: Who isn't comfortable? Give me names.

**Plaintiff**: Darren for one and also Shanel.

**Koepke**: You really need to stop hiring people from protected classes. They cause too many headaches and too much trouble, and you can never get rid of them. Get yourself some young, ambitious guys who want to leave a mark on the world.

**Plaintiff**: I hear you, but I think it's best to have a diverse workforce. I'm not bothered as long as people do their job.

**Koepke**: Chazz, minorities know they have a leg up in the modern workforce, and they will do anything they can to take advantage of that. Anyway, it doesn't matter; just make people come into the office, got it?

**Plaintiff**: Got it.

137.    On April 24, 2022, according to Koepke, Advocacy Holdings took in around $300,000 in revenue but spent $331,000 in costs. Koepke admitted that Plaintiff was doing everything in his power to sell new accounts and maintain some of the larger old accounts and made great progress to get the business to the point it was at, but the struggle to build a scalable business infrastructure. According to Koepke, he had "no answers as to how to do this" and there was "not much" that Advocacy Holdings could do "besides to try to get through the next several months and into the fall without bleeding to death."

138.    On April 29, 2022, Koepke emailed Plaintiff and Zenkich and stated, "This month we spent $331,000….and took in about $300,000… We have a large number of outstanding invoices (maybe $250k over 60 days) that we really don't have much of a process for collecting It's safe to say that our business is not run well. The cause is simple - the 3 of us do not have time (nor the experience) to run it…. **Chazz is doing everything in his power to sell new accounts and maintain some of the larger old accounts….and Raymond and I have our own businesses to run.** While we have made great progress to get this business where it is today, and I think we have some momentum going into the summer, we need to both develop a catalyst for revenue as well as build a scalable business infrastructure.……I don't have any answers as to how to do this

and I spoke with Chazz today about these challenges. There is not much we can do for now besides to try to get through the next several months and into the fall without bleeding to death……and see if we can make some incremental changes to product, personnel, etc." (Emphasis in original).

139.    On May 26, 2022, Koepke stated, "Ray/Chazz - I will be cashing the previous checks. However, $50 k is not going to be sufficient. May has been a very poor month (in terms of collecting and invoicing/sales). Please plan on contributing your pro rats [sic] of an addition [sic] $100k. Hopefully this can get us through June. I will need that by Wednesday."

140.    On May 31, 2022, Plaintiff emailed Koepke, copied to Zenkich, stating, "Attached are the financial reports for OCP that you sent me on March 23, 2021 at 9:06am ET. You will see that we had 277k in cash payments for March 2021 and 761k in cash payments YTD. Therefore, there is no possible way that the numbers you just sent out to Ray and I fifteen minutes ago are accurate. Are you saying that we received almost one million dollars in additional cash payments between March 24th - March 31st of 2021 to get us to 1.6 million for March 2021 YTD? I assume not."

141.    On June 2, 2022, Koepke signed a check on behalf of Advocacy Holdings containing Plaintiff's address reflecting as 1515 15th Street NW, Unit 416, Washington, DC 20005. On or about June 2, 2022, Koepke mailed the check to Plaintiff's address of 1515 15th Street NW, Unit 416, Washington, DC 20005.

142.    During a call on June 5, 2022, when referring to potentially firing a minority employee, Koepke remarked that the company had "protected class issues now with a lot of these people."

143.    On June 5, 2022, Koepke stated, "the business is declining." Koepke said "we're down 30% in collected revenue."

144.    On June 5, 2022, Koepke stated that from January 2021 through May 2021, the total revenue was $1.7 million and software revenue was $1 million.  But from January 2022 through May 2022, the total revenue was $1.2 million and the renewal revenue was only $387,000.

145.    On a June 5, 2022 Zoom conference, Plaintiff, Koepke, and Zenkich discussed the state of Advocacy Holdings.

146.    During the June 5, 2022 Zoom conference, Koepke stated, "[T]hrough last, through 2021 last May, we collected a million dollars worth of software revenue between new subscriptions and renewals. And this year our renewal collected renewal revenue for the same time period is $387,000. So, you know, something dramatically, you know, I don't know wrong. You know, it's uh we'd have to dig into it, but we collect it again. Let me say that again. We collected a million dollars through last May software revenue for giving. This is a subscription business. You would assume we would be very close. You know, again, if you had 100% repayments on that, you would collect another million dollars plus 5%. And that doesn't include new software sales. So, you know, the business is, you know, we're, it's down 30% the numbers aren't good and, you know, obviously it's not investable."

147.    During the June 5, 2022 Zoom conference, Koepke stated, "The three of us we've had years of doing it. We've thrown, I've calculated, you know, of all the sales people, you know, we've probably spent, you know, over, you know, $2 million you know, between the sales people of business development teams, the etcetera over the years and we've gotten very little for it. So, you know, I mean, I think uh you know, I, I don't, you know, uh to keep kind of throwing resources at it, I think is I think is foolish at this stage. So, you know, well, I don't, I mean, you know, I guess the only, you're ultimately gonna be the only guy selling here."

148.    During the June 5, 2022 Zoom conference, Koepke stated as follows regarding a person of a protected class, "And again, is Chanel [sic], uh, if do you think she's near leaving or what? What's your, I mean, because remember we got uh protected class issues now with a lot of these people."

149.    During the June 5, 2022 Zoom conference, Koepke stated, "I mean, there's no, you know, there's no, you know, kind of, you know, giving these people are in a protect [sic], you know, she's in a protected class, etcetera, you know, and Conan, you know, who knows what he does."

150.    On June 6, 2022, Koepke and Plaintiff had a call and Koepke stated, "What do you want me to tell you, Chad [sic], I'm sick of talking around it. I'm sick of it. And if you wanna go get another job, go get another job. I don't know what to do. We fucking invested tons of money, tons of time and we have no business, ok? Up to it. I'm not."

151.    During the June 6, 2022 call, Koepke also stated, "So we, we wanna raise money and you, you, so more sales people would quit so more sales people can't sell. What do you want? How many sales people do you wanna have, have go through the business?"

152.    During the June 6, 2022 call, Koepke also stated, "Ok, we brought in a million dollars of software revenue last year through May. So how much software renewal revenue this year through May? Would you expect close to a million dollars ideally? And what do we got? $360,000? I mean, I, we don't, I mean, I, I, I look, no, I appreciate how hard you work, your knowledge, your expertise, all of that stuff, your sales ability, trust me."

153.    During the June 6, 2022 call, Koepke also stated that investors would be interested in buying Advocacy, "I feel until they look under the hood, until they fucking look under the hood."

154.     During the June 6, 2022 call, Koepke also stated, "What do you want me to tell you? We're banging our heads against the wall right now and it's, and it's frustrating as hell. And I, and we're not honest with ourselves, you know, look, I fucking wish you were fucking Bill Gates Chazz [sic]."

155.     During the June 6, 2022 call, Koepke also stated, "losing money over a period of time, raising more money, losing more money is not a recipe for success. Ultimately."

156.     During the June 6, 2022 call, Koepke also stated, "So, I mean, what, how the hell can you say you should be still in charge of sales? I mean, of a sales team? I mean, how the hell, I mean, I don't like you."

157.     During the June 6, 2022 call, Koepke also stated, "I still hope you could be maybe the CEO forever. I don't give a shit. I mean, any way we can make money. Chazz [sic], I mean, I think you're in it for the same thing, you know, but you know, I mean, I think you're gonna, we're gonna have to find a guy, we're gonna have to find somebody who we say here's the opportunity, you know, took this from A to B, you know, you know, uh Mr Mr X, here's the opportunity chas [sic] took this thing from A to B, he's a top notch sales guy. He's an elephant hunter. He can close anything. He can sell ice to Eskimos. He knows the fucking business, you know, he knows the product, he knows the competitors, he knows everybody in it. He's the key. He's the key guy, ok? Mr X, what you need to do is build every fucking thing else, ok? You need to and by the way, here's 10% equity, same as what Chad [sic] got or whatever, here's this much equity, you gotta, you know, go here's the opportunity to create 100 create a $10 million revenue business in the next, you know, 34 years and you know, and everybody walks away."

158.     During the June 6, 2022 call, Koepke also stated, "So I, like I said, you, you might actually be able to get us through December to your, again to your credit. I mean, I'm, I'm, I'm

serious. I don't think you realize how much I appreciate your skills and the spike you have in the area of your strength. I don't, I honestly, I, you gotta believe me on that. I mean, you have literally taken this thing from $79 a month to 3.5 million in revenue."

159.    On the June 6, 2022, Koepke repeatedly berated Plaintiff with profanity laden tirades such as (e.g. "I'm just done with the whole fucking thing," "I'm fucking done," "I'm fucking done because there's no fucking business here").

160.    On July 28, 2022, Zenkich emailed Koepke, copied to Plaintiff, with subject line "Citibank CC maxed," and Zenkich stated, "John – Credit card hit the max again."

161.    On July 28, 2022, Koepke emailed Plaintiff and Zenkich, "I will issue a paper check for you and send on Monday……. (assuming we get a few wires) …. We are significantly short for July…."

162.    On July 28, 2022, Koepke sent Plaintiff an email coordinating delivery of a FedEx package to Plaintiff's Washington, DC address.

163.    The financial struggles of Advocacy Holdings continued in August 2022, as Koepke claimed the company had $15,000 in their account again demanded Plaintiff FedEx Advocacy Holdings a check for $10,000 of Plaintiff's own money. Koepke demanded that the $10,000 from Plaintiff could not be designated as a loan.

164.    Specifically, on August 16, 2022, Koepke emailed Plaintiff and Zenkich as follows, "we have less than $15k in the account. We need to put in $100k of capital (at a minimum) so please FedEx a check for $10k. I will also get a check from Raymond. We will use half of this to pay **$50k back Red Chalk (owed $94k)** and the other we can use to pay LittleBrook ($34k) and pay the Partnership Project ($19k). I will send a check today to LittleBrook. Call if you want to discuss. John." (Emphasis added).

165.    Accordingly, Defendants had just issued another "capital call," inclusive of money from Plaintiff, and Plaintiff's paycheck was again late, so that Advocacy Holdings could "pay $50k back [sic] Red Chalk."

166.    Defendants had not provided any information about any debt that Advocacy Holdings owed to Red Chalk Group. Moreover, a time of such strife and lack of liquidity (or solvency) would seem like the wrong time to "pay $50k back" to Red Chalk for a nonexistent obligation.

167.    Koepke never substantiated any alleged loans from Red Chalk mentioned on his August 16, 2022 email.

168.    On September 21, 2022, Koepke stated: "Your check (see below) states that it is for 'Loan to OCP.' As discussed, the $100,000 that was raised between Raymond ($45,000), you ($10,000), and I ($45,000) is NOT a Loan to OCP but a capital. Please confirm you [sic] acknowledgement of this and I will cash the check."

169.    On September 28, 2022, Plaintiff emailed Koepke, copied to Zenkich, stating, "I still have $13,000 of conference expenses over the past four months that I haven't submitted because of the businesses' financial troubles, so when it comes to cutting costs, I'm right there with you and Ray. I just watched $10,000 disappear from my bank account yesterday. As discussed, I'll send you and Ray an email...or we can have a call.... about conference related expenses on a monthly basis going forward."

170.    On September 29, 2022, Koepke emailed Plaintiff, copied to Zenkich, stating that "we will be paying for September's poor performance in October, November, December… As you know, we are operating month to month. To be even more clear regarding expenses: To the extent you have given approval to anyone to spend a single dollar on behalf of OCP, please advise them

that the 'APPROVAL' is no longer in effect. Not sure why you felt you couldn't tell Chris the conference was off… This is obviously not sustainable…"

171.   On October 3, 2022, Koepke was reminded about an unpaid bill, and he replied by stating "We don't have money. What do you suggest?"

172.   On October 11, 2022, Koepke disclosed that he has not paid the rent at the 1824 Jefferson Place NW location for the months of August or September 2022.

173.   On October 11, 2022, Koepke indicated that he may reduce Plaintiff's pay. In response, Plaintiff mentioned that Plaintiff recently personally wrote checks of $20,000 to fund the business when it couldn't make payroll. Koepke cut Plaintiff short and told Plaintiff, "Shut the fuck up, Chazz."

174.   Plaintiff respectfully asked Koepke to have a productive conversation. Showing his combative and violent temper, in response, Koepke became irate and screamed, "Chazz, fuck you!" Koepke then abruptly terminated the call.

175.   Later that evening during a Zoom call among Plaintiff, Koepke and Zenkich regarding the financial status of Advocacy Holdings, Plaintiff made suggestions to pay down certain debt obligations. Koepke remained angry and he derisively rejected Plaintiff's suggestions. Plaintiff essentially told Koepke that Advocacy Holdings' inability to pay its debts was causing irreconcilable damage to not only Plaintiff's personal reputation but also Advocacy Holdings' reputation. In response, Defendant Koepke became increasingly antagonistic toward Plaintiff.

176.   On October 24, 2022, further demonstrating Advocacy Holdings' insolvency, Koepke emailed Plaintiff copied to Zenkich, "We will need approximately $90-$100k to come in over the next week….

177.     October 28, 2022, Koepke sent Plaintiff an email coordinating delivery of a FedEx package to Plaintiff's Washington, DC address.

178.     On October 31, 2022, Koepke signed a check on behalf of Advocacy Holdings stating Plaintiff's address as 1515 15th Street NW, Unit 416, Washington, DC 20005. On or about October 31, 2022, Koepke mailed the check to Plaintiff's address of 1515 15th Street NW, Unit 416, Washington, DC 20005.

179.     On November 4, 2022, Koepke sent Plaintiff an email stating, "We need an additional $50k. No other options…. We will start bouncing checks on Monday…… Even if a check or two comes in, we cant run the business this way…. Plan on a fedex to me by Monday. If we need to get on a call let me know…. I simply cant squeeze this any longer……"

180.     On November 4, 2022, on behalf of Advocacy Holdings, Zenkich emailed Plaintiff, stating, "Letting Andrew go even today doesn't solve the immediate cash flow problem. Loan might feel better, but I think it ends up being the same since the business has no free cash to service it so it sits on the books as an unpaid loan."

