UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAZZ CLEVINGER,<br><br>    Plaintiff,<br><br>v.<br><br>ADVOCACY HOLDINGS, INC. *et al.*,<br><br>    Defendants. | Civil Action No. 23-1159 (JMC) |
| ADVOCACY HOLDINGS, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>CHAZZ CLEVINGER *et al.*,<br><br>    Defendants. | Civil Action No. 23-1176 (JMC) |

**MEMORANDUM OPINION[1]**

On February 1, 2023, Chazz Clevinger suddenly resigned from his position as CEO of Advocacy Holdings, Inc. ("Advocacy Holdings"), a digital advocacy provider that does business in the United States, Canada, and Australia. ECF 12 ¶¶ 1–2, 20. According to Advocacy Holdings, Clevinger undertook a campaign to steal its business by using its confidential information to establish his own competing digital advocacy companies, soliciting its customers, and disparaging it to other players in the advocacy space. *Id.* ¶¶ 3–5.

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

1

Advocacy Holdings filed suit against Clevinger and his two companies, CiviClick, Inc. ("CiviClick") and Superior Campaign Solutions, LLC ("SCS"). *See generally* ECF 12. Advocacy Holdings alleges that Clevinger has violated key provisions of his employment agreement, breached his fiduciary duties to it, interfered with its business contracts, and misappropriated its trade secrets in violation of state and federal law, among other transgressions. *Id.* ¶¶ 216–88. Clevinger, for his part, has filed a civil suit against his former company and colleagues, raising allegations of assault, wrongful termination, fraud, breach of contract, unjust enrichment, and other state law violations. ECF 29.

Before the Court now is Advocacy Holdings' Motion for Preliminary Injunction. ECF 13. Advocacy Holdings asks the Court to shut down CiviClick and SCS, prohibit Clevinger from using its customer contact lists, bar Clevinger from using the platform underpinning CiviClick's digital tool, stop Clevinger from soliciting or contracting with 339 businesses on its list of restricted customers, and enjoin him from using its trademark. Hr'g of July 7, 2023, at 39:13–40:11 (Draft Tr.); *see* ECF 13-1 at 44. Clevinger opposes. ECF 24. A hearing on the Motion for Preliminary Injunction was held on July 6, 2023, and July 7, 2023, during which the Parties examined live witnesses, introduced exhibits, and presented argument.

Though the Court has issued a temporary restraining order ("TRO") in this matter and extended it pending briefing on the Motion for a Preliminary Injunction, Case No. 23-cv-1176 (D.D.C.), ECF 35; ECF 10; ECF 20; ECF 38, the current record demonstrates that Advocacy Holdings has failed to justify further injunctive relief. While the question is certainly a close one, the Court finds that Advocacy Holdings has not established a likelihood that it will suffer irreparable harm in the absence of an injunction. In fact, the Founder and Co-Chairman of Advocacy Holdings testified that despite Clevinger's alleged conduct, Advocacy Holdings'

current business is "[a]bout the same," it "probably" has more customers now, and it is "not going out of business any time soon." Hr'g of July 6, 2023, at 115:5–14 (Draft Tr.). Accordingly, the Court opts to allow the normal litigation process to play out before determining whether Advocacy Holdings is entitled to the relief it seeks in this suit.

Before providing its rationale, it is worth noting that the Court's ruling is not an endorsement of Clevinger's alleged conduct. The allegations, if true, may well represent stunning breaches of Clevinger's fiduciary and (potentially) contractual obligations. Nor is the Court making findings about the significance of Advocacy Holdings' damages in the event of a liability finding. The Court only concludes that it cannot find irreparable harm on the current record.

With that in mind, and for the reasons detailed below, the Court DENIES without prejudice Advocacy Holdings' Motion for Preliminary Injunction. ECF 13.

