## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAZZ CLEVINGER,<br><br>         Plaintiff,<br><br>      v.<br><br>ADVOCACY HOLDINGS, INC., d/b/a<br>OneClickPolitics, *et al.*,<br><br>         Defendants. | Case No. 23-cv-1159 (JMC) |
| ADVOCACY HOLDINGS, INC., d/b/a<br>OneClickPolitics,<br><br>         Plaintiff,<br><br>      v.<br><br>CHAZZ CLEVINGER, *et al.*,<br><br>         Defendants. | Case No. 23-cv-1176 (JMC) |

## <u>MEMORANDUM OPINION</u>

In late 2016, Chazz Clevinger began his employment with a political advocacy software company known as OneClickPolitics (OCP).[1] By early 2023, the business relationship had soured, Clevinger resigned, and dueling lawsuits from each side followed. In total, the two complaints in the consolidated cases purport to assert thirty-eight separate counts of unlawful misconduct, including breach of contract, malicious prosecution, trade secret misappropriation, wage theft, and

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

assault. ECF 12; ECF 29.[2] But, of course, with these dueling complaints came dueling motions to dismiss, in which each Party argues that the other side has failed to state even a single claim for which relief can be granted. ECF 26; ECF 63. Upon review of the motions, while the Court agrees that several of the more-than-three-dozen counts fall short of the standard necessary to survive dismissal under Federal Rule of Civil Procedure 12(b)(6), several others are plausibly alleged. As such, and for the reasons below, the Court **PARTIALLY GRANTS** and **PARTIALLY DENIES** both motions. Advocacy Holdings may proceed with its claims for breach of contract, breach of fiduciary duty, tortious interference with contract and prospective business advantage, trade secret misappropriation, Computer Fraud and Abuse Act violations of subsection (a)(5)(A), and Lanham Act violations. Clevinger may proceed with his claims for assault, fraudulent inducement/concealment and negligent misrepresentation, and unjust enrichment. All other claims in this consolidated action are **DISMISSED**.

## I.      BACKGROUND

Comparing the myriad assertions in each complaint, the Court observes the following areas of substantial agreement regarding the events giving rise to each lawsuit. Clevinger joined OCP as Vice President in November 2016, and was named Chief Executive Officer (CEO) after one year. ECF 12 ¶ 34; ECF 29 ¶¶ 35–36, 38. As CEO, Clevinger managed sales and marketing operations, which included recruiting, hiring, training, and general business development. ECF 12 ¶ 36; ECF 29 ¶ 39. In July 2020, Clevinger entered into a noncompete agreement with OCP with an effective date of July 1, 2020. ECF 12 ¶ 49; ECF 29 ¶¶ 86, 89. On February 1, 2023, Clevinger resigned from OCP without notice. ECF 12 ¶ 59; ECF 29 ¶¶ 221, 224.

---

[2] These cases, while filed separately, were consolidated on May 30, 2023. *See* Minute Order, 05/30/2023. Unless otherwise specified, all citations to the docket refer to filings in the lead case, no. 23-cv-1159.

Past these basic points of agreement, however, each countercomplaint tells a different story. The Court recounts the relevant aspects of these disparate narratives below.

## A. Advocacy Holdings' Allegations

Advocacy Holdings, Inc., a Delaware corporation with its principal place of business in Illinois, doing business as OCP,[3] is a digital advocacy provider that offers a subscription-based online platform designed to enhance customers' lobbying and campaigning efforts. ECF 12 ¶¶ 2, 7, 21. Its products and services include, for example, a proprietary advocacy software that facilitates outreach to legislators, advocate acquisition services to identify those who may support grassroots campaigns, and bill tracking services. *Id.* ¶¶ 22–23, 25, 28. Since 2013, OCP has used the trade name "OneClickPolitics" continuously in interstate commerce. *Id.* ¶ 19. In 2018, OCP applied to register its trade name with the U.S. Patent and Trademark Office, and in April 2020 the mark was registered for use in connection with the type of web-based, government-relations services OCP had provided for years. *Id.*; ECF 12-15. Since then, "OCP has served almost 500 customers[,] generating over $10 million in revenue." ECF 12 ¶ 20.

When Clevinger came onboard in late 2016 and quickly ascended to CEO, he gained access to OCP's confidential information. This included marketing plans, customer information and contact lists, budgeting and financial information, and technical information as to both hardware and software research, development, and strategy. *Id.* ¶ 35. However, this access came with restrictions, and on July 15, 2020, Clevinger signed a "Non-Competition, Non-Solicitation and Non-Disclosure Agreement," with an effective date of July 1, 2020. *Id.* ¶ 49; *see generally* ECF 12-1. The noncompete agreement prohibited him from using or disclosing OCP's confidential information (e.g., customer, vendor, and supplier information, marketing plans, technical

---

[3] Consistent with Advocacy Holdings' complaint, the Court uses OCP and Advocacy Holdings interchangeably in this section. *See generally* ECF 12.

information, etc.) for any purpose other than "for use by or on behalf of [OCP]" while employed and for five years thereafter. ECF 12 ¶¶ 50–52. It required him to return all of OCP's property and confidential information, including electronic data, upon termination of his employment. *Id.* ¶ 54. And it prohibited him from soliciting OCP customers, hiring OCP employees, and generally competing with OCP—anywhere in the United States—during employment and for a period of one year thereafter. *Id.* ¶¶ 55–57; ECF 12-1 at 1–3. In the event of litigation, the noncompete provided that any restrictive period would be tolled up to twelve months. ECF 12-1 at 3.

Clevinger played a central role in the business for years. As CEO, he regularly interacted with the sales team, the customer service operations team, and the technology team to manage operations across the business. *Id.* ¶¶ 36–38. He "also managed all aspects of OCP's Google Adwords lead generation activity including keywords, budgets, and bidding strategies." *Id.* ¶ 36. When OCP started work on "a complete redesign of its platform" in early 2021, Clevinger "led the workstream" to ensure the new platform would "leap frog OCP's competitors." *Id.* ¶¶ 40–44, 46. In order to preserve the competitive value of this project, OCP intended to maintain the secrecy of the platform redesign until it was released to the public. *Id.* ¶ 47. To that end, OCP required the software development firm it hired for the project to sign a technical services agreement with non-disclosure obligations. *Id.* ¶ 45. After an iterative process, Clevinger was the one to sign off on the redesign in May 2022, with development work anticipated for 2023. *Id.* ¶ 46. In short, Clevinger was heavily involved in OCP's day-to-day operations, knew who OCP's customers, vendors, and suppliers were and how to reach them, and had special access to a wide range of confidential information. *Id.* ¶ 48.

After more than six years with OCP, and with no notice, Clevinger resigned on February 1, 2023, taking some of OCP's data with him—and destroying other data—on the way out.

Without authorization to do so, he deleted the user accounts for five OCP employees, including himself, which included "years of OCP email, calendar, files, and contact data." ECF 12 ¶¶ 63, 65–66. Prior to deleting his own account, he exported all the contacts associated with his OCP user and email account. *Id.* ¶ 64. When he returned his laptop that day, the laptop was inoperable and wiped of all information. *Id.* ¶ 67. OCP spent time and resources attempting to recover the deleted information and suffered losses in excess of $5,000. *Id.* ¶¶ 69, 268. According to Advocacy Holdings, however, this was only the tip of the iceberg of Clevinger's misconduct.

Following Clevinger's resignation, OCP discovered that Clevinger, while he was still acting as OCP CEO in 2021 and 2022, founded two competing political advocacy businesses under Delaware law: Superior Campaign Solutions, LLC (SCS) and CiviClick, Inc. *Id.* ¶¶ 3, 9–10, 70–71, 95–98. Even before Clevinger resigned, Clevinger attempted to divert OCP customers to purchase similar services from SCS and CiviClick rather than OCP, *see, e.g.*, *id.* ¶¶ 90–94, and did so with the help of OCP's former Director of Strategic Services, who CiviClick hired as Vice President of Client Services shortly after Clevinger resigned, *id.* ¶¶ 108–12. When engaging OCP's customers, Clevinger told them that "OCP was ceasing operations," *id.* ¶¶ 197–98, that CiviClick was "the successor" to OCP or "the new product," *id.* ¶¶ 203–04, and that Clevinger could "transfer accounts" from OCP to CiviClick, *id.* ¶ 118; ECF 12-7 at 1. Not all customers left OCP, *see, e.g.*, ECF 12 ¶ 199, but others did. In some instances, customers chose to not renew their OCP subscriptions despite having done so in the past and despite indicating that they would "maintain [their] relationship with OCP," *see, e.g.*, *id.* ¶¶ 128–35, and at least one customer "terminat[ed] its relationship with OCP one year early" instead of paying for the second half of its two-year subscription, *id.* ¶¶ 150–55. At some point after CiviClick went live on March 1, 2023, a Google search for "one click politics" produced—as the top-line "sponsored" result—a link to

"www.civiclick.com" with a hyperlink titled, "One Click Politics – CiviClick." *Id.* ¶¶ 103, 105. Additionally, CiviClick's website is "almost identical . . . to OCP's unreleased platform re-design" and includes "verbatim" language from OCP's unreleased platform. *Id.* ¶¶ 103–04.

### B.  Clevinger's Allegations

As a point of clarification on the who's who of this case, Clevinger's complaint suggests that it is imprecise to equate "OCP" and "Advocacy Holdings" for all relevant time periods, mainly because Advocacy Holdings was not incorporated (and thus did not exist) until roughly 2020. *See* ECF 29 ¶¶ 30, 77, 82. A public records search for "Advocacy Holdings" on the State of Delaware official website confirms this. *Cf.* Entity Search, DELAWARE DEPARTMENT OF STATE: DIVISION OF CORPORATIONS, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited July 3, 2024). Clevinger alleges that, prior to Advocacy Holdings' incorporation, OCP existed only through Red Chalk Group, LLC, a "consulting company formed in 2006" that, at the time Clevinger was hired, was running OCP as "a small side-business in the digital advocacy space." ECF 29 ¶¶ 21–24, 26, 30, 38.

Accordingly, by Clevinger's account, in October 2016 he was contacted by two members of Red Chalk—John Koepke and Raymond Zenkich—to recruit him to "lead[] Red Chalk's fledging involvement in digital advocacy." *Id.* ¶¶ 21–22. The three met on October 12, 2016, and discussed Clevinger's "proposed compensation structure, which was to include a base salary, commissions, and equity." *Id.* ¶ 28. Regarding equity, both Zenkich and Koepke represented to Clevinger: "You will be entitled to up to a quarter of equity in the business if you build this thing up." *Id.* ¶ 29. At the time, "no company other than Red Chalk existed." *Id.* ¶ 30. Clevinger joined Red Chalk on November 9, 2016, and by November 2017 he "was promoted to 'CEO' of the Red

Chalk enterprise, OCP." *Id.* ¶¶ 35, 38. "[U]nder [Clevinger's] leadership," OCP's business grew substantially. *Id.* ¶¶ 39, 41.

Over the next few years, Koepke and Zenkich told Clevinger on many occasions that he would receive equity and be made an "official" officer and director of "the company." *See id.* ¶¶ 424–26. Clevinger "followed up multiple times" with Koepke and Zenkich about these promises, but they often "avoided the conversation." *Id.* ¶ 42. On August 19, 2018, nearly two years into Clevinger's employment, "Koepke and Red Chalk" stated at an in-person meeting in Chicago both that (1) Clevinger "would receive 'founders shares' that 'could not be diluted'" because the Red Chalk leadership "w[ould] be fine giving [him] founders shares if [he] continue[d] to build up the business," and (2) they "intend[ed]" to make Clevinger "an owner, director[,] and officer of the company." *Id.* ¶¶ 43–45.

