**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHAZZ CLEVINGER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ADVOCACY HOLDINGS, INC., *et al.*,**<br><br>**Defendants.** | ) | |
| **ADVOCACY HOLDINGS, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CHAZZ CLEVINGER, *et al.*,**<br><br>**Defendants.** | ) | **Case No. 23-cv-1159 (JMC/GMH)** |

**ORDER**

This is the latest—and, since the discovery deadline has now passed, presumably the last—in a string of more than a dozen substantive discovery disputes in this case since October 2024. *See, e.g.*, ECF Nos. 87, 91, 95, 98, 102, 104, 117, 119, 120, 127, 129, 131, 133, 134, 136. Advocacy Holdings, John Koepke, and Raymond Zenkich (together, the "Advocacy Holdings Parties") have raised three issues arising from the deposition testimony of Chazz Clevinger on behalf of himself and his two companies, CiviClick and Superior Campaign Solutions ("SCS") (together, the "Clevinger Parties") on December 11, 2025.[1] The disputes relate to the Clevinger Parties' alleged

[1] The undersigned gave permission for the deposition of the Clevinger Parties to take place "within one week of the . . . discovery deadline of December 8, 2025." Minute Order (Dec. 2, 2025).

failure to produce certain tax return documents, invoices from clients of CiviClick and SCS, and notes Clevinger took during calls or meetings with Koepke and/or Zenkich. The Advocacy Holdings Parties' requests will be granted in part and denied in part.

**A. Tax Return Documents**

This dispute has its origins in a conflict raised in November 2025 over responses to the Advocacy Holdings Parties' Request for Production ("RFP") No. 4 served on both CiviClick and SCS, which sought "[a]ll documents reflecting income you received from any source." ECF No. 129 at 5 (RFP No. 4 to CiviClick), 9 (RFP No. 4 to SCS). The Advocacy Holdings Parties asserted that, upon reviewing the document discovery provided by CiviClick and SCS in preparation for the deposition of the Clevinger Parties, they discovered that CiviClick and SCS had failed to provide "income statements," which would reflect the aggregate income each of those entities had received. *Id.* at 1. In response, the Clevinger Parties asserted, among other things, that a search "confirmed that [SCS and CiviClick] do not possess" such documents. ECF No. 130 at 2. Accordingly, the undersigned issued a minute order dated December 1, 2025, denying the request because "[i]t is axiomatic that a court 'cannot compel a party to produce records that do not exist.'" Minute Order (Dec. 1, 2025) (quoting *U.S. EEOC v. George Washington Univ.*, 342 F.R.D. 161, 174 (D.D.C. 2022)).

The Advocacy Holdings Parties sought reconsideration and asked for "all portions of [CiviClick's and SCS's] tax returns that reflect income." ECF No. 131 at 2. The undersigned noted that the Advocacy Holdings Parties' November 2025 letter had sought "income statements" rather than "tax returns," but, because discovery was still open and CiviClick's and SCS's tax returns were responsive to RFP No. 4, ordered those to be produced by the day before the Clevinger Parties' deposition. Minute Order (Dec. 2, 2025). In a submission on December 10, 2025, the

Advocacy Holdings Parties asserted that counsel for the Clevinger Parties had indicated that "many" of the tax returns "do not exist" because applications for extensions of time to submit such returns were filed. ECF No. 134 at 2, 22. That submission attached several documents apparently produced by the Clevinger Parties—as relevant here, (1) emails between Clevinger and his tax preparers regarding the filing of applications for extensions to submit income tax returns, *id.* at 3–11; and (2) two "Account Transcripts" from the IRS, which appear to reflect that an extension for Clevinger's personal income tax for 2023 had been granted, *see id.* at 13–16. In response, counsel for the Clevinger Parties asserted that they had "served all documents in their possession along with the extensions that were filed for the applicable tax returns." ECF No. 135-1 at 1.