181.     On November 4, 2022, the parties discussed shutting the business down.

182.     On November 7, 2022, Koepke emailed Plaintiff and Zenkich stating, "We have a balance $272.22. I assume I will be receiving your checks today. If not please wire."

183.     On November 8, 2022, Plaintiff emailed Koepke stating, "My investment check in OCP of 5k should have arrived at 10:30am at RCG [Red Chalk Group] today."

184.     On December 29, 2022, Koepke emailed Plaintiff and Zenkich with the subject line "OCP Status," stating "I received and deposited the $41k in [capital call] checks [including money from Plaintiff]. Also received a wire for $5k. Payroll submitted."

185.    In addition to his $11,000 payment for the worthless Class B stocks, Defendants forced Plaintiff to contribute a total of $35,000 to Advocacy Holdings as equity and debt contributions.

186.    The capital calls were not undertaken pursuant to Class B shares, as the Stock Incentive Plan does not provide for capital calls and capital contributions for Class B common stockholders.

187.    These contributions were not met with the issuance of simultaneous additional shares of Class B stock to Plaintiff.

188.    Instead, they were treated as Plaintiff's share as an owner of standard, Class A stock. However, Plaintiff was not provided actual shares.

189.    The following chart summarizes Plaintiff's capital contribution for Class B Shares.

| Date of Plaintiff's Contribution Check | Amount | Date that Advocacy Deposited the Check |
|---|---|---|
| 12/11/2020 | $11,000 | 12/28/2020 |

190.    The following chart summarizes Plaintiff's capital contribution that should have been for Class A Shares.

| Date of Plaintiff's Contribution Check | Amount | Date that Advocacy Deposited the Check |
|---|---|---|
| 2/21/2022 | $5,000 | **5/27/2022** |
| 8/17/2022 | $10,000 | 8/17/2022 |
| 8/31/2022 | $10,000 | 9/26/2022 |
| 11/7/2022 | $5,000 | 11/8/2022 |
| 11/15/2022 | $5,000 | 11/21/2022 |
| **Total Class A Investment** | **$35,000** | |

191.    Therefore, Plaintiff invested a total of $46,000, consisting of $11,000 in Class B shares and $35,000 in what should rightfully be classified as Class A shares.

192.    Koepke has been held in contempt of court. Ex. A is a true and accurate copy of an appellate opinion describing Koepke's violent behavior and lack of candor.

193.    After Koepke was held in contempt of court, the appellate court affirmed the trial court's finding that Koepke is "not particularly truthful or credible."

194.    The appellate court also affirmed the trial court's finding that Koepke's conduct was "evasive and combative."

195.    Prior to the 2019 order whereby the Appellate Court of Illinois affirmed the circuit court's contempt finding against Koepke, Koepke was previously arrested for violating a protective order (Cook County, IL case no. 02200561201). In a separate incident, Koepke was charged with aggravated assault and assault with intent to commit a felony (Duval County, FL case no. 8735200).

196.    Koepke's violent and uncontrolled conduct reached a crescendo on January 17, 2023 when Koepke assaulted Plaintiff and threatened to beat him with a baseball bat.

197.    On January 17, 2023, in person, Koepke chided Plaintiff, "it looks like you have been gaining weight and puffing up, what's wrong with you, Chazz?"

198.    Koepke made those derogatory comments on January 17, 2023 with the intent to make Plaintiff feel uncomfortable in the workplace, which is unlawful.

199.    In the evening of January 17, 2023, Koepke derided Plaintiff for being single and for what Koepke described as Plaintiff's "eating habits."

200.    That evening on January 17, 2023, Koepke made more derogatory comments about Plaintiff not having kids.

201.    Later in the evening of January 17, 2023, Plaintiff, Koepke and Zenich were in Advocacy Holdings/Red Chalk Group's office in Chicago to discuss, among other things, the state of the business. Koepke had been verbally abusive toward Plaintiff throughout the day. During the meeting, Koepke stated, "today we are going to beat up on Chazz." This was not a funny joke, if it was a joke at all, and Plaintiff felt uncomfortable.

202.    Koepke then stated, with reference to "beating up" Plaintiff, "we may as well use a baseball bat on him." At this time, Koepke made a physically threatening gesture toward Plaintiff.

203.    At the time when Koepke stated that "we are going to beat up Chazz" and "we may as well use a baseball bat on him," Koepke, Zenich and Plaintiff were physically together in the conference room at 1 North Wacker Drive, Suite 3601, Chicago, Illinois 60606.

204.    The setup of the conference room was such that if physical violence ensued, it would have been difficult for Plaintiff to extricate himself from the room. Plaintiff's means of egress were partially blocked by Koepke.

205.    Plaintiff knew that if physical violence was initiated by Koepke, Zenich would have been unable and unlikely to stop it.

206.    When Koepke stated that "we are going to beat up Chazz" and "we may as well use a baseball bat on him," Koepke was sitting just a few feet away from Plaintiff and was within striking distance. Koepke had the ability to carry out a strike upon Plaintiff from the distance between Koepke and Plaintiff when Koepke.

207.    Essentially, Koepke lunged forward at Plaintiff, causing Plaintiff to experience imminent concern for his physical safety.

208.    Koepke's threat to "beat up" Plaintiff, which included the threat to use a "baseball bat," coupled with a physically threatening gesture was an aggravated assault.

209.    Koepke's reference to "using a baseball bat" to "beat up" Plaintiff in the workplace was unacceptable.

210.    At this point in January 2023, the workplace was more than hostile, it was physically dangerous.

211.    Plaintiff believed that Koepke could have had a baseball bat on the premises on January 17, 2023 and Plaintiff was placed in imminent apprehension and fear by Koepke that Koepke would commit a violent act against him either that evening or at some point in the near future. Plaintiff was aware of Koepke's past misconduct.

212.    After Koepke crossed this firewall in January 2023, Plaintiff became reasonably convinced that it was a "when" and not an "if" regarding Koepke's next abusive and physically violent threat or act.

213.    Plaintiff reasonably believed that if he had returned the negative sentiment to Koepke that evening, or at any point in the future, a physical altercation would ensue in the workplace.

214.    Six days after threatening to "beat up" Plaintiff with a "baseball bat," on January 23, 2023 at 11:40 am, Plaintiff had an eight-minute phone call with Koepke where Plaintiff addressed an email that Koepke sent to an employee. Koepke quickly began yelling and using profanity in a tirade at Plaintiff. Standing up for himself, Plaintiff tried to interrupt Koepke and asked Koepke to stop yelling and cursing at him.

215.    In response to that January 23, 2023 interruption from Plaintiff, Koepke called Plaintiff "stupid" and said Plaintiff was the reason the business was failing. Plaintiff asked Koepke to stop being so hostile and in response, Koepke threatened to fire Plaintiff.

216.    During that same January 23, 2023 encounter, Plaintiff told Koepke that he couldn't do that [fire Plaintiff] and suggested that Koepke talk to Zenkich. Koepke replied, "Fuck you, go talk to your lawyer then."

217.    On January 24, 2023, Koepke emailed Plaintiff and Zenkich stating, "As of this afternoon we have $50k in cash. (I am paying Azavea $12,500 as opposed to the $25k that is past due). Payroll needs to be processed on Friday for Payment on Tuesday. We will need another $70k - $80k."

218.    On January 28, 2023, Koepke emailed Plaintiff and stated, "I issued you a check for January. I will FedEx to office for Monday. (unless you advise me to send to your home address – please provide.)"

219.    On January 28, 2023, Koepke texted Clevinger and asked, "Where do u want FedEx," and in response Clevinger replied, "Chazz Clevinger 1515 15th Street NW, Unit 416, Washington, DC 20005."

220.    On January 28, 2023, Zenkich called Plaintiff to thank him for "enduring such a long, difficult day" after Plaintiff was subjected to Koepke's ongoing abuse. Zenkich was unable to stop Koepke's abuse, and Zenkich's only recommendation at that time was, "Chazz, you should talk to John and tell him you don't like what he's saying."

221.    On or about January 31, 2023, Koepke signed a check on behalf of Advocacy Holdings containing Plaintiff's address reflecting as 1515 15th Street NW, Unit 416, Washington,

DC 20005. On or about January 31, 2023, Koepke mailed the check to Plaintiff's address of 1515

15th Street NW, Unit 416, Washington, DC 20005. This check was likely post-dated because

Koepke presumably had no advance knowledge of Plaintiff's February 1, 2023 resignation.

222.    Per Koepke's system, if payroll was to be made on time, it would be made by direct

deposit. If payroll was late, the late paychecks would be mailed after the due date.  There would

be no reason for a check to be issued on January 31, 2023 because such a timely payment would

have been made by direct deposit.  Therefore, the January 31, 2023 check was likely backdated by

Koepke. Plaintiff did not receive and deposit the check until February 16, 2023.

223.    Because of the systematic and continuous verbal abuse perpetrated by Koepke, and

the hostile work environment he caused, Plaintiff was constructively terminated from Advocacy

Holdings on February 1, 2023.

224.    The constructive termination was manifested in Plaintiff's tendering of his

resignation on February 1, 2023.

225.    On February 22, 2023, Plaintiff filed an Initial Written Complaint with the D.C.

Office of Human Rights against Advocacy Holdings, based on the hostile work environment and

constructive discharge.

226.    On March 30, 2023, approximately two months after Plaintiff was constructively

terminated on February 1, 2023, Defendant Advocacy Holdings maliciously filed a "Verified

Complaint" riddled with perjury in the United States District Court for the Eastern District of

Virginia, styled *Advocacy Holdings, Inc. v. Chazz Clevinger*, 1:23-cv-00419-CMH-IDD.

227.    Defendant Koepke was the sole affiant of the Verified Complaint.

228.    On behalf of Advocacy Holdings, Defendant Koepke falsely represented to the

United States District Court for the Eastern District of Virginia under oath that, "Clevinger is an

individual who currently resides at 9030 Timberwolf Court in Vienna, Virginia… He has been a resident and domiciliary of Virginia since 2011… Clevinger is a citizen of the Commonwealth of Virginia for diversity jurisdiction purposes." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419-CMH-IDD, ECF No. 1, ¶ 6.

229.    On behalf of Advocacy Holdings, Defendant Koepke further swore that Plaintiff "has been domiciled in the Commonwealth of Virginia at all relevant times and for at least six months preceding the initiation of this lawsuit." *Id.*, ¶ 8.

230.    On March 30, 2023, Defendant Advocacy Holdings filed a "Motion for Temporary Restraining Order," and in that motion, Defendant Advocacy Holding's attorney, Anand Ramana, falsely represented to the tribunal that he satisfied the Fed. R. Civ. P. 65(b)(1) requirement that "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419-CMH-IDD, ECF No. 8-9.

231.    Despite the false certification regarding notice, Defendant Advocacy Holdings' attorney failed to provide any notice to Plaintiff's attorney in advance of the March 31, 2023 ex parte hearing on a temporary restraining order.

232.    The certification was false, as Plaintiff and Plaintiff's counsel had not heard from Defendants' attorney since February 13, 2023.

233.    On March 30, 2023, without any citation or evidentiary support, Ramana signed and filed "Plaintiff's Motion for Temporary Restraining Order," representing to the tribunal without evidence that "[i]n less than a month of CiviClick 'going live,' Defendant Clevinger has successfully stolen almost $1 million in OCP's business." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 2 at 1.

234.     Without providing any notice to the undersigned counsel for Clevinger, with whom Ramana corresponded in February 2023, Ramana calendared a March 31, 2023 hearing on the March 30, 2023 Motion for Temporary Restraining Order in Virginia.

235.     Still without having provided any notice to Clevinger or his counsel, at the March 31, 2023 ex parte hearing on the Motion for Temporary Restraining Order in the United States District Court for the Eastern District of Virginia, Ramana made inappropriate and disparaging remarks about Clevinger on the record on an ex parte basis as Ramana stated, "[w]hat I'm starting to learn is he [Clevinger] can be a little squirrelly, and he's -- he's tough to find. So, we have his address..." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-1176, ECF No. 32-1 at 236:4-7.

236.     Counsel was essentially representing to the Court that Clevinger was avoiding service in Virginia, when Clevinger clearly did not reside in Virginia.

237.     Advocacy Holdings apparently convinced the court in the Eastern District of Virginia that its counsel complied with the notice requirements under Rule 65(b)(1), but the Rule 65 certification was false and Advocacy Holdings provided no notice at all.

238.     Advocacy Holdings' March 30, 2023 Motion for Temporary Restraining Order contained no "specific facts in an affidavit or a verified complaint [which] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" as required by Fed. R. Civ. P. 65(b)(1)(A) and the motion lacked the required Fed. R. Civ. P. 65(b)(1)(B) certification of the moving party's counsel whereby "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 3.

239.     Instead of a Rule 65(b)(1)(B) certification of counsel, whereby "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required," Ramana represented as follows to the tribunal in the TRO memorandum, "the undersigned counsel certifies that, in February 2023, he made efforts to avoid this lawsuit by sending a cease and desist letter to Mr. Clevinger's Florida lawyer. While that lawyer stated he would respond, he never did." *Id.* at 9.

240.     Ramana's statement about communications in February 2023 about a lawsuit which had not even been filed is obviously not compliant under Rule 65(b)(1)(B). Without question, those representations about February 2023 communications are not a Rule 65 certification of "any efforts made to give notice and the reasons why it should not be required." No efforts were made "to give notice" Plaintiff's counsel before the March 31, 2023 TRO hearing.

241.     Moreover, Ramana's faux certification itself was a misrepresentation.

242.     Ramana represented to the tribunal that "Clevinger's Florida lawyer" never responded, but Plaintiff's undersigned counsel did respond as he emailed Ramana on February 22, 2023 with a letter and another attachment in response to Ramana's February 13, 2023 email. And Ramana failed to respond Clevinger's counsel's February 22, 2023 email.

243.     Advocacy Holdings' original motion for a TRO contained false statements and it lacked a Rule 65 certification. Yet, Advocacy Holdings and its counsel moved forward on it anyway while they knew or should have known that their actions were improper.