## I. BACKGROUND

### A. Factual Background

Advocacy Holdings, which does business as OneClickPolitics, is a digital advocacy provider that offers a suite of services to its customers. ECF 12 ¶ 2. Its primary product is a digital tool that facilitates government lobbying, but it also offers advocate acquisition services, advocacy consulting, and bill tracking services. *Id.*

In November 2016, Clevinger began his time at Advocacy Holdings as its Vice President, and he was named its Chief Executive Officer ("CEO") in November 2017. *Id.* ¶ 34. As CEO, Clevinger oversaw Advocacy Holdings' sales and marketing functions, and cultivated customer relationships by attending industry conferences. *Id.* ¶ 36. He had access to Advocacy Holdings' customer contact lists, was heavily involved in the day-to-day management of its online advocacy platform, and steered the redesign of its digital platform. *Id.* ¶¶ 36–48.

On July 15, 2020, Clevinger signed a Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Employment Agreement" or "Agreement"). *See* ECF 13-2, Ex. 1. In broad strokes, the Agreement purports to prohibit Clevinger from disclosing or benefitting from Advocacy Holdings' confidential information during his tenure, and for five years after any separation from the company. *Id.* ¶ 2. The Agreement also bars Clevinger from engaging in competitive and solicitation activities while employed, and for twelve months following any departure from the company. *Id.* ¶¶ 4–5. The geographic scope of the Agreement's non-competition provision is the United States. *Id.* ¶ 4. The Agreement also tolls the duration of its restrictive covenants for up to twelve months to account for litigation time if a court finds that Clevinger breached its non-competition or non-solicitation provisions. *Id.* ¶ 7.

Advocacy Holdings alleges that while employed as its CEO, Clevinger used proprietary information and trade secrets he obtained through his role overseeing sales, marketing, and the redesign of Advocacy Holdings' online platform to stand up two competing businesses, CiviClick and SCS. ECF 12 ¶ 3. Before he left, Clevinger deleted Advocacy Holdings' data and exported thousands of his work Gmail contacts, which included email addresses and phone numbers for Advocacy Holdings' customers. *See* ECF 13-3 at ¶¶27–28. According to Advocacy Holdings, he then encouraged many of those customers to use his business and products instead. ECF 12 ¶ 3; ECF 13-1 at 34. In the months following his resignation, Clevinger allegedly solicited a slew of Advocacy Holdings' customers for his competing business, and told some of Advocacy Holdings' customers that the company was "closing" or "pivoting" away from the advocacy space. *See* ECF 12 ¶¶ 113–206. CiviClick sent at least eighteen invoices to clients who have done business with Advocacy Holdings. Hr'g of July 6, 2023, Ex. 1; *see* Hr'g of July 7, 2023, at 32:21–25, 67:13–14.

Advocacy Holdings further alleges that Clevinger used its trademark in Google advertisements to promote CiviClick and trade on its goodwill. ECF 12 ¶¶ 269–73; *see* ECF 13-1 at 27.

Though the Parties do not agree on the full extent to which CiviClick and SCS compete with Advocacy Holdings' offerings, it is clear that Advocacy Holdings and, at minimum, CiviClick, are both players in the digital advocacy industry. *See* Hr'g of July 7, 2023, at 54:21–55:5 (Draft Tr.). Advocacy Holdings contends that CiviClick is a direct competitor, offering equivalent digital advocacy software, advocate acquisition services, and advisory services. ECF 12 ¶¶ 3, 22–27, 31–33. Advocacy Holdings also alleges that SCS competes with it by doing business as CiviClick and using Advocacy Holdings' technology. *See id.* ¶¶ 3–4; Hr'g of July 7, 2023, at 15:7–19 (Draft Tr.). Clevinger contends that his businesses' offerings are distinguishable from Advocacy Holdings' offerings, but concedes that CiviClick and Advocacy Holdings are "probably competitors." Hr'g of July 7, 2023, at 55:4 (Draft Tr.).