These statements morphed over time. For example, on December 20, 2018, during an in-person meeting in Chicago, "Koepke, Zenkich, and Red Chalk" repeated that they would give "founders shares" of 10–25% of "the whole company" and would make him "officer and director." *Id.* ¶¶ 49–51. By this time, however, the "company" in question was not Red Chalk, but rather "a [separate] corporate form" that would be a "new entity." *Id.* ¶¶ 53–54. On June 24, 2019, during a telephone call, Koepke told Clevinger that he would "make good on [his] founders shares" and "make [him] an officer and director of the [yet-to-be-created] company," telling him, "you'll definitely get your 10% piece of the company . . . [potentially] much more, maybe 20%, if you continue to double year-over-year revenue for OCP." *Id.* ¶¶ 60–62. In a (more contentious) conversation later that year, Koepke told Clevinger, "[j]ust wait for Ray and I to spin out the new company and then you'll get your f***ing 15% of the company." *Id.* ¶ 70. The promises of equity appeared to shift once again during an in-person meeting on December 23, 2019, in which Koepke

stated, "I know that we promised 25% of the company, but realistically we might only be able to give you 10–15%." *Id.* ¶ 74. In that same meeting, Zenkich and Koepke also stated that Clevinger "would be made an officer and director of the 'company' once the new company was formed," but would not be a "full partner of Red Chalk." *Id.* ¶ 72. That promise was reiterated the following month, when Koepke told Clevinger that he would "add [him] as an officer and director . . . [in] the next Delaware corporate filing" for the new company. *Id.* ¶ 77.

As of July 7, 2020, Advocacy Holdings was incorporated as the "new entity" to run OCP, Zenkich and Koepke gave Clevinger a "Stock Incentive Plan" that was "necessary but not sufficient to convey equity" in Advocacy Holdings, and Clevinger signed the noncompete shortly thereafter. *Id.* ¶¶ 82–86. But things did not pan out the way Clevinger hoped they would. On December 7, 2020, Koepke told Clevinger that he would not and could not receive "founders" or "Class A shares," stating, "[it] doesn't matter what I promised, our lawyer said only Ray and I can have Class A shares as founders. You will get Class B shares." *Id.* ¶¶ 99–103. Clevinger accepted Koepke's offer to take 10% of the outstanding, "worthless Class B shares in Advocacy Holdings in exchange for a[n] $11,000 capital contribution." *Id.* ¶¶ 102, 105–107. Then, throughout the year of 2022, Clevinger provided another $35,000 in "capital contribution[s]," but these contributions "were not met with the issuance of simultaneous additional shares of Class B stock." *Id.* ¶¶ 185, 190. Additionally, Clevinger was never named as "the official CEO [or] as an officer or director . . . in the corporate filings of Advocacy Holdings." *Id.* ¶ 426.

Eventually, tension between Clevinger and Red Chalk leadership reached a boiling point. Koepke would "raise[] his voice and use[] profanity toward [Clevinger]," question him "aggressively" about his dating life, and negatively comment on his bodyweight and eating habits. *See, e.g.*, *id.* ¶¶ 112–14, 116, 173–74, 197, 199. On the evening of January 17, 2023, Clevinger

attended an in-person meeting with Koepke and Zenkich, during which Koepke stated, "today we are going to beat up on [Clevinger]" and "we may as well use a baseball bat on him." *Id.* ¶¶ 201–03. When Koepke made this statement, he "lunged forward at [Clevinger]" with a "threatening gesture" while seated "just a few feet away" and "within striking distance." *Id.* ¶¶ 202, 206–07. Six days later, in a heated exchange between Koepke and Clevinger in which Koepke was "yelling and using profanity" while blaming Clevinger for the "failing" business, "Koepke threatened to fire [Clevinger]." *Id.* ¶¶ 214–16. Clevinger resigned approximately one week later, on February 1, 2023. *Id.* ¶ 224.

### C.  Procedural Background

On March 30, 2023, Advocacy Holdings filed suit against Chazz Clevinger in the Eastern District of Virginia. No. 23-cv-1176, ECF 1. Advocacy Holdings obtained an *ex parte* temporary restraining order (TRO) against Clevinger on March 31, 2023, No. 23-cv-1176, ECF 9, and Clevinger moved to dismiss for lack of personal jurisdiction thirteen days later, No. 23-cv-1176, ECF 18. Over Clevinger's objections, the TRO was extended through April 24, 2024, No. 23-cv-1176, ECF 21, at which point the Eastern District of Virginia heard argument, agreed that it lacked personal jurisdiction over Clevinger, and ordered that the case be transferred to this Court, No. 23-cv-1176, ECF 29.

On April 26, 2023, before this Court received the related transferred case, Clevinger filed his own complaint against Advocacy Holdings and John Koepke, and so began the saga here in the District of Columbia. ECF 1. One day after the case was transferred, Advocacy Holdings filed a renewed motion for a TRO, which this Court granted in part over Clevinger's objections on May 19, 2023, further extending restrictions on Clevinger's business activities through June 2, 2023. No. 23-cv-1176, ECF 35. Days later, at the request of the Parties and in recognition of the obvious

relation between the two actions, the Court consolidated the cases. *See* Minute Order, 05/30/2024.

Not long after consolidation, both Clevinger and Advocacy Holdings amended their complaints,

injecting four new Parties and twenty-eight new counts into the dispute. *Compare* No. 23-cv-1176,

ECF 1, *and* ECF 1, *with* ECF 12, *and* ECF 29.

The consolidated docket quickly ballooned. In a few months, this Court extended

Advocacy Holdings' TRO three times, ECF 10; ECF 20; ECF 38, heard argument for and largely

denied Advocacy Holdings' motion for preliminary injunction, ECF 51; ECF 52; ECF 66, and

partially granted requests for limited expedited discovery in both cases, Minute Orders,

06/26/2023. The Court also denied a motion from Clevinger seeking sanctions against Advocacy

Holdings based on alleged misrepresentations about Clevinger's residence made in the Eastern

District of Virginia's TRO proceedings. ECF 25; Minute Order, 08/09/2023. In its order, the Court

noted that "[t]here is no basis (or authority) for the Court to 'declare null and void' an expired

order issued by another federal court" and found that "counsel for Advocacy Holdings h[ad]

confirmed his good faith basis for initially filing this case in Virginia." Minute Order, 08/09/2023.

With the dust settled on the docket (for now), all that remains pending are the two motions

to dismiss the two amended complaints. Clevinger has moved to dismiss all ten counts in

Advocacy Holdings' amended complaint for failure to state a claim per Federal Rule of Civil

Procedure 12(b)(6). ECF 26. Advocacy Holdings has done the same as for all twenty-eight of

Clevinger's counts. ECF 63. Having reviewed the briefing from the Parties, the Court is now

prepared to rule on both motions.

## II.   LEGAL STANDARD

For a Rule 12(b)(6) motion for failure to state a claim, the Court must determine whether

the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court "must accept as true all of the allegations contained in a complaint," but need not do the same for legal conclusions or naked assertions of wrongdoing devoid of supporting facts. *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678. In ruling on a 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.    ANALYSIS

The Court will partially grant both motions to dismiss since neither complaint is quite as frivolous as the opposing Parties would like to think. The majority of Advocacy Holdings' claims survive dismissal, with the exception of its claim under D.C. law for unfair trade practices and aspects of its federal Computer Fraud and Abuse Act claim. Clevinger lands in a different situation, as more than half of his claims find no support in law or his own factual assertions. At bottom, however, both actions will proceed to discovery to some degree, and the Court will take each amended complaint and corresponding motion to dismiss in turn to explain why.

### A. Advocacy Holdings' Claims & Clevinger's Motion to Dismiss

In case no. 23-cv-1176, Advocacy Holdings, Inc. sues Chazz Clevinger and his companies, CiviClick, Inc. and Superior Campaign Solutions, LLC. ECF 12. Advocacy Holdings asserts the following claims: breach of contract and breach of fiduciary duty (Counts 1–2); tortious interference with contract and prospective business advantage (Counts 3–4); trade secret misappropriation in violation of 18 U.S.C. § 1836 and D.C. Code § 36-401 (Counts 5–6);

unauthorized access and unauthorized damage to a protected computer in violation of 18 U.S.C. §§ 1030(a)(2), (a)(4), (a)(5)(A), and (a)(5)(C) (Count 7); trademark infringement in violation of 15 U.S.C. § 1114(1) (Count 8); unfair competition and false designation in violation of 15 U.S.C. § 1125(a) (Count 9); and unfair trade practices in violation of D.C. Code § 28-3904(a) (Count 10). ECF 12 ¶¶ 216–88. This Court has subject matter jurisdiction under 18 U.S.C. § 1331 for the federal claims and supplemental jurisdiction under 18 U.S.C. § 1367(a) for the remaining claims, all of which derive from the same "common nucleus of operative fact." *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 423–24 (D.C. Cir. 2006). After considering Clevinger's arguments as to why each claim should be dismissed, the Court concludes that most of them survive dismissal and will explain the basis for its holding below, analyzing each claim in the order it was asserted.

### 1. *The Breach of Contract Claim Survives*

In Count 1, Advocacy Holdings alleges that Clevinger violated his noncompete agreement and is therefore liable for breach of contract. ECF 12 ¶ 223. The Parties agree that Delaware law controls claims regarding the noncompete agreement, consistent with the agreement's choice of law provision. ECF 26-1 at 3; ECF 60 at 4 n.2. Under Delaware law, breach of contract requires a showing of (1) the existence of a contract, (2) the breach of an obligation imposed by the contract, and (3) damages to the plaintiff resulting from that breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Advocacy Holdings has alleged sufficient facts to support a claim for breach of contract. It alleges that Clevinger entered into a noncompete agreement whose terms restricted his ability to use OCP's confidential data, solicit OCP customers and employees, and compete with OCP. ECF 12 ¶¶ 49–58. It also alleges that Clevinger acted contrary to those terms by using OCP's confidential data for his own benefit, soliciting OCP customers and employees, and competing

with OCP by forming two businesses in the same digital advocacy space, causing harm to OCP's business. *Id.* ¶¶ 61–69, 78, 99–100, 113–80. That is enough to plausibly state a claim.

Clevinger insists that more is needed to establish that the noncompete is "reasonable," particularly given its nationwide geographic restriction, ECF 26-1 at 5–6, but his reliance on such a fact-intensive defense is misplaced in a motion to dismiss. True enough, "Delaware courts do not 'mechanically' enforce noncompetes," but instead "carefully review the covenants" to ensure they are both reasonable in scope and proportionate to the employer's legitimate interests. *See FP UC Holdings, LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020). But the question of whether any particular noncompete term is "reasonable" is context-dependent—the same restriction may be enforceable in one situation and unenforceable in the next. For example, Clevinger protests the nationwide geographic scope and one-year prohibitive period in his noncompete, but neither of these terms is per se unreasonable, especially given that Clevinger worked as a high-level executive. *See Del. Exp. Shuttle, Inc. v. Older*, No. Civ. A. 19596, 2002 WL 31458243, at *14 n.76 (Del. Ch. Oct. 23, 2002) ("[T]his Court has imposed reasonable time restrictions of two years or greater on agreements not to compete in the employment context."); *Rsch. & Trading Corp. v. Pfuhl*, No. Civ. A. 12527, 1992 WL 345465, at *11–12 (Del. Ch. Nov. 18, 1992) (upholding one-year noncompete with "no geographic limitation" for former senior officers). Clevinger's insistence that the allegations do not plausibly show the reasonableness of the noncompete is neither accurate given the many details in the amended complaint nor relevant at this early stage. The Court therefore **DENIES** Clevinger's motion to dismiss as to Count 1.