In the Advocacy Holdings' Parties' most recent discovery letter, they state that "[t]he Clevinger Parties did not produce any tax filings at all." ECF No. 136 at 1. They also assert that Clevinger testified at his deposition that he filed extensions for his individual tax returns in 2021, 2022, 2023, and 2024; that CiviClick "filed extensions for tax years 2023 and 2024 'to the extent that tax extensions were needed'";[2] and that SCS filed extensions for tax years 2021, 2022, 2023, and 2024. *Id.* at 2 (quoting transcript of Clevinger deposition, *id.* at 18). The Advocacy Holdings Parties now seek Form 4868s for Clevinger and Form 7004s for CiviClick and SCS, which are tax extension forms that require the filer to "disclose [its] estimated tax"; from that estimated tax, the Advocacy Holdings Parties assert "an estimated income can be derived." *Id.* (citing *id.* at 66 (Form 7004 Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns), 67–70 (Form 4868 Application for Automatic Extension of Time to File U.S. Individual Income Tax Return)). According to the Advocacy Holdings Parties, Clevinger's applications for extensions as to his individual income taxes are "relevant because

[2] According to Clevinger's deposition testimony, CiviClick "didn't exist and produced no revenue in 2021 and 2022." ECF No. 136 at 17.

SCS is a limited liability company and therefore its income is a pass through to Mr. Clevinger's personal returns." *Id.* at 2 n.1. The Clevinger Parties respond that no tax returns reflecting income information exist, that the Advocacy Holdings Parties did not previously ask for the extension applications, and that discovery is now closed. ECF No. 137 at 1–2.

As to the request for extension applications for Clevinger as an individual, that is an entirely new request directed to the Court: The dispute raised on November 25, 2025, was explicitly focused only on CiviClick and SCS and related specifically to those entities' response to RFP No. 4 that was directed at them. *See* ECF No. 129 at 2 (seeking an order granting the Advocacy Holding Parties' "request for *CiviClick and SCS* to produce the income statements (emphasis added)). The ensuing request for reconsideration focused on documents sought from CiviClick and SCS—as it should have, given that RFP No. 4, the only RFP the Advocacy Holdings Parties identified as relevant, was directed to CiviClick and SCS—but also asked for "all portions of *each party's tax returns* that reflect income." ECF No. 131 at 2 (emphasis added). Although that could be read to include Clevinger's personal tax returns, the better reading in context is that it encompassed only the returns of CiviClick and SCS. And, indeed, the undersigned ordered only CiviClick and SCS to produce such documents. *See* Minute Order (Dec. 2, 2025) ("[I]t is hereby ORDERED that CiviClick shall provide the Advocacy Holdings Parties with tax returns reflecting income information from 2023 to the present that are within its possession, custody, or control . . . . It is further ORDERED that SCS shall provide the Advocacy Holdings Parties with tax returns reflecting income information from 2021 to the present that are within its possession, custody, or control . . . ." (internal citations omitted)). The Advocacy Holdings Parties have not provided the Court with an RFP that would encompass Clevinger's personal tax returns and it is too late to do

so now, after discovery has closed. Thus, the request for Form 4868s (the form for extensions regarding individual income tax returns) is denied.

The request for CiviClick and SCS's Form 7004s, however, will be granted. The Advocacy Holdings Parties seek information regarding the income of CiviClick and SCS. After their request for income statements proved fruitless, they settled on a request for the companies' "tax returns," and that request was granted. *See* ECF No. 131 at 2; Minute Order (Dec. 2, 2025). There is authority indicating that the tax extension Form 7004s constitute "tax returns": A provision of the Internal Revenue Code governing the confidentiality of tax returns and return information defines a tax "return" as "any tax or information return, *declaration of estimated tax*, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed." 26 U.S.C. § 6103(b)(1) (emphasis added). And, because the Advocacy Holdings Parties assert that income can be derived from the estimated tax—a representation the Clevinger Parties do not challenge—those documents can be said to "reflect[] income." Minute Order (Dec. 2, 2025). Thus, this is not, as the Clevinger Parties would have it, an "expan[sion]" of what the undersigned ordered produced on December 2, 2025. ECF No. 137 at 2. Indeed, it is difficult to see how the Clevinger Parties could think it is when they *already represented to the Court* that the extension applications were produced in response to that Order: "[The Clevinger Parties] served all documents in their possession *along with the extensions that were filed* for the applicable tax returns." ECF No. 135-1 at 1 (emphasis added). Accordingly, the Clevinger Parties will now make good on that representation and, to the extent they have not yet done so, produce

to the Advocacy Holdings Parties all Form 7004s filed on behalf of CiviClick for tax years 2023 and 2024 and all Form 7004s filed on behalf of SCS for tax years 2021, 2022, 2023, and 2024.