244.     Advocacy Holdings improperly obtained a temporary restraining order which should be declared null and void.

245.     At the March 31, 2023 improper ex parte TRO hearing, Ramana handed the presiding judge a proposed "Order Granting Plaintiff's Emergency Motion for Temporary

Restraining Order," which the judge signed at 10:22 am without modification. *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 9. But Fed. R. Civ. P. 65(b)(2) unambiguously provides that "[e]very temporary restraining order issued without notice must [] state why the order was issued without notice" and the March 31, 2023 TRO did not "state why the order was issued without notice." *Id.*

246.    Moreover, Fed. R. Civ. P. 65(b)(2) provides that the order is "not to exceed 14 days," but the TRO plainly spanned 17 days from March 31, 2023 to April 17, 2023. *Id.* Not only was the TRO improperly obtained, the March 31, 2023 TRO itself was facially void.

247.    On April 13, 2023, Plaintiff filed a motion to dismiss supported by 12 exhibits and five affidavits, including affidavits from a neighbor and building manager at Plaintiff's Washington, DC residential address that was provided to Koepke in 2021, leases, and utility bills. *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 18.

248.    Earlier in the day on April 13, 2023, Advocacy Holdings filed a motion and represented to the tribunal that Plaintiff's "landlord [from 2018-2019 in Virginia supposedly] explained [to an unknown person] that Defendant Clevinger abruptly terminated his tenancy and did not leave a forwarding address." ECF No. 12 at 2.

249.    This statement (if it was ever made in the first place) is misleading because Koepke clearly had Plaintiff's Washington, DC "forwarding address" and Koepke had been using Plaintiff's Washington, DC address since 2020.

250.    On April 14, 2023, despite the obvious lack of jurisdiction in Virginia, given that none of the parties are residents of Virginia, Ramana insisted that the improper TRO, which was obtained on an ex parte basis, be extended another 14 days.

251.    Ramana also falsely represented to the tribunal as follows, "Rule 65 obviously allows us to go in ex parte." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-1176, ECF No. 32-1 at 252:3-4. Ramana did not mention that he failed to include a Rule 65(b)(1) certification in the motion for TRO.

252.    Over Plaintiff's counsel's objection, based on the ex parte TRO, the court extended the TRO until April 24, 2023 when the motion to dismiss was scheduled to be heard. This was also prejudicial to Plaintiff.

253.    On April 19, 2023, Advocacy Holdings filed an opposition to the motion to dismiss, asserting that the absence of personal jurisdiction in Virginia is purportedly "provably wrong." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 23 at 1.

254.    Advocacy Holdings and Ramana's "proof" was a borderline ridiculous argument that a personal Bank of America "account" supposedly means "money" is "located in Virginia" because an ABA routing number supposedly corresponds to Henrico County (near Richmond) as shown by a Google search. *Id.* at 2.

255.    Advocacy Holdings then pointed to an "Accurint" investigative report, which purportedly "shows that Defendant Clevinger supposedly still lives in Vienna, Virginia." *Id.* at 3.

256.    But the "Accurint" report that Advocacy Holdings improperly published on April 19, 2023, containing personally identifiable information of Plaintiff and his family members, was not the correct time-stamped version which was actually relied upon.

257.    The correct Accurint report, dated February 10, 2023 subsequently provided by Ramana, plainly reflects Plaintiff's address as "1515 15th Street NW, Apt. 416, Washington, DC 20005." Accordingly, Advocacy Holdings and Ramana provided no valid explanation for Koepke's false statements regarding Plaintiff's residence.

258.    On April 24, 2023, the Virginia court rejected Ramana's attempt to compare bank routing numbers to real estate and the court ruled as follows, "I do find that there is no jurisdiction in this -- in this case. I think it's clear from the submissions here that this defendant is a resident of the District of Columbia." ECF No. 32-1 at 288:7-9.

259.    Regarding the TRO, the court held, "[t]hat expired at -- as of now. Or if it didn't, it expired at noon today." *Id.* at 290:22-23. As of April 24, 2023, the TRO had been discharged due to expiration.

260.    On May 31, 2023, Plaintiff signed and submitted his Charge of Discrimination with the D.C. Office of Human Rights.[1]

261.    At all relevant times, Koepke's actions and statements were made not only on behalf of himself but also on behalf of Red Chalk. At all relevant times after the creation of Advocacy Holdings, Koepke's actions and statements were made not only on behalf of himself but also on behalf of Red Chalk and Advocacy Holdings.

262.    Likewise, at all relevant times, Zenkich acted and spoke both individually and on behalf of Red Chalk. At all relevant times after the creation of Advocacy Holdings, Zenkich acted and spoke both individually and on behalf of Red Chalk and Advocacy Holdings.

263.    Plaintiff retained counsel and agreed to pay its counsel's reasonable attorneys' fees.

**COUNT ONE – ASSAULT**
**(Against Defendant Koepke)**

264.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

---

[1] Plaintiff is awaiting receipt of his right to sue letter.

265.     Intending to cause harmful and offensive contact, and an imminent apprehension of harmful and offensive contact, Defendant Koepke assaulted Plaintiff on January 17, 2023 by threatening to beat up Plaintiff and threatening to use a baseball bat to beat up Plaintiff. Defendant Koepke also made contemporaneous aggressive and threatening physical gestures toward Plaintiff.

266.     In conjunction with his threats regarding the baseball bat, Koepke physically lunged at Plaintiff.

267.     In doing so, Koepke intended to either physically contact Clevinger or at a minimum intended to put Clevinger in imminent apprehension of physical contact.

268.     Koepke's comments about beating up Clevinger and using a baseball bat on him, as set forth herein, were directed at Clevinger.

269.     As a result of Defendant Koepke's intentional conduct toward Plaintiff on January 17, 2023, including but not limited to Koepke's repeated verbal threats and reference to the use of a baseball bat on Plaintiff, Plaintiff was put in reasonable apprehension that such harmful and offensive contact was imminent. The apprehension of physical contact from Koepke that Clevinger experienced was immediate.

270.     Defendant Koepke's actions were not merely negligent or reckless. Defendant Koepke has a history of combative, aggressive and violent behavior, including without limitation when the Illinois court held Koepke in contempt for interfering with the parental rights of his ex-wife and as the court determined that Koepke is combative and not credible.

271.     Koepke was not making a joke. Koepke *intended* to cause Clevinger immediate apprehension of physical harm.

272.     Clevinger's feelings of imminent danger were objectively reasonable. Koepke's actions and behavior were serious. Koepke's lunge was serious. Koepke's past erratic behavior

was serious. Koepke's hot-head temper was serious. Koepke's combativeness was serious. Koepke's anger was serious. Koepke appeared under pressure and like he easily could have and would have taken the next step to actually strike Plaintiff. In that moment, Koepke intended to instill in Clevinger actual fear of an actual strike.

273.   Defendant Koepke's assault against Plaintiff was intentional. Koepke's behavior was, is, and continues to be erratic, threatening, and offensive to the average, like-minded individual.

274.   As a result of Koepke's assault, Plaintiff has suffered damages.

## COUNT TWO – WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Against Advocacy Holdings, Inc.)

275.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

276.   As discussed herein, the actions by Advocacy Holdings, through Koepke, created and perpetuated a hostile and unlawful working environment.

277.   After Koepke committed an assault, the workplace was no longer physically safe and Plaintiff was reasonably concerned for his physical safety around Koepke.

278.   Advocacy Holdings, through Koepke, implemented a discriminatory policy whereby Plaintiff was told to unlawfully discriminate by abstaining from hiring employees from protected classes in terms of race and gender.

279.   Plaintiff engaged in protective activity and refused to violate the discrimination laws.

280.   Defendant Koepke took adverse employment actions against Plaintiff as a result of Plaintiff's refusal to engage in invidious discrimination, including a reduction of Plaintiff's commission rate, a threat to cut Plaintiff's salary, and a threat to fire Plaintiff.

281.    Defendants Advocacy Holdings and Koepke's unlawful actions led to Plaintiff's constructive termination due to a hostile workplace.

282.    There was a direct causal connection and close fit between Plaintiff's refusal to engage in unlawful discrimination and the adverse employment actions taken against Plaintiff including the actions which resulted in Plaintiff's constructive termination.

283.    Defendants Advocacy Holdings and Koepke also wrongfully retaliated, as comprehensively discussed herein, against Plaintiff when Plaintiff engaged in other protected conduct by informing Defendants of the new D.C. law regarding the unenforceability of noncompete agreements.

284.    Defendants Advocacy Holdings and Koepke intentionally made working conditions at Advocacy Holdings so objectively intolerable that Plaintiff was driven to involuntarily resign.

285.    After being told to engage in unlawful discrimination on a regular basis, and after being punished for refusing to violate the law, and then after being physically threatened with a baseball bat, any reasonable person would find that working the conditions at Advocacy Holdings were intolerable.

286.    Advocacy Holdings' conduct is harmful to the public interest, as the conduct was frequent, consistent, severe, threatening, and humiliating, and not merely offensive.

287.    Advocacy Holdings' conduct unreasonably and pervasively interfered with Plaintiff's performance.

288.    Plaintiff was damaged as a result of the wrongful constructive termination in violation of public policy.

**COUNT THREE – DECLARATORY JUDGMENT TO HOLD NONCOMPETE
AGREEMENT UNENFORCEABLE AGAINST PLAINTIFF
PURSUANT TO DELAWARE LAW
(Against Defendant Advocacy Holdings, Inc.)**

289.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

290.     The noncompete agreement is not reasonable in geographic scope, particularly when it would apply throughout the entire United States.

291.     The hub of the digital advocacy industry centers around the beltway, in Washington, DC and northern Virginia, and a noncompete spanning the entire county is unreasonable in this circumstance. .

292.     As set forth herein, 12 months is not a reasonable temporal duration.

293.     Advocacy Holdings has no legitimate economic interest in seeking enforcement of the noncompete agreement.

294.     The noncompete agreement is not "essential" for Advocacy Holdings' economic interests.

295.     As discussed herein, the renewal rate on existing clients was approximately 50% year-on-year. Accordingly, to get to the prior year's level of revenue, it would be necessary to close sales equaling the entire existing client database each year. Therefore, new clients are necessary.

296.     Moreover, the year-on-year renewal rate for "year 3" is even lower, at approximately 15%. Therefore, even if clients stay for two years, those clients are very unlikely to renew for a third year.

297.   A noncompete does not serve a business which operates in that manner as keeping Plaintiff out of the industry is not whatsoever "essential" to Advocacy Holdings' economic interests.

298.   For Advocacy Holdings, sales to new clients are the most important aspect of revenue growth.

299.   Plaintiff's interest in practicing his chosen profession in a free market is strong.

300.   Advocacy Holdings presented the noncompete agreement on a "take it or leave it" basis.

301.   Advocacy Holdings also fraudulently induced Plaintiff into signing the noncompete in July 2020 under the auspices of a promise of 10%-25% of "founders share" equity.

302.   Instead, Advocacy Holdings waited until December 2020 before issuing non-voting and fully dilutable "B shares."

303.   Plaintiff was fraudulently induced into signing the noncompete.

304.   Enforcing the noncompete agreement under these circumstances would be an injustice.

305.   Plaintiff did not receive sufficient consideration in exchange for signing the noncompete.

306.   Defendants had repeatedly promised to confer equity to Plaintiff from the outset of their relationship in 2016.

307.   When it came time to confer that equity, Defendants demanded an additional concession in the noncompete, but then Defendants failed to follow through on their original promise to convey 10% or 25% in Class A "founders share" equity.

308.     Advocacy Holdings engaged in overreaching by imposing an unreasonable temporal and geographic restriction on Plaintiff.

309.     Defendants required the signing of the noncompete as a condition of Plaintiff continuing employment.

310.     Under careful scrutiny, under Delaware law, the noncompete agreement is unenforceable.

311.     The noncompete agreement is also unenforceable based due to Defendants' prior material breach of agreement and their breach of the covenant of good faith and fair dealing.

312.     There is an actual controversy between the parties as to the interpretation and enforceability of the noncompete agreement.

313.     This is a genuine dispute that needs to be resolved, rather than a hypothetical or speculative disagreement.

314.     The controversy involves legal rights and duties that are in question or uncertain.

315.     The controversy is ripe for resolution. The dispute is sufficiently developed and ready for a court to make a decision.

316.     Plaintiff has a sufficient stake in the controversy and will be directly affected by the outcome.

317.     Plaintiff has no other adequate remedy as it pertains to the enforceability of the noncompete agreement.

318.     Public policy precludes Advocacy Holdings' enforcement of the unreasonable and fraudulently-obtained noncompete agreement.

319.     Plaintiff requests a declaratory judgment stating, among other things, the following: the noncompete agreement is unenforceable under Delaware law, Plaintiff was constructively

terminated in violation of the law and Advocacy Holdings is estopped from enforcing the noncompete agreement.

### COUNT FOUR – DECLARATORY JUDGMENT TO HOLD NONCOMPETE AGREEMENT UNENFORCEABLE UNDER D.C. LAW
### (Against Defendant Advocacy Holdings, Inc.)

320.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

321.    After Plaintiff was wrongfully terminated, Defendants retaliated and attempted to enforce an unlawful, unreasonable, and fraudulently-induced noncompete agreement to preclude Plaintiff from earning a living in his lawfully chosen profession.

322.    The restraints on trade in the noncompete agreement are patently unreasonable, particularly in duration, geographic scope, in subject matter, and under the circumstances of Plaintiff's wrongful termination.

323.    The restraints on trade in the noncompete agreement are drastically larger and more extensive than what is required to protect Advocacy Holdings' business interests.

324.    Enforcing a noncompete agreement against Plaintiff under the facts set forth above would contravene public policy.

325.    Moreover, Advocacy Holdings failed to comply with D.C. law regarding the noncompete and it is unenforceable as a matter of law.

326.    There is an actual controversy between the parties as to the interpretation and enforceability of the Noncompete Agreement and the D.C. Non-Compete Clarification Amendment Act of 2022.

327.    This is a genuine dispute that needs to be resolved, rather than a hypothetical or speculative disagreement.

328.    The controversy involves legal rights and duties that are in question or uncertain.

329.    The controversy is ripe for resolution. The dispute is sufficiently developed and ready for a court to make a decision.