### B. Procedural Background

The Court has recounted the relevant factual and procedural background in its Order granting in part Advocacy Holdings' Second Motion for TRO, Case No. 23-cv-1176 (D.D.C.), ECF 35, and in its Orders extending that TRO, ECF 10; ECF 20; ECF 38. The Court summarizes and adds to the procedural history only as needed to resolve this Motion.

Advocacy Holdings initiated this action in the Eastern District of Virginia on March 30, 2023. Case No. 23-cv-1176 (D.D.C.), ECF 1. On the same day it filed suit, Advocacy Holdings moved for a TRO, which was granted the next day. *Id.* at ECF 2; *id.* at ECF 9. The Eastern District of Virginia court extended the TRO through April 24, 2023, *id.* at ECF 21, then transferred the case here after finding that it lacked personal jurisdiction over Clevinger, *id.* at ECF 27; *id.* at ECF 29.

On May 2, 2023, Advocacy Holdings filed a Second Motion for Temporary Restraining Order, *id.* at ECF 31, which this Court granted in part on May 19, 2023. *Id.* at ECF 35. The Court has extended that TRO three times, over Clevinger's opposition. ECF 10; ECF 20; ECF 38. In the midst of TRO litigation, the Parties agreed to hold a Preliminary Injunction Hearing on July 6, 2023, and July 7, 2023. Min. Entry of May 26, 2023. Advocacy Holdings filed its Motion for Preliminary Injunction on June 9, 2023. ECF 13. Clevinger filed his opposition on June 20, 2023. ECF 24.

The TRO in place prohibits Clevinger and his companies from soliciting any of Advocacy Holdings' current customers for the provision of digital advocacy subscription services, advocacy acquisition services, advocacy consulting services, and bill tracking services; soliciting any of Advocacy Holdings' current employees for employment with CiviClick or SCS; disparaging Advocacy Holdings by making false representations about Advocacy Holdings or its services and activities; and using Advocacy Holdings' confidential or proprietary information. ECF 38 at 6–7. The TRO expired on the earlier of the Court's ruling on the Motion for Preliminary Injunction or July 14, 2023. *Id.* at 7.

The Parties appeared at a Preliminary Injunction Hearing on July 6, 2023, and July 7, 2023. Three witnesses testified at the Hearing: Clevinger; Co-Founder, Co-Chairman, and self-described controller of Advocacy Holdings, John Koepke; and Garrett Devries, the Chief Technology Officer of a political advocacy organization called FreedomWorks (a former Advocacy Holdings customer who took his business to CiviClick). At this point in the litigation, the record includes declarations from Koepke; Advocacy Holdings' other Co-Founder and Co-Chairman, Raymond Zenkich; Sue Zoldak, the principal of a customer of Advocacy Holdings called The Zoldak Agency; and Clevinger. ECF 13-2; ECF 13-3; ECF 13-4; ECF 24-1. Advocacy Holdings admitted eight exhibits

6

that the Court has considered in resolving this Motion. *E.g.*, Ex. 1 (CiviClick invoices to customers); Ex.2 (Advocacy Holdings' restricted customer list); Ex. 3 (Advocacy Holdings' invoice records); Ex. 7 (Advocacy Holdings' revenue by month). The Parties also presented oral argument on the Motion for Preliminary Injunction to supplement written submissions.

## II.   LEGAL STANDARD

Preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. *Id.* at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The moving party bears the burden of persuasion, which means it must make a "clear showing" that all four factors support an injunction. *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Notably, if the moving party fails to carry its burden of showing irreparable injury, a court may deny a motion for preliminary injunction without considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).[2] Further, because a preliminary injunction is an "extraordinary remedy," *Winter*, 555 U.S. at 22, the Court will not order such relief to mitigate a harm that is fully redressable at the damages stage. *See CityFed Fin. Corp.*, 58 F.3d at 747.