### 2.  *The Breach of Fiduciary Duty Claim Survives*

In Count 2, Advocacy Holdings alleges that Clevinger breached the fiduciary duty he owed to OCP as its CEO. ECF 12 ¶ 226. The Parties dispute whether Delaware or D.C. law governs this claim. *Compare* ECF 26-1 at 6, *and* ECF 60 at 11 & n.3. While the Court is persuaded that D.C. law would control in the event of a conflict of law because it appears to be the jurisdiction "with the most significant relationship" to this tort, *see Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n.2 (D.C. 1985), it is not clear there is a conflict to begin with, and Clevinger's arguments fail regardless. In either jurisdiction, a claim for breach of fiduciary duty requires a plaintiff to show "(1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of fiduciary duties." *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 120 (D.D.C. 2018); *accord Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

Advocacy Holdings has alleged sufficient facts to support a claim for breach of fiduciary duty for many of the same reasons it has stated a claim for breach of contract. As an officer of OCP, Clevinger was bound by fiduciary duties to not compete with, and certainly to not actively harm, his employer. *See Willens v. 2720 Wisconsin Ave. Co-op. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C. 2004). Nonetheless, he is alleged to have taken data for himself, destroyed OCP property, solicited OCP employees, and diverted OCP business to his own competing entities. ECF 12 ¶¶ 61–69, 78, 99–100, 113–80. That is enough to plausibly state a claim.

Clevinger's two principal arguments for dismissal fail. Though Clevinger concedes that he owed a fiduciary duty to OCP, he argues that (1) his fiduciary duty evaporated once he left the company and (2) his conduct prior to resignation was protected by a "privilege" shielding employees who "make preparations to compete." ECF 26-1 at 6–7. Clevinger's first argument

ignores the several allegations of misconduct while he was still CEO, and his second argument

misrepresents the law. Both Delaware and D.C. recognize a privilege to prepare to compete, but

both jurisdictions also recognize that this privilege is "by no means absolute" and does not permit

an employee to commit "wrongful act[s]" in the name of "preparation." *Sci. Accessories Corp. v.

Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980); *accord PM Servs. Co. v. Odoi Assocs.,

Inc.*, No. 03-cv-1810, 2006 WL 20382, at *28 (D.D.C. Jan. 4, 2006). Examples of non-privileged

conduct, notably, include "misuse of confidential information" and "solicitation of the firm's

customers." *PM Servs. Co.*, 2006 WL 20382, at *28. In other words, the exact conduct Clevinger

is alleged to have engaged in prior to resigning. *See, e.g.*, ECF 12 ¶¶ 61–67 (deleting OCP data);

*id.* ¶¶ 90–94 (diverting business from an OCP customer to SCS); *id.* ¶¶ 108–12 (soliciting director

of OCP to work at CiviClick). As for Clevinger's other alleged conduct, such as the formation of

competing entities in advance of his resignation, it is not as obvious whether such behavior is

"wrongful." However, because "[t]he ultimate determination" on this issue "must be grounded

upon a thoroughgoing examination of the facts of th[is] particular case," *Furash & Co., Inc. v.

McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001), the Court concludes that the claim—as a whole—

may proceed. The Court therefore **DENIES** Clevinger's motion to dismiss as to Count 2.

### 3.  *Both Tortious Interference Claims Survive*

In Counts 3 and 4, Advocacy Holdings alleges that Clevinger tortiously interfered with

OCP's contracts and prospective economic advantages by diverting customers away from OCP.

ECF 12 ¶¶ 233, 237. The Parties agree that D.C. law governs these claims. *See* ECF 26-1 at 8–9;

ECF 60 at 13–14. Under D.C. law, "[t]o prevail on a claim of tortious interference with contract,

a plaintiff must establish: (1) the existence of a contract, (2) defendant's knowledge of the contract,

(3) defendant's intentional procurement of the contract's breach, and (4) damages resulting from

the breach." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008). "[A] breach of contract is an essential element of the tort." *Id.* at 326. The elements of tortious interference with prospective advantage are the same, though "a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction." *Uzoukwu v. Metro. Washington Council of Gov'ts*, 983 F. Supp. 2d 67, 90 (D.D.C. 2013).

Advocacy Holdings has alleged sufficient facts to support both claims for tortious interference. It alleges that Clevinger represented to OCP customers that, for example, OCP was ceasing operations, CiviClick was the successor product to OCP, and Clevinger was authorized to transfer customers over to his new—competing—business. *See, e.g.*, ECF 12 ¶¶ 130–35, 201–06. Advocacy Holdings alleges that, as a result of Clevinger's conduct, many of its customers who had previously renewed subscriptions to OCP and represented an intention to do so then took their business to Clevinger's competing entities, at times even placing "stop payment[s]" on incoming "annual subscription check[s]" to OCP. *See* ECF 12 ¶¶ 136–41. It also alleges that at least one customer opted to "terminate" a two-year subscription agreement one year early. ECF 12 ¶ 153. That is enough to plausibly state a claim as to both versions of tortious interference.

Clevinger's arguments to the contrary are unpersuasive. As for tortious interference with breach of contract, Clevinger argues that "alleged non-renewal is not a *breach* of a contract." ECF 26-1 at 9. This is correct insofar as there are no allegations suggesting that OCP's subscription agreements imposed any obligation to renew after the subscription ended, but Clevinger ignores the allegation that he caused at least one customer to terminate a subscription early, before paying for the remaining, agreed-upon year of services, which plausibly alleges a breach of that agreement. *See* ECF 12-8; ECF 12 ¶ 153. As for tortious interference with prospective advantage, the allegations that customers had renewed their contracts previously and expressed an intention

to do so again plausibly establish a commercially reasonable expectation of economic advantage. *Contra* ECF 26-1 at 10–11. Moreover, Clevinger's alleged dishonesty when soliciting OCP customers goes beyond "[m]erely competing and winning over customers." *Contra* ECF 26-1 at 11. The Court therefore **DENIES** Clevinger's motion to dismiss as to Counts 3 and 4.

### 4. *Both Trade Secret Misappropriation Claims Survive*

In Counts 5 and 6, Advocacy Holdings alleges that Clevinger violated the federal Defend Trade Secrets Act (DTSA) and the D.C. Uniform Trade Secrets Act (DCUTSA) by misappropriating two of OCP's trade secrets: (1) its "contact lists" for customers, vendors, and suppliers, and (2) its "platform re-design plans." ECF 12 ¶¶ 250, 254. The elements of trade secret misappropriation are identical under federal and D.C. law. *Compare* 18 U.S.C. § 1839, *with* D.C. Code § 36-401. To bring a claim, "a plaintiff must demonstrate the existence of a trade secret that has been misappropriated." *Meyer Grp., Ltd. v. Rayborn*, No. 19-cv-1945, 2020 WL 5763631, at *4 (D.D.C. Sept. 28, 2020). "The threshold inquiry in every trade secret case is whether or not there is a trade secret." *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007). A trade secret includes any "financial, business, scientific, technical, economic, or engineering information" that "derives independent economic value . . . from not being generally known," so long as "the owner thereof has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3); *accord.* D.C. Code § 36-401(4). The existence of a trade secret is "generally a question of fact," which "ordinarily is best resolved by a fact finder after full presentation of the evidence from each side." *DSMC, Inc.*, 479 F. Supp. 2d at 78–79. A plaintiff must also allege misappropriation or misuse, that is, "disclosure or use of a trade secret without express or implied consent by a person who used improper means" such as "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(5)–(6); *accord.* D.C. Code § 36-401(2).

Advocacy Holdings has alleged sufficient facts to establish the two basic elements of trade secret misappropriation. First, it has plausibly alleged the existence of two trade secrets. "[N]umerous federal courts have held that customer lists . . . and other business information . . . can constitute 'trade secrets'" so long as the other statutory requirements are met. *Aristotle Int'l, Inc. v. Acuant, Inc.*, No. 22-cv-741, 2023 WL 1469038, at *7 (D.D.C. Feb. 2, 2023) (collecting cases). Both the alleged contact lists and platform redesign information meet those requirements. Advocacy Holdings alleges that OCP had "contact lists" that contained information about its customers, suppliers, and vendors "and their business dealings with OCP," ECF 12 ¶ 35, that it designated such information as confidential and limited its use as per Clevinger's noncompete, *id.* ¶¶ 50–52, 54, and that this information was "valuable," *id.* ¶ 62. As for the redesign plans, Advocacy Holding alleges that the company worked on a comprehensive reformatting of its online platform, *id.* ¶¶ 40–43, "product development and testing information," "computer hardware and software," and "research and development" were all deemed confidential as per Clevinger's noncompete, *id.* ¶¶ 50–52, 54, the outside software development firm that helped with the project was subject to a nondisclosure agreement as to these confidential plans, *id.* ¶ 45, and the plans were valuable and intended to remain secret prior to launch, *id.* ¶ 47.

Second, Advocacy Holdings has plausibly alleged that Clevinger misappropriated its trade secrets. This element is often established by "circumstantial evidence that creates an inference of misappropriation," given that "misappropriation and misuse can rarely be proved by convincing direct evidence." *Aristotle Int'l Inc.*, 2023 WL 1469038, at *9. The well-pled factual allegations plausibly show that Clevinger misappropriated or misused both the contact lists and platform redesign plans. Advocacy Holdings alleges that Clevinger had broad access to the confidential customer information, ECF 12 ¶ 36, he played an essential role in managing the redesign of the

online platform, *id.* ¶ 44, and he was under express duties to maintain the secrecy of all of the aforementioned information and not use it against OCP, *id.* ¶¶ 51–52, 54, but he impermissibly took extensive OCP information for himself when he resigned, *id.* ¶ 64, diverted or attempted to divert several former OCP customers to his new business the same month he resigned, *see generally id.* ¶¶ 113–206, and the online platform for Clevinger's competing business is almost identical to OCP's still undisclosed redesigned platform, *id.* ¶¶ 99–104. That is sufficient to plausibly state a claim for trade secret misappropriation as to both alleged trade secrets.

Clevinger's arguments that Advocacy Holdings has not sufficiently alleged the existence of a trade secret ignore the factual allegations in the amended complaint and misstate the law. For example, Clevinger complains of Advocacy Holdings' purported reliance "on a nebulous alleged contacts list" as a trade secret. ECF 26-1 at 15. But the amended complaint identifies, with particularity, Clevinger's decision to "export[] the OCP contacts associated with his OCP user/email account chazz@oneclickpolitics.com," after explaining that "user contacts include[] valuable customer, supplier, and vendor contact information." ECF 12 ¶¶ 62, 64. As Clevinger ought to be aware (given his reliance on the two opinions that state these principles), the question of whether client lists or customer information can be considered trade secrets "is an inherently fact dependent question," *Meyer Grp., Ltd.*, 2020 WL 5763631, at *4, and, in general, trade secrets "need be identified only with enough specificity to place a defendant on notice of the bases for the claim being made against it," *Aristotle Int'l, Inc.*, 2023 WL 1469038, at *8, *see also* ECF 26-1 at 12–13 (citing both *Meyer Group, Ltd.* and *Aristotle International, Inc.*). These allegations are sufficient to put Clevinger on notice of what information is at issue, and his "demand for further precision in the pleading is thus misplaced." *Aristotle Int'l, Inc.*, 2023 WL 1469038, at *8.

Clevinger's arguments challenging the misappropriation element fare no better. For example, he relies on *Howard v. Goodman* for the proposition that, as a managing employee, he could not have "acquired the information from the contact lists and website design by improper means." ECF 26-1 at 13, 15 (citing No. 20-cv-2187, 2022 WL 4464978, at *4 (D.D.C. Sept. 26, 2022)). Again, Clevinger ignores the ruling and reasoning of the case he relies upon, given that the *Howard* court went on to deny a motion to dismiss after holding that the allegations of trade secret misuse—which are both present here and plausibly supported by the facts alleged—were sufficient to establish a claim for misappropriation. *Howard*, 2022 WL 4464978, at *5. The Court therefore **DENIES** Clevinger's motion to dismiss as to Counts 5 and 6.