**B. Invoices**

The Advocacy Holdings Parties assert that, at his deposition, Clevinger testified that 26 entities not previously disclosed were clients of one of the Clevinger Parties. ECF No. 136 at 2. The names of those 26 entities are found at ECF No. 136 at 7–8. The Advocacy Holdings Parties seek the Clevinger Parties' invoices for each of those entities. *See id.* at 2.

The parties first brought a dispute about identification of the Clevinger Parties' clients and/or production of invoices to the Court in March 2025. *See* ECF No. 95-8. Disputes have continued since. *See, e.g.*, ECF Nos. 104, 112–113, 117, 119. The Clevinger Parties' refrain has been that the Advocacy Holdings Parties' ongoing complaints that the Clevinger Parties failed to disclose their full complement of clients and to provide invoices for them are inaccurate because

> sometimes there is a client that would be engaged, but the client's actually engaging for the benefit of another client, or the client is engaging and the name of the engagement is some reference to a project, a discrete project. And so that circumstance being the case, there are sometimes different names given for the invoices as compared to the names of the clients on the client list.

Transcript of Sep. 25, 2025, Hearing at 76 (on file with the Chambers of the undersigned). The situation seems to have confused Clevinger, as well, who testified at his deposition that, for example, sometimes the records of the Clevinger Parties will reflect the name of a "master account" but not the names of the customers who have "subaccounts" under that master account and sometimes the name of a particular campaign or project will be used, which is information about which he was unable to testify. *See* ECF No. 136 at 41–42; *see also* Transcript of Sep. 25, 2025, Hearing at 84–85 (counsel for the Advocacy Holdings Parties asserting that an attempt to nail down with Clevinger whether sixteen entities counsel had identified were clients of one or

more of the Clevinger Parties "devolved into . . . a circuitous back and forth" in which "there were long explanations about, well, it's not really a client it's a project of another client or it's a subagent of a client or it's a representative of a client").

The Clevinger Parties reprise that refrain here, contending that the Advocacy Holdings Parties' representation "that there [are] 26 'other' clients" is "not accurate," because "sometimes invoices are issued in the name of the campaign, sometimes they are issued in the name of the recipient, and sometimes they are issued when the campaign is for the benefit of another entity." ECF No. 137 at 2. However, as noted, the Advocacy Holdings Parties maintain that Clevinger identified 26 heretofore undisclosed entities as "clients" at his deposition. *See* ECF No. 136 at 2, 7–8. The undersigned's review of the deposition transcript excerpts attached to the Advocacy Holdings Parties' submission confirms that Clevinger testified that each of the 26 identified entities was a client, and the Clevinger Parties point to no evidence that undermines that testimony. *See id.* at 40–65. The Advocacy Holdings Parties are entitled to invoices for those entities.

The question is the remedy. The Advocacy Holdings Parties offer two options: (1) an order requiring the Clevinger Parties to produce all invoices in their possession, custody, or control for those 26 entities or (2) an order granting leave for the Advocacy Holdings Parties to subpoena those entities, as it has done with other clients of the Clevinger Parties. *See id.* at 2. The Clevinger Parties have had almost a year to identify clients and produce invoices. *See* ECF No. 95-3 (CiviClick's initial responses to interrogatories dated Feb. 18, 2025); ECF No. 95-4 (SCS's initial responses to interrogatories dated Feb. 18, 2025); ECF No. 95-6 (CiviClick's initial responses to RFPs dated Feb. 19, 2025); ECF No. 95-7 (SCS's initial responses to RDPs dated Feb. 19, 2025). Instead, as noted, the parties have required Court intervention in connection with the Clevinger Parties' production of client names and invoices multiple times. On the other hand, the Advocacy