330.    Plaintiff has a sufficient stake in the controversy and will be directly affected by the outcome.

331.    Plaintiff has no other adequate remedy is it pertains to the enforceability of any Noncompete Agreement and the application of the D.C. Non-Compete Clarification Amendment Act of 2022.

332.    Public policy precludes Defendants' enforcement of the noncompete agreement.

333.    Plaintiff requests a declaratory judgment stating, among other things, the following: any noncompete agreement is unenforceable under the D.C. Non-Compete Clarification Amendment Act of 2022, Defendants failed to provide Plaintiff with the Plaintiff with the requisite notices, even for a person earning above $155,000, as required by the D.C. Non-Compete Clarification Amendment Act of 2022, Plaintiff was constructively terminated and Defendants are therefore estopped from enforcing any noncompete agreement.

### COUNT FIVE – MALICIOUS PROSECUTION
### (Against Defendant Advocacy Holdings, Inc.)

334.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

335.    Defendant Advocacy Holdings maliciously prosecuted a lawsuit against Plaintiff with no probable cause. The lawsuit was dismissed in Plaintiff's favor and Plaintiff suffered damages as a result.

336.    Dating back to November 24, 2019, Plaintiff informed Defendants that Plaintiff resides in the District of Columbia.

337.    At all relevant times since November 24, 2019, Defendants have known that Plaintiff resides in the District of Columbia.

338.    On November 24, 2019, Plaintiff informed Defendants in writing of his move to "1527 Church Street NW, #PH, Washington, DC 20005" so that Plaintiff would be an "8 minute walk" from the DC office of Advocacy Holdings.

339.    On April 1, 2021, Plaintiff informed Defendants that Plaintiff's address is "1515 15th Street NW, #416, Washington, DC 20005."

340.    Dating back to 2020, Defendants issued W-2s with Plaintiff's DC's address.

341.    On June 2, 2022, October 31, 2022, December 30, 2022, and January 31, 2023, Defendants signed paychecks reflecting Plaintiff's DC residential address and Defendants mailed those paychecks to Plaintiff's DC residential address.

342.    On August 30, 2021, July 29, 2022 and October 31, 2022, Defendants sent FedEx packages to Plaintiff at Plaintiff's home address in the District of Columbia.

343.    Following Plaintiff's February 1, 2023 termination, Advocacy Holdings issued Plaintiff's final paycheck, which Koepke falsely backdated as January 31, 2023, reflecting Plaintiff's District of Columbia address.

344.    In early February 2023, Advocacy Holdings and Koepke mailed Plaintiff's January 31, 2023 paycheck to Plaintiff's District of Columbia address.

345.    Less than two months later, on March 30, 2023, Advocacy Holdings filed a "Verified Complaint" containing perjury in the United States District Court for the Eastern District of Virginia, styled *Advocacy Holdings, Inc. v. Chazz Clevinger*, 1:23-cv-00419 (the "Underlying Suit" or the "Virginia lawsuit").

346.   Defendant Koepke, who was held in contempt of court by the Illinois trial court and confirmed to be "not particularly truthful or credible" by the Appellate Court of Illinois, was the sole affiant of the purported Verified Complaint.

347.   On behalf of Advocacy Holdings, Defendant Koepke falsely represented to the United States District Court for the Eastern District of Virginia under oath that, "Clevinger is an individual who currently resides at 9030 Timberwolf Court in Vienna, Virginia… He has been a resident and domiciliary of Virginia since 2011… Clevinger is a citizen of the Commonwealth of Virginia for diversity jurisdiction purposes." ECF No. 1, ¶ 6.

348.   On behalf of Advocacy Holdings, Defendant Koepke further falsely swore under oath that Plaintiff "has been domiciled in the Commonwealth of Virginia at all relevant times and for at least six months preceding the initiation of this lawsuit." *Id.*, ¶ 8.

349.   While Defendant Koepke falsely swore under oath on March 30, 2023 that Plaintiff was a resident of Virginia, and that he had been a resident of Virginia since 2011, and for the six months preceding the lawsuit, Defendant Koepke and Defendant Advocacy Holdings were fully aware at that time that Plaintiff was a resident of the District of Columbia and *not* Virginia. Defendants Koepke and Advocacy Holdings intentionally lied under oath.

350.   On March 30, 2023, Defendant Advocacy Holdings filed a "Motion for Temporary Restraining Order," and in that motion, Defendant Advocacy Holdings' attorney, Anand Ramana, falsely represented to the tribunal that he satisfied the Fed. R. Civ. P. 65(b)(1) requirement that "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  ECF No. 8-9.

351.    Despite the false certification regarding notice, Defendant Advocacy Holdings'
attorney failed to provide any notice to Plaintiff's attorney in advance of the March 31, 2023 ex
parte hearing on a temporary restraining order.

352.    The certification was false, as Plaintiff and Plaintiff's counsel had not heard from
Defendants' attorney since February 13, 2023.

353.    On March 30, 2023, without any citation or evidentiary support, Ramana signed
and filed "Plaintiff's Motion for Temporary Restraining Order," representing to the tribunal
without evidence that "[i]n less than a month of CiviClick 'going live,' Defendant Clevinger has
successfully stolen almost $1 million in OCP's business." *Advocacy Holdings, Inc. v. Clevinger*,
1:23-cv-00419, ECF No. 2 at 1.

354.    Without providing any notice to the undersigned counsel for Plaintiff, with whom
Ramana corresponded in February 2023, Ramana calendared a March 31, 2023 hearing on the
March 30, 2023 Motion for Temporary Restraining Order in Virginia.

355.    Still without having provided any notice to Clevinger or his counsel, at the March
31, 2023 ex parte hearing on the Motion for Temporary Restraining Order in the United States
District Court for the Eastern District of Virginia, Ramana made inappropriate and disparaging
remarks about Plaintiff on the record on an ex parte basis as Ramana stated, "[w]hat I'm starting
to learn is he [Clevinger] can be a little squirrelly, and he's -- he's tough to find. So, we have his
address..." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-1176, ECF No. 32-1 at 236:4-7.

356.    Ramana, on behalf of Advocacy Holdings, was essentially representing to the
Court, falsely, that Clevinger was avoiding service in Virginia, when Clevinger clearly did not
reside in Virginia and Ramana was well-aware of that fact.

357.    Advocacy Holdings apparently convinced the court in the Eastern District of Virginia that its counsel complied with the notice requirements under Rule 65(b)(1), but the Rule 65 certification was false and Advocacy Holdings provided no notice at all.

358.    Advocacy Holdings' March 30, 2023 Motion for Temporary Restraining Order contained no "specific facts in an affidavit or a verified complaint [which] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" as required by Fed. R. Civ. P. 65(b)(1)(A) and the motion lacked the required Fed. R. Civ. P. 65(b)(1)(B) certification of the moving party's counsel whereby "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 3.

359.    Instead of a Rule 65(b)(1)(B) certification of counsel, whereby "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required," Ramana represented as follows to the tribunal in the TRO memorandum, "the undersigned counsel certifies that, in February 2023, he made efforts to avoid this lawsuit by sending a cease and desist letter to Mr. Clevinger's Florida lawyer. While that lawyer stated he would respond, he never did." *Id.* at 9.

360.    Ramana's statement about communications in February 2023 about a lawsuit which had not even been filed is obviously not compliant under Rule 65(b)(1)(B). Without question, those representations about February 2023 communications are not a Rule 65 certification of "any efforts made to give notice and the reasons why it should not be required." No efforts were made "to give notice" Clevinger's counsel before the March 31, 2023 TRO hearing.

361.    Moreover, Ramana's faux certification itself was a misrepresentation.

362.    Ramana represented to the tribunal that "Clevinger's Florida lawyer" never responded, but Clevinger's undersigned counsel did respond as he emailed Ramana on February 22, 2023 with a letter and another attachment in response to Ramana's February 13, 2023 email. And Ramana failed to respond Clevinger's counsel's February 22, 2023 email.

363.    Advocacy Holdings' original TRO contained false statements and it lacked a Rule 65 certification. Yet, Advocacy Holdings and its counsel moved forward on it anyway while they knew or should have known that their actions were improper.

364.    Advocacy Holdings improperly obtained a temporary restraining order which should be declared null and void.

365.    At the March 31, 2023 improper ex parte TRO hearing, Ramana handed the presiding judge a proposed "Order Granting Plaintiff's Emergency Motion for Temporary Restraining Order," which the judge signed at 10:22 am without modification. *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 9. But Fed. R. Civ. P. 65(b)(2) unambiguously provides that "[e]very temporary restraining order issued without notice must [] state why the order was issued without notice" and the March 31, 2023 TRO did not "state why the order was issued without notice." *Id.* Moreover, Fed. R. Civ. P. 65(b)(2) provides that the order is "not to exceed 14 days," but the TRO plainly spanned 17 days from March 31, 2023 to April 17, 2023. *Id.* Not only was the TRO improperly obtained, the March 31, 2023 TRO itself was facially void.

366.    Advocacy Holdings made frivolous arguments and multiple false statements in the Virginia case.

367.    On April 13, 2023, Clevinger filed a motion to dismiss supported by 12 exhibits and five affidavits, including affidavits from a neighbor and building manager at Clevinger's Washington, DC residential address that was provided to Koepke in writing, dating back to 2021,

in addition to leases and utility bills. *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 18.

368.    Earlier in the day on April 13, 2023, Advocacy Holdings filed a motion and represented to the tribunal that Clevinger's "landlord [from 2018-2019 in Virginia supposedly] explained [to an unknown person] that Defendant Clevinger abruptly terminated his tenancy and did not leave a forwarding address." ECF No. 12 at 2.

369.    This statement (if it was ever made in the first place) is misleading because Koepke clearly had Clevinger's Washington, DC "forwarding address" and Koepke had been using Clevinger's Washington, DC address since 2020.

370.    On April 14, 2023, despite the obvious lack of jurisdiction in Virginia, given that none of the parties are residents of Virginia, Ramana insisted that the improper TRO, which was obtained on an ex parte basis, be extended another 14 days.

371.    Ramana also falsely represented to the tribunal as follows, "Rule 65 obviously allows us to go in ex parte." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-1176, ECF No. 32-1 at 252:3-4. Ramana did not mention that he failed to include a Rule 65(b)(1) certification in the motion for TRO.

372.    Over Clevinger counsel's objection, based on the improperly-obtained ex parte TRO, obtained with a false Rule 65 certification, and the perjury in Advocacy Holdings' filings, the court extended the TRO until April 24, 2023 when the motion to dismiss was scheduled to be heard. This was also prejudicial to Clevinger and it resulted in special damages.

373.    On April 19, 2023, Advocacy Holdings filed an opposition to the motion to dismiss, asserting that the absence of personal jurisdiction in Virginia is purportedly "provably wrong." *Advocacy Holdings, Inc. v. Clevinger*, 1:23-cv-00419, ECF No. 23 at 1.

374.     Advocacy Holdings and Ramana's "proof" was a borderline ridiculous argument that a personal Bank of America "account" supposedly means "money" is "located in Virginia" because an ABA routing number supposedly corresponds to Henrico County (near Richmond) as shown by a Google search. *Id.* at 2. This argument is obviously nonsensical and it is probative only of its proponent's lack of understanding of banking in this century.

375.     Advocacy Holdings then pointed to an "Accurint" investigative report, which purportedly "shows that Defendant Clevinger supposedly still lives in Vienna, Virginia." *Id.* at 3.

376.     But the "Accurint" report that Advocacy Holdings improperly published on April 19, 2023, containing personally identifiable information of Clevinger and his family members, was not the correct time-stamped version which was actually relied upon.

377.     The correct Accurint report, dated February 10, 2023 subsequently provided by Ramana, plainly reflects Clevinger's address as "1515 15th Street NW, Apt. 416, Washington, DC 20005." Accordingly, Advocacy Holdings and Ramana provided no valid explanation for Koepke's false statements regarding Clevinger's residence.

378.     On April 24, 2023, the Virginia court rejected Ramana's attempt to compare bank routing numbers to real estate and the court ruled as follows, "I do find that there is no jurisdiction in this -- in this case. I think it's clear from the submissions here that this defendant is a resident of the District of Columbia." ECF No. 32-1 at 288:7-9.

379.     Regarding the TRO, the court held, "[t]hat expired at -- as of now. Or if it didn't, it expired at noon today." *Id.* at 290:22-23. As of April 24, 2023, the TRO had been discharged due to expiration.

380.     Defendant Koepke's false statements under oath and Defendants' counsel's false certification regarding notice, as well as false representations at the ex parte hearing, caused the

United States District Court for the Eastern District of Virginia to issue an ex parte temporary restraining order, which resulted in a special injury to Plaintiff.

381.    Defendants failed to explain why Defendant Koepke falsely represented to the court that Plaintiff was a resident of Virginia when Koepke knew that Plaintiff had resided in the District of Columbia since 2019.

382.    The Underlying Suit was terminated in Plaintiff's favor.

383.    The prosecution of the Underlying Suit by Defendants was undertaken with malice. The Underlying Suit was predicated on Defendant Koepke's false statements under oath and Defendants were aware of the falsity of their representations when made.

384.    Defendants' malice is shown through Defendants' willful, wanton, reckless, and oppressive disregard for the rights of Plaintiff.

385.    Defendants lacked probable cause to have filed the Underlying Suit, which was based on perjury.

386.    The facts and circumstances, including Defendants' knowledge of Plaintiff's DC address coupled with the false attestation as to a Virginia address, would warrant a cautious man to believe that the action and the means taken in prosecuting it are not legally just and proper.

387.    Plaintiff sustained a special injury as a result of Defendants' misconduct.

388.    After Defendants wrongfully obtained an ex parte temporary restraining order, based on perjury and a false certification regarding notice, Defendants used the TRO to inhibit and prevent Plaintiff from conducting his business and from engaging in lawful commerce.

389.    As a result of Defendants' wrongful acts, Plaintiff was required to cancel appearances at multiple conferences and other client events. Plaintiff was also forced to abstain from and deterred from engaging in other commercial enterprises.

390.    As a result of the special injury, Plaintiff lost a substantial amount of business and opportunities to develop business.