---

[2] Before the Supreme Court decided *Winter*, courts in this Circuit assessed the preliminary injunction factors using a sliding scale. The sliding scale approach permitted a relatively weak showing on one factor to be overcome by a relatively strong showing on another. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). Since the Supreme Court's decision in *Winter*, the D.C. Circuit has suggested, but not decided, that the sliding scale approach does not survive *Winter*'s holding. *Sherley*, 644 F.3d at 392. What is clear, however, is that parties seeking a preliminary injunction must make some showing of irreparable injury before a court orders a preliminary injunction. *CityFed Fin. Corp.*, 58 F.3d at 747.

**III.    ANALYSIS**

The cornerstone of preliminary injunctive relief is irreparable harm that injures the moving party in a manner that cannot be remedied through other types of relief. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974); *CityFed Fin. Corp*, 58 F.3d at 747. The irreparable harm factor therefore imposes a "considerable burden" on the moving party. *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005). In this Circuit, the movant must demonstrate such harm by establishing that an injury to it is "certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Because a finding of irreparable harm requires proof of an injury that cannot be adequately redressed by final relief on the merits, economic loss does not count unless that loss "threatens the very existence of the movant's business." *Id.*

To show a likelihood of irreparable harm, a movant must present more than "[b]are allegations of what is likely to occur." *Id.* Instead, the moving party must "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future" as a direct result of the action it seeks to enjoin. *Id.* Courts may not issue preliminary injunctions based on a *possibility* of irreparable harm. *See Winter*, 555 U.S. at 22. Doing so would be inconsistent with the principle that injunctive relief is "an extraordinary remedy" that a court can only award upon a "clear showing" that the plaintiff is entitled to it. *Id.*

In its Motion, Advocacy Holdings argues that irreparable harms have accrued, and will continue to accrue, because of Clevinger's conduct. ECF 13-1 at 34–35. Advocacy Holdings acknowledges that if it prevails in this litigation, its alleged monetary losses can be calculated and awarded as damages. *Id.* at 34. But it identifies three harms it attributes to Clevinger and his businesses that it insists are irreparable. *Id.* at 34–35.

First, Advocacy Holdings argues that its "loss of customers" (past and future) is an irreparable harm. *Id.* at 34. It points to eighteen invoices that CiviClick has issued to its customers to show that Clevinger is taking its business, says that other customers have not renewed subscriptions to its services, and warns that additional "advocacy services" may be lost to Clevinger and his businesses "for a period of time in the future that is unknowable." *Id.* at 34, 42; Hr'g of July 7, 2023, at 32:21–33:35. Second, Advocacy Holdings maintains that it will be irreparably injured by "Clevinger's and CiviClick's misuse of [its] confidential or proprietary information, and the concomitant loss of customer trust and goodwill." ECF 13-1 at 34. Advocacy Holdings argues that this harm stems from Clevinger's decision to download contacts from his company email account and use those contacts to solicit its customers for his competing business. *Id.* Third, Advocacy Holdings claims that it has suffered, and will continue to suffer, irreparable harm from Clevinger's "misrepresentations to [its] customers." *Id*. Advocacy Holdings argues that these misrepresentations have injured its reputation in the industry by creating the impression that it is "unstable" or "going out of business." *Id.* at 34–35. Advocacy Holdings also argues that equivalent irreparable harms stem from Clevinger's alleged tortious interference with its business relationships and contracts, breaches of his fiduciary duties to it, and violations of the federal Computer Fraud and Abuse Act. *See* Hr'g of July 7, 2023, at 37:3–39:7 (Draft Tr.).

The Court addresses each argument in turn, ultimately concluding that Advocacy Holdings has not satisfied its burden on the record before the Court.

### A. Advocacy Holdings has not carried its burden of showing loss of customers that rises to an irreparable harm.

Advocacy Holdings urges the Court to find that it has suffered, and will continue to suffer, irreparable harm through its loss of customers to Clevinger, but the Court cannot make that finding on this record. *See* ECF 13-1 at 34.