### 5. *The Computer Fraud and Abuse Act (CFAA) Claim Partially Survives*

In Count 7, Advocacy Holdings alleges that Clevinger violated the CFAA by accessing OCP computers, using the information on those computers to compete with OCP, and deleting OCP information to cause damage to OCP's database. ECF 12 ¶¶ 259, 261, 263. The CFAA is a criminal statute, but it also "provides a civil cause of action to 'any person who suffers damage or loss by reason of a violation' of the [Act]." *Lewis-Burke Assocs., LLC v. Widder*, 725 F. Supp. 2d 187, 191 (D.D.C. 2010) (quoting 18 U.S.C. § 1030(g)). In an action for damages such as this one, the plaintiff must plausibly allege both a violation of the CFAA and resulting loss (meaning "any reasonable cost to any victim, including the cost of responding to an offense") during a one-year period aggregating at least $5,000. 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (e)(11), (g).[4] Here, Advocacy Holdings alleges Clevinger "exceed[ed] authorized access" in violation of subsections (a)(2) and

---

[4] Many provisions of the CFAA only proscribe unauthorized access or harm to "protected computer[s]." *See, e.g.*, 18 U.S.C. §§ 1030(a)(2)(C). However, "protected computer[s]" include those "used in or affecting interstate or foreign commerce or communication," *id.* § 1030(e)(2)(B), and "[c]ourts have agreed that effectively all computers with Internet access constitute protected computers under this broad definition," *New Touch Digital Inc. v. Cabral*, No. 20-cv-1878, 2020 WL 5946067, at *2 (D.D.C. Oct. 7, 2020) (collecting cases). Advocacy Holdings has alleged that OCP computers are protected computers under this definition, ECF 12 ¶ 256, and Clevinger does not contest that allegation in his motion to dismiss.

(a)(4) by intentionally accessing OCP computers and "us[ing] the information [therein] to compete with OCP," accessed OCP computers "without authorization and caused damage" in violation of (a)(5)(C) by "delet[ing] OCP data," and knowingly transmitted "a program, information, code, or command" to "intentionally cause damage without authorization" to an OCP computer in violation of subsection (a)(5)(A) through the same data deletion. ECF 12 ¶¶ 257–68.

Advocacy Holdings has failed to state a claim for violations of (a)(2), (a)(4), or (a)(5)(C) based on Clevinger's alleged access to OCP information in a manner that was "unauthorized" or "exceed[ed] authorized access." *See* 18 U.S.C. § 1030(a)(2), (a)(4), (a)(5)(C). Advocacy Holdings argues that Clevinger "did not have authority to log in to OCP computers for the purpose of . . . exporting detailed customer information for use with his competing companies," but otherwise concedes that he "[o]f course" had authorization to log onto OCP computers and access the information therein while working as CEO. ECF 60 at 17. As Clevinger points out, this concession is fatal. *See* ECF 72 at 5. For one, subsection (a)(5)(C) captures "access . . . without authorization" but does not even mention "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(5)(C). Subsections (a)(2) and (a)(4), in contrast, do cover those who "exceed[] authorized access," but that phrase only captures those who "obtain information from particular areas in the computer— such as files, folders, or databases—to which their computer access does not extend." *See Van Buren v. United States*, 593 U.S. 374, 378 (2021). That language "does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *Id.* In other words, if Clevinger was authorized to retrieve the information at issue, then he had authorized access and did not "exceed authorized access . . . even [if] he obtained the information from the database for an improper purpose." *Id.* at 396; *see also Lewis-Burke Assocs., LLC*, 725 F. Supp. 2d at 194 ("Exceeds authorized access should not be confused with exceeds authorized use.").

However, Advocacy Holdings has alleged sufficient facts to support its claim under subsection (a)(5)(A). This provision "has nothing to do with mere access," but instead punishes those who "intentionally cause damage without authorization." *New Touch Digital Inc.*, 2020 WL 5946067, at *2 (quoting 18 U.S.C. § 1030(a)(5)(A)). And "damage" includes "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). For the purposes of Advocacy Holdings' (a)(5)(A) claim then, it is irrelevant whether Clevinger was allowed to access the information—all that matters is whether he was authorized to delete information or otherwise make it more difficult for others to access. *See New Touch Digital Inc.*, 2020 WL 5946067, at *2. According to Advocacy Holdings, he was not. The amended complaint alleges that Clevinger acted without authorization when he deleted multiple OCP user accounts (including his own) and all the "email, files, calendar entries, and contacts" along with them. ECF 12 ¶¶ 62–66; 262–63. It also alleges that Clevinger left his OCP laptop "destroyed internally and inoperable," which made it "difficult to ascertain the full extent" of what Clevinger had done. *Id.* ¶ 67. And it alleges that OCP spent resources remedying the harm caused by Clevinger's misconduct, causing losses in excess of $5,000. *Id.* ¶¶ 69, 267–68. That is sufficient to plausibly state a claim for a violation of subsection (a)(5)(A) of the CFAA.

Clevinger has no substantive response to Advocacy Holdings' claim under subsection (a)(5)(A) other than to label the amended complaint's allegations as "conclusory" and argue that he is not "the computer hacker that the CFAA was designed to protect against." ECF 26-1 at 17–18. But neither his mischaracterization of the allegations in the amended complaint nor his generic policy argument is persuasive. *See New Touch Digital Inc.*, 2020 WL 5946067, at *2 ("[B]road overtures to statutory purpose cannot narrow the CFAA's plain text."). The Court therefore

**GRANTS** Clevinger's motion to dismiss as to any claims under (a)(2), (a)(4), and (a)(5)(C) of the CFAA and otherwise **DENIES** the motion as to Count 7.

### 6. Both Lanham Act Claims Survive

In Counts 8 and 9, Advocacy Holdings alleges that Clevinger has infringed its federally registered trademark, "OneClickPolitics," and engaged in unfair competition through false designation of origin, in violation of the Lanham Act. ECF 12 ¶¶ 270, 277. These claims arise under 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), respectively, both of which "are measured by the same standards under the Lanham Act, although the former section requires registration of the mark at issue, while the latter does not." *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 29 (D.D.C. 2008). To prevail on trademark infringement and false designation of origin claims, "a plaintiff must allege that [it] owns a valid trademark, that [the mark] is distinctive or has acquired a secondary meaning, and that there is a likelihood of confusion." *Potter v. Toei Animation Inc.*, 839 F. Supp. 2d 49, 53 (D.D.C. 2012), *aff'd*, No. 12-5084, 2012 WL 3055990 (D.C. Cir. July 18, 2012). The question of trademark distinctiveness and likelihood of confusion "are questions of fact." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 743 F. App'x 457, 464 (D.C. Cir. 2018); *Globalaw Ltd. v. Carmon & Carmon Law Off.*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006) (quoting *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)).

Advocacy Holdings has alleged sufficient facts to support its Lanham Act claims. It alleges that its trade name "OneClickPolitics" is a federally registered trademark. ECF 12 ¶¶ 19, 105; ECF 12-15. It alleges that it has used the mark for ten years, the mark is associated with a multimillion-dollar business, it has "buil[t] a strong and reputable brand" using the mark, and the mark is specifically registered for use in the digital advocacy space. *See* ECF 12 ¶¶ 19–21. It

alleges that Clevinger established CiviClick as a competing entity offering similar services, using a virtually identical online platform, to the same customers. *See id.* ¶¶ 3–4, 95–100, 104, 106–12. And it has alleged that Clevinger, who formerly managed all of OCP's Google Adwords marketing, *id.* ¶ 36, not only set up a Google-sponsored ad result for CiviClick's website with a hyperlink including the exact words, "One Click Politics," *id.* ¶ 105, but also told customers that CiviClick was a "new" or "successor" product of OCP, *id.* ¶¶ 203–04. That is sufficient to plausibly state claims for infringement and false designation of origin under the Lanham Act.

Clevinger offers three arguments for dismissal, one that he appears to abandon in his reply brief and two others that, as Clevinger has done for other counts, ask this Court to dive into a fact-bound analysis that has no place at the motion to dismiss stage. First, he argues that Advocacy Holdings lacks standing because it "does not even own the trademark, ONECLICKPOLITICS, as that trademark is owned by 'Red Chalk Group, LLC.'" ECF 26-1 at 18. This assertion contradicts the well-pled factual allegations in the amended complaint (which the Court must take as true), ECF 12 ¶ 19, and public records from the U.S. Patent and Trademark Office showing that, as Advocacy Holdings points out, the mark was assigned to Advocacy Holdings while Clevinger was still CEO, *see* Trademark Assignment Search, USPTO (last visited July 9, 2024), https://assignment.uspto.gov/trademark/index.html#/trademark/search/resultAbstract?id=889771 52&type=serialNum; *see also* ECF 60-1 (screenshot of the same, listing recorded assignment date as June 23, 2020). Clevinger seems to concede this in his reply. *See* ECF 72 at 5–6. He nonetheless presses forward to argue that the allegations do not support a likelihood of confusion, but he does nothing more than argue facts that would require this Court to disregard Advocacy Holdings' allegations (and all favorable reasonable inferences drawn from them) and instead adopt his preferred interpretation. *See* ECF 26-1 at 20–23. The well-pled facts speak for themselves:

Clevinger is alleged to have used a near-identical version of Advocacy Holdings' registered mark in association with his competing business in the same industry. The amended complaint provides well-pled factual allegations—not "far-fetched pontification[s]"—that plausibly support what is a quintessential claim for trademark infringement and false designation of origin. *Contra* ECF 72 at 5–6. The Court therefore **DENIES** Clevinger's motion to dismiss as to Counts 8 and 9.

### 7.  *The D.C. Unfair Trade Practices Claim is Dismissed*

In its tenth and final count, Advocacy Holdings alleges that Clevinger engaged in unfair trade practices in violation of the D.C. Consumer Protection Procedures Act (CPPA) through his unauthorized use of the OCP mark. ECF 12 ¶ 287. As Clevinger points out, however, the CPPA "applies only to consumer-merchant relationships," *Busby v. Capitol One, N.A.*, 772 F. Supp. 2d 268, 279 (D.D.C. 2011), and only authorizes suits by consumers themselves or certain organizations acting on behalf of consumers, *see* D.C. Code § 28-3905(k)(1). Advocacy Holdings concedes that it is not a consumer of Clevinger's products or services, but nonetheless argues that it qualifies as a "public interest organization" and therefore may "bring an action on behalf of digital political advocacy consumers." ECF 60 at 21 (citing D.C. Code § 28-3905(k)(1)(D)). This argument contradicts the plain text of the CPPA, which defines "public interest organization" as: "a nonprofit organization that is organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers." D.C. Code § 28-3901(a)(15). No allegations suggest that OCP is a public interest organization. In fact, the allegations seem to clearly establish that it is not. *See* ECF 12 ¶¶ 7, 17–21 (describing OCP as "a corporation" that "generat[ed] over $10 million in revenue" by "selling access to its subscription-based online advocacy platform"). The Court therefore **GRANTS** Clevinger's motion to dismiss as to Count 10.