Holdings Parties' issuance of subpoenas has garnered only a single dispute in this Court—a blanket challenge to those subpoenas brought by the Clevinger Parties and denied by the undersigned. *See* Transcript of Aug. 19, 2025, Hearing at 23–29 (on file with the Chambers of the undersigned). Because the Advocacy Holdings parties have offered as a proposed remedy leave to issue subpoenas to the 26 entities they have identified—as they have apparently successfully done with dozens of other clients of the Clevinger Parties—the undersigned finds that is likely the more efficient manner to bring this long-running dispute to a close and get those documents to the Advocacy Holdings Parties. Accordingly, the undersigned will grant the Advocacy Holdings Parties leave to issue subpoenas "substantively similar to those issued to the other clients in this case" to those 26 entities. ECF No. 136 at 2.

**C. Notes of Phone Calls and Meetings**

The Advocacy Holdings Parties cite 38 paragraphs from Plaintiff's amended complaint that include alleged direct quotations from calls or meetings between Clevinger and Koepke and/or Zenkich. ECF No. 136 at 2–3. Clevinger testified at his deposition that any quotations in that document were lifted from contemporaneous notes that he took during phone calls or nearly contemporaneous notes he took during meetings. *See, e.g.*, *id.* at 26 ("I often would make contemporaneous memorandums of various phone conversations that me and Mr. Koepke had, you know, due to the fact that, you know, by 2019, I was already starting to not trust him."), 26–27 ("Those quotations of Mr. Koepke were all based on my contemporaneous memorandums which I made, you know, at the time or immediately after the phone calls. . . . And I specifically wrote down, verbatim, things that, you know, Mr. Koepke said to me, and just, you know, kept a simple record, you know, of it, you know, in a Word document."), 28 (testifying that the quotations in paragraphs 61 and 62 of the amended complaint are taken from contemporaneous notes of a June

24, 2019, call), 29 ("To my knowledge, all of the quotes either came from my contemporaneous memorandums or my actual physical memory. But the vast majority came from my contemporaneous memorandums."), 32 ("[W]henever I physically met with Mr. Koepke and Mr. Zenkich, which only ever happened at the Red Chalk, like, offices in Chicago, or at Gibsons Steakhouse, over the years, all those contemporaneous memorandums were written the same day of the meeting, but were written in the privacy of my hotel room, after the meeting actually happened."), 34 ("I always wrote down exactly what was said, like, in real time, if it was a phone call or if it was a Zoom call."). He also testified that he turned those notes over to his counsel to draft the amended complaint. *See, e.g.*, *id.* at 28 ("I supplied my contemporaneous memorandums to my attorney, who compiled [the amended complaint]."), 30 ("[T]hose [contemporaneous memoranda] were supplied to my attorney and my attorney put together [the amended complaint]." The Advocacy Holdings Parties assert those notes are responsive to RFP Nos. 31 and 32 served on Clevinger, which seek, respectively, "[a]ll documents that reference any promise to confer any equity in Advocacy Holdings, Inc." on Clevinger and "[a]ll documents that reference any promise to make [Clevinger] an officer or director of Advocacy Holdings, Inc."[3] *Id.* at 3, 79.

The Clevinger Parties call the request a "non-starter," asserting that "emails between a lawyer and client are protected by the attorney-client privilege." ECF No. 137 at 2. That echoes their position in their meet-and-confer letter to the Advocacy Holdings Parties: "[C]ommunications between attorney and client, whether memorialized in notes or otherwise, are privileged and not discoverable." ECF No. 136 at 5. The Clevinger Parties appear to misunderstand both the request and the law.

[3] Clevinger agreed to produce documents responsive to both those RFPs. *See* ECF No. 136 at 79.