391.    The special injury to Plaintiff is beyond that which would normally be incurred in regular litigation. Plaintiff's rights were flagrantly violated and Defendants' actions were predicated on perjury and a false certification regarding notice.  The Court should not tolerate this abuse of process.

392.    After the falsity of Defendants' statements was shown through five affidavits and 12 exhibits, Defendants insisted on perpetuating their misconduct as Defendants argued for, and obtained, a renewal of the improperly obtained ex parte TRO.

393.    These actions exacerbated the special damages to Plaintiff.

394.    Plaintiff was damaged beyond the normal expenses of litigation as a result of Defendants' wrongful conduct.

395.    The Underlying Suit lacked probable cause.

396.    The claims in the Underlying Suit were baseless and predicated on perjury and misstatements. Clevinger filed a motion to dismiss.  In response to the motion to dismiss, Advocacy Holdings filed an Amended Complaint, which is also presently subject to dismissal. Clevinger v. Advocacy Holdings, Inc., et al., 1:23-cv-01159, ECF No. 26. The motions to dismiss, both of which are well taken, are incorporated by reference as if fully set forth herein.

397.    Plaintiff is entitled to recover his reasonable costs and attorneys' fees incurred in the Underlying Suit.

398.    Plaintiff is also entitled to special damages for the lost business sustained as a result of Defendants' false statements and fraud on the court.

## COUNT SIX – ABUSE OF PROCESS
### (Against Defendant Advocacy Holdings, Inc.)

399.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 and 335-398 as if fully set out herein.

400.    As set forth pursuant to the facts herein, Defendant Advocacy Holdings used and misused a legal proceeding, the Underlying Suit, and process related thereto solely for improper and ulterior motives, which caused special damages to Plaintiff.

401.    By intentionally committing perjury regarding Plaintiff's address, Defendant Advocacy Holdings was not acting in good faith.

402.    By falsely certifying that the notice requirements of Rule 65 were satisfied, despite the absence of notice, Defendant Advocacy Holdings was not acting in good faith.

403.    Defendant Advocacy Holdings had an ulterior motive for initiating and pursuing its unlawful and knowingly frivolous claims which were based on the false sworn representation by Koepke that Plaintiff resided in Vienna, Virginia.

404.    Defendant Advocacy Holdings' ulterior motives included a desire to unlawfully obstruct Plaintiff's lawful pursuit of his chosen profession.

405.    Defendant Advocacy Holdings ulterior motives also included the desire to tarnish Plaintiff's reputation, to ridicule Plaintiff publicly, to intimidate Plaintiff, and to extort Plaintiff into a settlement of Plaintiff's discrimination claims, among other claims.

406.    Defendant Advocacy Holdings' ulterior motives also included the malevolent intent to harm Plaintiff on the part of Defendant Koepke.

407.    Defendant Koepke is an angry, unstable, and erratic person who is often governed by motives of revenge and harm to others.

408.    As of February 22, 2023, Defendant Advocacy Holdings was aware of Plaintiff's pending claims with the D.C. Office of Human Rights because on February 22, 2023, Plaintiff's counsel informed Defendant Advocacy Holdings' counsel of Plaintiff's pending claim with the D.C. Office of Human Rights.

409.    When Defendant Advocacy Holdings became aware that Plaintiff does not live in Virginia, after speaking with the owner of the Vienna, Virginia home, Defendant Advocacy Holdings concealed this fact from the tribunal and instead misled the court.

410.    Defendant Advocacy Holdings doubled down and argued for an extension of the ex parte TRO based on improper ulterior motives.

411.    On April 17, 2023, Defendant Advocacy Holdings was undisputedly aware that Plaintiff lives in the District of Columbia and Defendant Advocacy Holdings dispatched its agent to serve Plaintiff at his DC residence pursuant to the Underlying Suit.

412.    On April 17, 2023, Defendant Advocacy Holdings' agent approached Plaintiff's building manager in the District of Columbia and its process falsely represented to Plaintiff's building manager that he is an "FBI agent."

413.    To be sure, on April 17, 2023, Defendant Advocacy Holdings' agent unlawfully impersonated a law enforcement officer by showing Plaintiff's building manager a fake FBI badge while falsely stating that Defendant Advocacy Holdings' process server was an "FBI agent."

414.    A composite of still photographs attached as Ex. B depict Defendant Advocacy Holdings' agent's unlawful impersonation of an FBI agent together with his display of a fake FBI badge.

415.    These wrongful acts are attributable to Defendant Advocacy Holdings and these actions are outrageous and abusive.

416.    Defendant Advocacy Holdings decided to sue Plaintiff in Virginia because Defendant Advocacy Holdings intended to obtain an improper TRO in that court without notice and with a false Rule 65 certification. Defendant Advocacy Holdings knew that Plaintiff's counsel was not admitted in Virginia and Defendant Advocacy Holdings hoped that Plaintiff would not be able to obtain local counsel quick enough to discharge the improper TRO and move to dismiss the case.  Thus, Defendant Advocacy Holdings misused and perverted the judicial process to effectuate its nefarious plans, which included fraud on the court.

417.    Defendant Advocacy Holdings used a wrongfully obtained ex parte TRO to prevent Plaintiff from engaging in his lawfully chosen profession, causing a special injury to Plaintiff.

418.    As a result of the special injury, Plaintiff lost a substantial amount of business and opportunities to develop business.

419.    Plaintiff is entitled to recover his reasonable costs and attorneys' fees incurred in the Underlying Suit.

420.    Plaintiff is also entitled to damages for the lost business sustained as a result of Defendants' false statements to the court, Defendants' fraud on the court, and Defendant's agent's unlawful impersonation of an FBI agent.

## COUNT SEVEN – FRAUDULENT INDUCEMENT
### (Against Defendants Zenkich and Advocacy Holdings, Inc.)

421.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

422.    As set forth herein, Defendants Koepke and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive.

423.    As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

424.    As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

425.    Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

426.    These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

427.    These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

428.    Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

429.    Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the lion's share of the profits and remained in total control of the business.

430.    Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 in Advocacy Holdings ($11,000 for the Class B shares and the additional capital contributions totaling $35,000).

431.    As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving the distributions, title and control of the company, and now being purportedly restrained from competing with Advocacy Holdings under the noncompete agreement, among other damages.

## COUNT EIGHT – NEGLIGENT MISREPRESENTATION
### (Against Defendants Koepke and Advocacy Holdings, Inc.)

432.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

433.    As set forth herein, Defendants Koepke and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive or with reckless disregard for the truth of such statements.

434.     As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

435.     As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

436.     Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

437.     These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

438.     These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

439.     Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

440.     Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the lion's share of the profits and remained in total control of the business.

441.     Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 in Advocacy Holdings ($11,000 for the Class B shares and the additional capital contributions totaling $35,000).

442.     As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving the distributions, title and control of the company, and now being purportedly restrained from competing with Advocacy Holdings under the noncompete agreement, among other damages.

## COUNT NINE – FRAUDULENT INDUCEMENT
### (Against Defendants Zenkich and Advocacy Holdings, Inc.)

443.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

444.     As set forth herein, Defendants Zenkich and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive.

445.     As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

446.     As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

447.     Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

448.    These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

449.    These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

450.    Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

451.    Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the all the profits and remained in total control of the business.

452.    Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 to Advocacy Holdings, including $11,000 for the Class B shares and additional capital contributions totaling $35,000.

453.    As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving distributions, ownership, and control of the company, and now being harassed with baseless litigation involving an unenforceable  noncompete agreement, among other damages.

## COUNT TEN – NEGLIGENT MISREPRESENTATION
### (Against Defendants Zenkich and Advocacy Holdings, Inc.)

454.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

455.    As set forth herein, Defendants Zenkich and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive or with reckless disregard for the truth of such statements.

456.    As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

457.    As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

458.    Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

459.    These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

460.    These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

461.    Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

462.    Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the all the profits and remained in total control of the business.

463.    Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 to Advocacy Holdings, including $11,000 for the Class B shares and additional capital contributions totaling $35,000.

464.    As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving distributions, ownership, and control of the company, and now being harassed with baseless litigation involving an unenforceable  noncompete agreement, among other damages.

### COUNT ELEVEN – FRAUDULENT CONCEALMENT
### (Against Defendants Koepke and Advocacy Holdings, Inc.)

465.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

466.    As set forth herein, Defendants Koepke and Advocacy Holdings had a duty to disclose a material fact to Plaintiff, to wit their intent to never provide Class A shares to him and their habit of siphoning off money from the company, Defendants Koepke and Advocacy Holdings failed to disclose that fact and they intended to defraud or deceive Plaintiff.

467.     Plaintiff acted in justifiable reliance on the concealment and suffered damages as a result as set forth herein.

468.     As set forth herein, Defendants Koepke and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive.

469.     As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

470.     As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

471.     Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

472.     These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

473.     These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

474.     Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

475.     Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the lion's share of the profits and remained in total control of the business.

476.     Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 in Advocacy Holdings ($11,000 for the Class B shares and the additional capital contributions totaling $35,000).

477.     As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving the distributions, title and control of the company, and now being purportedly restrained from competing with Advocacy Holdings under the noncompete agreement, among other damages.

### COUNT TWELVE – FRAUDULENT CONCEALMENT
### (Against Defendants Zenkich and Advocacy Holdings, Inc.)

478.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

479.     As set forth herein, Defendants Zenkich and Advocacy Holdings had a duty to disclose a material fact to Plaintiff, to wit their intent to never provide Class A shares to him and their habit of siphoning off money from the company, Defendants Zenkich and Advocacy Holdings failed to disclose that fact and they intended to defraud or deceive Plaintiff.

480.    Plaintiff acted in justifiable reliance on the concealment and suffered damages as a result as set forth herein.

481.    As set forth herein, Defendants Zenkich and Advocacy Holdings made false representations of material fact with knowledge of the falsity of such representations and with the intent to deceive.

482.    As set forth herein, Plaintiff took actions and incurred forbearance as a result of the false representations and such actions were reasonable, which resulted in provable damages.

483.    As set forth herein, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will receive non-dilutable, founders shares in Advocacy Holdings.

484.    Likewise, prior to entering into the noncompete agreement, Defendants fraudulently represented to Plaintiff that Plaintiff will be officially listed as the actual CEO of Advocacy Holdings as a named officer and director.

485.    These representations were false as Plaintiff was never actually provided non-dilutable, founders shares in Advocacy Holdings and was never named as the official CEO as an officer or director of the company in the corporate filings of Advocacy Holdings.

486.    These representations were also material. Plaintiff would not have signed the noncompete agreement without an understanding that Plaintiff would be made an actual officer/director of the company and without an understanding that Plaintiff would be able to receive non-dilutable founders shares in Advocacy Holdings.

487.    Defendants made these representations with actual knowledge that they were false, as Defendants knew that Defendants would not provide Plaintiff with non-dilutable founders shares in Advocacy Holdings and knew that they would not make Plaintiff an actual officer/director of the company.

488.    Defendants intended to deceive Plaintiff with their fraudulent misrepresentations in order to get Plaintiff to sign the noncompete agreement, keep Plaintiff working for Advocacy Holdings and keep generating sales while Defendants kept the lion's share of the profits and remained in total control of the business.

489.    Plaintiff acted in reasonable reliance on these false misrepresentations, as Plaintiff signed the noncompete agreement, continued working for Advocacy Holdings as the purported CEO, and contributed $46,000 in Advocacy Holdings ($11,000 for the Class B shares and the additional capital contributions totaling $35,000).

490.    As a result, Plaintiff suffered provable damages in the form of working for multiple years without receiving the distributions, title and control of the company, and now being purportedly restrained from competing with Advocacy Holdings under the noncompete agreement, among other damages.

### COUNT THIRTEEN – BREACH OF CONTRACT
### (Against Defendant Koepke)

491.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

492.    A valid contract exists between the parties.

493.    Koepke and Plaintiff entered into a contractual agreement whereby Koepke promised to effectuate the issuance of founders shares of Advocacy Holdings to Plaintiff and promised to make Plaintiff an officer and director of Advocacy in exchange for Plaintiff continuing to work for "OCP" as CEO.

494.    Plaintiff accepted the offer and continued to work as the purported CEO, first with Red Chalk Group and then with Advocacy Holdings.

495.    Pursuant to the contract, Koepke was obligated to effectuate the issuance of founders shares to Plaintiff and to make Plaintiff an officer and director of Advocacy Holdings.

496.    Koepke breached the contract by failing to effectuate the issuance of founders shares to Plaintiff and by failing to make Plaintiff an officer and director of Advocacy Holdings.

497.    As a result of this breach, Plaintiff suffered damages as, among other things, he was not paid the distributions to which he was entitled, he was forced to contribute $46,000 of his own money, with $11,000 for the Class B shares and the additional capital contributions totaling $35,000, Plaintiff was unable to vote or control the company, and Plaintiff did not receive the compensation as an officer and director of the company that he should have been paid.

## COUNT FOURTEEN – BREACH OF CONTRACT
### (Against Defendant Advocacy Holdings, Inc.)

498.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

499.    A valid contract exists between the parties.

500.    Acting on behalf of "OCP," Advocacy Holdings, then known as Red Chalk, promised to effectuate the issuance of founders shares of Advocacy Holdings to Plaintiff and promised to make Plaintiff an officer and director of Advocacy Holdings in exchange for Plaintiff continuing to work for "OCP" as CEO.

501.    Plaintiff accepted the offer and continued to work as the purported CEO, first with Red Chalk Group and then with Advocacy Holdings.

502.    Pursuant to the contract, Advocacy Holdings was obligated to effectuate the issuance of founders shares to Plaintiff and to make Plaintiff an officer and director of Advocacy Holdings.

503.    Advocacy Holdings breached the contract by failing to effectuate the issuance of founders shares to Plaintiff and by failing to make Plaintiff an officer and director of Advocacy Holdings.

504.    As a result of this breach, Plaintiff suffered damages as, among other things, he was not paid the distributions to which he was entitled, he was forced to contribute $46,000 of his own money, with $11,000 for the Class B shares and the additional capital contributions totaling $35,000, Plaintiff was unable to vote or control the company, and Plaintiff did not receive the compensation as an officer and director of the company that he should have been paid.

## COUNT FIFTEEN – UNJUST ENRICHMENT
### (Against Defendant Koepke)

505.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

506.    This count is pled in the alternative in the event that the court finds there is no enforceable contract between Plaintiff and Defendant Koepke.

507.    Koepke was unjustly enriched by Plaintiff in several ways, including but not limited to the form of Plaintiff's work as the purported CEO of an enterprise that received more than $10 million in revenue, and through Plaintiff's contributions of $46,000 through Advocacy Holdings.

508.    Plaintiff was impoverished as a result, as Plaintiff was not justly compensated, he did not receive Class A stock ownership in Advocacy Holdings as promised, and he was forced to contribute $46,000 to a defunct enterprise from which Koepke skimmed off the top and engaged in self-dealing while it was insolvent. This includes, but is not limited to, the wrongful payment of at least $94,000 to Red Chalk for services which Red Chalk did not render.

509.    A sufficient relationship exists between the Plaintiff's enrichment of Koepke as set forth above and Plaintiff's impoverishment as set forth above.

510.    Pleading in the alternative, Plaintiff has no remedy at law.

## COUNT SIXTEEN – UNJUST ENRICHMENT
### (Against Defendant Zenkich)

511.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

512.    Zenkich was unjustly enriched by Plaintiff in several ways, including but not limited to the form of Plaintiff's work as the purported CEO of an enterprise that received more than $10 million in revenue, and through Plaintiff's contributions of $46,000 through Advocacy Holdings.

513.    Plaintiff was impoverished as a result, as Plaintiff was not justly compensated, he did not receive Class A stock ownership in Advocacy Holdings as promised, and he was forced to contribute $46,000 to a defunct enterprise from which Zenkich skimmed off the top and engaged in self-dealing while it was insolvent. This includes, but is not limited to, the wrongful payment of at least $94,000 to Red Chalk for services which Red Chalk did not render.

514.    A sufficient relationship exists between the Plaintiff's enrichment of Zenkich as set forth above and Plaintiff's impoverishment as set forth above.

515.    Pleading in the alternative, Plaintiff has no remedy at law.

## COUNT SEVENTEEN – UNJUST ENRICHMENT
### (Against Defendant Advocacy Holdings)

516.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

517.   Advocacy Holdings was unjustly enriched by Plaintiff in several ways, including but not limited to the form of Plaintiff's work as the purported CEO of an enterprise that received more than $10 million in revenue, and through Plaintiff's contributions of $46,000 to Advocacy Holdings.

518.   Plaintiff was impoverished as a result, as Plaintiff was not justly compensated, he did not receive Class A stock ownership in Advocacy Holdings as promised, and he was forced to contribute $46,000 to a defunct enterprise from which the other Defendants skimmed off the top and engaged in self-dealing while it was insolvent. This includes, but is not limited to, the wrongful payment of at least $94,000 to Red Chalk for services which Red Chalk did not render.

519.   A sufficient relationship exists between the Plaintiff's enrichment of Advocacy Holdings as set forth above and Plaintiff's impoverishment as set forth above.

520.   Pleading in the alternative, Plaintiff has no remedy at law.

## COUNT EIGHTEEN – UNJUST ENRICHMENT
### (Against Defendant Red Chalk)

521.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

522.   Red Chalk was unjustly enriched by Plaintiff in several ways, including but not limited to the form of Plaintiff's work as the purported CEO of an enterprise that received more than $10 million in revenue, and through Plaintiff's contributions of $46,000 to Advocacy Holdings, some of which were wrongfully diverted to Red Chalk.

523.    Plaintiff was impoverished as a result, as Plaintiff was not justly compensated, he did not receive Class A stock ownership in Advocacy Holdings as promised, and he was forced to contribute $46,000 to a defunct enterprise from which the other Defendants skimmed off the top and engaged in self-dealing while it was insolvent. This includes, but is not limited to, the wrongful payment of at least $94,000 to Red Chalk for services which Red Chalk did not render.

524.    A sufficient relationship exists between the Plaintiff's enrichment of Red Chalk as set forth above and Plaintiff's impoverishment as set forth above.

525.    Pleading in the alternative, Plaintiff has no remedy at law.

## COUNT NINETEEN – DECLARATORY JUDGMENT TO DETERMINE PLAINTIFF'S OWNERSHIP INTEREST IN ADVOCACY HOLDINGS, INC.
### (Against Defendants Advocacy Holdings, Inc., Koepke and Zenkich)

526.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

527.    There is an actual controversy between the parties as to Plaintiff's ownership interest in Defendant Advocacy Holdings.

528.    This is a genuine dispute that needs to be resolved, rather than a hypothetical or speculative disagreement.

529.    The controversy involves legal rights and duties that are in question or uncertain.

530.    The controversy is ripe for resolution. The dispute is sufficiently developed and ready for a court to make a decision.

531.    Plaintiff has a sufficient stake in the controversy and will be directly affected by the outcome.

532.    Plaintiff has no other adequate remedy is it pertains to determining its percentage ownership and classification of shares.

533.     Plaintiff requests a declaratory judgment stating, among other things, the following:

A.     Plaintiff owns an interest in Advocacy Holdings, in Class A stock, in an amount sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.

B.     Plaintiff has a voting interest in Advocacy Holdings sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.

C.     Plaintiff is owed distributions from Advocacy Holdings in an amount sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.

## COUNT TWENTY –WAGE THEFT, DC STAT 32-1303
### (Against Defendant Advocacy Holdings, Inc.)

534.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

535.     Plaintiff was constructively terminated from his employment with the Defendant Advocacy Holdings on or about February 1, 2023. The effective date of his termination was February 1, 2023. Defendant Advocacy Holdings, however, willfully failed to pay Plaintiff all wages owed to him not later than the working day following such discharge in violation of D.C. Code § 32-1303.

536.     Specifically, Defendant Advocacy Holdings was approximately ten days late in tendering Plaintiff's final paycheck. The check was fraudulently backdated for January 31, 2023. No payment was made for February 1, 2023. The check was not mailed until early/mid February 2023 and was not deposited until mid-February 2023. The paycheck should have been made by direct deposit. No payment was ever made for February 2023.

537.     Plaintiff was not reimbursed for $18,000 in unpaid business expenses, which Plaintiff submitted for reimbursement.

538.     Plaintiff was not paid earned commissions in the amount of $8,000.

539.    Pursuant to D.C. Code § 32-1303(4) Plaintiff is entitled to liquidated damages in the amount of 10% of the unpaid wages per working day after the day that wages were due or an amount equal to treble the unpaid wages, whichever is smaller.

540.    Under D.C. Code § 32-1308, Plaintiff is entitled to: (i) the payment of any back wages unlawfully withheld; (ii) liquidated damages equal to treble the amount of unpaid wages; (iii) statutory penalties; and (iv) such legal or equitable relief as may be appropriate, including reinstatement of employment, and other injunctive relief.

541.    Under D.C. Code § 32-1308, Clevinger is entitled to costs of this action, including expert witness fees, depositions fees, witness fees, juror fees, filing fees, certification fees, the costs of collecting and presenting evidence, and any other costs incurred in connection with obtaining, preserving, or enforcing the judgment.

542.    Under D.C. Code § 32-1308, Plaintiff is entitled to attorney's fees as computed pursuant to the matrix approved in *Salazar v. District of Columbia*, 123 F.Supp.2d 8 (D.D.C. 2000), and updated to account for the current market hourly rates for attorney's services.

543.    Plaintiff prays for relief in the form of a judgment against Defendant Advocacy Holdings awarding: (1) compensatory damages; (2) a civil penalty of $10,000 under D.C. Code § 32-1311; (3) liquidated damages in the amount of $10,000; (4) costs and attorney's fees; (5) punitive damages; (6) statutory penalties; (7) all legal or equitable relief available, including without limitation, reinstatement of employment and front pay; and (8) any other relief the Court deems proper.

**COUNT TWENTY ONE – FAILURE TO PAY ACCRUED SICK LEAVE
AND ACCRUED VACATION PAY
(Against Defendant Advocacy Holdings, Inc.)**

544.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

545.    Under D.C. Code § 32-531.02, Defendant Advocacy Holdings was required to "provide for each employee not less than one hour of paid leave for every 43 hours worked, not to exceed 5 days per calendar year."

546.    At all times relevant, Defendant Advocacy Holdings failed to provide any paid leave to Plaintiff 77.33 vacation hours amounting to approximately $7,500.

547.    Plaintiff prays for relief, individually and on behalf of those similarly situated, in the form of a judgment against Defendant Advocacy Holdings awarding (1) compensatory damages; (2) additional damages provided under D.C. Code § 32-531.12(b); (3) equitable relief, including but not limited to, mandatory adoption of paid leave required under D.C. Code § 32-531.01. et seq.; (4) costs and attorney's fees; (5) punitive damages and (6) any other relief the Court deems proper.

**COUNT TWENTY TWO – WAGE THEFT, IMPROPER RECORD KEEPING
(Against Defendant Advocacy Holdings, Inc.)**

548.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

549.    Defendant Advocacy Holdings failed to retain records documenting hours worked by employees and paid leave taken by employees for a period of 3 years or the prevailing federal standard at the time the record was created.

550.    At all times relevant, Defendant Advocacy Holdings failed to provide any paid leave to Plaintiff and similarly situated employees.

551.    Under D.C. Code § 32-531.02, Defendant Advocacy Holdings was required to "provide for each employee not less than one hour of paid leave for every 43 hours worked, not to exceed 5 days per calendar year."

552.    Under D.C. Code § 32-531.10b, Plaintiff is entitled to a rebuttable presumption that Defendant Advocacy Holdings has violated D.C. Code § 32-531.02.

### COUNT TWENTY THREE – BREACH OF FIDUCARY DUTY
### AND MISMANAGEMENT OF THE FINANCIALS OF THE COMPANY
### (Against Defendant Koepke)

553.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

554.    Koepke knowingly and recklessly and in bad faith violated his fiduciary duties of care, loyalty, good faith, and independence owed to the Plaintiff, a shareholder of Defendant Advocacy Holdings and has acted to put his personal interests ahead of the interests of the other shareholders.

555.    Koepke kept Plaintiff in the dark regarding certain aspects of Advocacy Holdings' past and current business and future plans.

556.    Even though Plaintiff was allegedly an "owner" of Advocacy Holdings and the CEO of "OCP" through both Red Chalk Group and Advocacy Holdings (although, officially this is not quite clear), Koepke kept the true books and records of both Advocacy Holdings and Red Chalk Group concealed and hidden from Plaintiff.

557.    Koepke would constantly complain to Plaintiff that the "company" did not have money to pay the bills, yet Plaintiff continued to bring in substantial revenue.

558.    Despite his cries of corporate poverty, Koepke told Plaintiff that he "paid himself back."

559. At best, Koepke was robbing Peter to pay Paul. However, more likely Koepke engaged in corporate malfeasance and breached his fiduciary duties to Plaintiff and Advocacy Holdings.

560. Meanwhile, Koepke continued to keep the official books and records, bank statements, financial statements and other records of Advocacy Holdings secret.

561. As a result of Koepke' breaches of his fiduciary duties, Plaintiff will suffer irreparable injury in that they have he will not receive his fair portion of the value of Defendant Advocacy Holdings' distributions assets and will be prevented from benefiting his equity.

### COUNT TWENTY FOUR – GROSS MISMANAGEMENT
### (Against Defendant Koepke)

562. Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

563. Defendant Koepke controlled and was responsible for managing the business affairs of Defendant Advocacy Holdings.

564. If properly and responsibly managed, Defendant Advocacy Holdings would have been profitable.

565. Profits were never realized, however, because of severe and blatant mismanagement by Defendant Koepke. Among the numerous examples of such mismanagement, Defendant Advocacy Holdings, under the management of Koepke:

    A.    Failed to retain talented employees;

    B.    Failed to deliver the services and products sold to customers leading to dismal customer retention;

    C.    Failed to properly and responsibly manage cashflow leading to shortfalls and constant negative cashflow; and

D.      Failed to deliver any distribution other than to Defendant Koepke.

566.    As a result of these and other instances of mismanagement, Defendant Advocacy Holdings was consistently unprofitable.

567.    The actions and omissions of Defendant Koepke constitute gross negligence in the management of the business affairs of Defendant Advocacy Holdings.

568.    Further, after the revenue had been squandered by his mismanagement, Koepke would transfer funds to Defendant Red Chalk Group.

569.    As a result of Defendant Koepke's gross mismanagement and intentional misconduct, Plaintiff has suffered a special injury.

570.    As set forth herein, Plaintiff is entitled to damages and equitable relief.

### COUNT TWENTY FIVE – EQUITABLE ACCOUNTING
### (Against Defendant Advocacy Holdings, Inc.)

571.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

572.    Mutual accounts exist between the parties.

573.    A fiduciary relationship exists and Defendant Advocacy Holdings has a duty to account to its shareholders.

574.    Even though Plaintiff was a shareholder of Advocacy Holdings and the CEO of "OCP" through both Red Chalk Group and Advocacy Holdings, Koepke concealed the company records and Koepke kept the true books and records of both Advocacy Holdings and Red Chalk Group concealed and hidden from Plaintiff.  This resulted in great complication.

575.    Koepke would constantly complain to Plaintiff that the "company" did not have money to pay the bills, yet Plaintiff continued to bring in substantial revenue.

576.    Despite asserting that the company was insolvent and failing to pay vendors and creditors, Koepke told Plaintiff that he "paid himself back."

577.    Koepke also diverted at least $94,000 to Red Chalk, an insider transaction.

578.    Plaintiff reasonably interpreted this to mean that Koepke used capital and revenue from Advocacy Holdings, which was established on December 30, 2019, to purportedly "pay himself back" for whatever Koepke felt he contributed to "OCP," through Red Chalk. This would include not only capital contributed to Advocacy Holdings but also whatever Koepke felt he invested in OCP through Red Chalk.

579.    Koepke consistently kept the official books and records, bank statements, financial statements and other records of Advocacy Holdings secret.

580.    Koepke consistently obfuscated and distorted the company's financial position and even asked Plaintiff to make $46,000 of equity contributions to the business, while offering no proof of his own contributions. Yet, Koepke made unauthorized distributions, the scale of which are unknown because Koepke kept the books secret.

581.    Koepke and Zenich have personally profited from their misappropriation of Company assets and self-dealing transactions.

582.    Accordingly, Plaintiff demands from an accounting from Defendant Advocacy Holdings as a shareholder of the company. Said accounting shall include the identification of the sources and distribution of all payments or consideration received to date as well as identifying all future rights to receive further compensation or consideration.

583.    Proper relief cannot be accorded amongst the parties without an equitable accounting for the payments or consideration improperly usurped from Defendant Advocacy Holdings.

## COUNT TWENTY SIX – UNPAID EQUITY DISTRIBUTIONS
### (Against Defendant Advocacy Holdings, Inc.)

584.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

585.    Beginning in 2020, and coinciding with the parties' enhanced strife about equity, Koepke began repeatedly asserting to Plaintiff that the company's margins were problematic despite Plaintiff's successful continuing year-on-year overall revenue growth. Koepke and Zenkich refused to disclose to Plaintiff the amount, frequency, and manner in which distributions were siphoned from Advocacy Holdings.

586.    The critical distribution information remained concealed and Koepke failed to disclose to Plaintiff the accounting and financial arrangements between Advocacy Holdings and Red Chalk Group. Koepke even forced Plaintiff to make numerous capital contributions, of $46,000, amid Koepke's assertions about Advocacy Holdings' profitability.

587.    The financial problems and servicing issues caused by Koepke's unauthorized distributions likely account for Advocacy Holdings' drop in customers.

588.    Koepke consistently obfuscated and distorted the company's financial position and made unauthorized distributions, the scale of which are unknown because Koepke kept the books secret.

589.    Plaintiff has right to proportionate distributions.

590.    Plaintiff has not received his distribution due to Defendant Koepke's and Defendant Zenkich's fraud and gross abuse of discretion.

## COUNT TWENTY SEVEN – BREACH OF THE
## IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Koepke)

591.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

592.    In the District of Columbia, all contracts contain "an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 107 (D.D.C. 2010) (*citing Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)). A party breaches this implied duty of good faith and fair dealing when it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.*

593.    Koepke breached the implied duty of good faith and fair dealing by evading the spirit of his contractual agreement with Plaintiff to include Plaintiff as an officer and director of Advocacy Holdings and to confer upon Plaintiff Class A founders shares in Advocacy Holdings.

594.    Koepke willfully rendered imperfect performance by not abiding by his promise to make Plaintiff an officer of record and by conferring to Plaintiff worthless Class B non-voting shares instead of Class A founders shares as agreed.

595.    As a result of Koepke's breach of the implied duty of good faith and fair dealing, Plaintiff suffered damages.

## COUNT TWENTY EIGHT – BREACH OF THE
## IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Advocacy Holdings)

596.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-263 as if fully set out herein.

597.     In the District of Columbia, all contracts contain "an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 107 (D.D.C. 2010) (*citing Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)). A party breaches this implied duty of good faith and fair dealing when it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.*

598.     Advocacy Holdings breached the implied duty of good faith and fair dealing by evading the spirit of its contractual agreement with Plaintiff to include Plaintiff as an officer and director of Advocacy Holdings and to confer upon Plaintiff Class A founders shares in Advocacy Holdings.

599.     Advocacy Holdings willfully rendered imperfect performance by not abiding by its promise to make Plaintiff an officer of record and by conferring to Plaintiff worthless Class B non-voting shares instead of Class A founders shares as agreed.

600.     As a result of Koepke's breach of the implied duty of good faith and fair dealing, Plaintiff suffered damages.

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor and against Defendants as follows:

A.     Damages in excess of $1,500,000 in an amount to be determined at trial;

B.     A declaratory judgment stating that:

- The noncompete agreement is unenforceable under Delaware law.
- Plaintiff did not voluntarily resign from his employment with Defendant and instead was constructively terminated.
- The Noncompete is unreasonable and unenforceable on its terms.
- Because Plaintiff was constructively terminated, Advocacy Holdings is estopped from enforcing any non-compete agreement.

- Any noncompete agreement sought to be enforced by Defendants against Plaintiff is unenforceable against Plaintiff and is void under public policy and the D.C. Non-Compete Clarification Amendment Act of 2022.
- Defendants failed to provide Plaintiff with the requisite notices as required by the D.C. Non-Compete Clarification Amendment Act of 2022.
- Plaintiff did not voluntarily resign from his employment with Defendant and instead was constructively terminated.
- The non-compete is unreasonable and unenforceable on its terms.
- Because Plaintiff was constructively terminated, OCP is estopped from enforcing any non-compete.
- Plaintiff owns an interest in Advocacy Holdings, in Class A stock, in an amount sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.
- Plaintiff has a voting interest in Advocacy Holdings sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.
- Plaintiff is owed distributions from Advocacy Holdings in an amount sufficient to correspond to Plaintiff's $46,000 investment in Advocacy Holdings.

C.     Costs and attorneys' fees; and,

D.     Such other and further relief as this Court deems just and proper in these circumstances.


                              Respectfully submitted,

                              CHASE LAW & ASSOCIATES, P.A.

                 By:     */s/ Kenneth E. Chase*
                              Kenneth E. Chase
                              D.C. Bar No. 985629
                              Chase Law & Associates, P.A.
                              1141 71st Street
                              Miami Beach, FL 33141
                              Tel: (305) 402-9800
                              Fax: (305) 402-2725
                              Email: kchase@chaselaw.com

                              *Attorneys for Plaintiff Chazz Clevinger*

## CERTIFICATE OF SERVICE

I, Kenneth E. Chase, hereby certify that I served the foregoing via CM/ECF, which serves notice to all counsel of record, on June 26, 2023.

By:  */s/ Kenneth E. Chase*
      Kenneth E. Chase

# EXHIBIT A

2019 IL App (1st) 180779-U

THIRD DIVISION
September 30, 2019

No. 1-18-0779

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| JOHN KOEPKE, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | 11 D 9851 |
| and | ) | |
| | ) | Honorable |
| TAMARA KOEPKE, | ) | Raul Vega, |
| | ) | Judge Presiding |
| Respondent-Appellee. | ) | |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1   *Held*: Affirmed. Court did not err by allowing certain testimony into evidence. Finding appellant in indirect civil contempt was not against manifest weight of evidence. Contempt order contained appropriate purge provision.

¶ 2   As part of their divorce, petitioner John Koepke got primary custody of the couples' children, while respondent Tamara Koepke was allowed visitation rights. Tamara filed a rule to show cause claiming that John was interfering with those rights. The court found John in indirect civil contempt. John appeals. We find no error and affirm.

No. 1-18-0779

¶ 3                                        BACKGROUND

¶ 4      In 2016, after a protracted proceeding, John and Tamara agreed to custody and visitation for their minor children—Jack (17), Jillian (13), and Peter (12). They also have an adult child, Greta (19).The parental allocation judgment provides Tamara with initial supervised visitation, additional summer visitation, and limited unsupervised overnight visitations. In order to qualify for unsupervised overnight visitation, Tamara was required to provide proof of compliance with certain psychiatric treatment obligations. Initially, Tamara's treating physician refused to provide adequate proof of compliance. So in May 2017, the circuit court modified the allocation judgment and eased Tamara's obligations to prove compliance.

¶ 5      Shortly after the modification, in late June or early July 2017—the record is unclear on this point—Tamara became eligible for unsupervised overnight visitation. Almost immediately, Tamara filed a petition for rule to show cause. The petition alleged that John was interfering with her right to summer and overnight visitation. The petition requested "[t]hat upon finding [John] guilty of indirect civil contempt," the court should allow Tamara "adequate make-up parenting time." John denied the allegations.

¶ 6      In August, the circuit court found "a *prima facie* case of indirect civil contempt" and issued a rule "to show cause why [John] should not be held in contempt of Court for failure to comply with the parenting time Schedule(s) set forth in the Allocation Judgment." The court conducted an evidentiary hearing, which took place over three months. At the hearing, John, Tamara, and the supervisor Kate Wilson testified.

¶ 7      John and Tamara have not communicated since 2011. They live about half a mile from each other, but the kids do not typically go directly to Tamara's house for visitation. Instead, they meet at the library, as provided by the allocation judgment. Almost always, one of the older

No. 1-18-0779

children will drive the other children to the library for visitation. From the library, Wilson drives the kids to Tamara's house. When visitation ends, Wilson and Tamara typically drive the kids back to the library. There was some testimony that occasionally, the older children will take the younger ones directly to and from visitation.

¶ 8    The allocation judgment entitled Tamara to parenting time on Wednesdays from 4:00 to 6:00 p.m. She is also scheduled for regular visitation on Saturdays from 10:00 a.m. to 5 p.m., with alternating Saturdays being extended overnight to 1:00 p.m. on Sunday. Finally, she gets additional visitation during the summer—two weekdays from 9:00 a.m. to 5:00 p.m., while John is at work. The Wednesday visitations, Saturday visitations, and summer visitations are all supervised by Wilson. Tamara's only unsupervised parenting time is from 10 p.m. Saturday to 1 p.m. Sunday during overnight visitations.

¶ 9    Tamara was receiving her Wednesday visitation. All three witnesses agreed that, save a few exceptions, the Saturday visitations—including dates which were supposed to be overnight—only last from 10:00 a.m. to approximately 3:00 p.m. Saturday. That is, not only is the *regular* Saturday visitation cut short by two hours but, for the most part, she has not received her *unsupervised* overnight visitation. There was no dispute as to these facts; it was the reason *why* Tamara did not receive all of this visitation time that was hotly contested.

¶ 10    Wilson expressly and unequivocally testified that John controlled when visitation began and ended, that Tamara has never set the schedule. Until recently, John texted with Wilson about the visitation schedule. However, after the hearing began, John stopped discussing visitation times because Tamara "knew the schedule." John testified that he stopped discussing times because he was frustrated that it was being used against him. As for the visitations ending early, Wilson said, "[i]t's done because the children say that they have to leave." On cross-

- 3 -

No. 1-18-0779

examination, Wilson admitted that, besides leaving for a hockey game, the kids do not say why they have to leave early. She has also never been present with John and the kids and does not know what he says to them. Likewise, she has never seen John call the kids and has not seen any texts between them.

¶ 11    John emphatically denied that he was interfering with Tamara's parenting time. His testimony centered around one basic tenet—that what the kids do after they leave his care is between them and Tamara. He denied sending text messages to either Wilson or the kids telling them that they must end the visitations early.

¶ 12    Tamara's testimony primarily focused on the fact that she never wanted her parenting time to end early. She acknowledged that she willingly allowed the kids to leave early when they had other social obligations. Although she agreed to allow them to leave early, "they don't ask me. They tell me" they are leaving early. She agrees they can leave because "[t]hey've received a text from their father." She doesn't object at that point "[s]o that there isn't any punishment *** [t]o the children." But like Wilson, there is no indication that she has seen these text messages.

¶ 13    No text messages between any of the witnesses were entered into evidence. Nor were the specific contents of any text message discussed during the hearing.

¶ 14    As for summer time, John testified that, through their lawyers, the parties agreed on Mondays but were unable to come to an agreement on the second day. On the other hand, Tamara testified that the parties initially agreed to Mondays and Fridays, but Fridays were changed to Wednesdays later in the summer. Regarding the Monday visitation, John testified that Tamara got "just about every Monday throughout the summer." Tamara disagreed, testifying that she only got "some Mondays" even though she wanted all of them; for those other Mondays, "[t]he children weren't brought to the library" (where the handoff usually took place).

No. 1-18-0779

¶ 15    After the hearing, the court issued a written order finding John "in indirect civil contempt for failing to comply with the Allocation Judgment entered November 15, 2016 in that he has failed to provide and allow Tammy all of her parenting time pursuant to the Judgment." In its findings, the court specifically "did not find John to be particularly truthful or credible." On the other hand, "[t]he testimony of Kate Wilson crystallized John's refusal to abide by the parenting schedule as required by the Allocation Judgment. Th[e] Court found Ms. Wilson to be impartial, and not biased, and truthful."

¶ 16    The court ordered that "John shall purge himself of the indirect civil contempt by allowing Tammy make-up parenting time beginning upon entry of this order; the make-up parenting time shall be completed by August 31, 2018."

¶ 17    John timely appealed.

¶ 18                                                ANALYSIS

¶ 19    John makes three arguments on appeal: that the finding of contempt was against the manifest weight of the evidence, that the court erred by allowing in hearsay testimony, and that the purge provision of the contempt order was improper.

¶ 20                                        I. Evidentiary Errors

¶ 21    Because it will aid in our later discussion, we begin with John's second argument, that the circuit court erred by allowing two hearsay statements into evidence. Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion—that is, unless the ruling is so arbitrary or irrational that "no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 22    Hearsay is an out-of-court statement offered for the truth of the matter asserted. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1064 (2001). As defined by the rules, "[a]

No. 1-18-0779

'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a) (eff. Oct. 15, 2015).

¶ 23    John complains of two statements that he claims were inadmissible hearsay. First, Wilson testified that visitation gets terminated early because "the children say that they have to leave." Second, Tamara testified that she agrees that the kids can leave visitation early because "[t]hey've received a text from their father."

¶ 24    Taking them in that order, we agree with the trial court that Wilson's testimony that visitation gets terminated early because "the children say that they have to leave" was hearsay. Wilson was testifying about the children's out-of-court statement, and it was offered to prove the truth of that statement—that the children were required to leave visitation early, as opposed to leaving of their own accord. Tamara's theory, of course, was that it was *John* who was directing them to leave early, and Wilson's testimony was offered to support that theory.

¶ 25    Properly finding this testimony as eliciting hearsay, the trial court initially sustained John's objection. But Tamara's counsel argued that the statement was reliable and thus admissible under controlling case law. The trial court ultimately allowed Wilson's hearsay testimony because the court found it to be "reliable."

¶ 26    Before the adoption of the Illinois Rules of Evidence, hearsay regarding the declarant's state of mind was admissible "when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case." *Caffey*, 205 Ill. 2d at 91.

¶ 27    But the Illinois Rules of Evidence eliminated the requirements of witness unavailability and reasonable probability of truthfulness. See Ill. R. Evid. 803(c) Committee Commentary ("Rule 803(3) eliminates the requirements currently existing in Illinois law, that do not exist in

No. 1-18-0779

any other jurisdiction, with respect to statements of then existing mental, emotional, or physical condition, that the statement be made by a declarant found unavailable to testify, and that the trial court find that there is a 'reasonable probability' that the statement is truthful."). Instead, under the Illinois Rules of Evidence, "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plant, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule, regardless of witness availability or the reliability of the out-of-court statement. Ill. R. Evid. 803(3) (eff. Apr. 26, 2012).

¶ 28    So the court's finding that the statement was "reliable," and John's argument on appeal to contrary, are beside the point. Still, we may uphold a trial court's evidentiary ruling on any ground in the record, even if we disagree with the trial court's stated basis. *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 408 (2005). So the question is whether the challenged statement was properly admitted under Illinois Rule of Evidence 803(3) (eff. Apr. 26, 2012) as a state-of-mind exception to the hearsay prohibition.

¶ 29    We find no abuse of discretion in admitting this testimony. The children's statement that "they have to leave" could reasonably be construed as an explanation of their current state of mind, their "motivation[] at the time of the utterance." *People v. Munoz*, 398 Ill. App. 3d 455, 479 (2010). The children weren't leaving because they were bored or unhappy or because of some voluntary decision, but because they believed that they "had" to. We cannot say that no reasonable person would agree with the admission of this testimony under the state-of-mind exception to the hearsay rule, and thus no abuse of discretion occurred.

¶ 30    The other testimony that John cites as inadmissible hearsay took place during the examination of Tamara:

MR. ROSENFELD [Tamara's attorney]: Tammy, why do you agree that they can leave?

- 7 -

No. 1-18-0779

TAMARA: They've received a text from their father.

MR. KAFOGLIS [John's attorney]: Objection. Hearsay.

¶ 31    The court overruled the objection because "[s]he hasn't testified about what's in it, the content."

¶ 32    We agree with the trial court and Tamara that this testimony did not elicit hearsay in the first instance. Tamara did not testify to any out-of-court "statement," any "oral or written assertion." Ill. R. Evid. 801(a) (eff. Oct. 15, 2015) (defining "hearsay"). She merely testified to a sequence of events that happened routinely during visitation—the children receive a text from their father, so she lets them leave. Was there an inference there, as John argues, that the text message contained some direction to the children to leave? Certainly. But that doesn't make it hearsay. No oral or written assertion was introduced for the purpose of proving the truth of that assertion. No hearsay was elicited.

¶ 33    John also argues that Tamara couldn't have known that the text came from John unless she had relied on the children's hearsay statement telling her so (presumably something along the lines of "I just got a text from Dad"). Again, that may be true, but it doesn't convert anything Tamara said into hearsay. If anything, that would speak to the foundation for Tamara's testimony—how it was that she knew the text messages came from John. But John did not object on foundational grounds in the trial court. He only objected that it was hearsay. And it was not, because no out-of-court statement was elicited.

¶ 34    We find no error in either evidentiary ruling.

¶ 35                              II. Sufficiency of Evidence

¶ 36    John challenges the trial court's finding of indirect civil contempt. Generally, a party commits indirect civil contempt when he or she violates a court order through conduct outside

No. 1-18-0779

the court's presence. *In re Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494, ¶ 50. The burden initially falls on the petitioner to show, by a preponderance of the evidence, that the alleged contemnor has violated the court order. *Id*. If so established, the burden shifts to the contemnor to show that the violation was not willful. *Id*. Ultimately, a finding of " 'willful disobedience of a court order' " is necessary to a finding of indirect civil contempt. *Id*. (quoting *In re Marriage of McCormick,* 2013 IL App (2d) 120100, ¶ 17).

¶ 37    John argues that the court's finding of contempt is against the manifest weight of the evidence. Whether a party is guilty of contempt is a question of fact for the trial court, and we will not disturb the trial court's determination "unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17. A decision is against the manifest weight of the evidence if "the opposite conclusion is clearly evident" or the court's findings are "unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43.

¶ 38    The trial court made two findings critical to its decision to find John in indirect civil contempt: John terminated parenting time early, and John failed to allow Tamara her summer parenting time. Specifically:

> "John has violated the parties' Allocation Judgment that was entered on November 15,
> 2016 in that he failed and by his actions refused to allow Tammy her regular and summer
> parenting time since June 2017 to date of hearing with the exception of two overnights,
> and even during her regular parenting time failed to allow her to have the complete time
> required by the Judgment."

No. 1-18-0779

¶ 39    Either of these findings, alone, is sufficient to support a contempt finding, as either would constitute a violation of the allocation judgment alleged in Tamara's petition for a rule to show cause.

¶ 40    We first note that John does not make any argument with respect to the court's finding that he denied Tamara summer visitation time. As such, any claimed error on this finding of fact is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised on appeal are deemed forfeited). In any event, the trial court's finding on this issue was not against the manifest weight of the evidence. At a minimum, the parties agreed that Monday was supposed to be a summer visitation day. John said she got the children on Mondays; she said she got "some Mondays" but not the bulk of them. The trial court believed Tamara. That finding, alone, would be sufficient to support the trial court's finding of indirect civil contempt.

¶ 41    John does, however, challenge the first finding—that he controlled the start and end times for the visitation. He begins by arguing that "there was no evidence or testimony as to the specific dates and times that the visitation was cut short, nor was there any evidence or testimony as to the number of hours it was shortened."

¶ 42    True, no one testified to every single date, every precise hour. But the evidence showed that nearly every Saturday visitation—regular or overnight—was terminated at 3 p.m. There was some testimony about specific dates. For example, Tamara testified that on certain dates, she did allow the kids to leave early. While not exactly precise, every witness testified that Saturday visitations ended at around 3 p.m. We believe that sufficient evidence was introduced about those dates and times when visitation was cut short.

¶ 43    In his brief, John says his "argument can be summed up in one concept: John cannot be held in contempt of court for the actions or inactions, of Tamara or the children." John's problem

- 10 -

No. 1-18-0779

is the trial court found that the children left early because John controlled when visitation ended, not because of Tamara or the children's actions.  Both parties acknowledge that a custodial parent cannot deny the other their visitation rights "merely because his or her children do not desire to visit the noncustodial parent." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 111 (2006). "Where a dissolution judgment places the ultimate responsibility for compliance with the visitation provisions upon the custodial parent, the custodial parent cannot escape his or her duty to comply with the visitation provisions by 'attempting to shift this burden to the discretion of [his or] her children.' " *Id.* at 111-12 (quoting *Doggett v. Doggett*, 51 Ill. App. 3d 868, 872 (1977)).

¶ 44      John attempts to distinguish *Charous* because here, the allocation judgment did not specifically place the ultimate responsibility for compliance on him. In *Charous*, the allocation judgment required the mother "to have the 'children prepared [for visitation] with the appropriate clothing and times the children will need to take with them' and to have the children 'ready to leave promptly at the scheduled time.' " *Id.* at 112. The court found the mother failed to meet those obligations. *Id.* In contrast, here, John notes, the allocation judgment does not contain these specific obligations.

¶ 45      But we do not find this holding in *Charous* particularly pertinent to this case. There was conflicting testimony about whether John properly prepared the children for visitation, but that was *not* the basis of the court's ruling. Instead, the court premised its finding on the fact that "[p]arenting time terminates because the children say they have to leave. They say they have to leave because John dictates the end time for parenting time with Tammy."

¶ 46      This finding of fact is entitled to great deference under our standard of review. *Hoxha v. LaSalle Nat. Bank*, 365 Ill. App. 3d 80, 84 (2006). We must be "mindful that '[a] reviewing court

No. 1-18-0779

may not overturn a judgment merely because the reviewing court might disagree with the

judgment, or, had the reviewing court been the trier of fact, might have come to a different

conclusion.' " *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007) (quoting *People v. A*

*Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County,*

*Illinois*, 217 Ill. 2d 481, 510 (2005)).

¶ 47     While we wouldn't say that the evidence supporting the trial court's finding was

overwhelming, there is no question that there was sufficient evidence to support the court's

finding. Most of it came from Wilson, who had supervised the visits for over five years and

whom the trial court found to be "to be impartial and not biased, and truthful." Wilson clearly

testified that John, not Tamara (or Wilson herself), was in control of the visitation schedule:

> "MR. ROSENFELD: Okay. Now, Kate, are you aware of the schedule in which the
>
> children are supposed to be with their mother?
>
> KATE WILSON: Yes.
>
> Q: And has that schedule been followed?
>
> A: No.
>
> Q: Kate, who sets up the dates for the times that the children come and go?
>
> A: John.
>
> Q: John Koepke?
>
> A: Yes.
>
> Q: And he sets them up with you how?
>
> A: Through text messages.
>
> Q: Any other way?
>
> A: No.

No. 1-18-0779

***

MR. ROSENFELD: Now, Kate, has Tammy ever set the schedule for the children?

KATE WILSON: No.

Q: Have you seen the children come for visitation time with their mom and parenting time and leave early?

A: Yes.

Q: Is that because Tammy wants them to leave early?

A: No."

¶ 48    We couple that, of course, with the testimony we discussed above, which John challenged on hearsay grounds but which we found was properly admitted. Wilson said that the children would simply announce that they had to leave, and Tamara testified that they left when they received text messages from their father, and she let them go so John wouldn't punish them.

¶ 49    And while John claimed that he had nothing to do with his children leaving visitations early, the trial court did not believe him. The court found John "evasive and combative" and not "particularly truthful or credible." We must defer to these credibility findings by the trial court, which is in a far superior position to make such determinations. *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1035 (1993). Between Wilson's and Tamara's testimony, the court was left with the distinct impression that John dictated the visitation schedule, that John was responsible for the children cutting their visitations short, and thus that John willfully violated the allocation judgment. The evidence supported that determination.

¶ 50    The principal point of contention on appeal is those text messages that John supposedly sent to his children, instructing them to cut visitation short. Neither Wilson nor Tamara claimed to have read those text messages. And the court and the parties, at least initially, were strongly

- 13 -

No. 1-18-0779

opposed to hauling in the children to testify on this question. (Later, John's counsel seemed to change his tune on that point, after the challenged hearsay testimony was admitted.)

¶ 51    So it is true, as John points out, that we don't have definitive proof as to what those text messages said. But does the absence of that evidence fall on the trial court's shoulders or on John's? After all, as we noted above and as even John acknowledges, once the court found that Tamara had proven a violation of the court order by a preponderance of the evidence and issued a rule to show cause against John, it was *John's* burden to prove that he did not willfully violate the court's order. See *Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494, ¶ 50; *Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17.

¶ 52    Yes, John's counsel did broach the subject of bringing in the children to testify, which the court strongly opposed for the children's sake. But John could have introduced his *own* text messages as part of his case-in-chief or even in rebuttal; he could have disclosed any and all text communications with his children on the relevant dates. Or in lieu of calling the children to testify, he could have produced his *children's* text messages. One would think that if a party were accused of sending text messages that directed his children to violate a visitation schedule, the easiest way in the world to disprove that assertion would be to show those text messages (or prove the lack thereof) to the court. John did not do that.

¶ 53    We thus have no basis to overturn the trial court's finding of a willful violation of the court's allocation judgment. We can't say that the "the opposite conclusion is clearly evident" or that the court's finding on this point was "unreasonable, arbitrary, and not based on any of the evidence." *Demaret*, 2012 IL App (1st) 111916, ¶ 43.

- 14 -

No. 1-18-0779

¶ 54                                III. Purge Provision

¶ 55     John's final argument is that the order contains an improper purge provision. "Because [civil contempt] is intended to compel the contemnor to comply with the underlying court order in the future, the contemnor must be able to avoid or purge himself by complying with the terms of the underlying order." *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 29. John likens this case to *Marriage of Knoll and Coyne*, 2016 IL App (1st) 152494. There, the trial court held the non-custodial parent in contempt for failure to allow visitation and required "the parties [to] immediately determine a make-up parenting time schedule" for the missed parenting time. *Id.* ¶ 40.

¶ 56     On appeal, this court found the purge provision improper, as it required the ex-husband's participation in order for the ex-wife to purge contempt. *Id.* ¶ 58. Because the other party could single-handedly prevent purging contempt, the court found that the purge was not proper because it did not give the contemnor "the keys to [her] cell." *Id.*; see *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 44 (requiring third party to make recommendation appeared to "take the keys out of the defendants' hands and give them to the receiver, for even if defendants cooperate with the receiver, the contempt will not be purged until the receiver determines that his investigation is complete and makes a report and recommendation to the court").

¶ 57     The order in this case does not suffer from the same defect. Here, the order simply provides: "John shall purge himself of the indirect civil contempt by allowing Tammy make-up parenting time beginning upon the entry of this order; the make-up parenting time shall be completed by August 31, 2018." All John has to do is provide make-up time by August 31, 2018. But according to John, Tamara's "participation is a necessary prerequisite to establishing a

- 15 -

No. 1-18-0779

make-up parenting time schedule." We do not agree and, in fact, this brings us to the distinction between this case and *Knoll*.

¶ 58    In *Knoll*, 2016 IL App (1st) 152494, ¶ 57, the purge provision left it entirely up to the parties—both the contemnor and her ex-husband—to work out a schedule for make-up parenting time, placing the ex-husband in a position to frustrate the contemnor's attempt to purge. Here, in contrast, the contempt order provides that "this matter is set for status of the make-up parenting time schedule on a future date agreed by all parties by separate order." So it is not solely up to the parties here to figure out the make-up schedule. The court gave them the *first* opportunity to figure out a schedule, which strikes us as a perfectly sensible initial step; John and Tamara are in a far better position than the trial court to work out a schedule that the court would then approve. But the obvious point of the status hearing is to ensure that a schedule has been put in place and, if it has not—if the parties can't agree on a schedule—the trial court would have to intervene to set the schedule.

¶ 59    And once that schedule is in place, John truly will hold the keys to his cell. He will simply be required to comply with a court-approved visitation schedule. *Knoll* is thus distinguishable and does not compel a different result. We find nothing improper in this purge provision.

¶ 60                                    CONCLUSION

¶ 61    For the reasons stated, we affirm the circuit court's judgment.

¶ 62    Affirmed.

# EXHIBIT B