Loss of business (or customers) is an economic harm. However, such loss, especially when it results from injury to a company's reputation, ability to compete, or market share, can, in theory, be an irreparable harm if the party seeking injunctive relief can establish that the economic loss cannot be calculated or threatens its ability to stay in business. *See, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 199 (D.D.C. 2010); *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996); *Ajilon Pro. Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 (D.D.C. 2007); *L.G. Balfour Co. v. McGinnis*, 759 F. Supp. 840, 846 (D.D.C. 1991). Such a claim cannot be conclusory—the moving party must provide factual support for its argument to obtain a preliminary injunction. *See Reyes*, 736 F. Supp. 2d at 199–200.

Advocacy Holdings has not made a sufficient showing here. The Court cannot find that any damages resulting from its loss of customers to Clevinger are "incalculable." There is evidence that Clevinger sent an email blast to the contacts he exported from his email account, which included Advocacy Holdings' customers, to inform them of his new business venture. *See* ECF 13-3 ¶ 30. The record is also clear that CiviClick is doing (or has done) business with some customers of Advocacy Holdings. *See* ECF 13-2 ¶¶ 31–39 (Koepke identifying eight Advocacy Holdings customers that Clevinger has solicited); Hr'g of July 6, 2023, Ex. 1 (including CiviClick invoices issued to Advocacy Holdings customers). What Advocacy Holdings has not made clear, however, is why any lost business arising from Clevinger's conduct cannot be compensated by monetary damages. *See Smith, Bucklin & Assocs.*, 83 F.3d at 481 (affirming denial of preliminary injunction and recognizing that lost client account resulting from alleged breach of a noncompete agreement "can be adequately compensated at law"). Indeed, courts in this district have routinely recognized that the value associated with loss of customers can be distilled to monetary damages. *See, e.g., Econ. Rsch. Servs., Inc. v. Resol. Econs., LLC*, 140 F. Supp. 3d 47, 52 (D.D.C. 2015);

*Air Transp. Ass'n of Am., Inc. v. Export–Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *Reyes*, 736 F. Supp. 2d at 199–200; *Clipper Cruise Line, Inc. v. United States*, 855 F. Supp. 1, 4 (D.D.C. 1994).

Here, Advocacy Holdings should be able to quantify the loss of each customer it contends Clevinger took from it (perhaps by looking to its historical invoices or any invoices issued by CiviClick or SCS) and recover that amount as damages if there is a liability finding. *See Reyes*, 736 F. Supp. 2d at 200. It has not suggested that Clevinger, CiviClick, or SCS will not be able to satisfy a money judgment. And its contrary claim that it would be "impossible" to calculate such past or future losses, ECF 13-1 at 34, is made in a conclusory fashion. Koepke repeats this conclusion in his declaration, ECF 13-2 ¶42, but Advocacy Holdings points to no facts in the current record to support it. Indeed, Advocacy Holdings has sought, and the Court has permitted, discovery of CiviClick and SCS's invoices and bank records, presumably so that Advocacy Holdings can identify lost customers and calculate its alleged damages.

Nor does the record demonstrate that Clevinger's alleged conduct threatens Advocacy Holdings' ability to stay in business such that a preliminary injunction is warranted.[3] Evidence amassed thus far demonstrates that Advocacy Holdings has hundreds of customers and has continued to gain new customers since Clevinger's departure. Hr'g of July 6, 2023, at 120:17–121:5 (Draft Tr.); *see* Hr'g of July 6, 2023, Ex. 2, 3. Advocacy Holdings admits that despite any cyclical changes in its revenue since Clevinger established CiviClick and SCS, Hr'g of July 6,

---

[3] The moving papers suggest that Advocacy Holdings has lost most of its business since Clevinger's departure, but that is not borne out in the record so far. For example, in his declaration, Koepke swears that Advocacy Holdings had 186 paying customers in 2022, but as of May 2023, it only had 57 paying customers. ECF 13-2 ¶ 13. Presumably, the Court is meant to infer that Clevinger's conduct has caused this drop in Advocacy Holdings' number of paying customers and revenue. But the Court cannot make such an inference. Indeed, Koepke testified that these cycles of customer gains and losses are normal for his business, *see* Hr'g of July 6, 2023, at 115:9–10 (Draft Tr.), and other records suggest that Advocacy Holdings has far more than 57 customers. Perhaps Advocacy Holdings will be able to prove this allegation during the litigation, but it has not done so yet.

11

2023, Ex. 7, there has been no change that would put it out of business and it is not at risk of shutting down. *See* Hr'g of July 6, 2023, at 115:5–14 (Draft Tr.). These candid admissions preclude the Court from finding that economic loss resulting from any loss of customers as a result of Clevinger's conduct will imminently threaten Advocacy Holdings' existence if Clevinger is not enjoined now.[4] To be clear, the Court is not suggesting that Advocacy Holdings will not be able to establish that it has significant damages in the event of a liability finding; the Court only concludes that it has not shown irreparable injury.[5]

In sum, the Court finds that Advocacy Holdings' loss of customers is a calculable, economic loss and that there is nothing suggesting that its business is at risk if the Court does not act immediately. So, the Court does not find that a preliminary injunction is warranted.[6]

**B. Advocacy Holdings has not carried its burden of showing that Clevinger's use of its confidential or proprietary information has caused it to lose customer trust or goodwill in a manner that rises to an irreparable harm.**

Advocacy Holdings also argues that Clevinger and his businesses have used its confidential and proprietary information in a way that will cause irreparable harm to its customer trust and goodwill. ECF 13-1 at 34. In its Motion, Advocacy Holdings contends that this type of irreparable harm stems from Clevinger's alleged theft of its customer contacts, and his subsequent use of the

---

[4] The Court appreciates that a TRO has been in place pending the briefing of this Motion, but it is significantly narrower than the relief sought in this Motion and does not explain the absence of the irreparable harm that Advocacy Holdings alleges as a result of the continued operation of Clevinger's business.

[5] Advocacy Holdings further contends that customers would "migrate back" to it "out of necessity" if a preliminary injunction forced Clevinger's businesses to close, ECF 13-1 at 20, ECF 13-2 ¶ 43, but that conclusion is speculative. The Court has no information before it to determine that Advocacy Holdings would regain any lost customers if the Court granted its Motion. Indeed, the Chief Technology Officer of one of its former customers testified (for Clevinger) that it terminated its business dealings with Advocacy Holdings because it was no longer satisfied with Advocacy Holdings' services. Hr'g of July 6, 2023, at 146:5–147:15. Regardless of whether or not that is true, the Court cannot assume that this customer (or any other customer) would take its business back to Advocacy Holdings if an injunction issued.

[6] The Court acknowledges that Clevinger's Employment Agreement includes a provision wherein Clevinger confirms his awareness that irreparable harm will result to Advocacy Holdings if he violates the Agreement's provisions. ECF 13-2, Ex. 1 ¶ 11. But, as the D.C. Circuit has recognized, that sort of provision alone is "an insufficient prop" to support a preliminary injunction. *Smith, Bucklin & Assocs., Inc.*, 83 F.3d at 481.

exported contact list to "blast[]" CiviClick advertisements to its customers. *Id.* It further argues that Clevinger's alleged use of its propriety information and trade secrets to create a website and platform for CiviClick constitutes irreparable harm. *See* ECF 13-1 at 34–35, 42. Advocacy Holdings has failed to satisfy its burden.

Claims of irreparable harm arising from a former employee's use of customer contact lists have been rejected when the party moving for injunctive relief can only establish monetary loss. *See, e.g.*, *Ajilon*, 503 F. Supp. 2d at 362. When the main thrust of a party's complaint is that its customers are being stolen, a party's "attempts to shoehorn its injury into the aegis of irreparable harm" are untenable even when framed as the ongoing use of purportedly confidential information. *Econ. Rsch. Servs., Inc.*, 140 F. Supp. 3d at 52–53. Here, Advocacy Holdings' complaint about Clevinger exporting his work contacts is that he used those contacts to solicit its customers. Thus, for the same reasons that the Court concluded that Advocacy Holdings failed to satisfy its burden of establishing irreparable harm as a result of any loss of its customer base, it has failed to do so as a result of Clevinger's possession and use of any customer contact list. Its potential damages include revenues associated with lost business that can be compensated by a money judgment.[7]

With respect to Advocacy Holdings' claim that it will suffer irreparable harm from Clevinger's use of proprietary information to create CiviClick's website platform, the record is too underdeveloped for the Court to make findings about what allegedly occurred and the harm Advocacy Holdings will suffer as a result. In general, courts find irreparable harm when evidence

---

[7] Advocacy Holdings cites *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) in support of its argument that use (or misuse) of a customer list can constitute irreparable harm. But that case is sufficiently distinguishable. The information at issue in that case included an alleged misuse of customer's sensitive financial information in a manner that, if allowed to continue, would mean "each client's sensitive financial information would be stripped of its confidentiality." *Rothe*, 150 F. Supp. 2d at 77–78; *see also Reyes*, 736 F. Supp. 2d at 200. The court in *Rothe* determined that a finding of irreparable harm was appropriate because "[i]f clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill." *Id.* at 78. There are no similar considerations here.

indicates that proprietary information or trade secrets are at risk of being appropriated or revealed. *See, e.g.*, *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009); *Rothe*, 150 F. Supp. 2d at 76–77; *Reyes*, 736 F. Supp. 2d at 200. Although Advocacy Holdings alleges that Clevinger has used its proprietary codes, design plans, and customer information to develop his platform, it does not have evidence yet to prove this claim. ECF 12 ¶¶ 99–104. It has produced images of the website designs of Advocacy Holdings and CiviClick. ECF 13-2 at 3. The Court acknowledges the pictures look similar, but the Court cannot make anything out of that at this point. Koepke acknowledged that he had "no idea" whether Clevinger misused Advocacy Holdings' code (or other protected information) to create CiviClick's website and platform. Hr'g of July 6, 2023, at 83:18–84:24 (Draft Tr.). Clevinger, for his part, testified that he did not. *Id.* at 25:23–27:9. The Court cannot assess harm or weigh any other factors that may warrant preliminary relief on this scant record.[8]

---

[8] Advocacy Holdings based part of its Preliminary Injunction Motion on its allegation that Clevinger has violated the Lanham Act's prohibitions on trademark infringement and unfair competition. ECF 13-1 at 40–41, 43. As an initial point, the Court notes that Advocacy Holdings admits it "[p]rimarily" relies on other allegations to support its request for preliminary injunctive relief. Hr'g of July 6, 2023, at 18:14–16. Moreover, to the extent its Motion for an order enjoining Clevinger from using its trademark remains live, the Court concludes that the record does not support a preliminary injunction. Advocacy Holdings has offered a screenshot of a Google search result taken on April 27, 2023, that shows "One Click Politics - CiviClick" appearing as the first search result for the keywords "one click politics." ECF 13-3 at 24. But it has not yet presented evidence that explains how that happened; Clevinger claims that Google's Dynamic Search Ads generated the name's appearance. *See* ECF 24-1 at 18. Even if the Court had enough information to find that Advocacy Holdings is likely to succeed on the merits of its Lanham Act claim, which would in turn entitle it to a rebuttable presumption of irreparable harm under the Lanham Act, 15 U.S.C. § 1116(a) (2020), the Court finds that such a presumption would be rebutted because the record makes no mention of any ongoing violations. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Clevinger attests that he directed Google to remove the information from search results for CiviClick. ECF 24-1 at 18. Although the Court declines to enjoin Clevinger's use of Advocacy Holdings' trademarks at this time, if there is an allegation that Clevinger or his businesses are using those trademarks at a later date, Advocacy Holdings may again move the Court for an injunction. At that point, the Court will allow the Parties to submit additional evidence and argument on the topic.

Additionally, in its oral argument on the Motion, Advocacy Holdings argued that Clevinger's alleged violations of the Computer Fraud and Abuse Act give rise to a need for injunctive relief. Hr'g of July 7, 2023, at 38:22–39: 5. However, the Court concludes that the record is insufficient to support a finding of irreparable harm arising from Clevinger's alleged computer fraud and abuse. It reaches this conclusion for the same reasons identified in its analysis of Advocacy Holdings' arguments that Clevinger's alleged use of its customer contact lists and proprietary information constitutes irreparable harm. Further, it is likely that any losses attributable to this alleged conduct can be reduced to money

### C. Advocacy Holdings has not carried its burden of showing damage to its reputation that rises to an irreparable harm.

Finally, Advocacy Holdings argues that Clevinger's alleged misrepresentations to its customers has damaged its reputation. ECF 13-1 at 34–35. It contends that "Clevinger's disinformation campaign" against it has caused its customers to think it is "closing," undergoing "major changes," and "transitioning to another platform." ECF 13-2 ¶ 43. It insists that an injunction that will force Clevinger to cease operating his businesses will "immediately restore [its] reputation to where it was before Clevinger disparaged it." ECF 13-1 at 35.

It is true that reputational injury can constitute irreparable harm when a moving party shows that the harm cannot be remedied by monetary damages. *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (collecting cases). Generally, a moving party must establish that the reputational damage has tainted the business's good name, caused the loss of business opportunities, and made it more difficult for it to compete in the marketplace. *See id.* Evidence that the movant will lose "substantial revenue" from customers that are unlikely to return, or will have to renege on its existing contracts, may be sufficient. *See, e.g.*, *Everglades Harvesting and Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019); *Regeneron Pharms., Inc. v. U.S. Dep't of Health and Hum. Servs.*, 510 F. Supp. 3d 29, 40–41 (S.D.N.Y. 2020).

Advocacy Holdings has not carried its burden of showing irreparable harm through an injury to its reputation. The Court observes that there is not much in the record to support a conclusion that Advocacy Holdings' reputation has been damaged because of Clevinger's conduct. But even assuming that the Court could identify some reputational damage, for the reasons identified above, the Court cannot find that such damage is likely to cause irreparable harm in the

---

damages because Koepke's declaration quantifies the losses attributable to Clevinger's alleged computer abuse. *See* 13-2 ¶¶ 44–46.

absence of an injunction. There is no evidence of any substantial decline in Advocacy Holdings' revenue that the Court can attribute to Clevinger's misrepresentations, or any indication that Advocacy Holdings is unable to meet its contractual obligations or compete in the marketplace because its name has been hurt in its industry. Particularly given Koepke's acknowledgment that Advocacy Holdings continues to gain customers, the Court cannot find that Clevinger caused a "black mark" on its reputation that warrants injunctive relief. *See Beacon Assocs., Inc.*, 308 F. Supp. 3d at 288. Again, Advocacy Holdings may be able to prove its allegations as the litigation moves forward, but it has not made a sufficient showing for injunctive relief at this time.

### IV.   CONCLUSION

Accordingly, for the reasons described above the Court ORDERS that Advocacy Holdings' Motion for Preliminary Injunction, ECF 13, is DENIED.

**SO ORDERED**.

Date: July 15, 2023

_____
Hon. Jia M. Cobb
U.S. District Judge