### B.  Clevinger's Claims & Advocacy Holdings' Motion to Dismiss

In case no. 23-cv-1159, Chazz Clevinger sues Advocacy Holdings, Inc.; Red Chalk Group, LLC; John Koepke; and Raymond Zenkich (collectively, Advocacy Holdings). ECF 29. Clevinger asserts the following claims: assault (Count 1); wrongful termination in violation of public policy (Count 2); malicious prosecution and abuse of process (Counts 5–6); fraudulent inducement, fraudulent concealment, and negligent misrepresentation (Counts 7–12); breach of contract (Counts 13–14); unjust enrichment (Counts 15–18); wage theft and denial of paid vacation under D.C. Code §§ 32-1303, 32-531.02, and 32-531.10b (Counts 20–22); breach of fiduciary duty (Counts 23–24); unpaid equity distributions (Count 26); and breach of the implied duty of good faith and fair dealing (Counts 27–28). ECF 29 ¶¶ 264–88, 334–525, 534–70, 584–600. He also seeks a declaratory judgment holding the noncompete unenforceable under Delaware and D.C. law (Counts 3–4); a declaratory judgment holding that he is entitled to "Class A stock" and a "voting interest" proportionate to his $46,000 in capital contributions (Count 19); and an equitable accounting of Advocacy Holdings' financial records (Count 25). ECF 29 ¶¶ 289–333, 526–33, 571–83.[5] This Court has subject matter jurisdiction under 18 U.S.C. § 1332 because there is complete diversity between the Parties and the amount in controversy exceeds $75,000. ECF 29 ¶¶ 6–11. After considering Advocacy Holdings' motion to dismiss, the Court concludes that most of Clevinger's claims must be dismissed and will explain the basis for its holding below, taking each claim in the order it was asserted.

---

[5] The Parties agree that D.C. law controls almost all of the state common law claims in Clevinger's amended complaint. *See, e.g.*, ECF 63-1 at 3 n.5; ECF 73 at 13. As such, unless otherwise specified, the Court will resolve the motion under District of Columbia law.

1. ***The Assault Claim Survives***

In Count 1, Clevinger alleges that Koepke "assaulted [him] on January 17, 2023[,] by threatening to beat up [Clevinger] . . . [and] ma[king] contemporaneous aggressive and threatening physical gestures toward [him]." ECF 29 ¶ 265. Under District of Columbia law, an individual has committed assault if (1) they acted with intent to cause imminent harmful or offensive contact or the apprehension of such a contact, (2) the victim is thereby put in such imminent apprehension, and (3) the victim's apprehension is objectively reasonable. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014) (discussing D.C. law).

Clevinger has alleged sufficient facts to support each element of assault. He alleges that "Koepke intended to cause Clevinger immediate apprehension of physical harm" when he stated he was "going to beat up on [Clevinger]" and "may as well use a baseball bat," and at the same time made a "physically threatening gesture" consisting of a "lunge[] forward at [Clevinger]." ECF 29 ¶¶ 201–03, 206–07, 271. He alleges that this occurred while Koepke, an individual who "appeared under pressure" and "ang[ry]," was "within striking distance," and that Koepke's conduct placed Clevinger in "apprehension that such harmful and offensive contact was imminent." ECF 29 ¶¶ 206, 269. This is sufficient to state a claim for assault.

Koepke's arguments to the contrary are unpersuasive. His first argument that Clevinger "pleads himself out of an assault claim" by alleging that he feared an attack "either that evening or at some point in the near future," ECF 63-1 at 4 (quoting ECF 29 ¶ 211), is incorrect. If Clevinger had stated only that he feared an attack "at some point in the near future," the Court would be inclined to agree with Koepke's position. However, the amended complaint alleges that the assault itself took place "in the evening," ECF 29 ¶ 201, and thus an apprehension of an attack "that evening," *id.* ¶ 211, is consistent with Clevinger's express allegation that he was in apprehension

of an "imminent" attack, *id.* ¶ 269. Moreover, while Koepke may well be able to demonstrate that Clevinger's allegations are "totally false," or that other circumstantial evidence (or lack thereof) will prove that "Clevinger's alleged feelings . . . were not objectively reasonable," ECF 63-1 at 5, the Court must take the allegations in the amended complaint as true and draw all reasonable inferences in favor of Clevinger. The Court therefore **DENIES** Advocacy Holdings' motion to dismiss as to Count 1.

### 2. *The Wrongful Termination Claim is Dismissed*

In Count 2, Clevinger alleges that Advocacy Holdings wrongfully terminated him in violation of public policy under D.C. law by causing his "constructive termination" in response to Clevinger's "refusal to engage in invidious discrimination." *See* ECF 29 ¶¶ 280–82; ECF 73 at 17. In a footnote, Advocacy Holdings argues that because Clevinger filed a complaint with the D.C. Office of Human Rights (OHR) based on similar allegations, he cannot sustain his wrongful termination claim in this Court. ECF 63-1 at 6 n.7. Because courts in this District have construed the rule of mutual exclusivity between "the court[s] and [the] OHR" as a jurisdictional issue, *see, e.g.*, *Burton-Barrett v. Gilead Scis., Inc.*, 640 F. Supp. 3d 152, 157 (D.D.C. 2022), the Court will address this argument first.

Upfront, the Court concludes that Clevinger's tort claim for wrongful termination is separate from his claims before the OHR, and therefore this Court may address the merits of his wrongful termination claim. Under D.C. law, a plaintiff must "choose between an administrative or a judicial forum in which to pursue their claims." *Adams v. District of Columbia*, 740 F. Supp. 2d 173, 189 (D.D.C. 2010); *see* D.C. Code § 2-1403.16(a) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction . . . unless such person has filed a complaint [with the OHR]."). As such, a court must

dismiss claims under the D.C. Human Rights Act (DCHRA) when the same claims are pending before the OHR. *See, e.g.*, *Ruffin v. District of Columbia*, 662 F. Supp. 3d 1, 7–8 (D.D.C. 2023). Here, Clevinger did submit a charge of discrimination with the OHR on May 31, 2023, ECF 29 ¶ 260, and that charge appears to contain virtually identical allegations as the ones in his amended complaint before this Court, *see* ECF 63-2. However, Clevinger's present lawsuit in tort (for wrongful termination) is distinct in kind from his charge with the OHR under the DCHRA (for discrimination based on "personal appearance" and "marital status," which are protected traits under D.C. Code § 2-1402.11(a)). *See* ECF 63-2; *cf. Taylor v. WMATA*, 109 F. Supp. 2d 11, 17–18 (D.D.C. 2000) (distinguishing between "common law tort of wrongful demotion in retaliation for an alleged whistleblowing act" and separate "violat[ions] of the DHCRA" arising out of the same demotion). That is to say, while the line between his two sets of claims may be thin, D.C. law does not prevent him from "maintain[ing] an action in this Court while [his OHR proceeding] is pending." *Contra* ECF 63-1 at 6 n.7.

That said, Clevinger's allegations do not support a claim for wrongful termination in violation of public policy and must be dismissed. In the District of Columbia, "it is a general rule that 'an employer may discharge an at-will employee at anytime and for any reason, or no reason at all.'" *Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 136 (D.D.C. 2004) (quoting *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 30 (D.C. 1991)). To state a claim under the narrow "public policy" exception, "the plaintiff must show that he (1) engaged in a protected activity, i.e., refused to violate the law; (2) the employer took an adverse personnel action against him [namely, termination]; and (3) there was a causal connection between the two." *Id.* at 137. And while employees may show that their resignation—which would generally be presumed voluntary—was in fact a "constructive discharge" and may support a claim for wrongful termination, *see Aliotta v.*

*Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010), simply invoking the words "constructive discharge," without more, will not carry an otherwise insufficient complaint over the line of plausibility, *see Iqbal*, 556 U.S. at 678. Rather, a plaintiff must allege facts plausibly establishing "discriminatory intimidation, ridicule, and insult" that is so severe or pervasive as "to alter the conditions of the victim's employment," *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008), *and* "the existence of certain 'aggravating factors' . . . that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job," *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006).

While Clevinger may have arguably alleged sufficient "aggravating factors" to plausibly establish constructive discharge, *see, e.g.*, ECF 29 ¶¶ 201–16 (describing assault and threats to terminate Clevinger), the Court agrees with Advocacy Holdings' argument that he fails to allege that he engaged in any protected activity in the first place, *see* ECF 63-1 at 6–7, 9–10. The public policy exception to the general rule of at-will employment requires a plaintiff to engage in "an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing his job." *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 6 (D.D.C. 2002). Yet all Clevinger offers to support his purported "refusal to engage in unlawful discrimination" are conclusory statements that Advocacy Holdings had some (undefined) "discriminatory policies," made vague statements about "excessive employment risk," and responded negatively to Clevinger emailing a link about a D.C. law on noncompetes. *See* ECF 29 ¶¶ 58–59, 114. The sole allegation that comes close to showing that Clevinger was ever instructed to violate the law is one instance where Koepke told Clevinger that he "need[ed] to stop hiring people from protected classes" on March 20, 2022. ECF 29 ¶ 136. The problem is that Clevinger never alleges that he subsequently "refused" that instruction by hiring anyone "from [a] protected

class" or by doing anything else contrary to the instruction. At bottom, Clevinger fails to allege a single instance when he defied an order from his employer to violate the law.

Even if Clevinger engaged in protected activity, Advocacy Holdings is also correct to note that his allegations do not plausibly connect his protected conduct to his "termination." ECF 63-1 at 9–10. To state a claim for wrongful termination in violation of public policy, Clevinger must provide sufficient well-pled facts to show that his protected actions were at least "the 'predominant cause' of his termination." *Craig v. Not for Profit Hosp. Corp.*, 626 F. Supp. 3d 87, 106–07 (D.D.C. 2022). But the Court fails to see a connection between Clevinger allegedly hiring minorities in December 2019 (which he stopped doing after receiving the aforementioned "instruction" from Koepke anyway) or his statement about noncompete law in June 2021, ECF 29 ¶¶ 67, 113, and his resignation years later in 2023, which was allegedly brought about in large part by his employer making negative comments about his eating habits, personal appearance, and marital status, *id.* ¶¶ 112–14, 116, 173–74, 197, 199. As a matter of temporal proximity and common sense, Clevinger's allegations come nowhere close to plausibly establishing that any "protected" conduct was the "predominant cause" of his termination. *See Craig*, 626 F. Supp. 3d at 107. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Count 2.

### 3.   *The Declaratory Judgment Claims Regarding the Noncompete are Dismissed*

In Counts 3 and 4, Clevinger asks this Court to declare the noncompete unenforceable under both Delaware and D.C. law. ECF 29 ¶¶ 319, 333. Under the Declaratory Judgment Act, this Court may enter a declaratory judgment "[i]n a case of actual controversy within its jurisdiction," 28 U.S.C. § 2201(a), if the party seeking relief shows (1) existence of an actual substantial controversy, (2) involving interested parties with adverse legal interests, which (3) warrants the issuance of a declaratory judgment, *Glenn v. Thomas Fortune Fay*, 222 F. Supp.

3d 31, 35 (D.D.C. 2016). The Declaratory Judgment Act "confers discretion on the courts rather than an absolute right upon the litigant," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995), and requests for declaratory relief may be dismissed "when those claims are duplicative or redundant of other claims," *Morinville v. U.S. Patent & Trademark Off.*, 442 F. Supp. 3d 286, 296 (D.D.C. 2020). The same is true of declaratory counterclaims that duplicate a litigant's defenses. *See Malibu Media, LLC v. Parsons*, No. 12-cv-1331, 2013 WL 12324463, at *9–10 (D.D.C. May 31, 2013). After all, a declaratory judgment is only "useful" in situations "involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." 21 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (4th ed. 2023).

Clevinger's declaratory judgment claims are no more than repackaged versions of his defense to Advocacy Holdings' breach of contract claim, and the Court agrees with Advocacy Holdings that there is no need to rule on his parallel, duplicative claims. *See* ECF 77 at 6. Clevinger's sole basis for requesting declaratory relief is that he thinks the noncompete is unenforceable, ECF 73 at 20–21, which is the same argument he relies on to defend Advocacy Holdings' breach of contract claim, *see* ECF 26-1 at 5–6; ECF 72 at 2–3. The Court agrees with Clevinger that there is an actual, substantial controversy between the Parties as to the enforceability of the contract, but there is also already a pending lawsuit against Clevinger that requires resolution of that issue. This is not a situation where "a party who could sue for coercive relief has not yet done so" and a declaratory judgment is the only way to clarify the rights of a would-be defendant. *See* Wright & Miller, Federal Practice and Procedure § 2751. Clevinger *is* a defendant—here and now—and the Court sees no reason to move forward with his redundant counterclaims.

There is an additional basis to dismiss Clevinger's claim for relief under D.C. law in particular. Clevinger asks for a declaration that his noncompete is unenforceable under "the D.C. Non-Compete Clarification Amendment Act of 2022." ECF 29 ¶ 326. Yet as the name of the Act suggests (and as Advocacy Holdings points out), this Act regulates noncompetes executed in 2022, specifically "on or after October 1, 2022." D.C. Code §§ 32-581.02(a)(2), 32-581.03(a); ECF 63-1 at 14. That alone precludes Clevinger's claim that this law nullifies (let alone applies to) a noncompete he signed in July 2020. *See* ECF 29 ¶ 89. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 3 and 4.

### 4. *The Malicious Prosecution and Abuse of Process Claims are Dismissed*

In Counts 5 and 6, Clevinger alleges that Advocacy Holdings engaged in malicious prosecution and abuse of process by filing its lawsuit in the Eastern District of Virginia despite "know[ing] that [Clevinger] resides in the District of Columbia." ECF 29 ¶¶ 337, 401. Malicious prosecution has four elements: (1) the underlying suit terminated in the plaintiff's favor, (2) malice on the part of the defendant, (3) lack of probable cause for the underlying suit, and (4) special injury caused by the action. *Tyler v. Central Charge Serv., Inc.*, 444 A.2d 965, 968 (D.C. 1982). Abuse of process has two elements: (1) an ulterior motive, and (2) a perversion of the judicial process and achievement of an end "not regularly or legally obtainable." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).

Clevinger's claim of malicious prosecution cannot proceed. Again, the only basis for his claim is that Advocacy Holdings filed a complaint "containing perjury" about his residence "in the United States District Court for the Eastern District of Virginia." ECF 29 ¶ 345. He therefore defines "the underlying suit" as the one that started in Virginia, was transferred here, and will now advance to discovery on nine of the ten counts filed against him. But the Court does not understand

Clevinger's insistence that a lawsuit he is currently defending "was dismissed in [his] favor," let alone "terminated" at all. ECF 29 ¶¶ 335, 382; ECF 73 at 11. Because there is no cause of action for "malicious filing of a complaint in an adjacent venue for a still-pending case," Clevinger's claim for malicious prosecution must be dismissed.

Clevinger's claim for abuse of process, based on almost identical allegations, fails for largely the same reasons. Clevinger has not alleged any perversion in the judicial process. That is, even crediting his allegations that Advocacy Holdings filed its lawsuit in Virginia with the ulterior motive of "unlawfully obstruct[ing] [Clevinger's] lawful pursuit of his chosen profession," ECF 29 ¶ 404, which the Court is required to do at this stage, there are no well-pled allegations supporting Clevinger's insistence that Advocacy Holdings gained something "not regularly or legally obtainable" by filing this suit in Alexandria, *see Morowitz*, 423 A.2d at 198. Notably, Clevinger takes the bold step of accusing Advocacy Holdings' service agent of a felony, alleging that the agent impersonated a federal officer by "showing [Clevinger's] building manager a fake FBI badge." ECF 29 ¶¶ 411–14. Despite the lofty accusation, however, Clevinger makes no attempt to connect this alleged crime with the achievement of some "end not contemplated in the regular prosecution of the charge." *Morowitz*, 423 A.2d at 198. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 5 and 6.

### 5. *The Fraud/Mistake Claims Survive*

In Counts 7 through 12, Clevinger alleges that Advocacy Holdings engaged in fraudulent inducement, fraudulent concealment, and negligent misrepresentation by intentionally misleading Clevinger with promises that he would receive "founders shares" in Advocacy Holdings and would be made a formal officer and director of the company, which he relied on by signing the noncompete agreement, working for Advocacy Holdings, and contributing $46,000 to the

34

company. *E.g.*, ECF 29 ¶¶ 427–30. To state a claim for fraudulent misrepresentation or fraud in the inducement, a plaintiff "must prove (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken . . . in reliance upon the representation, (6) which consequently resulted in provable damages." *Keister v. AARP Benefits Comm.*, 410 F. Supp. 3d 244, 259 (D.D.C. 2019). Negligent misrepresentation requires largely the same showing plus a "duty to disclose," although allegations of "not only [negligent] omissions but also [intentionally] false statements" obviate the need to "allege a duty to disclose." *Heyer v. Schwartz & Assocs. PLLC*, 319 F. Supp. 3d 299, 307 (D.D.C. 2018). Additionally, fraudulent inducement to enter a contract in particular requires proof that the misrepresentation related to an "essential term of [the] contract" and was a "material factor in inducing [the plaintiff] to sign [the] contract." *Haynes v. Kuder*, 591 A.2d 1286, 1290 n.5 (D.C. 1991).

Claims of fraud and mistake are held to a higher pleading standard. Under Federal Rule of Civil Procedure 9(b), "when a plaintiff alleges fraud or negligent misrepresentation . . . the complaint must 'state with particularity the circumstances constituting the fraud or mistake,'" meaning the plaintiff must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the United States*, 258 F. Supp. 3d 1, 12 (D.D.C. 2017). Rule 9(b) does not abrogate the general pleading standard of Rule 8, but "simply requires the pleader to provide a higher degree of notice" regarding the alleged fraud. *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004). And while the complaint must allege "the 'who, what, when, where, and how' with respect to the circumstances of the fraud," *id.*, the speaker's

"malice, intent, knowledge, and other conditions of [their] mind may be alleged generally," Fed. R. Civ. P. 9(b).

Clevinger describes—with particularity—at least two concrete, false promises of future behavior that plausibly constitute intentionally deceptive misrepresentations of material fact upon which he relied. Advocacy Holdings promised to give Clevinger "founders shares in Advocacy Holdings" and make him "a named officer and director." ECF 29 ¶¶ 424–25. While many of the alleged promises are so vague that it is unclear which corporate entity (i.e., Advocacy Holdings, Inc. or Red Chalk Group, LLC) they related to, others are described with sufficient detail. At one point, for example, Advocacy Holdings "reiterated [a] promise . . . to convey 'founders shares' of equity of at least 10% and up to 25% of the 'whole company'" and to make him an "'officer and director' of the company," this time "referring to a corporate form, other than Red Chalk" (i.e., Advocacy Holdings, Inc.). ECF 29 ¶¶ 49–55. This is alleged to have occurred "[o]n December 20, 2018," during an "in-person meeting" between "[Clevinger], Koepke, and Zenkich . . . between 9:00 am and 2:00 pm at the Red Chalk office . . . [in] Chicago." *Id.* ¶ 49. Other, related promises are similarly described with the "who, what, where, when, and how" necessary to satisfy Rule 9(b). *See Anderson*, 221 F.R.D. at 253; ECF 29 ¶¶ 61–62, 72, 77. Clevinger adds that these promises were made with the intent to deceive and no intent to perform. *E.g.*, *id.* ¶¶ 55–56, 63, 78, 428, 450–51. And Clevinger alleges that these misrepresentations were material and caused him harm—he would not have "signed the noncompete agreement, continued working for Advocacy Holdings . . . [or] contributed $46,000" to the company if he knew the promises were false. *E.g.*, *id.* ¶ 430. That is sufficient to support the fraud claims Clevinger asserts.

Advocacy Holdings' first of three defenses is that the statute of limitations bars Clevinger's fraud and mistake claims, ECF 63-1 at 19–20, but the allegations in Clevinger's amended

complaint do not compel that conclusion. The limitations period for fraud claims is three years from the point at which a plaintiff "has either actual or inquiry notice of (1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Drake v. McNair*, 993 A.2d 607, 617 (D.C. 2010) (citing, *inter alia*, D.C. Code § 12-301(8)). Advocacy Holdings argues that, in December 2019, any promise of equity was disavowed when Koepke stated, "I know that we promised 25% of the company, but realistically we might only be able to give you 10–15%." ECF 29 ¶ 74 (cited in ECF 63-1 at 20). True enough, Koepke's statement is inconsistent with any guarantee of equity in the exact amount of "25%," but it is still consistent with a promise of "at least 10%" equity in the form of "founders shares." *Compare* ECF 29 ¶ 74, *with id.* ¶ 50. That is to say, if Clevinger relied on the promise of "founders shares" somewhere in the range of 10–25%, which is precisely what he alleges, then Koepke's statement in December 2019 would not put him on "actual notice" that the promise was false. *Contra* ECF 63-1 at 20. Instead, it appears that Clevinger was not on notice until one year later, on December 7, 2020, when Koepke told Clevinger, "our lawyer said only Ray [Zenkich] and I can have Class A shares as founders [and] [y]ou will get Class B shares." ECF 29 ¶ 103. While that statement, as discussed below, is fatal to some of Clevinger's other claims, it does not render his lawsuit untimely. To the extent Advocacy Holdings argues in the alternative that "[Clevinger] was, at the very least, on inquiry notice," ECF 77 at 9, that determination requires "a highly factual analysis" that, at least on this record, is premature, *see Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996). This Court, like many others, is "hesita[nt] to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint," *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996), and does not find a sufficient basis to do so here.

Advocacy Holdings next argues that Clevinger fails to state a claim for fraud because "[a] fraud claim must rest on a misrepresentation of fact, and not on oral promises of future behavior," ECF 63-1 at 21, but the law is more nuanced than Advocacy Holdings suggests. At least two key principles mediate the relationship between mere breach of contractual obligations (or broken promises generally) on one hand, and intentional fraud on the other. First, although "[g]enerally, a cause of action for fraud will not lie for misrepresentations as to future promises or facts . . . [an] exception to this rule is made for cases in which, at the time the promise was made, the promisor had 'an intent not to perform the promised act.'" *Shear v. NRA*, 606 F.2d 1251, 1259 n.39 (D.C. Cir. 1979). To be clear, "[t]he mere breach of a promise is never enough to establish the fraudulent intent" in and of itself, but a factfinder may infer intent "from the circumstances, such as . . . repudiation of the promise soon after it is made . . . [a] failure to even attempt any performance, or [providing] continued assurances after it is clear that [the promisor] will not [perform]." *Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1234–35 (D.C. 2005). Consistent with Rule 9(b), however, which permits "conditions of a person's mind [to] be alleged generally," courts reviewing motions to dismiss tend to credit allegations of intent to not perform rather than dive into a searching review of the "circumstances" surrounding the fraud. *See, e.g.*, *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 108 (D.D.C. 2010). Second, lest all claimants be incentivized to seek punitive damages in what is better characterized as a contract or quasi-contract issue, fraud claims must be based on "an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for [or otherwise promised] benefit." *See Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 136 (D.D.C. 2018). This "separate harm" may include, for example, "enter[ing] a contract . . . that [one] would not have otherwise," *id.* at 137, or incurring unnecessary costs in maintaining a harmful business

relationship that would have been abandoned if not for repeated false promises of compliance, *see Ludwig & Robinson, PLLC v. BiotechPharma, LLC*, 186 A.3d 105, 114 (D.C. 2018).

As described in the amended complaint, Advocacy Holdings' broken promises plausibly constitute misrepresentations of material fact supporting claims for fraud. Not only are the circumstances and content of the statements described with particularity, but Clevinger alleges that they were made with deceitful intent, knowledge of falsity, and no intent to perform. *E.g.*, ECF 29 ¶¶ 450–51. That is all Rule 9(b) requires, but even if more were needed, the Court would find that Advocacy Holdings' repeated assurances in response to Clevinger's requests for performance plausibly support an inference of fraudulent intent sufficient to transform a mere broken promise into a material misrepresentation of fact. *See, e.g.*, ECF 29 ¶¶ 49–55, 61–62, 64, 70, 72, 77. Clevinger also alleges harm that is independent of his disappointment in not receiving founders shares or becoming a formal officer and director of the company: he entered a noncompete, continued to work for Advocacy Holdings, and contributed $46,000 to the company. *E.g.*, *id.* ¶ 430. To the extent Advocacy Holdings takes issue with the fraudulent inducement claim for entering the noncompete in particular, the Court is not convinced that the promises of equity or leadership are as unrelated to the terms of the noncompete as Advocacy Holdings suggests. *See* ECF 77 at 10. After all, Advocacy Holdings recognizes that Clevinger's "continued employment" was the sole "consideration" for his noncompete, ECF 63-1 at 11, and the Court finds it plausible, if not common sense, that his "continued employment" would be more valuable and thus worth entering a restrictive noncompete agreement if he believed he was entitled to higher status, recognition, and ownership of the company.

Advocacy Holdings' final argument for dismissal is that Clevinger fails to establish that he reasonably relied on any promise, ECF 63-1 at 22, but this argument falls flat as well. Advocacy

Holdings relies on the aforementioned statement from December 2019 regarding the possibility that he would receive less than 25% equity as proof that his reliance on *any* promise of equity was unreasonable. *Id.* Yet, as discussed, the December 2019 statement is consistent with the promise of "founders shares" upon which Clevinger relied. *Id.* Granted, the unequivocal statement *one year later* that Clevinger would "get Class B shares" and that "only [Zenkich] and [Koepke] c[ould] have Class A shares as founders," ECF 29 ¶ 103, may well foreclose any reasonable reliance on an expectation of "founders shares" at any point thereafter. At bottom, however, the "reasonableness of . . . reliance upon a misrepresentation is a question of fact, for which disposition by pre-trial motion is generally inappropriate." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 48 (D.C. Cir. 2014) (quoting *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987)). Although the reasonableness of Clevinger's reliance does not jump off the pages of his amended complaint by any means, it does not strike the Court as implausible. The Court therefore **DENIES** Advocacy Holdings' motion to dismiss as to Counts 7 through 12.

### 6.  *The Breach of Contract Claims are Dismissed*

In Counts 13 and 14, Clevinger alleges that Advocacy Holdings and Koepke breached oral contracts with Clevinger by failing to make good on the promises to give him founders shares in Advocacy Holdings and make him a formal officer and director in the company. Breach of contract requires "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Butler v. Enter. Integration Corp.*, 459 F. Supp. 3d 78, 92 (D.D.C. 2020) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). To survive a Rule 12(b)(6) motion to dismiss, "it is enough for the plaintiff to describe the terms of the alleged contract and the nature of defendant's breach." *Molock*, 297 F. Supp. 3d at 131. That said, the alleged contract still must be "clear enough for the

court to determine whether a breach has occurred," since a contract cannot be enforced unless it is "sufficiently definite as to its material terms." *Butler*, 459 F. Supp. 3d at 92. When it comes to bonuses or promises of equity in the employment context, employees enter agreements of this nature with their employers all the time. *See Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 70 (D.D.C. 2005). But just like any other contract, the standards of performance and other material terms must be clear enough for a court of law to enforce the agreement. *See Butler*, 459 F. Supp. 3d at 88, 92 (contract existed where employees were guaranteed full ownership when profits generated by them "surpassed $600,000"); *Molock*, 297 F. Supp. 3d at 119, 131 (contract existed where employer "awarded bonuses to employees whose departments performed under budget by automatically distributing the surplus savings among the employees in that department").

Clevinger has failed to state a claim for breach of contract because, as Advocacy Holdings argues, he has not pled facts sufficient to establish the existence of a valid contract between the relevant Parties, at least with regard to the specific terms Clevinger would like to enforce. ECF 63-1 at 23. None of the alleged promises of equity or leadership status meet the requisite level of clarity to show that a contract was formed. Consider the first alleged promise of equity in 2016, before Clevinger joined OCP, when he was told: "You will be entitled to up to a quarter of equity in the business if you build this thing up," ECF 29 ¶ 29, which does not describe a standard of performance, timeline, or even the type of equity promised (e.g., "Class A" versus "worthless Class B shares," ECF 29 ¶¶ 103, 105). Clevinger then worked at OCP for almost two years before there was any mention of "founders shares" or making him "an owner, director[,] and officer of the company," *id.* ¶¶ 43–45, and even then, these promises seemed to be conditioned on a vague expectation that Clevinger "build up the business," *id.* ¶ 45, or perhaps "continue to double year-over-year revenue" for some (undefined) period of time, *id.* ¶ 62. Across the 600 paragraphs in

Clevinger's amended complaint, the Court cannot identify a single instance of offer, acceptance, and consideration that plausibly created an agreement incorporating the variety of vaguely conditioned (or even unconditional) promises he asks this Court to enforce as a matter of contract law. Any agreement arising from these particular promises is too indefinite to enforce, so the Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 13 and 14.

### 7. *The Unjust Enrichment Claims Survive*

In Counts 15 through 18, Clevinger alleges (in the alternative) that, if there was no contract formed between himself and Advocacy Holdings regarding founders shares and formal officer and director status in the company, it was unjust for Advocacy Holdings to retain the benefit of Clevinger's labor and capital contributions without making good on those promises. *E.g.*, ECF 29 ¶¶ 506–10. "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Comm'cns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). This equitable claim provides "a remedy to unwind entanglements that may have arisen from a failed agreement, for instance, . . . where the agreement is too indefinite to be enforced." *Butler*, 459 F. Supp. 3d at 101. However, such a claim "will not lie when 'the parties have a contract governing an aspect of their relation,' because 'a court will not displace the terms of that contract and impose some other duties not chosen by the parties.'" *In re APA Assessment*, 766 F.3d at 46.

Clevinger has plausibly stated a claim for unjust enrichment as an alternative to his breach of contract claims. Clevinger alleges that Advocacy Holdings retained the benefits Clevinger conferred by working as the "CEO" of OCP, substantially increasing its revenue, and providing thousands of dollars to support the company in times of need. *See, e.g.*, ECF 29 ¶¶ 39, 41, 57, 163,

190. He also alleges that he provided many of these benefits in large part because of Advocacy

Holdings' false promises that he would receive Class A stock and formal leadership status in the

company. *See, e.g.*, *id.* ¶¶ 47, 449, 507–08. The Court finds that these circumstances, if true, would

render Advocacy Holdings' retention of those benefits unjust. The Court disagrees with Advocacy

Holdings' suggestion that because Clevinger received some payment for his work in the form of a

salary the retention of the benefit of his labor is necessarily fair and would be unjust only if he

worked "for no compensation" at all. ECF 63-1 at 25. Advocacy Holdings cites no caselaw in

support of its somewhat extreme categorical limitation as to when providing labor under false

pretenses is "unjust," and the Court will not draw such a bright line here.

Advocacy Holdings' more persuasive argument in favor of dismissal is that Clevinger has

pled the existence of two contracts that preclude his unjust enrichment claim, ECF 63-1 at 24, but

the Court still concludes that the claim ought to proceed. Clevinger's allegations support the

existence of an employment agreement under which he agreed to work in exchange for "base

salary, commissions, and equity," ECF 29 ¶ 28, and a separate agreement for the purchase of

equity, in which he accepted an offer to purchase Class B shares in exchange for $11,000, *id.*

¶¶ 105, 107. At this early stage, however, the Court is hesitant to dismiss Clevinger's unjust

enrichment claims merely because some other contracts—the terms of which are unclear—

appeared to exist between the Parties. *Cf. Molock*, 297 F. Supp. 3d at 133 (declining to dismiss

unjust enrichment claim even though it might have been "duplicative of Plaintiffs' breach-of-

contract claim"). Unjust enrichment claims are displaced only when they arise out of "matters

within [a contract's] scope," but are not precluded if the contract "does not cover the issue in

dispute." *In re APA Assessment*, 766 F.3d at 46. As relevant here, an employment agreement

defining compensation does not automatically preclude a claimant from seeking legal redress for

an unfulfilled promised of a separate perk or bonus. *Cf. Daisley*, 372 F. Supp. 2d at 70; *Molock*, 297 F. Supp. 3d at 133. Here, the Parties dispute the terms of whatever contracts may have existed, ECF 73 at 39, and "it is not yet clear whether the activities at issue in the unjust enrichment claim . . . overlap entirely" with those contracts, *Dist. Title v. Warren*, No. 14-cv-1808, 2015 WL 12964657, at *10 (D.D.C. June 1, 2015). The Court therefore **DENIES** Advocacy Holdings' motion to dismiss as to Counts 15 through 18.

### 8.   *The Declaratory Judgment Claim Regarding Stock Ownership is Dismissed*

In Count 19, Clevinger seeks a declaratory judgment that he "owns an interest in Advocacy Holdings, in Class A stock, in an amount sufficient to correspond to [his] $46,000 investment in Advocacy Holdings." ECF 29 ¶ 533. Again, the Declaratory Judgment Act confers discretion on the Court to enter a declaratory judgment, not "an absolute right upon the litigant," *Wilton*, 515 U.S. at 287, and only "[i]n a case of actual controversy within [the Court's] jurisdiction," 28 U.S.C. § 2201(a).

As Advocacy Holdings argues, there is no actual controversy or judicially remediable right to enforce here because Clevinger pleads himself out of claiming any entitlement to the relief requested. *See* ECF 63-1 at 25. Before Clevinger contributed a cent to Advocacy Holdings, he was told—by the owners of the company—that any prior promise of a particular type of equity was off the table, he was ineligible to receive Class A shares, and he would receive Class B shares and Class B shares only. ECF 29 ¶¶ 101–03. Clevinger paid all $46,000 of his "capital contributions" *after* these terms were made clear to him. *Id.* ¶¶ 189–90. Indeed, Clevinger appears to accept that his initial $11,000 "capital contribution [was] for Class B shares," *id.* ¶ 189, making it all the more confusing as to why he now believes he is entitled to a judicial declaration that he "owns an interest in Advocacy Holdings, in Class A stock, in an amount sufficient to correspond to [his full] $46,000

investment," *id.* ¶ 533.[6] The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Count 19.

### 9.  *The Unpaid Wages Claim is Dismissed*

In Count 20, Clevinger alleges that Advocacy Holdings did not timely pay his final paycheck and withheld wages in violation of D.C. law. ECF 29 ¶¶ 536–39. Under D.C. Code § 32-1303(2), when an employee resigns or quits, the employer must pay the former employee's final paycheck "upon the next regular payday or within 7 days from the date of quitting or resigning." When an employer discharges the employee, wages must be paid "the working day following such discharge." D.C. Code § 32-1303(1). District of Columbia law also authorizes employees to bring civil actions for unpaid wages, which is defined by statute to include bonuses, commissions, overtime premiums, and any "[o]ther remuneration promised or owed" pursuant to an employment agreement. D.C. Code §§ 32-1301(3), 32-1308(a)(1)(A).

Clevinger has failed to state a claim for untimely payment of his final paycheck. He begins by incorrectly applying the timeline for those who are discharged, complaining that he was not paid "the working day following [his] discharge." ECF 29 ¶ 535. But Clevinger resigned, *id.* ¶ 224, and any dispute over the voluntariness of his resignation does not change that fact. Accordingly, Advocacy Holdings is correct that it had seven days—i.e., until February 8, 2023—to pay Clevinger his final paycheck. ECF 63-1 at 26 (citing D.C. Code § 32-1303(2)). Yet none of Clevinger's well-pled factual allegations plausibly establish that his final paycheck was unlawfully delayed: he alleges that his final paycheck was dated January 31, 2023, mailed in early February

---

[6] The Court acknowledges that there may be some dispute as to whether Clevinger should have received "additional shares of Class B stock," which were not issued when he contributed an additional $35,000 to the company after his first stock purchase. ECF 29 ¶ 187. But Clevinger does not request, nor does he seem interested in, a declaration that he owns any amount "worthless Class B stocks." *Id.* ¶ 185. In fact, he appears to concede that he has already given up whatever Class B stock he had. *See* ECF 73 at 45; ECF 77 at 15–16. The Court will not waste judicial resources to consider a claim that Clevinger did not make for something he does not want.

2023, and deposited (by him) in mid-February 2023. ECF 29 ¶ 536. Aside from a conclusory allegation that the check was "fraudulently backdated," *id.*; *see also* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."), no well-pled allegation supports the conclusion that he was paid after February 8, 2023.

Clevinger has also failed to state a claim for unpaid wages generally. Clevinger provides only two allegations in support of his claim: (1) he "was not reimbursed for $18,000 in unpaid business expenses, which [he] submitted for reimbursement" and (2) he "was not paid earned commissions in the amount of $8,000." ECF 29 ¶¶ 537–38. These allegations are insufficient as a matter of law. For one, expense reimbursements are not considered "wages" under D.C. law. *Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1075 (D.C. 2020). Commissions, on the other hand, are considered wages, but only if they are "automatic and mandatory upon satisfaction of a [particular] condition," *Molock*, 297 F. Supp. 3d at 134, rather than "discretionary," *Ronaldson v. Nat'l Ass'n of Home Builders*, 502 F. Supp. 3d 290, 297 (D.D.C. 2020), and Clevinger provides no information about the commissions he "earned." The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Count 20.

### 10. The Denial of Paid Leave Claims are Dismissed

In Counts 21 and 22, Clevinger alleges that Advocacy Holdings denied him paid leave and failed to maintain proper records of paid leave in violation of D.C. law. ECF 29 ¶¶ 546, 549–50. The District of Columbia Accrued Sick and Safe Leave Act mandates minimum paid leave hours for employees, the amount of which varies according to employer size. *See* D.C. Code § 32-531.02(a)(1)–(3). This law "does not require employers 'to provide the cash equivalent of unused paid . . . leave to employees who resign or are terminated.'" *Omotoye v. Glob. Tech. Talent, Inc.*, No. 22-cv-3862, 2024 WL 1071044, at *5 (D.D.C. Mar. 12, 2024). Rather, it "prohibits an

employer from interfering with or denying an employee's [paid] leave," so an aggrieved employee must show that they were "eligible for and denied [paid] leave" in order to obtain relief under this provision. *Hu v. K4 Sols., Inc.*, No. 18-cv-1240, 2020 WL 1189297, at *10 (D.D.C. Mar. 12, 2020); *see also Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95, 118 (D.D.C. 2018). The law also imposes a record-keeping requirement on employers, and the failure to comply with that requirement can lead to an adverse (but rebuttable) presumption against the employer in the event of a dispute under the Leave Act. D.C. Code § 32-531.10b.

Clevinger's claims under the Leave Act fail. For one, Clevinger attempts to bring a claim for a "failure to *pay*" accrued leave, but the Leave Act does not mandate payment of unused leave. *Omotoye*, 2024 WL 1071044, at *5. Moreover, and as Advocacy Holdings is correct to observe, Clevinger does not allege that he was ever "denied the opportunity to take . . . leave when [he] asked for it." *Stephens*, 291 F. Supp. 3d at 118; *see* ECF 63-1 at 26–27. As for Clevinger's claim for failure to maintain records, the law is unclear as to whether a record-keeping violation in and of itself can be the basis for a standalone cause of action. *See* D.C. Code § 32-531.10b(b). If anything, the plain language of the statute indicates that record-keeping violations are only relevant insofar as they relate to "compliance with the [other] requirements of [the Leave Act]." D.C. Code § 32-531.10b(a). *But see Harbour v. Univ. Club of Washington*, 610 F. Supp. 3d 123, 137 (D.D.C. 2022) (noting that there are "open legal and interpretive questions" regarding the Leave Act's record-keeping provisions). But even if a standalone cause of action existed, Clevinger bases his claim on four inadequate allegations in which he parrots the language from the statute, reiterates his conclusory assertion that "Advocacy Holdings failed to provide any paid leave," quotes the statute, and then claims entitlement "to a rebuttable presumption" that Advocacy Holdings denied

him paid leave. ECF 29 ¶¶ 549–52. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 21 and 22.

### 11. The Breach of Fiduciary Duty Claims are Dismissed

In Counts 23 and 24, Clevinger alleges that Koepke grossly mismanaged Advocacy Holdings, which interfered with its profitability and the value of its stock, breaching his fiduciary duties owed to the company and to Clevinger as a minority shareholder. ECF 29 ¶¶ 561, 564–67. Once again, the elements of breach of fiduciary duty boil down to (1) a fiduciary relationship, (2) breach of the duties arising out of that relationship, and (3) injuries proximately caused by the breach. *Democracy Partners*, 285 F. Supp. 3d at 120. Majority shareholders owe a fiduciary duty to minority shareholders to not abuse their power to the disadvantage of the minority shareholders, *Silberberg v. Becker*, 191 A.3d 324, 338 n.9 (D.C. 2018), but direct-action shareholder suits against management or majority owners will only lie if "the injury to the stockholders [is] independent of any injury to the corporation," *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1038 (Del. 2004); *accord. Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 77 (D.D.C. 2009).[7] Otherwise, the claim is "derivative in nature and any damages suffered are owed to the corporation," *Labovitz v. Washington Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999), in which case the claim may only be brought by the corporation or current shareholders, *see Giron v. Zeytuna*, 597 F. Supp. 3d 29, 44 (D.D.C. 2022).

Clevinger's claims, which only describe injury to Advocacy Holdings itself, are derivative in nature and must be dismissed. None of the allegations indicate that Clevinger, or any other minority shareholder, suffered harm independent from whatever the company suffered as a result of Koepke's alleged "corporate malfeasance." *See* ECF 29 ¶ 559. Despite Clevinger's statement

---

[7] Courts in the District of Columbia regularly "look[] to Delaware for guidance on matters of corporate law." *Harpole Architects*, 668 F. Supp. 2d at 77 n.4.

in his opposition to the motion to dismiss that he "seeks to protect his own interests as a shareholder of the company, rather than the interests of the company," ECF 73 at 46, there is nothing in his amended complaint that plausibly supports that conclusion, *see, e.g.*, ECF 29 ¶ 559 ("Koepke . . . breached his fiduciary duties to . . . Advocacy Holdings."); *id.* ¶ 565 ("Profits were never realized."); *id.* ¶ 566 ("Advocacy Holdings was consistently unprofitable."). In addition to Clevinger's lack of standing (as a former, but not current, shareholder) to enforce the rights of Advocacy Holdings, the Court is inclined to agree with Advocacy Holdings' argument that his allegations, most of which are conclusory, do not plausibly demonstrate actionable wrongdoing or consequent harm to Clevinger in the first place. ECF 77 at 15. The Court sees nothing beyond "unadorned, the-defendant-unlawfully-harmed me accusation[s]," which fall short of the requisite pleading standard. *Iqbal*, 556 U.S. at 678. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 23 and 24.

### 12. The Equitable Accounting Claim is Dismissed

In Count 25, Clevinger seeks an accounting from Advocacy Holdings that "include[s] the identification of the sources and distribution of all payments or consideration received to date as well as identifying all future rights to receive further compensation or consideration." ECF 29 ¶ 582. Strictly speaking, a request for an accounting "is not . . . a stand-alone claim at all." *Butler*, 459 F. Supp. 3d at 109. Instead, it is "an extraordinary remedy" in equity compelling "a detailed statement of the debts and credits between parties arising out of a contract or a fiduciary relation . . . at the close of a litigation." *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 103 (D.D.C. 2006). This remedy may be "appropriate when a plaintiff is unable to determine how much, if any, money is due to him from another," *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 10 (D.D.C. 2014), and is necessary only "when accounts between the parties are of such a

complicated nature that they can be satisfactorily unraveled only by a court of equity," *Donovan v. USPS*, 530 F. Supp. 894, 900–01 (D.D.C. 1981).

Clevinger's request for this extreme equitable remedy fails. As Advocacy Holdings argues, Clevinger is no longer a shareholder (minority or otherwise) and therefore is no longer owed any fiduciary duty by Advocacy Holdings, nor does he allege the existence of any ongoing contractual relationship that would justify granting him access to his former employer's financial records. ECF 63-1 at 29. On top of that, the damages Advocacy Holdings might owe to Clevinger due to this lawsuit are not complex. Clevinger's reliance on the fact that he "does not know how his capital contributions or [other] money was used" is misplaced because it has nothing to do with his surviving claims. *See* ECF 73 at 47. Should Clevinger prevail on his remaining claims, his damages will presumably be based on a straightforward valuation of the money and labor he contributed to Advocacy Holdings. That simple calculation does not depend on Advocacy Holdings' financial records and does not justify the "extraordinary" equitable remedy Clevinger seeks. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Count 25.

### 13. The Unpaid Equity Distributions Claim is Dismissed

In Count 26, Clevinger asks this Court to order Advocacy Holdings to pay the "distribution" he is owed based on his capital contributions. ECF 29 ¶¶ 588–90. The Parties dispute which law governs this claim, *see* ECF 77 at 16–18, but their dispute is inconsequential. Clevinger has not presented and the Court does not know of any law that would compel Advocacy Holdings to pay a (wholly undefined) "distribution" based on allegations that do not describe when or how any dividend was "withheld," the company's history of providing dividends, or why any alleged decision to not issue a dividend "is explicable only on the theory of an oppressive or fraudulent abuse of discretion," *Gabelli & Co., Inc. v. Liggett Grp. Inc.*, 479 A.2d 276, 280 (Del. 1984),

especially when the person requesting the dividend was never a preferred shareholder and, indeed, is no longer a shareholder at all, *see* ECF 29 ¶¶ 105, 574. The Court therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Count 26.

### 14. The Breach of Good Faith/Fair Dealing Claims are Dismissed

In Counts 27 and 28, Clevinger alleges that "Advocacy Holdings breached the implied duty of good faith and fair dealing by evading the spirit of its contractual agreement with [Clevinger] to include [him] as an officer and director of Advocacy Holdings and to confer upon [him] Class A founders shares in Advocacy Holdings." ECF 29 ¶ 598. The existence of a valid contract is an essential element of any claim for the breach of the implied duty of good faith and fair dealing. *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 27–28 (D.D.C. 2014). The Court has found that Clevinger fails to allege a valid contract of the sort he believes existed and therefore **GRANTS** Advocacy Holdings' motion to dismiss as to Counts 27 and 28.

## IV.   CONCLUSION

In sum, after reviewing each of the thirty-eight counts asserted by the Parties in this matter, the Court concludes that a great deal of this dispute shall move forward to discovery.

As for Clevinger's motion to dismiss Advocacy Holdings' amended complaint, ECF 26, that motion is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Count 10 is **DISMISSED**, as is any portion of Count 7 that relies on CFAA subsections (a)(2), (a)(4), or (a)(5)(C). Advocacy Holdings may proceed with its claims for breach of contract, breach of fiduciary duty, tortious interference with contract and prospective business advantage, trade secret misappropriation, CFAA violations of subsection (a)(5)(A), and Lanham Act violations.

As for Advocacy Holdings' motion to dismiss Clevinger's amended complaint, ECF 63, that motion is also **GRANTED IN PART** and **DENIED IN PART**. Specifically, Counts 2 through

6, 13 through 14, and 19 through 28 are **DISMISSED**. Clevinger may proceed with his claims for assault, fraudulent inducement/concealment and negligent misrepresentation, and unjust enrichment.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 10, 2024