First, the Advocacy Holdings Parties are not seeking emails or other communications between an attorney and a client. They are seeking notes that Clevinger testified he took during or immediately after calls or meetings with Koepke and/or Zenkich.

Second, the Clevinger Parties' statement that emails between an attorney and client are privileged not only oversimplifies of the contours of the attorney-client privilege, but also reflects a misapprehension of its applicability. The D.C. Circuit explained decades ago that

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984) (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358–59 (D. Mass. 1950)). "[T]he proponent must establish the claimed privilege with 'reasonably certainty.'" *In re Veiga*, 746 F. Supp. 2d 27, 33 (D.D.C. 2010) (quoting *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750–51 (D.C. Cir. 2006)). The Clevinger Parties make no attempt to carry that burden.

As noted, Clevinger testified that the notes at issue were taken during or soon after calls or meetings with Kopke and/or Zenkich. They reflect the content of conversations with Defendants Kopke and/or Zenkich, neither of whom is or ever has been an attorney for any of the Clevinger Parties. To be sure, Clevinger also testified that he sent those notes to his counsel to aid in drafting the amended complaint and it is that communication—the sending of the notes to his attorney—on which the Clevinger Parties' claim of privilege rests. But pre-existing documents in a client's possession do not become privileged merely because the client sends them to his attorney when he

seeks legal advice. As the Supreme Court has explained, courts have "uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice." *Fisher v. United States,* 425 U.S. 391, 403–04 (1976). That is, mere transmittal to an attorney "does not shield from discovery the forwarded documents." *Banks v. Off. of Senate Sergeant-At-Arms & Doorkeeper*, 236 F.R.D. 16, 21 (D.D.C. 2006), *amended on other grounds on denial of reconsideration,* No. 03-cv-2080, 2006 WL 1933471 (D.D.C. July 12, 2006); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-mc-489, 2010 WL 11570865, at *3 (D.D.C. Sept. 28, 2010) ("[A] document is not privileged merely because it was transmitted to counsel."); *Minebea Co. v. Papst*, 228 F.R.D. 13, 23 (D.D.C. 2005) ("[S]ending a non-privileged document to an attorney does not render it privileged."). The Clevinger Parties nowhere suggest that the notes at issue were privileged when created and the record before the undersigned provides no basis on which to find that they were; indeed, Clevinger testified that he routinely began taking those notes years before this action was filed. And, in any case, Clevinger has waived any potential attorney-client privilege over the material he disclosed to the public in the amended complaint. *See, e.g.*, *Truman v. City of Orem*, 362 F. Supp. 3d 1121, 1130 (D. Utah 2019) (finding privilege waived over facts the plaintiff included in his complaint); *Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 511 (S.D.N.Y. 2003) ("By placing this information into the public record, [the plaintiff] waived any claim that these matters are . . . privileged.").

Accordingly, the Clevinger Parties shall produce all notes reflecting the substance of any call or meeting referenced in the amended complaint that are responsive to RFP Nos. 31 and/or 32 served on Clevinger.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Advocacy Holdings Parties' request for discovery is **GRANTED-IN PART** and **DENIED-IN-PART**. It is further

**ORDERED** that the Clevinger Parties shall, on or before January 27, 2026, produce to the Advocacy Holdings Parties all Form 7004s filed on behalf of CiviClick for tax years 2023 and 2024 and all Form 7004s filed on behalf of SCS for tax years 2021, 2022, 2023, and 2024. It is further

**ORDERED** that the Clevinger Parties shall, on or before January 27, 2026, produce to the Advocacy Holdings Parties all notes reflecting any call or meeting referenced in the amended complaint that are responsive to RFP Nos. 31 and/or 32 served on Clevinger. It is further

**ORDERED** that the Advocacy Holdings Parties are granted leave to issue subpoenas in a form substantively similar to those issued to other clients of the Clevinger Parties in this case to the 26 entities the Clevinger Parties first disclosed as clients at their December 11, 2025, deposition, which are listed at ECF No. 136 at 7–8.

**SO ORDERED.**

G. Michael Harvey

Date: January 20, 2026

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE