**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHAZZ CLEVINGER**,<br><br>*Plaintiff*,<br><br>v.<br><br>**ADVOCACY HOLDINGS, INC.**, and **JOHN KOEPKE**, and **RED CHALK GROUP, LLC**, and **RAYMOND ZENKICH**,<br><br>*Defendants*. | Case No. 1:23-cv-1159 (**JMC**) |
| **ADVOCACY HOLDINGS, INC.**,<br><br>*Plaintiff*,<br><br>v.<br><br>**CHAZZ CLEVINGER**, and **CIVICLICK, INC.**, and **SUPERIOR CAMPAIGN SOLUTIONS, LLC**,<br><br>*Defendants*. | Case No. 1:23-cv-1176 (**JMC**) |

**ADVOCACY HOLDINGS PARTIES' MOTION FOR SUMMARY JUDGMENT**

Advocacy Holdings, Inc. d/b/a OneClickPolitics ("Advocacy Holdings"), John Koepke, Raymond Zenkich, and Red Chalk Group, LLC (collectively, the "Advocacy Holdings Parties"), by counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), respectfully move this Court for summary judgment against Chazz Clevinger ("Clevinger"), CiviClick, Inc. ("CiviClick"), and Superior Campaign Solutions, LLC ("SCS") (collectively, the "Clevinger Parties") in the above-captioned consolidated actions.

Advocacy Holdings is entitled to summary judgment against the Clevinger Parties on Counts I (breach of contract), II (breach of fiduciary duty), III (tortious interference with contracts), and IV (tortious interference with prospective business advantage) of its Amended Complaint (ECF No. 12). The undisputed record, drawn largely from Clevinger's own sworn deposition testimony and documents, establishes that while serving as Advocacy Holdings' Chief Executive Officer, Clevinger formed and operated directly competing businesses, CiviClick and SCS; diverted Advocacy Holdings' customers and revenues; misappropriated its confidential information, including its proprietary platform redesign; and solicited its employees, in breach of his Non-Competition, Non-Solicitation and Non-Disclosure Agreement and his fiduciary duties, and in tortious interference with Advocacy Holdings' existing and prospective customer relationships. The Clevinger Parties' conduct has caused Advocacy Holdings at least $3,017,616.50 in compensatory damages. Because the conduct was willful and malicious, Advocacy Holdings is also entitled to $15,088,082.50 in punitive damages.

The Advocacy Holdings Parties are entitled to summary judgment on all of Clevinger's remaining claims: assault (Count I), fraud in the inducement (Counts VII and IX), negligent misrepresentation (Counts VIII and X), fraudulent concealment (Counts XI and XII), and unjust enrichment (Counts XV through XVIII). Clevinger's testimony undermines his assault claim; his fraud, negligent misrepresentation, and concealment claims rest on purported equity offers he admits he knew by 2020 were no longer available; and his unjust enrichment claims identify no benefit unjustly retained at his expense.

The grounds for this motion are set forth more fully in the accompanying Memorandum of Points and Authorities, the Statement of Undisputed Material Facts filed pursuant to Local Civil Rule 7(h)(1), and the exhibits cited therein, all of which are incorporated by reference.

**WHEREFORE**, the Advocacy Holdings Parties respectfully request that the Court:

**GRANT** this Motion for Summary Judgment in full;

**ENTER JUDGMENT** for Advocacy Holdings on Counts I through IV of its Amended Complaint (ECF No. 12) in Case No. 1:23-cv-1176 in the amount of $3,017,616.50 in compensatory damages and $15,088,082.50 in punitive damages;

**DENY** Clevinger's Motion for Summary Judgment in full;

**ENTER JUDGMENT** for the Advocacy Holdings Parties on Counts I, VII through XII, and XV through XVIII of Clevinger's Amended Complaint in Case No. 1:23-cv-1159; and

**GRANT** such other and further relief as the Court deems just and proper.

A proposed order is submitted herewith pursuant to Local Civil Rule 7(c).

Dated: November 24, 2026

Respectfully Submitted,

**ADVOCACY HOLDINGS, INC.**
**JOHN KOEPKE**
**RAYMOND ZENKICH**
**RED CHALK GROUP, LLC**

**By:**

/s/ *Anand Ramana*

Anand Ramana (DC Bar No. 489478)
M. Hunter Rush (DC Bar No. 90000036)
VEDDER PRICE, P.C.
1401 New York Avenue., NW
Suite 500
Washington, DC 20005
Tel: 202-312-3325
aramana@vedder.com
hrush@vedder.com
*Counsel for Advocacy Holdings, Inc., John Koepke, Raymond Zenkich, and Red Chalk Group, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing on November 24, 2026, with the Clerk of the Court using the CM/ECF system. That system will send notification of such filing to the following persons, and I also certify that I delivered these papers by electronic mail to the following persons:

Kenneth Chase
CHASE LAW & ASSOCIATES, PA
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
kchase@chaselaw.com
*Counsel for Chazz Clevinger, CiviClick, Inc., and Superior Campaign Solutions, LLC.*

/s/ *Anand Ramana*
Anand Ramana (D.C. Bar No. 489478)
VEDDER PRICE, P.C.
1401 New York Ave., NW, Suite 500
Washington, DC 20005
(202) 312-3325
(202) 312-3322 (Facsimile)
aramana@vedder.com
*Counsel for Advocacy Holdings, Inc., John Koepke, Raymond Zenkich, and Red Chalk Group, LLC*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAZZ CLEVINGER,<br><br>*Plaintiff*,<br><br>v.<br><br>ADVOCACY HOLDINGS, INC., and JOHN KOEPKE, and RED CHALK GROUP, LLC, and RAYMOND ZENKICH,<br><br>*Defendants*. | Case No. 1:23-cv-1159 (JMC) |
| ADVOCACY HOLDINGS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>CHAZZ CLEVINGER, and CIVICLICK, INC., and SUPERIOR CAMPAIGN SOLUTIONS, LLC,<br><br>*Defendants*. | Case No. 1:23-cv-1176 (JMC) |

**ADVOCACY HOLDINGS PARTIES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Advocacy Holdings, Inc. d/b/a OneClickPolitics ("Advocacy Holdings"), John Koepke, Raymond Zenkich, and Red Chalk Group, LLC ("Red Chalk") (collectively, the "Advocacy Holdings Parties"), respectfully submit this memorandum of points and authorities in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. By this motion, Advocacy Holdings seeks summary judgment on Counts I (breach of contract), II (breach of fiduciary duty), III (tortious interference with contracts), and IV (tortious interference with prospective business advantage) of its amended complaint (ECF No. 12) against Chazz Clevinger

("Clevinger"), CiviClick, Inc. ("CiviClick"), and Superior Campaign Solutions, LLC ("SCS") (collectively, the "Clevinger Parties"). The Advocacy Holdings Parties also seek summary judgment on all of Clevinger's remaining claims: assault (Count I), fraud in the inducement (Counts VII and IX), negligent misrepresentation (Counts VIII and X), fraudulent concealment (Counts XI and XII), and unjust enrichment (Counts XV through XVIII). For the following reasons, this Court should enter summary judgment for the Advocacy Holdings Parties in both cases and award Advocacy Holdings judgment in the amount of $3,023,616.50 in compensatory damages and an additional $15,118,082.50 in punitive damages.

## INTRODUCTION

The undisputed record—based largely on Clevinger's sworn deposition testimony—establishes that Clevinger maliciously formed and operated competing businesses while Advocacy Holdings' CEO, used them to engage in transactions involving Advocacy Holdings' customers and services, and targeted and deceptively stole Advocacy Holdings' customer relationships for CiviClick immediately after his abrupt and planned resignation. This conduct breached his contractual and fiduciary obligations to Advocacy Holdings and tortiously interfered with Advocacy Holdings' contractual and prospective business relationships, costing his former employer millions of dollars in lost profits.

The record also defeats all of Clevinger's claims that remain after the Advocacy Holdings Parties' motion to dismiss. Clevinger's testimony completely undermines his assault claim. His fraud, negligent misrepresentation, and concealment claims depend on purported equity offers he admits he knew by 2020 were not available, so he knowingly purchased Class B shares and made additional contributions. His unjust-enrichment claims identify no benefit unjustly retained at his expense, and, in any event, written contracts govern the benefits he conferred on Advocacy

Holdings.

The developed Rule 56 record presents no genuine dispute requiring trial on the claims addressed below. Accordingly, and for the following reasons, this Court should enter summary judgment for the Advocacy Holdings Parties and against the Clevinger Parties.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it may affect the outcome under the governing law, and a dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court credits the nonmovant's evidence and draws reasonable inferences in its favor, it need not accept "conclusory allegations lacking any factual basis in the record." *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

This motion for summary judgment is based chiefly on Clevinger's sworn deposition testimony and documents either produced by Clevinger or secured from third parties when Clevinger refused to comply with his discovery obligations. The Clevinger Parties have no legitimate basis to challenge the veracity of Clevinger's own testimony or refute their own documents, and they cannot genuinely dispute the facts upon which this motion is based.

## ARGUMENT

### I. ADVOCACY HOLDINGS IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I THROUGH IV OF ITS AMENDED COMPLAINT

#### A. Clevinger Breached His Contract with Advocacy Holdings (Count I)

Count I alleges breach of Clevinger's Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Agreement"). (ECF No. 12 ¶¶ 216–23.) Under Delaware law, a breach-

of-contract plaintiff must prove "(1) a contractual obligation, (2) a breach of that obligation by the defendant, and (3) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, No. 2020-0310-JTL, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020) (citation omitted). The record establishes enforceable restrictive covenants, Clevinger's breach of them, and resulting monetary harm warranting damages and injunctive relief.

### 1. The Restrictive Covenants in the Agreement Are Valid and Enforceable[1]

Advocacy Holdings seeks enforcement of the restrictive covenants in Sections 4, 5, and 6 of the Agreement. Section 4 prohibits Clevinger from starting, owning, or working for a competing business in an executive, management, or sales capacity. Section 5 prohibits him from soliciting, serving, or diverting Advocacy Holdings' protected customers and vendors. Section 6 prohibits him from soliciting or hiring protected Advocacy Holdings personnel, each during employment and for twelve months afterward. (SUMF ¶¶ 18–20.) Each is enforceable here.

A restrictive covenant is valid and enforceable if it (1) meets general contract law requirements, (2) is reasonable in geographic scope and temporal duration, (3) advances the legitimate economic interests of the party seeking enforcement, and (4) survives a balancing of the equities. *See Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 (Del. 2024); *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005). All four elements are met here.

#### a. The Agreement Meets General Contract Requirements

A valid contract requires offer, acceptance, and consideration. *James J. Gory Mech. Contracting, Inc. v. BPG Residential Partners V, LLC*, No. CIV.A. 6999-VCG, 2011 WL 6935279,

[1] D.C. law governs the other claims. *See infra* note 4.

at *2 (Del. Ch. Dec. 30, 2011). These elements are satisfied when the parties (1) intend to be bound; (2) agree to sufficiently definite terms; and (3) make a bargained-for exchange. *Tigani v. Fisher Dev. Co.*, No. N21A-05-001 CEB, 2022 WL 1039969, at *4–5 (Del. Super. Ct. 2022) (citation omitted).

Advocacy Holdings offered Clevinger the Agreement in 2020. (SUMF ¶ 10.) Clevinger acknowledged that there was "only ever one" non-compete, that he executed the Agreement "in good faith," and that he intended to abide by its terms. (SUMF ¶¶ 12–14.) Under Delaware's objective theory of contracts, signing manifests intent to be bound. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158–59 (Del. 2010).

"[T]he retention of an employee at will, in exchange for a covenant not to compete with the employer, constitutes consideration sufficient to support contractual obligations." *Rsch. & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *9 (Del. Ch. Nov. 18, 1992). Clevinger disputes neither definiteness nor consideration. The Agreement states that Advocacy Holdings "requires [Clevinger] to enter into this Agreement as a condition of entering into and continuing" his at-will employment, "for good and valuable consideration." (SUMF ¶ 17.) His acceptance and continued CEO service bound the parties. (SUMF ¶ 1.)

**b. The Geographic and Temporal Scopes of the Restrictive Covenants Are Reasonable**

"A court reviews the duration and geographic scope of a restriction together, and the restriction's reasonableness is a fact-intensive inquiry." *Payscale Inc. v. Norman*, 361 A.3d 886, 890 (Del. 2026). To determine whether a non-compete is reasonable, Delaware law "focuses on whether the non-compete is essential for the protection of the employer's interests." *Hub Grp., Inc. v. Knoll*, No. 2024-0471-SG, 2024 WL 3453863, at *7 (Del. Ch. July 18, 2024) (cleaned up). At the pleading stage, this Court concluded that neither the Agreement's nationwide scope nor its

"one-year prohibitive period" is "per se unreasonable, especially given that Clevinger worked as a high-level executive," while noting that reasonableness is "context-dependent." (ECF No. 78 at 13); *see also, e.g.*, *Pfuhl*, 1992 WL 345465, at *11–12 (upholding one-year non-compete with "no geographic limitation" for former senior officers). The undisputed record developed since then confirms that conclusion.

The covenants reasonably restrict competition and customer, client, and employee solicitation for twelve months after termination, tolled by litigation enforcing the restrictions. (SUMF ¶¶ 18–20.) Delaware courts regard a year or less as temporally modest and uphold comparable or longer restrictions. *See, e.g.*, *Payscale*, 361 A.3d at 890–93 (finding an "eighteen-month nationwide non-compete" was enforceable against a senior sales director); *Delaware Elevator, Inc. v. Williams*, No. CIV.A. 5596-VCL, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011) (explaining that a "shorter period, such as a year or less" is reasonable because the "former employee could live off savings, take a long vacation, or enjoy some garden leave"); *Dravo Bay LLC v. Whalen*, No. 2025-0355-SEM, 2026 WL 681754, at *11 (Del. Ch. Mar. 10, 2026) (enforcing *three-year* client non-solicitation agreement against departing employee).

A nationwide scope is likewise reasonable, measured by "the area in which a covenantee has an interest the covenants are designed to protect," not physical distance alone. *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011). Delaware courts uphold restrictions coextensive with the area in which the employer does business, and "[a] national scope can be particularly necessary in today's world where so many businesses operate on a national or even global scale." *Id.* (internal quotations omitted); *see also, e.g.*, *Payscale*, 361 A.3d at 892; *Cleveland Integrity Servs., LLC v. Byers*, No. 2024-0371-MTZ, 2025 WL 658369, at *12 (Del. Ch. Feb. 28, 2025); *Wheel Pros, LLC v. ASR Motorsport, LLC*, No.

2:25-CV-929 (NJC) (ARL), 2026 WL 180313, at *13 (E.D.N.Y. Jan. 23, 2026).

The Agreement prohibits establishing or operating a U.S. business that directly competes with Advocacy Holdings. (SUMF ¶¶ 18, 21.) It also prohibits customer/vendor solicitation and employee hiring to engage "in Competitive Business Activity," which is defined to cover the United States. (SUMF ¶¶ 19–20.) Nationwide scope matches Advocacy Holdings' nationwide digital-advocacy and government-relations business connecting constituents with elected representatives and officials in the federal and state governments. (SUMF ¶ 24; ECF No. 72, at 3.) Advocacy Holdings' customers include nonprofit organizations, associations, companies, and agencies across the United States. (Koepke Decl., ECF No. 13-2, ¶ 12; Koepke Decl., Ex. 1 ¶ 9.) Just months after Clevinger's resignation, Advocacy Holdings had served 431 customers in 43 states. (Koepke Decl., ECF No. 13-2, ¶ 12.) It had also secured 32 customers in Australia, Canada, and the United Kingdom by the commencement of this action. (Koepke Decl., ECF No. 13-2, ¶ 12.)

Notably, Clevinger agreed the covenants were reasonable. (SUMF ¶ 23.) Specifically, Clevinger stipulated that "the geographic scope is necessary given that [Advocacy Holdings] conducts business throughout the United States in a specialized industry, regardless of whether it maintains a physical office in a particular location." (SUMF ¶ 23.) His stipulation carries weight, even if it is not dispositive. *See Sunder Energy,* 332 A.3d at 491–92.

#### c. <u>**The Restrictive Covenants Protect Advocacy Holdings' Legitimate Business Interests**</u>

Delaware law recognizes the "protection of employer goodwill, and protection of employer confidential information" as legitimate business interests. *Payscale*, 361 A.3d at 890 (internal citation omitted). Goodwill includes the customer relationships developed at the employer's expense: "[A]n employer has an interest in the goodwill created by its sales representatives and

other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *All Pro Maids*, 2004 WL 1878784, at *5. That interest intensifies where, as here, a senior employee "had the opportunity to develop economically valuable relationships with [the employer's] customers" and "knew all the clients, what services they needed and how much they paid." *Id.* Indeed, "where valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced." *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4 (Del. Ch. 1987).

The covenants protect four legitimate interests. ***First***, they protect Advocacy Holdings' customer relationships. Clevinger has admitted to possessing and exporting a contact list containing 5,471 contacts, modifying customer-account records in Salesforce, and exercising administrative access to Advocacy Holdings' G-Suite system. (Clevinger Decl., ECF No. 24–1, at 48–51, 53, 56–58.) Its confidential customer database supports client service.

***Second***, the covenants protect Advocacy Holdings' goodwill and are designed to stave off customer confusion. The confusion intentionally created by Clevinger was concrete. For example, after migrating to CiviClick, Northeast Maglev informed Advocacy Holdings that "[i]t was our understanding that OCP was no longer going to be developed and that CiviClick was the new iteration," and asked, "Is this not the case?" (ECF No. 55-1, at 4). In soliciting Tennessee Firearms Association, Clevinger asserted that "no one else at OneClickPolitics knows how to conduct those projects other than me" and that Advocacy Holdings' digital advocacy product had performed poorly "as I knew they would in my absence. . . . I've got some things I can do to help," while pitching CiviClick as an alternative product. (SUMF ¶¶ 27–29.) The restrictive covenants prevent

successor-product misrepresentations and disparagement from eroding goodwill and retention.

***Third***, the restrictive covenants protect Advocacy Holdings' launch of a state-of-the-art online digital advocacy platform. In November 2022, while still employed by Advocacy Holdings, Clevinger urgently requested eSpace's design files and received three PDFs totaling 143 redesign pages. (Raymond Zenkich Supplemental Decl., ECF No. 55-2 ¶¶ 11–12, at 5–6.) Advocacy Holdings and CiviClick later featured identical navigation labels and ordering, identical campaign-creation instructions, and matching sample data and typographical errors. (*Id.* at 7–15.) As this Court found during the preliminary injunction proceedings, Clevinger stole the platform design, rebranded it as CiviClick's after his abrupt departure, and offered it to the public. (Mem. Op., ECF No. 65, at 4).

***Fourth***, the restrictive covenants protect Advocacy Holdings' marketability to potential buyers. Zenkich testified that a non-compete from the operating CEO was "critical" because "any buyer was going to want to make sure that all the employees have a non-compete in place." (SUMF ¶ 33.)

Clevinger cannot genuinely dispute that his restrictive covenants seek to protect Advocacy Holdings' legitimate interests.

**d. <u>The Balance of the Equities Clearly Favors Enforcement</u>**

The equities heavily favor enforcement. Delaware courts "balance the employer's interests against the employee's interests," and "a court of equity will not enforce [a non-compete] if, on balance, to do so would impose an unusual hardship on a former employee." *FP UC Holdings, LLC v. Hamilton*, No. CV 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (quotation omitted). Equitable concerns include (1) the employer's need for protection against hardship to the employee, (2) the consideration the employee received, and (3) the defendant's

own conduct. *See McCann Surveyors*, 611 A.2d at 4–5 ("[A] central aspect of the analysis is a balancing of the harms that are threatened to plaintiff and the consequences of specific enforcement to the defendant."); *Payscale*, 361 A.3d at 893 ("[T]he relative value of the consideration that an employee receives is appropriately included in the balancing of the equities."); *Hough Assocs., Inc. v. Hill*, No. CIV.A. 2385-N, 2007 WL 148751, at *19 (Del. Ch. Jan. 17, 2007). Each of those equitable considerations favors enforcement here.

***First***, Clevinger, as a longtime CEO, was clearly in a position to seriously threaten Advocacy Holdings' business if he left to directly compete with, and solicit employees and customers of, Advocacy Holdings. Clevinger claims primary responsibility for Advocacy Holdings' rapid growth while he was CEO. (SUMF ¶¶ 30–32.) Clevinger's theft of Advocacy Holdings' new platform design, export of 5,471 contacts, Salesforce modifications, and G-Suite administrative access positioned him to exploit Advocacy Holdings' confidential information and customer relationships. (Clevinger Decl., ECF No. 24–1, at 48–51, 53, 56–58; Mem. Op., ECF No. 65, at 4.) The twelve-month restraint protected against those insider advantages immediately after departure; Clevinger began prospecting the day after he resigned. (SUMF ¶¶ 2, 65.) A defined competitive restraint does not establish "unusual hardship" merely by delaying competition. *FP UC Holdings*, 2020 WL 1492783, at *6; *McCann Surveyors*, 611 A.2d at 4–5.

***Second***, Clevinger accepted the restrictions in exchange for continued CEO employment. (SUMF ¶¶ 1, 17.) He also was an owner—he purchased and held Class B equity in Advocacy Holdings. (SUMF ¶¶ 188–191.) Continued employment was concrete consideration, independent of anticipated share value. Under *Payscale*, those benefits count despite his present view that his shares are worthless. *Payscale*, 361 A.3d at 893.

***Third***, Clevinger's deliberate conduct diminishes his claimed enforcement costs. While

CEO, he pursued business and collected payments for Advocacy Holdings' services through his secret "side hustle," SCS. (SUMF ¶¶ 38, 46–50, 59–62.) Beginning in fall 2022, he also paid Advocacy Holdings' Director of Strategic Services through SCS to attend conferences and pursue business for SCS. (SUMF ¶¶ 59–62.) Clevinger then began prospecting for competing customers immediately after his resignation, rather than observing the agreed twelve-month restriction. (SUMF ¶ 65.) Under *Hough*, the costs of enforcing the Agreement against a business Clevinger chose to develop in conscious violation of its restrictions "do not weigh heavily on the equitable scale." 2007 WL 148751, at *19. His prohibited enterprise cannot itself excuse compliance.

Advocacy Holdings' need for protection, Clevinger's consideration, and his deliberate competition outweigh the limited restraint's burden. Clevinger cannot genuinely dispute this.

* * *

The three restrictive covenants meet general contract law requirements, are reasonable in duration and geographic scope given Advocacy Holdings' robust nationwide business, and protect Advocacy Holdings' legitimate economic interests. The equities heavily weigh in favor of holding Clevinger to his promises. The covenants are enforceable under Delaware law.

**2. Clevinger Breached the Restrictive Covenants by Operating Competing Businesses and Soliciting Advocacy Holdings' Customers and Personnel**

Sections 4 through 6 of the Agreement prohibit competing business ownership or operation, competitive customer solicitation or contracting, and employee solicitation or hiring during employment and continuing to date. (SUMF ¶¶ 18–20.) Clevinger concedes conduct that breaches each obligation.

***First***, Clevinger breached his obligation to not "fund, own, invest in, set up or start a Competing Business located in the United States; or . . . become employed by, work for or

otherwise provide services to or on behalf of a Competing Business in the United States, to the extent that such employment, work or services involves executive, management or sales responsibilities or duties." (SUMF ¶ 18.) Clevinger has "at all times" been the "hundred percent owner" of CiviClick and the sole owner of SCS "since it was organized." (SUMF ¶¶ 34–35.) He organized SCS on or about May 11, 2021, and incorporated CiviClick on or about July 21, 2022. (SUMF ¶¶ 36–39.) He resigned from Advocacy Holdings on February 1, 2023. (SUMF ¶ 2.)

That CiviClick and SCS are direct competitors of Advocacy Holdings is not genuinely in dispute. CiviClick offers an online grassroots-advocacy software platform and related advocate-acquisition services, the same services Advocacy Holdings provides. (SUMF ¶¶ 24, 41–42, 353.) Clevinger's co-venturer, Christopher Tosto, testified that CiviClick "is a digital grassroots advocacy company." (SUMF ¶ 43.) Tosto further testified that the CiviClick and Advocacy Holdings platforms "all look the same," and counsel for both sides stipulated on the record that "Advocacy Holdings and CiviClick are competitors." (SUMF ¶¶ 43–44.) Clevinger also stole Advocacy Holdings' confidential, unreleased platform redesign and used identical design elements for CiviClick's website and user interface, down to the same typographical errors, before Advocacy Holdings could implement its own redesign. (Mem. Op., ECF No. 65, at 4 ("Clevinger copied Advocacy Holdings' redesign plans for his own use, and . . . Clevinger only had access to those plans because he was CEO of Advocacy Holdings."); Raymond Zenkich Supplemental Declaration, ECF No. 55-2 ¶¶ 11–12, at 5–6.) These admissions establish a Section 4 violation.

***Second***, Clevinger breached his obligation to not "solicit, call upon or contact any Restricted Customer . . . for the purpose of engaging in Competitive Business Activity; . . . contract with, sell to or perform services for or on behalf of a Restricted Customer; . . . or . . . divert, interfere with, or attempt to divert or interfere with, [Advocacy Holdings'] business relationship

with any Restricted Customer . . . ." (SUMF ¶ 19.) Clevinger breached this obligation both before and after he resigned from Advocacy Holdings. Clevinger's breaches are too numerous to detail, but several examples paint a clear picture. While still CEO, Clevinger used SCS to pursue business and to collect customer payments, including payments for Advocacy Holdings' own services. (SUMF ¶¶ 46–50.) On several occasions in 2021 and 2022, Clevinger "brought in business for OneClick and secured . . . funds as part of those broader SCS services to pay for the OneClickPolitics . . . solution." (SUMF ¶ 46.) Rather than have customers pay Advocacy Holdings directly, Clevinger had them pay SCS and then paid Advocacy Holdings himself, because "[i]t was easier for them to make one payment for everything and for me to simply pay . . . OneClick;" the amount SCS remitted "was the portion of what they paid me that was being allocated for grassroots . . . software." (SUMF ¶ 49.) Clevinger always held check-writing authority for SCS and CiviClick, and SCS's checks to Advocacy Holdings bear his signature. (SUMF ¶¶ 51–53.) SCS also undertook a donor-prospecting engagement for the Firearms Policy Coalition, under an initial $150,000 agreement, of which $50,000 was paid, for work Advocacy Holdings was equipped to perform, and the resulting data "was ultimately uploaded . . . into OneClickPolitics." (SUMF ¶¶ 54–58.) And beginning in fall 2022, Clevinger paid Advocacy Holdings' Director of Strategic Services, Christopher Tosto, $1,500 through SCS to attend conferences and trade shows and pursue business for SCS. (SUMF ¶ 60.) Clevinger thus used a competing entity that he alone owned and controlled to develop a customer base while serving as Advocacy Holdings' CEO, in breach of Section 4 of the Agreement.

Clevinger's solicitation of Advocacy Holdings' customers intensified immediately after his resignation. According to Clevinger, he "did not begin prospecting for customers until . . . February the 2nd [2023], the day following [his] departure from Advocacy Holdings."

(SUMF ¶ 65.) CiviClick issued its first invoices days later. (SUMF ¶ 66.) The resulting customer overlap was substantial. The Clevinger Parties have identified 81 CiviClick and SCS customers and affiliated customer entities as of October 2025, 42 of which were Advocacy Holdings customers during the year preceding Clevinger's departure. (Koepke Decl. ¶ 10 & Ex. 1; SUMF ¶ 67.) Those 42 former Advocacy Holdings customers thereafter generated at least $455,155 in revenue for CiviClick or SCS, as reflected in the Clevinger Parties' own invoices and financial records. (Koepke Decl. ¶ 10 & Ex. 1; SUMF ¶¶ 146–260.)

There is no genuine dispute that Advocacy Holdings customers became CiviClick customers during the ongoing restricted period.[2] Clevinger admitted that he had "already transferred quite a few OCP clients to my new platform" and was "doing this for all of our other clients as well." (Clevinger Decl., ECF No. 24-1, at 67.) And the customers confirmed the transfers themselves: JVA Campaigns had "already paid for an account on Chazz's new platform," Waterways Council was "going to try out CiviClicks," and the Coalition for a Prosperous America had "switched over to the CiviClick platform." (*Id.* at 31–32.) These contract and subscription transfers during the restricted period violated Section 5.

***Third***, Clevinger breached his obligation to not "solicit, induce or encourage any [person employed or otherwise engaged by Advocacy Holdings over which Clevinger had supervisory responsibility or work-related contact] to terminate his . . . employment . . . with [Advocacy Holdings]; or . . . hire or attempt to hire any [such person] on behalf of a [competing business]." (SUMF ¶ 20.) In January 2023, while still at Advocacy Holdings, Clevinger told Advocacy Holdings' Director of Strategic Services, Christopher Tosto, that "he was going to be starting his

[2] The restricted period began on the day Clevinger resigned, and under the tolling provision in the Agreement, continues until about 10 months after this Court enters an affirmative judgment against Clevinger for breach of contract. (SUMF ¶ 22.)

own thing." (SUMF ¶ 45.) Tosto resigned from Advocacy Holdings at 3:45 p.m. on February 1, 2023, (SUMF ¶ 63), and Clevinger resigned seven minutes later. (SUMF ¶ 64.) Tosto started working at CiviClick, Advocacy Holdings' direct competitor, as its Director of Client Services (now Chief Operating Officer) in February 2023. (SUMF ¶ 68.) Clevinger breached Section 6 of the Agreement by soliciting and hiring his direct report at Advocacy Holdings.

* * *

Clevinger's sworn testimony conclusively establishes that he violated his covenants to not own or fund a competing business, solicit or contract with Advocacy Holdings' customers, and hire Advocacy Holdings' personnel.

### 3. Clevinger's Breaches Caused Advocacy Holdings Compensable Harm

Under Delaware law, the remedy for breach of a noncompetition agreement is designed to give the employer the benefit of its bargain. *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000) ("It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching party the benefit of its bargain by putting that party in the position it would have been but for the breach."). The profits of the business a non-compete protects "constitute the benefit for which the protected party bargained," so profits gained by the breaching competitor are direct damages, not consequential ones. *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. CV 7471–VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013). The employer also does not need to prove the amount with mathematical certainty: once "the fact of damages" is established, "less certainty is required of the proof establishing the amount of damages," and "doubts about the extent of damages are generally resolved against the breaching party," especially when the breach was willful. *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015).

Banking records show that, among the CiviClick and SCS customers that had been Advocacy Holdings customers during the year preceding Clevinger's departure, CiviClick received $1,131,012.50 from 23 former Advocacy Holdings customers, while SCS received $366,004.00 from at least 12 former Advocacy Holdings customers between February 17, 2023 and October 21, 2025. (SUMF ¶¶ 146–260.) These receipts resulted from Clevinger's competing businesses, customer diversion, and hiring of Tosto. Together, CiviClick and SCS received $1,497,016.50 from former Advocacy Holdings customers identified in those records. (SUMF ¶¶ 255–299 ($613,924) and ¶¶ 300–357 ($883,092.50).)

In addition, Clevinger diverted an additional $1.55 million through the Camp Lejeune business he developed through his competing SCS business while still serving as Advocacy Holdings' CEO. (SUMF ¶¶ 351–58.) SCS provided client-acquisition and marketing services in connection with Camp Lejeune claims by marketing to potential claimants and connecting responsive individuals with law firms. (SUMF ¶ 352.) SCS received $50,000 from Milberg Coleman for Camp Lejeune case-acquisition work in November 2022, (SUMF ¶ 142), and another $500,000 from NSPR Law Services in January 2023 in a wire expressly identifying "CAMP LEJUENE." (SUMF ¶ 143.) At the time, Clevinger remained Advocacy Holdings' CEO. (SUMF ¶ 1.) In June 2023, CiviClick invoiced Paul Napoli/NSPR $500,000 for 250 case retainers at $2,000 each, and the invoice is marked "Paid in Full." (SUMF ¶ 144.) In September 2023, CiviClick invoiced NSPR Law Services another $500,000 for 250 "Camp Lejeune Case Retainers" at $2,000 per retainer, and that invoice likewise is marked paid in full. (SUMF ¶ 145.) Those later payments arose from the same Camp Lejeune client-acquisition business Clevinger pursued through SCS while he remained Advocacy Holdings' CEO and owed it undivided fiduciary duties. (SUMF ¶¶ 1, 142–145.)

Thus, the $1,473,616.50 in lost profits from diverted customer business, together with the $1.55 million generated from the diverted Camp Lejeune business, establishes that Clevinger owes Advocacy Holdings at least $3,023,616.50 in compensatory damages for his breach of restrictive covenants.

Lost profits equal anticipated revenues less the costs of generating them. *E. States Constr. Serv., Inc. v. Darleycap, LLC*, No. N21C-07-188 SPL, 2025 WL 3527000, at *18 (Del. Super. Ct. Sept. 29, 2025). Incremental costs of serving diverted customers must therefore be deducted to calculate a fair damages award.

Those incremental costs are minimal. Advocacy Holdings operates OneClickPolitics as a Software-as-a-Service business, through which its digital advocacy platform is hosted on centralized cloud servers and licensed to customers on a recurring-subscription basis. (SUMF ¶ 148.) Adding additional customers does not require Advocacy Holdings to recreate the product or incur substantial additional labor costs. (SUMF ¶ 149.) Advocacy Holdings incurs approximately $25 per month in incremental cloud-hosting costs and $25 per month in message delivery costs for each additional customer. (SUMF ¶ 152.) Its existing customer support employee currently supports approximately 150 customers and could support at least 100 additional customers without additional staffing, making the incremental customer-support cost negligible. (SUMF ¶ 156.) Accordingly, Advocacy Holdings' total incremental cost of serving an additional customer is approximately $500 to $600 per year. (SUMF ¶¶ 150–57.)

The Clevinger Parties identified 81 CiviClick and SCS customers, 42 of whom were former Advocacy Holdings customers, leaving 39 additional customers that Advocacy Holdings had the capacity to serve. (SUMF ¶ 67; SUMF ¶¶ 56, 139–40, 148–49.) Advocacy Holdings' existing customer support employee could accommodate at least 100 additional customers without

additional staffing, and the incremental cost of serving an additional customer is approximately $500 to $600 per year. (SUMF ¶ 157.) Even using the higher $600 estimate, Advocacy Holdings could have served all 39 additional customers at an incremental cost of only $23,400 per year, without adding customer-support personnel. (SUMF ¶¶ 150–57.) After deducting that $23,400 in incremental costs from the $3,047,016.50 in revenues generated from former Advocacy Holdings customers, Advocacy Holdings' lost profits total at least $3,023,616.50.

* * *

There is no genuine dispute that the restrictive covenants in the Agreement are enforceable under Delaware law, that Clevinger breached them, and that Advocacy Holdings suffered at least $3,023,616.50 in damages as a direct and proximate result. Accordingly, this Court should enter summary judgment on Count I for Advocacy Holdings and against Clevinger, and award Advocacy Holdings $3,023,616.50 in compensatory damages.[3]

### B. Clevinger Breached His Fiduciary Duties to Advocacy Holdings (Count II)

In Count II, Advocacy Holdings asserts a claim for breach of fiduciary duty against Clevinger. (ECF No. 12 ¶¶ 224–27.) Clevinger breached his fiduciary duties to Advocacy Holdings, resulting in millions of dollars in damages to Advocacy Holdings.

To prevail on a claim of breach of fiduciary duty under District of Columbia law,[4] a

---

[3] This is the amount of damages sustained by Advocacy Holdings through October 2025. Not surprisingly, the Clevinger Parties have refused to comply with their Rule 26(e) obligation to supplement their discovery with documents that reflect CiviClick's and SCS' revenues since October 2025. The Advocacy Holdings Parties are currently attempting to compel, once again, documents that are responsive to discovery requests issued years ago. Advocacy Holdings intends to supplement its damage calculations in its reply brief once it receives the supplemental discovery to which it is entitled.

[4] Under D.C. law for tort claims, the choice of law depends on (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the residence and place of business of the parties, and (4) the place where the parties' relationship is centered. RESTATEMENT (SECOND) OF CONFLICTS, § 145(2). Here, the breach of fiduciary duty took place in the District, the parties were situated in the District at all relevant times, and their relationship was centered in D.C. Additionally, the extent of Delaware corporate law—especially for cases involving Delaware corporations like Advocacy Holdings—is persuasive authority here. *See Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 77 n.4 (D.D.C. 2009).

plaintiff must show "(1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of fiduciary duties." *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 120 (D.D.C. 2018) (quoting *Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234, 248 (D.D.C. 2013)). "Employees – especially managers, corporate officers, and directors – owe an undivided and unselfish loyalty to the corporation such that there shall be no conflict between duty and self interest." *PM Servs. Co. v. Odoi Assocs., Inc.*, No. 03-cv-1810, 2006 WL 20382, at *27 (D.D.C. Jan. 4, 2006) (citation omitted). The undisputed evidence supports all three breach of fiduciary duty elements.

### 1. **Clevinger Owed Fiduciary Duties to Advocacy Holdings as Its Longtime Chief Executive Officer**

The material facts establishing the first element are not genuinely in dispute. Under D.C. law, an employee "owe[s] his employer the duty of undivided loyalty" and a corresponding "duty to disclose to [the corporation] any knowledge he obtain[s] which [i]s relevant to his agency relationship." *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 783 (D.C. 1976); *accord United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1050 (Del. 2021) (recognizing the same duty of "undivided and unselfish loyalty" under Delaware law). This Court has already explained that "[a]s an officer of Advocacy Holdings, Clevinger was bound by fiduciary duties to not compete with, and certainly to not actively harm, his employer." ECF No. 78, at 14 (citing *Willens v. 2720 Wisconsin Ave. Co-op. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C. 2004)).

Clevinger served as Advocacy Holdings' Chief Executive Officer from November 2016 until his resignation on February 1, 2023. (SUMF ¶¶ 1–2.) In that role he "managed sales and marketing operations, which included recruiting, hiring, training, and general business

development." (Clevinger First Am. Compl., ECF No. 29 ¶ 39.) Co-owner Raymond Zenkich testified that Clevinger "was an officer" of the company—meaning "someone who can contract on behalf of the company," who could "act as the face of" Advocacy Holdings, "[h]ave customer discussions, talk to vendors . . . sign contracts where appropriate." (SUMF ¶ 8.) Clevinger conceded he "owed a fiduciary duty to OCP." (ECF No. 78 at 14; ECF No. 26–1 at 6–7.) His CEO role imposed the fiduciary duties of loyalty and nondisclosure.

#### 2. **Clevinger Breached His Fiduciary Duties by Sabotaging Advocacy Holdings Before He Resigned and by Operating Competing Businesses Both Before and After Managing Advocacy Holdings**

The duty of loyalty forbids an officer, during his employment, from "actively and directly competing with the employer for customers," from "solicit[ing] for himself . . . business which the position requires the employee to obtain for the employer," and, more generally, from permitting any "conflict between duty and self-interest." *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996); *see also Phillips v. Mabus*, 894 F. Supp. 2d 71, 92–93 (D.D.C. 2012).

The Count I admissions establish fiduciary breaches. While CEO, Clevinger wholly owned competing SCS and CiviClick, diverted business, routed customer payments through SCS, controlled their remittances, and paid Christopher Tosto to pursue SCS business. (SUMF ¶¶ 57–64, 69–73.)

Before resigning abruptly on February 1, 2023, Clevinger deprived Advocacy Holdings of personnel and data, terminating Andrew Tucker on January 20 and Darren Pyles on January 31. (July 6, 2023 Hr'g Tr., ECF No. 74-1, at 32:16–36:2.) Neither Koepke nor Zenkich knew of his imminent resignation or Tosto's departure when he made those terminations. (July 6, 2023 Hr'g Tr., ECF No. 74-1, at 35:19–36:2.) Clevinger also deleted Advocacy Holdings' user accounts and

the associated company data. (July 6, 2023 Hr'g Tr., ECF No. 74-1, at 36:3–37:18.) Google audit records show deletion of Pyles's account at 3:38 p.m. on January 31. (Clevinger Decl., ECF No. 24-1 at 46.) His routine-deletion explanation did not account for deleting Tosto's account before consistently identifying Tosto's resignation. (July 6, 2023 Hr'g Tr., ECF No. 74-1, 37:1–18.) Clevinger then resigned on February 1, 2023. (SUMF ¶ 2.)

Following his resignation, Clevinger launched CiviClick using Advocacy Holdings' stolen confidential redesign. While Advocacy Holdings' CEO, Clevinger led the effort beginning in May 2022 to "leap frog OCP's competitors" by overhauling the Advocacy Holdings online platform, design, and user experience. (ECF No. 12-1 ¶ 40; Mem. Op., ECF No. 65, at 3 (finding Clevinger was "heavily involved in the redesign of Advocacy Holdings' website and platform while he was CEO").) Indeed, "the information on CiviClick's website is identical to Advocacy Holdings' redesign plans," down to graphics containing the same typographical errors. ECF No. 65, at 4. The Court thus found it "apparent that Clevinger copied Advocacy Holdings' redesign plans for his own use" and used Advocacy Holdings' proprietary website, user interface, and platform redesign to develop CiviClick's competing platform. ECF No. 65, at 3–4. He also blurred the products' identities: days after resigning, asked whether CiviClick was Advocacy Holdings' "successor product," he responded: "CiviClick is the new product. You'll love it." (SUMF ¶ 89.) He converted Advocacy Holdings' contacts and relationships into competing revenue through immediate solicitation and misleading claims about Advocacy Holdings' future.

Clevinger's testimony ties his knowing, malicious conduct to a personal grievance. He testified that by 2020, he "1000 percent knew" that he was "being betrayed" and "being lied to." (SUMF ¶ 195.) He described that misperceived betrayal as "very personal," that he still carried "a great deal of pain" from it, and accused Advocacy Holdings' principals of betraying him "in the

worst form." (SUMF ¶ 93.) Most tellingly, Clevinger admitted that his motivation to start CiviClick was "derived . . . largely" from what he regarded as Advocacy Holdings' "false promises," "lies," and "fraudulent inducements," explaining that "when somebody lies to you and screws you, you should be able to get out of that situation." (SUMF ¶ 93.) He reiterated that CiviClick was his means of "free[ing] [him]self" from people whom he believed had lied to him for years. (SUMF ¶ 93.) By his own account, that sense of betrayal motivated the competing enterprise.

Clevinger used his entrusted position to weaken Advocacy Holdings and strengthen his competing businesses through firing Tucker and Pyles, appropriating its unreleased product and customer information, and exploiting insider knowledge, in breach of his fiduciary duties.

### 3. **Advocacy Holdings Is Entitled to Relief for Clevinger's Breaches of Fiduciary Duty**

The final element, resulting injury, is also satisfied. Under D.C. law, a fiduciary breach is actionable when "injury accrues to the beneficiary or the fiduciary profits thereby." *Beckman v. Farmer*, 579 A.2d 618, 651–52 (D.C. 1990). Advocacy Holdings therefore need not prove a lost-profits figure to recover. Where a beneficiary cannot quantify its own loss, disgorgement of the fiduciary's profits is "just compensation for the wrong," and refusing it would "leave [the beneficiary] without a remedy" and "gut fiduciary law." *In re Est. of Corriea*, 719 A.2d 1234, 1241 (D.C. 1998). Disgorgement is not a penalty; it is intended "to prevent an unjust enrichment" after a breach of fiduciary duty. *Id.* at 1240–41.

The undisputed record establishes that Clevinger owes Advocacy Holdings at least $3,023,616.50 in compensatory damages for his breaches of fiduciary duty.[5] First, Advocacy

[5] The presently documented receipts establish a floor, not a ceiling, on Advocacy Holdings' damages. Advocacy Holdings repeatedly sought identification of the Clevinger Parties' clients and production of their invoices. *See generally* ECF Nos. 95, 96, 104, 112–13, 117, 119, 136, 138. SCS and CiviClick have not produced ordinary

Holdings lost $1,473,616.50 in profits from former Advocacy Holdings customers whose business Clevinger diverted to SCS and CiviClick. (*See supra* § I.A.3; SUMF ¶¶ 146–260.) The Clevinger Parties' banking records establish $1,497,016.50 in corresponding receipts, consisting of $613,924 in customer payments that reconcile by payer and amount to Clevinger's produced invoices and another $883,092.50 in receipts that reconcile by unique amount and timing to his produced invoices. (SUMF ¶¶ 255–299 ($613,924) and ¶¶ 300–357 ($883,092.50).) After deducting $23,400 in incremental costs that Advocacy Holdings would have incurred to service the corresponding business, Advocacy Holdings lost $1,473,616.50 in profits. Second, Clevinger diverted an additional $1.55 million through the Camp Lejeune business he developed through SCS while still serving as Advocacy Holdings' CEO. (*See supra* § I.A.3; SUMF ¶¶ 351–58.) Thus, the $1,473,616.50 in lost profits from diverted customer business, together with the $1.55 million generated from the diverted Camp Lejeune business, establishes that Clevinger owes Advocacy Holdings at least $3,023,616.50 in compensatory damages for his breaches of fiduciary duty.

In addition to a compensatory damages award, Advocacy Holdings also seeks and is entitled to punitive damages at a ratio of 5:1 given the brazen, malicious, and intentional breaches of Clevinger's fiduciary duties. Punitive damages are recoverable where "there exists an independent fiduciary relationship between the parties," *Wagman v. Lee*, 457 A.2d 401, 404 (D.C. 1983), upon clear and convincing evidence of malice, recklessness, or willful disregard of the plaintiff's rights, *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995). The requested award of five times compensatory damages falls well within the single-digit range that the Supreme Court and D.C. courts have found most likely to satisfy due process. *See, e.g.*, *Modern*

financial records establishing their complete income. They represented that they lacked income statements and tax returns reflecting income and declared that Court-ordered Form 7004 extension applications did not exist. (*Id.* at 2–6, 12; ECF No. 141-1 ¶¶ 3–4.) The present record therefore does not capture the full amount of revenues generated by Clevinger's competing businesses.

*Mgmt. Co. v. Wilson*, 997 A.2d 37, 52–59 (D.C. 2010) (upholding punitive awards of approximately 6:1 and 11.1:1 arising from a calculated scheme to deprive a homeowner of her equity); *Dyer v. William S. Bergman & Assocs., Inc.*, 657 A.2d 1132, 1135, 1138–39 (D.C. 1995).

The scienter element is supported by clear and convincing instances of self-dealing in this case. As explained above, Clevinger knowingly operated competing businesses, routed Advocacy Holdings' customer funds through a company he controlled, diverted corporate opportunities and revenues, stole Advocacy Holdings' new digital advocacy platform, and deleted or altered company information before his departure. That sustained, self-interested conduct with the clear intent to significantly harm Advocacy Holdings' business demonstrates at minimum willful disregard of Advocacy Holdings' rights. Accordingly, this Court should additionally award Advocacy Holdings punitive damages for his knowing and malicious misconduct.

* * *

This Court has already found that, as Advocacy Holdings' CEO, Clevinger was "bound by fiduciary duties to not compete with, and certainly to not actively harm, his employer." (ECF No. 78, at 14.) The developed record establishes that Clevinger repeatedly, intentionally, and maliciously breached his duties while still serving as Advocacy Holdings' CEO by operating a competing business, diverting corporate opportunities and customer revenues to that business, using Advocacy Holdings personnel to advance it, and taking or destroying company information before his departure. Accordingly, this Court should award Advocacy Holdings at least $3,023,616.50 in compensatory damages for Clevinger's breaches of fiduciary duty, together with $15,118,082.50 in punitive damages for his knowing, malicious, and brazen misconduct.

### C. The Clevinger Parties Tortiously Interfered with Advocacy Holdings' Contractual and Prospective Business Relationships (Counts III and IV)

In Counts III and IV, Advocacy Holdings contends that the Clevinger Parties tortiously

interfered with its existing and prospective customer relationships, respectively. (ECF No. 12 ¶¶ 228–38.) Clevinger used insider knowledge of customer relationships, pricing, and contract terms, together with misleading statements about Advocacy Holdings and CiviClick, to divert customers to his competing entities. (SUMF ¶¶ 3–8, 83–117.) That conduct supports Advocacy Holdings' claims for tortious interference with contract and prospective business advantage.

D.C. law governs both claims. (ECF No. 78 at 15–16.) To establish tortious interference with contract, Advocacy Holdings must prove: "(1) the existence of a contract, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of the contract's breach, and (4) damages resulting from the breach." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008) (internal citation omitted). Intent is satisfied where the defendant desires the interference or "knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 203 (D.C. 2017). The prospective business advantage claim requires the same showing, except that Advocacy Holdings need only prove a prospective advantageous business transaction rather than an existing contract. *Uzoukwu v. Metro. Washington Council of Governments*, 983 F. Supp. 2d 67, 90 (D.D.C. 2013). The record establishes interference with existing contracts (Count III) and expiring subscribers' renewals (Count IV).

### 1. The Clevinger Parties Tortiously Interfered with Advocacy Holdings' Freedomworks Contract (Count III)

Advocacy Holdings and FreedomWorks had an existing two-year contract when Clevinger left Advocacy Holdings. (ECF No. 12-8.) Their agreement ran from March 15, 2022 through March 14, 2024, and required FreedomWorks to pay $40,000 per year, leaving a $40,000 payment due during the remaining contract term. (ECF No. 12-8.) Clevinger knew of the FreedomWorks relationship and contract through his work as Advocacy Holdings' chief executive, where he

prided himself on micromanaging Advocacy Holdings' sales and customer relationships. (SUMF ¶¶ 3–4, 83.)

The timing is not happenstance. On March 9, 2023, while FreedomWorks' Advocacy Holdings contract remained in effect, Advocacy Holdings intercepted an email from FreedomWorks to Clevinger's former Advocacy Holdings account indicating that Clevinger had been working with FreedomWorks on Wisconsin campaigns. (SUMF ¶¶ 83–84.) Two weeks later, on March 23, FreedomWorks terminated its relationship with Advocacy Holdings, nearly a year before the contract's March 14, 2024 end date. (Am. Compl., ECF No. 12-8, at 1; SUMF ¶ 85.) By April 2023, FreedomWorks was using CiviClick to deliver the same advocacy messages Advocacy Holdings had previously delivered. (July 6, 2023 Prelim. Inj. Hr'g Tr., ECF No. 74-1, at 163:15–164:17). The Clevinger Parties admit in verified interrogatory responses that FreedomWorks was a CiviClick client. (SUMF ¶ 75.)

Materially similar facts supported intentional procurement in *Dyer*, where a departing employee met with his employer's client and proposed to take over the account, and the client then terminated its contract so the employee's new firm could service it. *Dyer*, 657 A.2d at 1137–38. The court held that the circumstantial evidence permitted the inference that the employee's conduct was designed to induce the client's departure. *Id.* at 1138. Likewise, Clevinger served FreedomWorks during its Advocacy Holdings contract; it then terminated nearly a year early and moved equivalent work to CiviClick.

FreedomWorks' early termination deprived Advocacy Holdings of the remaining $40,000 contract payment. D.C. law requires only the interference to procure "a failure of performance, whether by the terms of the contract in question or not." *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003). CiviClick's records confirm that

FreedomWorks paid CiviClick for the diverted relationship. (SUMF ¶¶ 70–75.) This Court should enter summary judgment in favor of Advocacy Holdings for $40,000 on Count III.

### 2. The Clevinger Parties tortiously interfered with Advocacy Holdings' prospective customer relationships (Count IV)

Count IV addresses Advocacy Holdings' recurring subscribers whose subscriptions were up for renewal when Clevinger approached them. The Clevinger Parties intentionally diverted those annual subscribers from Advocacy Holdings to CiviClick or SCS. The undisputed record establishes each of the elements of tortious interference with business expectancies.

#### a. Advocacy Holdings had commercially reasonable renewal expectations with its recurring subscribers.

Advocacy Holdings had protected business expectancies in the continued patronage of its recurring subscribers. D.C. law protects "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate," including "the opportunity of obtaining customers." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978). An expectancy is commercially reasonable where the plaintiff's actual business history supports it. *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 351 (D.C. 2015).

Advocacy Holdings' subscription business created precisely that type of expectancy. It licensed access to its online advocacy platform through annual and multi-year subscriptions, with customers paying for defined subscription terms and returning for successive terms. (SUMF ¶¶ 8–9, 139–48.) Advocacy Holdings had 138 paying customers in 2020, 246 in 2021, and 200 in 2022, the final full year before Clevinger departed. (ECF No. 13-2, at 4.) During the year preceding Clevinger's departure, Advocacy Holdings maintained invoiced customer relationships with 197 customers. (SUMF ¶ 26.) The Clevinger Parties disclosed 81 combined CiviClick and SCS customers and affiliated customer entities. (SUMF ¶ 67.) Comparing those lists shows that 42 of

those 81 entities were former Advocacy Holdings customers. The 42 customers at issue held subscriptions with defined terms, and several had renewed before. That renewal history is the "background of business experience" that makes continued business commercially reasonable to anticipate. *Carr*, 395 A.2d at 84. (SUMF ¶ 25.)

**b. The Clevinger Parties knew about Advocacy Holdings' annual customer relationships**

As Advocacy Holdings' CEO, Clevinger (and therefore his companies CiviClick and SCS) knew about Advocacy Holdings' annual subscriber customers.

A defendant must know of the business relationships or expectancies with which it interferes, although the plaintiff may establish knowledge of an existing array of business relationships rather than the defendant's direct knowledge of every individual transaction. *See Close It! Title Services, Inc. v. Nadel*, 248 A.3d 132, 141 (D.C. 2021).

Clevinger knew those relationships as the top executive from the inside. Knowledge of an expectancy "may be shown by the interferer's conduct," including targeting of the very transactions at issue. *Havilah*, 108 A.3d at 352. As CEO, Clevinger oversaw sales and customer contract discussions. (SUMF ¶ 30.) Google audit records show he exported his Advocacy Holdings account's 5,471 contacts shortly before resigning. (Zenkich Decl., ECF No. 13-3, ¶¶ 24, 27–30.) At least 42 of the 81 CiviClick and SCS customers were Advocacy Holdings customers in the preceding year, confirming knowledge. (SUMF ¶ 67.) Customer overlap and Clevinger's management role support knowledge of the recurring relationships. *See Close It!*, 248 A.3d at 141–42; *Havilah*, 108 A.3d at 351–52.

**c. The Clevinger Parties intentionally procured the switch from Advocacy Holdings to CiviClick**

Intentional interference exists when the defendant desires to interfere with the plaintiff's

business expectancy or knows that its conduct is certain or substantially certain to do so. *Whitt*, 157 A.3d at 202–04. Once the plaintiff establishes intentional interference, the defendant bears the burden of establishing justification or privilege. *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900–01 (D.C. 2008).

As the Court recognized, dishonest solicitation goes beyond "[m]erely competing and winning over customers." (ECF No. 78, at 17.) The actor's motive and the nature of the conduct drive whether interference is improper. *Armstrong v. Thompson*, 80 A.3d 177, 190–91 (D.C. 2013).

The record establishes a systematic pattern of intentional interference. Clevinger began prospecting for customers on February 2, 2023, the day after leaving Advocacy Holdings. (SUMF ¶ 65.) He then approached Advocacy Holdings customers as their annual or multi-year subscriptions reached renewal and offered to move their advocacy work to CiviClick. (SUMF ¶¶ 67–147.) In doing so, Clevinger repeatedly invoked his existing customer relationships and, in several instances, portrayed CiviClick as the continuation of Advocacy Holdings' platform. He told Waterways Council that he had "dozens of my old customers on the new product" and offered pricing based on their "longstanding relationship." (SUMF ¶¶ 79–80.) He offered to "migrate" Firearms Policy Coalition to CiviClick while representing that Advocacy Holdings was "closing." (SUMF ¶¶ 110.) And he told NAIOP's CEO while NAIOP remained an Advocacy Holdings subscriber that "CiviClick is the new product. You'll love it." (SUMF ¶ 89.)

That conduct closely resembles the interference sustained in *NCRIC*, where the defendant told customers that the plaintiff was going to close and assisted them in moving their business elsewhere. 957 A.2d at 896, 900–01. Here, the inference is reinforced by the result: 42 entities in the Clevinger Parties' 81-entity combined customer universe were Advocacy Holdings customers during the year preceding Clevinger's departure. (SUMF ¶¶ 67–147.) That migration, insider

knowledge, and solicitation support intentional targeting rather than independent customer development.

**d. Advocacy Holdings has suffered at least $455,155 in damages as a result of the Clevinger Parties' tortious interference with its annual subscribers**

D.C. law permits recovery of "the pecuniary loss of the benefits of the contract or the prospective relation," which need not be calculated with mathematical precision so long as it rests on a reasonable estimate. *Havilah*, 108 A.3d at 352–53. Although an award may not rest on "speculation or guesswork," it may constitute a "just and reasonable estimate based on relevant data," and "'mathematical precision' is not required." *NCRIC,* 957 A.2d at 903. The evidence need only provide "an adequate basis for a reasoned judgment." *Id.* There must be a "substantial and direct causal link" between the interference and its damages. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1039 (D.C. 2015).

The customer records supply that causal connection. Forty-two former Advocacy Holdings customers subsequently became customers of CiviClick or SCS. (SUMF ¶¶ 67, 83–147.)

Invoices and financial records quantify revenue from former Advocacy Holdings customers diverted to CiviClick or SCS. (SUMF ¶¶ 231–358.) The presently matched invoices and bank records establish at least $455,155 in CiviClick and SCS revenue from those diverted customer relationships. (SUMF ¶¶ 146–260.) These records provide "an adequate basis for a reasoned judgment" about Advocacy Holdings' diverted revenue. *NCRIC*, 957 A.2d at 903.

*NCRIC* confirms that customer-generated revenue provides the starting point for that calculation. In that case, the defendant's interference caused physicians to leave a hospital, resulting in an approximately $10 million annual decline in gross patient revenue. *Id.* at 903. The hospital then applied a 30% marginal cost rate to that lost revenue to calculate a $7 million annual

net revenue loss. *Id.* The court upheld the award because revenue evidence reasonably supported the estimated interference loss. *Id.* at 903–04. The court emphasized that it did not need to "reconstruct the precise mathematical formula that the jury adopted" so long as the award constituted a "just and reasonable estimate based on relevant data." *Id.* at 904. The $455,155 figure is conservative. The Clevinger Parties have not produced every invoice or fully supplemented their financial records for the relevant period.[6] Traceable CiviClick and SCS revenue identifies diverted customer business and supports a reasonable pecuniary-loss estimate. *See NCRIC*, 957 A.2d at 902–04.

* * *

The record establishes liability, causation, and a reasonable basis for damages on Counts III and IV. The Clevinger Parties diverted FreedomWorks' existing contract, resulting in the loss of $40,000, and intentionally interfered with Advocacy Holdings' expectancies for subscription renewals, resulting in an additional $455,155 in damages. Summary judgment should enter for Advocacy Holdings on both counts.

## II. CLEVINGER'S CLAIMS FAIL AS A MATTER OF LAW

Clevinger's assault, fraudulent-inducement, negligent-misrepresentation, fraudulent-concealment, and unjust-enrichment claims survived the pleadings challenge but fail on the developed record. The Advocacy Holdings Parties are entitled to judgment on Clevinger's remaining claims.

### A. Clevinger's Assault Claim Fails as a Matter of Law (Count I)

In Count I of his amended complaint, Clevinger maintains that Koepke assaulted him on January 17, 2023. (ECF No. 29 ¶¶ 201–204, 265–274.) Clevinger cannot establish that Koepke

---

[6] *See supra* note 5.

assaulted him during the January 17, 2023 meeting in Chicago—or at any time.

Under D.C. law,[7] assault requires proof that the defendant (1) acted with intent to cause imminent harmful or offensive contact, or apprehension of such contact; (2) thereby placed the plaintiff in imminent apprehension of that contact; and (3) the plaintiff's apprehension was objectively reasonable. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014). Clevinger's own testimony establishes that Koepke did not intend to assault him, shows that Clevinger did not subjectively believe he was in imminent physical danger, and in any event the circumstances gave him no objectively reasonable basis to do so.

**1. The record does not establish that Koepke intended to cause imminent harmful or offensive contact or apprehension of such contact**

Intent is an essential element of assault. *Madden v. D.C. Transit System, Inc.*, 307 A.2d 756, 757 (D.C. 1973). The required intent entails a "purposeful design either to engender fear" or "do violence to" the plaintiff. *Caesar v. United States*, 357 A.3d 1146, 1162 (D.C. 2026).

Clevinger conceded under oath that he has no evidence of the required intent. Clevinger testified that the "assault" was simply when Koepke said, "I think we should take a baseball bat to Chazz," while making what Clevinger described as a "lunge" in his chair. (SUMF ¶¶ 180–181.) According to Clevinger, the "lunge" was a ***seated*** shoulder movement that Clevinger estimated at six to eighteen inches, made from approximately four feet away across a conference table. Clevinger did not recall Koepke even standing up. (SUMF ¶¶ 169–172.) Asked whether he thought Koepke might assault him "right then and right there" or sometime after the meeting, Clevinger

[7] Because the Court has already applied D.C. law to this claim, the Advocacy Holdings Parties do the same here. (ECF No. 78 at 26 n.5, 27.) Even so, Illinois likewise defines civil assault as "an intentional act," directed toward the plaintiff, that causes the plaintiff "reasonable apprehension of an imminent . . . offensive contact with the plaintiff's person." *McNeil v. Carter*, 318 Ill. App. 3d 939, 944 (2001). Illinois further requires the defendant to have had the "apparent present ability" to engage in the harmful or offensive contact. *Parrish v. Donahue*, 110 Ill. App. 3d 1081, 1083 (1982). Thus, under either jurisdiction's law, Clevinger must establish intentional conduct causing a reasonable apprehension of imminent harmful or offensive contact.

answered: "I wasn't sure." (SUMF ¶ 158.) Koepke, for his part, categorically denied making any threat to assault Clevinger, including the alleged statement involving a baseball bat, or having any intent to do so. (SUMF ¶¶ 166–167.) Clevinger's description of the event does not establish the required intent.

**2. Clevinger did not apprehend imminent harmful or offensive contact.**

Nor did Clevinger even worry that Koepke was serious. Assault requires fear of "imminent contact, as distinguished from any contact in the future." *Blackwell v. Planet Fitness Franchising, LLC*, 356 A.3d 1251, 1257–59 (D.C. 2026). While words can support an assault, they do so only when "accompanied by other circumstances that put a person in reasonable apprehension of imminent offensive contact." *Id.* at 1258–59.

As a threshold matter, Clevinger testified that he could not tell whether the statement was "an actual legitimate threat or a joke," and no bat, contact, or other menacing conduct accompanied the statement. (SUMF ¶ 165.) Clevinger also testified that he was not sure how or when Koepke planned the assault: Koepke, he explained, "might physically assault me with his fists, or some other body part, in that moment," or "might assault me with a bat at some point . . . in the future." (SUMF ¶ 160.) Clevinger "really didn't know." (SUMF ¶¶ 159–161.) Clevinger's own background also provides context negating any purported "apprehension." Clevinger played defensive back and running back on his high school varsity football team. (SUMF ¶ 162.) Thus, Clevinger's personal experience with a violent contact sport belies the reasonableness of interpreting Koepke's six-to-eighteen-inch seated shoulder movement as signaling an imminent physical strike intended to harm him.

Clevinger's uncertainty defeats the second element. The Court itself noted at the pleading stage that "[i]f Clevinger had stated only that he feared an attack 'at some point in the near future,'

the Court would be inclined to agree with Koepke's position." (ECF No. 78 at 27.) *Blackwell* has since confirmed that apprehension of contact "possible at some point later in the future" does not suffice. 356 A.3d at 1258–59.

According to Clevinger, he continued to meet with Koepke and Zenkich for another thirty minutes to an hour after the "assault," conduct inconsistent with imminent apprehension. (SUMF ¶¶ 173–76.) After the meeting, Clevinger accepted bourbon in Koepke's private office. (SUMF ¶ 175.) He then accepted a ride from Koepke in Koepke's Jeep to Gibson's Steakhouse for dinner and more drinks before accepting Koepke's transportation back to his hotel. (SUMF ¶ 176.) He described a "civil," conflict-free dinner. (SUMF ¶¶ 178–79.) This is not the conduct of a person in fear of an imminent physical assault.

**3. Any claimed apprehension was not objectively reasonable.**

These circumstances also defeat objective reasonableness. *See Blackwell*, 356 A.3d at 1258–59. Clevinger anticipated no imminent contact and identified no bat in the conference room or Red Chalk offices. (SUMF ¶ 164.) Koepke never touched him and, by Clevinger's admission, had never physically assaulted him before. (SUMF ¶¶ 165.) Nor did the alleged incident interrupt the business meeting. Clevinger remained with Koepke, and the meeting continued for another thirty minutes to an hour before rolling straight into a one-on-one cocktail hour and premium Chicago steakhouse dinner. (SUMF ¶¶ 174–79.)

* * *

No reasonable jury could find the required intent, imminent apprehension, or objectively reasonable fear on this record. Judgment should enter for Koepke on Clevinger's assault claim.

**B. Clevinger's Fraudulent Inducement Claims Fail as a Matter of Law (Counts VII and IX)**

Clevinger alleges that false promises of "founders shares" and formal officer/director

positions induced continued work and a $46,000 contribution. (ECF No. 78 at 34–39.) The record defeats those allegations.

Under D.C. law, a fraudulent-inducement plaintiff must prove "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken . . . in reliance upon the representation, (6) which consequently resulted in provable damages." *Railan v. Katyal*, 766 A.2d 998, 1010 (D.C. 2001). Fraud "is never presumed," and each element "must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977). That burden governs at summary judgment. *Washington Inv. Partners of Delaware, LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 575 n.7 (D.C. 2011).

Two further rules apply here. *First*, a promise of future conduct supports fraud only when "at the time of its making, the promisor had no present intention of carrying it out," and "[t]he mere breach of a promise is never enough in itself to establish the fraudulent intent." *Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005); *Farooqui v. Silkwave Holdings Ltd.*, 363 A.3d 1153, 1167–68 (D.C. 2026). By contrast, "a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence." *Bennett*, 377 A.2d at 61. *Second*, a party seeking to avoid a contract for fraudulent inducement must show that the misrepresentation concerned an essential term of the contract, that it was a material factor in inducing him to sign, and that he signed believing it to be true. *Haynes v. Kuder*, 591 A.2d 1286, 1290 n.5 (D.C. 1991). Clevinger cannot carry his burden on falsity, fraudulent intent, reliance, or damages.[8]

[8] As argued, the Advocacy Holdings Parties move for summary judgment on their pleaded affirmative defense of waiver. *See* Answer to Amended Compl., ECF No. 82, at 30.

**1. The Developed Record Does Not Establish an Actionable False Representation Concerning Clevinger's Equity**

"A mere promise to perform or not perform a future act, which is subsequently broken, is not embraced in the term [of fraud] as it is used here." *Giotis v. Lampkin*, 145 A.2d 779, 781 (D.C. 1958). Clevinger's own descriptions of the supposed equity promise are irreconcilable. His amended complaint alleges "founders shares" ranging from 10% to 25%. (ECF No. 29 ¶¶ 49–55.) He then testified that he had been promised 33.3% and equal partnership with Koepke and Zenkich. (SUMF ¶ 182.) His supplemental interrogatory responses are themselves inconsistent. In one response, Clevinger describes the alleged promise as a 10–25% "founders share" equity stake; elsewhere, he says the original promise was 25%, later reduced to 10%, then 5.5%, and ultimately Class B shares. (SUMF ¶ 183.) A shifting range of future equity in an entity that did not yet exist is not a definite statement of fact. The D.C. Court of Appeals has affirmed summary judgment where the alleged statement about future benefits was qualified as a hope or likely future occurrence. *See, e.g.*, *Sibley v. St. Albans Sch.*, 134 A.3d 789, 810 (D.C. 2016). An unspecified percentage that Clevinger himself cannot describe consistently is no more definite.

In December 2020, Clevinger signed a Subscription Agreement to purchase 55,000 Class B shares. (SUMF ¶¶ 188–91.) He did not dispute his signature at deposition. (SUMF ¶ 215.) Clevinger then paid $11,000 to purchase those shares. (SUMF ¶ 216.) He later exercised his 55,000-share award in writing and expressly identified the shares as Class B shares. (SUMF ¶¶ 190–91.) The written record establishes his knowing acceptance of Class B equity over two years before he resigned.

**2. The Written Record Shows Agreement and Performance, Not a Preconceived Plan to Deceive**

No clear and convincing evidence establishes Koepke's or Zenkich's intent to withhold

"founders shares;" the record indicates otherwise. Advocacy Holdings was formed in 2019 and adopted a stock plan on July 1, 2020. (SUMF ¶ 185.) The written Subscription Agreement disclosed to Clevinger in July 2020 that the corporation was authorized to issue 500,000 Class A voting (i.e., "founder") shares and 500,000 Class B nonvoting shares, and it provided for Clevinger to acquire 55,000 Class B shares. (SUMF ¶¶ 186–87.) Several months later, Clevinger paid $11,000 for those shares and later wrote that he was exercising 100% of his fully vested stock award of 55,000 shares, expressly describing them as Class B Shares. (SUMF ¶ 189.)

That evidence forecloses any inference that the Advocacy Holdings Parties never intended to give Clevinger equity at all, or that they did intend to give him Class A shares. In *Farooqui*, the Court of Appeals affirmed summary judgment on a broken-promise fraud claim because the plaintiff's own evidence showed that the promisor repeatedly tried to make good on his promises. At most, the parties reached an impasse or the promisor had a later change of heart, and no reasonable factfinder could be firmly convinced that he had always intended to renege. 363 A.3d at 1168. Here, adoption of a stock plan in July 2020 and Clevinger's acceptance of it five months later demonstrate a performed deal, not an intent of Advocacy Holdings to deceive him.

**3. Clevinger Cannot Establish Reasonable Reliance**

Reliance requires that a misrepresentation play a substantial part, and thus be a substantial factor, in influencing a decision, with summary judgment appropriate when testimony fails to establish that influence. *Virginia Acad.*, 878 A.2d at 1238–39; *see also Haynes*, 591 A.2d at 1290 n.5. A fraud plaintiff must actually rely on the alleged misrepresentation, and one who knows the representation is false cannot claim to have relied on it. *Morris v. Morris*, 110 A.3d 1273, 1274 (D.C. 2015).

Clevinger's testimony establishes that Advocacy Holdings presented him with a written

stock offer in July 2020 which he accepted in December 2020. He cannot genuinely claim that he continued to stay with Advocacy Holdings until January 2023 because of some (fabricated) promise before July 2020. In the summer of 2020, Clevinger, "without a doubt, 1000 percent knew that I was being betrayed, I was being lied to, and I had been fraudulently induced." (SUMF ¶¶ 193–95.) Clevinger alleges that, at that time, Koepke expressly told him he would not receive Class A founder shares and would receive Class B shares instead. (ECF No. 29 ¶¶ 101–03.) When asked whether the alleged equity representations from the summer of 2020 affected his thinking about the Agreement, Clevinger declined to say that they did. (SUMF ¶ 198.)

Instead, Clevinger decided to purchase the Class B shares five months later. He continued working for Advocacy Holdings for another 25 months (until February 2023), during which time he made the capital contributions. Those later decisions cannot have been made in reliance on a representation Clevinger admits at the very least was overcome by an accepted written deal.

Where a party proceeds under a written agreement whose terms he understands to differ materially from earlier oral assurances, continued reliance on those assurances is unreasonable. *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 934 (D.C. 1992). A party who learns of the alleged fraud and then insists on going forward with an executory arrangement waives a fraud action based on it. *Simon v. Rossier*, 127 A.2d 394, 395 (D.C. Mun. App. 1956). Having signed for and paid for Class B shares, Clevinger cannot claim that he continued his employment with Advocacy Holdings in reliance on a promise of something that preceded the equity deal.

**4. Clevinger Cannot Prove Damages Caused By Any Misrepresentation**

"[A] sine qua non of any recovery for misrepresentation is a showing of pecuniary loss proximately caused by reliance on the misrepresentation." *Day v. Avery*, 548 F.2d 1018, 1029 (D.C. Cir. 1976). The D.C. Circuit there affirmed summary judgment where the claimed harm

rested on what the plaintiff might have done differently, which was "a matter of sheer speculation." *Id.* at 1028–29. The Court of Appeals likewise affirmed summary judgment where the plaintiff offered only blanket damages allegations and conceded that his earnings had *increased*. *Kitt v. Cap. Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999).

At no point has Clevinger itemized his damages for Counts VII and IX. At his deposition, Clevinger identified "opportunity costs," lost educational opportunities, the possibility of attending law school, unidentified alternative jobs and businesses, and "untold damages." (SUMF ¶¶ 198–202.) His interrogatory answers claim "deferred compensation," "lost earnings from alternative career opportunities," and other reliance losses, asserting that he "forwent higher-paying opportunities" and could have earned $1.5–$2 million in some undescribed and alternative executive role. (SUMF ¶ 207.) He connects none of these speculative losses to the alleged Class A share promise rather than his purchased Class B shares. He has not quantified, and cannot quantify, any damages, nor their causation to any pre-July 2020 Class A equity promise.

* * *

The Rule 56 record defeats falsity, fraudulent intent, reasonable reliance, and resulting damages. This Court should accordingly enter summary judgment for the Advocacy Holdings Parties on Counts VII and IX of Clevinger's amended complaint.

### C. Clevinger's Negligent Misrepresentation Claims Fail (Counts VIII and X)

In Counts VIII and X, Clevinger alleges that Koepke and Zenkich negligently misrepresented that he would receive an equity interest in Advocacy Holdings. These negligent-misrepresentation claims concern the same purported equity promises and require "(1) that [the defendant] made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that [the plaintiff] reasonably relied upon the false statement or omission to his detriment." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015). The

record establishes neither falsity nor reasonable reliance on any factual misrepresentation.

"Opinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance." *Howard v. Riggs Nat. Bank*, 432 A.2d 701, 706 (D.C. 1981). Here, Clevinger alleges that in 2018 Advocacy Holdings told him it would sell him "founders shares" if he continued as Advocacy Holdings' CEO. (Am. Compl., ECF No. 29 ¶ 44.) Even assuming arguendo that this was true (it is not), this is a promise to perform in the future, and not a misrepresentation of present fact.

Nor is any claimed reliance on this purported future promise reasonable. Reliance is unreasonable where the plaintiff had an adequate opportunity to investigate. *Washington Inv. Partners*, 28 A.3d at 576. According to Clevinger, Advocacy Holdings circulated its stock plan to him in July 2020. He considered it for several months, and then entered into a written transaction to purchase 55,000 Class B nonvoting shares. (SUMF ¶¶ 190–91.) Clevinger, by his own account, knew and accepted that he was being issued Class B shares. *Morris*, 110 A.3d at 1274. There is no factual misrepresentation, nor did Clevinger rely on any such representation to continue his employment with Advocacy Holdings. Counts VIII and X therefore fail as a matter of law, and this Court should enter summary judgment for Advocacy Holdings on these claims.

**D. Clevinger's Fraudulent Concealment Claims Fail (Counts XI and XII)**

In Counts XI and XII, Clevinger contends that the Advocacy Holdings Parties fraudulently concealed their supposed intent never to give Clevinger Class A shares and their alleged practice of "siphoning off money from the company." (ECF No. 29 ¶¶ 465–67, 478–90.) Clevinger confirmed that the concealment counts rest on the "[s]ame facts" as his affirmative fraud claims. (SUMF ¶¶ 192.)

Fraudulent concealment requires a willful omission of a material fact that the defendant

knew of and intended the plaintiff to rely upon, actual reliance on that omission, and resulting damages. *Sundberg*, 109 A.3d at 1130–31. An omission constitutes fraud only where a duty to disclose existed because "mere silence does not constitute fraud unless there is a duty to speak." *Id.* at 1131. Reliance necessarily requires ignorance of the allegedly concealed truth. *See Morris*, 110 A.3d at 1274 (finding that fraud plaintiff must be "ignoran[t] of [the] falsity" to establish reasonable reliance). Both concealment claims fail on a simple ground: Clevinger cannot prove concealment of facts he admittedly knew.

Clevinger's sworn testimony forecloses concealment, reliance, and causation. As shown above, he knew "1000 percent" by summer 2020 that he had been misled about his equity, was told on December 7, 2020 that he would receive Class B shares, and *then* subscribed for and exercised 55,000 Class B nonvoting shares under a written agreement disclosing both share classes. (SUMF ¶ 216; ECF No. 29 ¶¶ 101–03.)

The Court already found, in dismissing Clevinger's declaratory judgment claim, that before he contributed any funds, he had been told that he would receive Class B shares and Class B shares only. (ECF No. 78 at 43.) Knowledge defeats reliance and causation: the subscription, payment, exercise, and later decisions followed his admitted discovery. The concealment claims therefore fail for lack of any injury caused by the supposed concealment. *See Blount v. Padgett*, 261 A.3d 200, 208 n.13 (D.C. 2021) (no actionable fraud where court could "discern [no] injury" from alleged nondisclosure). Summary judgment should enter on Counts XI and XII.

### E. Clevinger's Unjust-Enrichment Claims Fail (Counts XV–XVIII)

Clevinger asserts claims for unjust enrichment in Counts XV through XVIII. (ECF No. 29 ¶¶ 505–25.) In order to prevail, Clevinger must show that (1) he conferred a benefit on a defendant, (2) the defendant retained the benefit, and (3) under the circumstances, the defendant's retention

of the benefit is unjust. *See Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 813 (D.C. 2009). Clevinger's testimony conclusively disproves the first element in Counts XV and XVI and the third element in Counts XVII and XVIII. Moreover, Clevinger cannot recover under an unjust enrichment theory when an express agreement governs the benefits conferred.

### 1. Koepke and Zenkich Were Not Enriched by the Benefits Clevinger Allegedly Conferred (Counts XV and XVI)

Clevinger's unjust enrichment claims against Koepke (Count XV) and Zenkich (Count XVI) fail at the threshold. A plaintiff must trace the asserted benefit to the defendant from whom restitution is sought, and a benefit conferred on a corporation is not, without more, a benefit conferred on its shareholders or officers. *Equitas Disability Advocates, LLC v. Bryant*, 134 F. Supp. 3d 209, 221–22 (D.D.C. 2015). Otherwise, unjust enrichment would become a "backdoor" means of disregarding the corporate form. *Id.* at 221.

The undisputed record identifies Advocacy Holdings and Red Chalk, not Koepke or Zenkich, as the recipients of every benefit Clevinger claims. His pleading itself defines the alleged benefits as his work as the paid CEO of the enterprise as well as his $46,000 in contributions "through Advocacy Holdings." (ECF No. 29 ¶¶ 507, 512.) At deposition, Clevinger agreed that he "conferred benefits on Red Chalk and Advocacy Holdings through [his] work," testifying, "Yes. I conferred a great deal of value." (SUMF ¶ 210.) But when asked to identify what he had given Koepke or Zenkich "personally," apart from work performed for the companies, he identified no labor, money, property, or service that he transferred to either man. (SUMF ¶ 210.) That concession is dispositive for the claims against Koepke and Zenkich personally: the alleged benefit was corporate, not personal. Counts XV and XVI fail because Clevinger did not confer any benefits on Koepke or Zenkich personally.

### 2. Clevinger Cannot Recover Against Advocacy Holdings or Red Chalk Because Their Acceptance of His CEO Services and Capital Contributions Was Not Unjust (Counts XVII and XVIII)

Count XVII alleges that Advocacy Holdings was unjustly enriched by Clevinger's "work as the purported CEO" and by his "contributions of $46,000 to Advocacy Holdings." (First Am. Compl., ECF No. 29 ¶¶ 517, 518.) Clevinger's work and capital contributions were not unjustly retained by either Advocacy Holdings or Red Chalk.

Whether retention is unjust "must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution." *4934, Inc. v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).

Clevinger's compensated services as Advocacy Holdings' CEO and $11,000 share purchase were contractual. Clevinger was paid by Red Chalk, and then Advocacy Holdings, in an agreed base salary of $180,000, plus at least 15% commissions on sales. (SUMF ¶ 222.) Clevinger cannot now complain that Advocacy Holdings was unjustly enriched by CEO services he agreed to provide for a six-figure salary and commissions.

Similarly, Advocacy Holdings did not wrongly retain Clevinger's capital contributions. A capital contributor's claim to repayment arises only through the entity's own decision to distribute its assets. *See Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497–98 (D.C. 1985). Delaware courts agree that losses falling on investors "as a function of and in proportion to [their] pro rata investment" are injuries to the entity, not the individual. *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, No. CIV.A. 7092-VCP, 2012 WL 6632681, at *8 (Del. Ch. Dec. 20, 2012) (citation omitted).

Clevinger's $35,000 capital contributions funded his company as a shareholder. By the time of the capital calls, Clevinger held "10 percent of equity." (Zenkich Dep. 350:14–351:1.)

When the business declined, "[a]ll of the shareholders . . . [were] hit . . . with capital contributions because of the poor performance of the business." (SUMF ¶ 219.) Clevinger contributed in proportion to his ownership on a "pro rata" basis, (SUMF ¶ 220), and his own pleading alleges that the contributions were "treated as Plaintiff's share as an owner," ECF No. 29 ¶ 188. Nothing in equity entitles Clevinger to withdraw his pro rata share of capital while the other owners' identical contributions remain invested. Clevinger's claims in Counts XVII and XVIII fail because neither Advocacy Holdings nor Red Chalk unjustly retained any benefit from him.

### 3. Clevinger Cannot Recover Against the Advocacy Holdings Parties for Unjust Enrichment Because an Express Agreement Governs the Benefits Clevinger Conferred (Counts XV through XVIII)[9]

The Advocacy Holdings Parties also move for summary judgment on Counts XV through XVIII because Clevinger's employment and capital contributions are governed by written contracts. *See* Answer to Amended Compl., ECF No. 82, at 30.

"[T]here can be no claim for unjust enrichment when an express contract exists between the parties." *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997). Where "the essential facts are not in dispute," whether to impose a quasi-contract is a question of law suitable for summary disposition. *Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C. Cir. 1973).

Clevinger's unjust enrichment counts seek quasi-contractual remedies for these contractual CEO services. ECF No. 29 ¶ 517. Unjust enrichment cannot override agreed salary and employment terms. *See Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996). Clevinger's

[9] In so arguing, Advocacy Holdings moves for summary judgment on its pleaded affirmative defense: agreements governed the transactions in which Clevinger conferred benefits to Advocacy Holdings. *See* Answer to Amended Compl., ECF No. 82, at 30. Clevinger purchased his Advocacy Holdings shares under his December 2020 Subscription Agreement. (SUMF ¶¶ 185–89.) He did not dispute his signature. (SUMF ¶ 214–15.) The $11,000 was the subscription price, as his own complaint alleges: he "received equity of worthless Class B shares in Advocacy Holdings in exchange for an $11,000 capital contribution." (ECF No. 29 ¶ 105.) Zenkich confirmed that Clevinger, "through a subscription agreement, . . . got his ten percent right off the bat." (SUMF ¶ 218.) At the pleading stage, this Court was "hesitant" to apply the contract bar only because the terms of the parties' agreements were then "unclear." (ECF No. 78 at 43.) The executed Subscription Agreement now establishes those terms.

compensated services were governed by an express agreement with his employers, Red Chalk and Advocacy Holdings. Clevinger technically worked for Red Chalk while it initially seeded and grew its digital advocacy business. (SUMF ¶¶ 228–29.) His work as a Red Chalk 1099 contractor ended in 2019 and he was compensated through an at-will employment arrangement.[10] (SUMF ¶ 229.) Clevinger became a W-2 employee of Red Chalk in January 2020 and remained on Red Chalk's payroll until Advocacy Holdings began paying him later that year. (SUMF ¶ 230.)

When it came time to form Advocacy Holdings, Clevinger alleges that "Zenkich and Koepke discussed the proposed compensation structure, which was to include a base salary, commissions, and equity." ECF No. 29 ¶ 28. He testified that his base salary when he left was $180,000, plus commissions, and that he "started at 15 percent commission." (SUMF ¶ 221.)

Clevinger received the very shares he paid for under a written contract. A party that "received nothing that it would not have expected to be given" under the parties' arrangement is not unjustly enriched. *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 66 (D.C. 2005).

* * *

Koepke and Zenkich did not personally receive any benefits from Clevinger. Advocacy Holdings and Red Chalk received benefits from Clevinger, but contractually paid for them. Clevinger cannot establish any unjust enrichment claim as a matter of law on these facts. Counts XV through XVIII fail on the undisputed record, and this Court should enter summary judgment against Clevinger on them.

---

[10] Any equitable claim seeking additional compensation for those services is untimely under D.C.'s three-year limitations period. *See* D.C. Code § 12-301(8); *Boyd v. Kilpatrick Townsend & Stockton, LLP*, 164 A.3d 72, 79–80 (D.C. 2017) (applying three-year limitations period to unjust-enrichment claim).

## CONCLUSION

For these reasons, the Advocacy Holdings Parties respectfully request that the Court (1) GRANT their motion for summary judgment in full; (2) ENTER JUDGMENT for Advocacy Holdings on Counts I through IV of its amended complaint in the amount of $3,023,616.50 in compensatory damages and $15,118,082.50 in punitive damages; (3) ENTER JUDGMENT for the Advocacy Holdings Parties on Counts I, VII through XII, and XV through XVIII of Clevinger's amended complaint; (4) DENY Clevinger's motion for summary judgment in full; and (5) GRANT such other relief as the Court deems just and proper.

Dated: November 24, 2026

Respectfully Submitted,

**ADVOCACY HOLDINGS, INC.**
**JOHN KOEPKE**
**RAYMOND ZENKICH**
**RED CHALK GROUP, LLC**

**By:**

/s/ *Anand Ramana*

Anand Ramana (D.C. Bar No. 489478)
M. Hunter Rush (D.C. Bar No. 90000036)
VEDDER PRICE P.C.
1401 New York Avenue, NW
Suite 500
Washington, DC 20005
Tel: 202-312-3325
aramana@vedder.com
hrush@vedder.com
*Counsel for Advocacy Holdings, Inc., John Koepke, Raymond Zenkich, and Red Chalk Group, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing on November 24, 2026, with the Clerk of the Court using the CM/ECF system. That system will send notification of such filing to the following persons, and I also certify that I delivered these papers by electronic mail to the following persons:

Kenneth Chase
CHASE LAW & ASSOCIATES, PA
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
kchase@chaselaw.com
*Counsel for Chazz Clevinger, CiviClick, Inc., and Superior Campaign Solutions, LLC*

/s/ *Anand Ramana*
Anand Ramana (D.C. Bar No. 489478)
VEDDER PRICE, P.C.
1401 New York Ave., NW, Suite 500
Washington, DC 20005
(202) 312-3325
(202) 312-3322 (Facsimile)
aramana@vedder.com
*Counsel for Advocacy Holdings, Inc., John Koepke, Raymond Zenkich, and Red Chalk Group, LLC*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAZZ CLEVINGER,<br><br>*Plaintiff*,<br><br>v.<br><br>ADVOCACY HOLDINGS, INC., and JOHN KOEPKE, and RED CHALK GROUP, LLC, and RAYMOND ZENKICH,<br><br>*Defendants*. | Case No. 1:23-cv-1159 (JMC) |
| ADVOCACY HOLDINGS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>CHAZZ CLEVINGER, and CIVICLICK, INC., and SUPERIOR CAMPAIGN SOLUTIONS, LLC,<br><br>*Defendants*. | Case No. 1:23-cv-1176 (JMC) |

**ADVOCACY HOLDINGS PARTIES' STATEMENT**
**OF UNDISPUTED MATERIAL FACTS**

| Fact | Genuinely Disputed? |
|---|---|
| 1. Chazz Clevinger served as Advocacy Holdings' Chief Executive Officer from November 2016 until February 1, 2023. Clevinger Dep., Ex. 2 to Advocacy Holdings Parties' Br., at 132:19–22, 133:1; 86:7–18. | |
| 2. Chazz Clevinger resigned from Advocacy Holdings on February 1, 2023. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 71:17–19. | |
| 3. During Clevinger's tenure as Advocacy Holdings' Chief Executive Officer, he managed its sales and marketing functions and was involved in customer relationships, customer-contract discussions, pricing, and business | |

| | |
|---|---|
| development. Koepke Decl. Ex. 12 to Advocacy Holdings Parties' Br., ¶ 7. | |
| 4. Chazz Clevinger knew Advocacy Holdings' pricing structure for Advocacy Holdings subscriptions. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 129:21–132:3. | |
| 5. Chazz Clevinger had authority to contract on behalf of Advocacy Holdings. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 230:14–22. | |
| 6. Chazz Clevinger could act as the face of Advocacy Holdings. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 231:4–8. | |
| 7. Chazz Clevinger could conduct customer discussions and communicate with vendors on Advocacy Holdings' behalf. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 231:4–8. | |
| 8. Chazz Clevinger could sign contracts for Advocacy Holdings where appropriate. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 231:4–8. | |
| 9. Chazz Clevinger had a role of importance at Advocacy Holdings and had management responsibilities. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 137:6–21. | |
| 10. Advocacy Holdings offered Chazz Clevinger a noncompetition, nonsolicitation, and nondisclosure agreement in 2020. Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000151. | |
| 11. Chazz Clevinger executed the Agreement. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 226:17–227:1–4; 228:1–3. | |
| 12. At deposition, Chazz Clevinger acknowledged there was "only ever one" agreement. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 228:1–3. | |
| 13. Chazz Clevinger testified that he executed the Agreement "in good faith." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 232:3–22. | |
| 14. Chazz Clevinger testified that he intended to abide by the Agreement's terms. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 232:3–22. | |
| 15. At deposition, Chazz Clevinger acknowledged that the Agreement is dated July 15, 2020. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 229:1–15. | |
| 16. Chazz Clevinger testified that he could not say "with any certainty" when the Agreement was signed. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 229:7–230:2. | |
| 17. The Agreement states that Advocacy Holdings required Chazz Clevinger to enter it as a c of entering into and continuing his at-will employment. Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000146. | |
| 18. The Agreement ¶ 4 states that "At all times during the Relationship and for a period of twelve (12) months thereafter, | |

| | |
|---|---|
| Employee will not, without the Company's prior written consent, directly or indirectly through another person or entity or by assisting others: (a) fund, own, invest in, set up or start a Competing Business located in the United States; or (b) become employed by, work for or otherwise provide services to or on behalf of a Competing Business, in the United States, to the extent such employment, work or services involves executive, management or sales responsibilities or duties." Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000148. | |
| 19. The Agreement ¶ 5 states that "At all times during the Relationship and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly through another person or entity or by assisting others: (a) solicit, call upon or contact any Restricted Customer or Restricted Vendor for the purpose of engaging in Competitive Business Activity; (b) contract with, sell to or perform services for or on behalf of a Restricted Customer or Restricted Vendor in connection with Competitive Business Activity; or (c) divert, interfere with, or attempt to divert or interfere with, the Company's business relationship with any Restricted Customer or Restricted Vendor." Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000148. | |
| 20. The Agreement ¶ 6 states that "At all times during the Relationship and for a period of twelve (12) months thereafter, Employee will not, directly or indirectly, through another person or entity, or by assisting others: (a) solicit, induce or encourage any Restricted Person to terminate his or her employment or other association with the Company; or (b) hire or attempt to hire any Restricted Person on behalf of a person or entity engaged in Competitive Business Activity." Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000148. | |
| 21. The Agreement ¶ 1(a) states that "'Competing Business' or 'Competitive Business Activity' means any business that competes with or business activity that is competitive with digital advocacy, advocate acquisition services, grassroots advocacy, stakeholder management, stakeholder engagement, government relations advocacy, legislative tracking, regulatory tracking, and advocacy strategy conducted by the Company across the United States." Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000146. | |
| 22. The Agreement ¶ 7 states "If Employee breaches any of the restrictions set forth in Sections 4 through 6 above and the Company commences a legal proceeding in connection therewith, the time period applicable to each such restriction shall be tolled and extended for a period of time equal to the period of time during which Employee is determined by a court | |

| | |
|---|---|
| of competent jurisdiction to be in breach (not to exceed twelve (12) months) commencing on the date of such determination." Agreement, Ex. 1 to Advocacy Holdings' Br., § 7, at OCP0000149. | |
| 23. The Agreement ¶ 9 states that "Employee stipulates that the restrictions and obligations in this Agreement are reasonable (including the time periods, geographic scope and activity limitations) and necessary for the protection of the Company's legitimate business interests, do not prohibit Employee from using general skills and know-how acquired during or prior to employment with the Company, and do not preclude Employee from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship. Employee further stipulates that the geographic scope is necessary given that the Company conducts business throughout the United States in a specialized industry, regardless of whether it maintains a physical office in a particular location." Agreement, Ex. 1 to Advocacy Holdings' Br., at OCP0000149. | |
| 24. Advocacy Holdings provides digital-advocacy and government-relations business across the United States, offering technology that facilitates communications between constituents and elected representatives or government officials. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 105:14–22. | |
| 25. A number of Advocacy Holdings customers renewed their subscriptions for successive terms. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 6. | |
| 26. During the year preceding Clevinger's February 1, 2023 departure, Advocacy Holdings maintained invoiced customer relationships with 311 customers. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 8. | |
| 27. Chazz Clevinger wrote to Tennessee Firearms Association that "no one else at OneClickPolitics knows how to conduct those projects other than me." CiviClick Emails with TN Firearms Association, Ex. 24 to Advocacy Holdings' Br., at OCP0013306–08. | |
| 28. Chazz Clevinger wrote to Tennessee Firearms Association that the product had performed poorly "as I knew they would in my absence." CiviClick Emails with TN Firearms Association, Ex. 24 to Advocacy Holdings' Br., at OCP0013306–08. | |
| 29. Chazz Clevinger told Tennessee Firearms Association, "I've got some things I can do to help." CiviClick Emails with TN Firearms Association, Ex. 24 to Advocacy Holdings' Br., at OCP0013306–08. | |
| 30. Chazz Clevinger managed Advocacy Holdings' day-to-day operations and oversaw its sales and marketing functions. | |

| | |
|---|---|
| Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 79:17–80:10. | |
| 31. When asked whether Advocacy Holdings' growth was "primarily attributable" to him, Chazz Clevinger testified, "I would not say exclusively, but . . . almost exclusively." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 138:5–139:10. | |
| 32. Chazz Clevinger identified Evan Ashy as the only other salesperson who made a "meaningful contribution" to Advocacy Holdings' growth. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 138:5–139:10. | |
| 33. Raymond Zenkich testified that a noncompete for the operating CEO was "critical" because a buyer would want employees to have non-compete agreements in place. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 209:9–210:9. | |
| 34. Chazz Clevinger has at all times owned 100% of CiviClick. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 87:6–19; 88:1–9. | |
| 35. Chazz Clevinger has been the sole owner of SCS since it was organized. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 91:8–12. | |
| 36. Chazz Clevinger organized SCS on May 11, 2021. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 217:12–21. | |
| 37. Chazz Clevinger incorporated CiviClick on July 21, 2022. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 219:4–10. | |
| 38. SCS was organized while Chazz Clevinger was Advocacy Holdings' CEO. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 217:12–21; 264:8–10. | |
| 39. CiviClick was incorporated while Chazz Clevinger was Advocacy Holdings' CEO. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 219:4–10; 264:8–10. | |
| 40. CiviClick offers an online grassroots-advocacy software platform. Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 59:5–60:22. | |
| 41. CiviClick provides online grassroots-advocacy software and advocate-acquisition services. Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 131:3–21. | |
| 42. SCS has offered client-acquisition and marketing services that overlap with services offered by Advocacy Holdings. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 11. | |
| 43. CiviClick "is a digital grassroots advocacy company." Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 131:3–21. | |

| | |
|---|---|
| 44. CiviClick and Advocacy Holdings platforms "all look the same." Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 128:6–19. | |
| 45. In January 2023, while still employed by Advocacy Holdings, Chazz Clevinger told Christopher Tosto that "he was going to be starting his own thing." Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 104:12–17; Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 261:15–262:19. | |
| 46. In 2021 and 2022, Chazz Clevinger brought business to Advocacy Holdings through broader SCS services. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 129:21–130:13. | |
| 47. Chazz Clevinger secured customer funds through SCS that included payment for Advocacy Holdings' services. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 129:21–130:13. | |
| 48. Customers paid SCS rather than paying Advocacy Holdings directly. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 130:14–132:3. | |
| 49. Chazz Clevinger then remitted to Advocacy Holdings the portion of the customers' payments allocated to Advocacy Holdings' grassroots-advocacy software. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 130:14–132:2. | |
| 50. Chazz Clevinger testified that customers paid SCS rather than Advocacy Holdings directly because it was easier for the customers to make one payment and for Chazz Clevinger to pay Advocacy Holdings. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 130:13–22, 131:1–22, 132:1–2. | |
| 51. Chazz Clevinger was the only person with check-writing authority for SCS. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 93:3–12; 145:17–22. | |
| 52. Chazz Clevinger was the only person with check-writing authority for CiviClick. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 93:13–19; 145:17–22. | |
| 53. Checks from SCS to Advocacy Holdings bear Chazz Clevinger's signature. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 129:5–20. | |
| 54. SCS undertook a donor-prospecting engagement for the Firearms Policy Coalition. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 127:3–128:16. | |
| 55. The initial agreement for SCS's donor-prospecting engagement for the Firearms Policy Coalition stated a value of $150,000. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 128:9–16. | |
| 56. SCS received $50,000 under the donor-prospecting engagement for the Firearms Policy Coalition. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 128:9–16. | |
| 57. Chazz Clevinger testified that, after SCS ran a fundraising and donor-prospecting campaign for Firearms Policy Coalition, | |

| | |
|---|---|
| Firearms Policy Coalition wanted to use the resulting data to engage those individuals in advocacy as well. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 127:7–128:8. | |
| 58. Data resulting from SCS's donor-prospecting engagement for the Firearms Policy Coalition was ultimately uploaded into Advocacy Holdings. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 127:7–128:8. | |
| 59. Beginning in fall 2022, Chazz Clevinger paid Advocacy Holdings's Director of Strategic Services, Christopher Tosto, through SCS. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 92:9–12, 94:2–95:19. | |
| 60. Christopher Tosto attended conferences and trade shows for SCS. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 94:4–11. | |
| 61. Christopher Tosto pursued mass-tort business for SCS. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 94:8–16. | |
| 62. The first SCS check to Christopher Tosto was for $1,500 and was issued in September 2022. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 93:20–94:1–7. | |
| 63. Christopher Tosto resigned from Advocacy Holdings at 3:45 p.m. on February 1, 2023. Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 145:10–21. | |
| 64. Chazz Clevinger resigned from Advocacy Holdings at 3:52 p.m. on February 1, 2023, seven minutes after Christopher Tosto resigned. Feb. 1, 2023 Resignation Email and Letter, Ex. 3 to Advocacy Holdings' Br., at OCP0000328. | |
| 65. Chazz Clevinger testified that he began prospecting for customers on February 2, 2023, the day after leaving Advocacy Holdings. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 87:1–5. | |
| 66. CiviClick issued its first invoices days after Chazz Clevinger's resignation. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 28:8–21, 29:1–3. | |
| 67. The Clevinger Parties identified 91 CiviClick and SCS customers and affiliated customer entities in their supplemental response to Interrogatory No. 3. Clevinger Apr. 2, 2025 Suppl. Interrog. Resps., Ex. 25 to Advocacy Holdings' Br., at Resp. No. 3, pp. 12–15. | |
| 68. CiviClick hired former Advocacy Holdings Director of Strategic Services Christopher Tosto as Vice President of Client Services during the same month that Chazz Clevinger resigned. Christopher Tosto Dep., Ex. 7 to Advocacy Holdings' Br., at 109:19–114:20. | |
| 69. Chazz Clevinger told NAIOP's CEO that CiviClick could become the vendor for NAIOP SoCal's advocacy program. | |

| | |
|---|---|
| NAIOP SoCal/CiviClick Emails, Ex. 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872-0004875. | |
| 70. Chazz Clevinger knew about Advocacy Holdings' relationship with FreedomWorks. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 129:21–132:5. | |
| 71. On March 9, 2023, an email from FreedomWorks concerning campaign work in Wisconsin was sent to Chazz Clevinger's former Advocacy Holdings email account. FreedomWorks Email, Ex. 11 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001444. | |
| 72. The March 9, 2023 FreedomWorks email indicated that Chazz Clevinger had been working with FreedomWorks on campaigns in Wisconsin. FreedomWorks Email, Ex. 11 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001444. | |
| 73. FreedomWorks terminated its relationship with Advocacy Holdings on March 23, 2023. FreedomWorks Email, Ex. 11 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001444–45. | |
| 74. By April 2023, FreedomWorks was using CiviClick to deliver advocacy messages of the same type previously delivered through Advocacy Holdings. FreedomWorks Email, Ex. 11 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001444–45; Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. No. 3, pp. 14, 16. | |
| 75. The Clevinger Parties admitted in verified interrogatory responses that FreedomWorks became a CiviClick client. Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. No. 3, pp. 14, 16. | |
| 76. Waterways Council paid Advocacy Holdings $7,500 per year under a two-year subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002207, Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002622. | |
| 77. Waterways Council's two-year Advocacy Holdings subscription ran through March 31, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002207, Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002622. | |
| 78. On February 21, 2023, before Waterways Council's Advocacy Holdings subscription expired, Chazz Clevinger solicited Waterways Council for CiviClick. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005017–21. | |

| | |
|---|---|
| 79. Chazz Clevinger told Waterways Council that he had "dozens of my old customers on the new product." CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005019. | |
| 80. Chazz Clevinger offered Waterways Council the same pricing based on their "longstanding relationship." CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005019. | |
| 81. Waterways Council entered a two-year CiviClick agreement on March 15, 2023. Waterways CiviClick Service Agreement, Ex. 14 to Advocacy Holdings' Br., at OCP0008376–78. | |
| 82. The CiviClick agreement charged $7,500 annually. Waterways CiviClick Service Agreement, Ex. 14 to Advocacy Holdings' Br., at OCP0008376–78. | |
| 83. Waterways Council's CiviClick agreement began the day after its Advocacy Holdings subscription expired. CiviClick Service Agreement, Waterways Council Subpoena Response, Ex. 14 to Advocacy Holdings Parties' Br. at OCP0008376–78. | |
| 84. Waterways paid CiviClick's second-year invoice in March 2024. Waterways CiviClick Service Agreement, Ex. 14 to Advocacy Holdings' Br., at OCP0008376–78. | |
| 85. NAIOP SoCal paid Advocacy Holdings $7,500 for an annual subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002133. | |
| 86. NAIOP subsequently paid OCP $7,875 for another annual subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002133. | |
| 87. NAIOP SoCal's $7,875 Advocacy Holdings subscription ran through February 28, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002133. | |
| 88. On February 5, 2023, while NAIOP SoCal's Advocacy Holdings subscription remained in effect, Chazz Clevinger pitched CiviClick to NAIOP's CEO. NAIOP SoCal/CiviClick Emails, Ex. 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872–75. | |
| 89. Chazz Clevinger told NAIOP's CEO, "CiviClick is the new product. You'll love it." NAIOP SoCal/CiviClick Emails, Ex. 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872–75. | |
| 90. Chazz Clevinger demonstrated CiviClick to NAIOP personnel. NAIOP SoCal/CiviClick Emails, Ex. 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872–75. | |
| 91. On March 1, 2023, Chazz Clevinger asked NAIOP whether "everything is good to get NAIOP-SoCal switched over to my new product, CiviClick." NAIOP SoCal/CiviClick Emails, Ex. | |

| | |
|---|---|
| 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872–75. | |
| 92. NAIOP's CEO responded to Chazz Clevinger's March 1 question, "Yes will approve." NAIOP SoCal/CiviClick Emails, Ex. 15 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004872–75. | |
| 93. Chazz Clevinger described the betrayal as "very personal" and that he was "free[ing] himself" from Advocacy Holdings. Chazz Clevinger testified that his "motivation for . . . wanting to start CiviClick . . . was derived . . . largely because of those false promises and those lies and the fraudulent inducements." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 172:13–19, 173:1–14, 175:1–22.. | |
| 94. Chazz Clevinger testified that CiviClick "was intended to be a way for me to . . . get out and free myself." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 173:11–14. | |
| 95. The FreedomWorks agreement provided for payments of $40,000 per year. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007594, CLEVINGER PARTIES CONFIDENTIAL 0007610. | |
| 96. NAIOP paid CiviClick $7,500 for an annual subscription. CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001494. | |
| 97. Lincoln Technical Institute had sent its Advocacy Holdings renewal payment for processing by March 27, 2023. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005382. | |
| 98. On March 27, 2023, Chazz Clevinger offered to honor the same pricing if Lincoln Technical Institute wanted to discuss switching to CiviClick before its Advocacy Holdings renewal. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005382–83. | |
| 99. Lincoln Technical Institute stated it would see whether it could stop its Advocacy Holdings renewal payment so it could speak with Chazz Clevinger. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005382. | |
| 100. Lincoln Technical Institute later stated that it "very much would like to switch to CiviClick." CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005475–76. | |

| | |
|---|---|
| 101. Lincoln stated that CiviClick's $9,000 price was $400 less than Advocacy Holdings' price. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005475–76. | |
| 102. Lincoln executed a one-year $9,000 CiviClick agreement. CiviClick Service Agreement Lincoln Tech, Ex. 25 to Advocacy Holdings Parties' Br. at OCP0006996–98. | |
| 103. NHCA renewed with Advocacy Holdings in March 2022 for $10,000. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at OCP0007695 | |
| 104. Chazz Clevinger personally handled NHCA's March 2022 renewal with Advocacy Holdings. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at OCP0007695 | |
| 105. In March 2023, as the Advocacy Holdings subscription approached expiration, Chazz Clevinger sent NHCA a $7,500 invoice for "my new advocacy software platform." Fumari Renewal Emails, Ex. 16 to Advocacy Holdings' Br., at OCP0007703–04; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007557. | |
| 106. NHCA signed a one-year CiviClick agreement on March 8, 2023. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005087, 0005090. | |
| 107. Firearms Policy Coalition paid Advocacy Holdings $21,000 for a subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002603. | |
| 108. Firearms Policy Coalition's $21,000 Advocacy Holdings subscription ran through March 15, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002603. | |
| 109. In February 2023, Chazz Clevinger offered to "migrate" FPC to CiviClick. Firearms Policy Coalition Emails, Ex. 17 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001747. | |
| 110. Chazz Clevinger told FPC that Advocacy Holdings was "closing." Firearms Policy Coalition Emails, Ex. 17 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001747. | |
| 111. On March 12, 2023, FPC informed Advocacy Holdings that it would not renew its Advocacy Holdings subscription. Firearms Policy Coalition Emails, Ex. 17 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001747. | |

| | |
|---|---|
| 112. The Clevinger Parties admit FPC subsequently became a CiviClick client. Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. No. 3, pp. 14, 16. | |
| 113. Advocacy Holdings deposited Shawmut Strategies' $11,050 renewal payment on February 16, 2023. Providence Bank Records, Ex. 18 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004312–13. | |
| 114. CiviClick invoiced Shawmut Strategies $11,500 for an annual subscription on February 9, 2023. CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001490. | |
| 115. Shawmut Strategies paid CiviClick's $11,500 annual-subscription invoice. CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001490. | |
| 116. On February 22, 2023, Shawmut Strategies stopped payment on its $11,050 Advocacy Holdings renewal. Providence Bank Records, Ex. 18 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004312–13. | |
| 117. Shawmut renewed with CiviClick in 2024. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007616. | |
| 118. Shawmut renewed with CiviClick again in 2025. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007673. | |
| 119. Advocacy Holdings invoiced People for Opportunity $12,000 on January 23, 2023 for an annual subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002899. | |
| 120. PFO tendered a $12,000 check on January 31, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002899; CLEVINGER PARTIES CONFIDENTIAL 0001611. | |
| 121. PFO stopped payment on its $12,000 Advocacy Holdings check on February 6, 2023, five days after Chazz Clevinger left Advocacy Holdings. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002899; CLEVINGER PARTIES CONFIDENTIAL 0001611. | |
| 122. On February 8, 2023, PFO's agency contacted Chazz Clevinger at CiviClick to open a "new account" for a PFO project. CLEVINGER PARTIES CONFIDENTIAL 0001611. | |

| | |
|---|---|
| 123. The Clevinger Parties admit PFO became a CiviClick client. Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. No. 3, pp. 14–16. Clevinger Am. Suppl. ROG Resp. No. 3 at 14–16. | |
| 124. CiviClick invoiced PFO's agency in two $12,500 installments for PFO's CiviClick subscription in 2023 and 2024. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007618, 0007648. | |
| 125. ACU paid Advocacy Holdings $12,500 for one annual subscription. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002525. | |
| 126. ACU then paid Advocacy Holdings $13,125 for a successive annual subscription. ACU Subscription and Payment Records, Ex. 20 to Advocacy Holdings' Br., at OCP0003617–18, OCP0003785–86. | |
| 127. ACU's $13,125 Advocacy Holdings subscription ended January 16, 2023. ACU Subscription and Payment Records, Ex. 20 to Advocacy Holdings' Br., at OCP0003617–18, OCP0003785–86. | |
| 128. In late January 2023, Chazz Clevinger told ACU he had built a new system. Email with Julie Emerson, Ex. 27 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001816. | |
| 129. ACU understood from Chazz Clevinger that Advocacy Holdings was transitioning to the new platform. Email with Julie Emerson, Ex. 27 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001816. | |
| 130. On February 9, Chazz Clevinger asked ACU for the API code from its Advocacy Holdings dashboard. Chazz Clevinger sought ACU's Advocacy Holdings API code to launch an ACU campaign through CiviClick. ACU Emails, Ex. 19 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004937–41. | |
| 131. On February 11, 2023, Chazz Clevinger invoiced ACU for an annual CiviClick subscription. ACU Emails, Ex. 19 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004937–41. | |
| 132. Chazz Clevinger stated that he would be "upgrading ACU and ACUF." ACU Emails, Ex. 19 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004937–41. | |
| 133. ACU told Advocacy Holdings that it had not been unhappy with Advocacy Holdings. Email with Julie Emerson, Ex. 27 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001816. | |

| | |
|---|---|
| 134. ACU said it would remain with CiviClick because it had already paid for CiviClick. Email with Julie Emerson, Ex. 27 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001816. | |
| 135. ACU renewed with CiviClick in 2024. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at OCP0003785–86. | |
| 136. CPA paid Advocacy Holdings $8,500 for a subscription ending April 10, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002636. | |
| 137. On April 7, 2023, three days before CPA's Advocacy Holdings subscription expired, Chazz Clevinger executed an $8,500 one-year CiviClick agreement with CPA. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005500–02. | |
| 138. CPA's CiviClick agreement began April 10, 2023. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005500–02. | |
| 139. CPA renewed with CiviClick for $8,500 in 2024. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007636. | |
| 140. CPA renewed with CiviClick for $8,500 in 2025. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007695. | |
| 141. JVA Campaigns paid Advocacy Holdings $10,500 for a software renewal through January 9, 2023. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002139, OCP0002662. | |
| 142. JVA also purchased substantial advocate-acquisition services from Advocacy Holdings in 2022. Advocacy Holdings Customer Invoices, Ex. 13 to Advocacy Holdings' Br., at OCP0002514, OCP0002600. | |
| 143. On February 9, 2023, Chazz Clevinger, through SCS doing business as CiviClick, invoiced JVA $11,500 for an annual CiviClick subscription. CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001492. | |
| 144. Chazz Clevinger's February 9, 2023 invoice to JVA also included $3,000 for a guaranteed-response campaign. CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001492. | |

| | |
|---|---|
| 145. JVA paid Chazz Clevinger's $14,500 February 9, 2023 invoice. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007542. | |
| 146. The Clevinger Parties admit that JVA became a CiviClick client. Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. No. 3, pp. 14–16. | |
| 147. The Clevinger Parties serviced JVA campaigns through 2024. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007615, 0007624, 0007634. | |
| 148. Advocacy Holdings operates a Software-as-a-Service business. Its digital-advocacy platform is hosted on centralized cloud servers and licensed over the internet on a recurring-subscription basis. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 15. | |
| 149. A single version of Advocacy Holdings' platform serves multiple customers, and adding another customer does not require Advocacy Holdings to recreate the platform or purchase a physical product. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 15. | |
| 150. Most costs associated with operating and maintaining Advocacy Holdings' platform are incurred regardless of whether a particular customer purchases or maintains a subscription. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 16. | |
| 151. Advocacy Holdings spends approximately $10,000 per month on Amazon Web Services to support approximately 200 customers, and at least half of that expense would be incurred even if Advocacy Holdings had no customers. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 17. | |
| 152. Koepke estimates the incremental cloud-hosting expense attributable to an additional customer at approximately $25 per month. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 17. | |
| 153. Advocacy Holdings incurs approximately $4,000 per month to deliver advocacy messages through its platform. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 18. | |
| 154. Koepke estimates the incremental message-delivery expense attributable to an additional customer at approximately $25 per month. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 18. | |
| 155. One Advocacy Holdings employee provides customer support for approximately 150 customers at an annual salary of | |

| | |
|---|---|
| approximately $120,000. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 19. | |
| 156. That employee could support at least 100 additional customers without Advocacy Holdings hiring additional customer-support personnel. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 19. | |
| 157. Koepke estimates the incremental cost of serving an additional customer at approximately $500 to $600 per year. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 20. | |
| 158. When asked whether he thought John Koepke might assault him during the January 17, 2023 meeting or afterward, Chazz Clevinger answered, "I wasn't sure." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 275:20–276:15. | |
| 159. Chazz Clevinger testified that John Koepke might assault him with his fists or another body part "in that moment." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 275:20–276:15. | |
| 160. Chazz Clevinger also testified that John Koepke might assault him "with a bat at some point . . . in the future." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 275:20–276:15. | |
| 161. Chazz Clevinger testified that he "really didn't know" if John Koepke would assault him in the future. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 275:20–276:15. | |
| 162. Chazz Clevinger played defensive back and running back on his high school varsity football team. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 69:5-70:2. | |
| 163. Chazz Clevinger testified that it was unclear to him whether John Koepke's statement was an actual threat or a joke. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 289:13–17. | |
| 164. Chazz Clevinger could not identify a baseball bat anywhere in the Red Chalk offices. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 275:20–276:15. | |
| 165. John Koepke never touched Chazz Clevinger during the incident. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 268:19–269:20. | |
| 166. John Koepke did not say that he was going to "beat up on Chazz." Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 317:22–318:20. | |
| 167. When asked whether he recalled saying "we're going to beat up on Chazz with a baseball bat," John Koepke answered, "No." Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 317:22–318:20. | |

| | |
|---|---|
| 168. Chazz Clevinger admitted that John Koepke had never physically assaulted him before. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 268:19–269:20. | |
| 169. The alleged "lunge" by John Koepke consisted of a shoulder movement while John Koepke was seated. Clevinger Dep. 289:13–290:18. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 289:13–290:18. | |
| 170. Chazz Clevinger estimated the movement at six to eighteen inches. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 290:9–18. | |
| 171. John Koepke was approximately four feet away across a conference table. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 172. Chazz Clevinger could not recall whether John Koepke stood up. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 289:13–290:18. | |
| 173. Chazz Clevinger did not leave after the alleged incident. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 174. After the alleged incident, Chazz Clevinger went with John Koepke to Koepke's office. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 175. After the alleged incident, Chazz Clevinger had a drink from John Koepke's private bar. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 176. After the alleged incident, Chazz Clevinger went with John Koepke to Gibson's for steak. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 177. After the alleged incident, Chazz Clevinger accepted a ride from John Koepke. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 178. Chazz Clevinger and John Koepke left on "good terms" after the alleged incident. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:1–17. | |
| 179. Chazz Clevinger explained that he decided to "play it cool and be nice." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 291:5–17. | |
| 180. Chazz Clevinger testified that John Koepke said, "I think we should take a baseball bat to Chazz." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 268:19–269:20. | |
| 181. Chazz Clevinger testified that John Koepke made the alleged "lunge" in his chair in connection with the statement. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 289:13–290:18. | |
| 182. At deposition, Chazz Clevinger testified that he had been promised 33.3% ownership and an equal partnership with | |

| | |
|---|---|
| John Koepke and Raymond Zenkich. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 319:9–21. | |
| 183. In his supplemental interrogatory responses, Chazz Clevinger separately described the alleged equity interest as 25%, later 10%, then 5.5%, and then Class B shares. Clevinger Feb. 19, 2025 Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., Resp. No. 19, at 46–48. | |
| 184. Chazz Clevinger testified that he received the Subscription Agreement in "the summer of 2020," and "[m]ost likely" in June 2020. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 178:15–179:20. | |
| 185. Advocacy Holdings was formed and adopted a stock plan. Advocacy Holdings Incorporation and Stock Plan, Ex. 28 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001386-88. | |
| 186. The Subscription Agreement states that Advocacy Holdings was authorized to issue 500,000 Class A voting shares. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 187. The Subscription Agreement states that Advocacy Holdings was authorized to issue 500,000 Class B nonvoting shares. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 188. The Subscription Agreement provided for Chazz Clevinger to acquire 55,000 Class B shares. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 189. Chazz Clevinger paid $11,000 for 55,000 Class B shares. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 190. Chazz Clevinger later wrote that he was exercising 100% of his fully vested stock award of 55,000 shares. Clevinger July 12, 2021 Stock Option Letter, Ex. 6 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004561. | |
| 191. When exercising 100% of his fully vested stock award of 55,000 shares, Chazz Clevinger expressly described the shares as Class B shares. Clevinger July 12, 2021 Stock Option Letter, Ex. 6 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0004561. | |
| 192. Chazz Clevinger testified that his fraudulent-concealment claims rest on the "[s]ame facts" as his fraud | |

| | |
|---|---|
| claims. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 337:11-338:1. | |
| 193. Chazz Clevinger testified that, by summer 2020, he knew "without a doubt" that he had been misled. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 179:1–13. | |
| 194. Chazz Clevinger identified the June 27, 2020 email as the point at which he discovered the alleged deception. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 184:6–14. | |
| 195. Chazz Clevinger testified that he was "1000 percent certain" by summer 2020 that he knew he was being betrayed, lied to, and fraudulently induced. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 179:1–13. | |
| 196. Chazz Clevinger continued working for Advocacy Holdings until February 2023. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 86:7–18, 132:19–133:1. | |
| 197. Chazz Clevinger made additional capital contributions after learning of the alleged discrepancy concerning his equity. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 179; Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 193:15–18; 194:21–25. | |
| 198. When asked whether the alleged equity representations affected his thinking about entering the noncompete Agreement, Chazz Clevinger testified that he was "not making any statements, one way or another," as to their effect on that thinking. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 298:11–19. | |
| 199. At deposition, Chazz Clevinger identified "opportunity costs" as damages. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 299:1–300:3. | |
| 200. At deposition, Chazz Clevinger identified lost educational opportunities as damages. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 299:11–21. | |
| 201. At deposition, Chazz Clevinger identified the possibility of attending Michigan Law School as part of his claimed damages. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 299:19–21. | |
| 202. At deposition, Chazz Clevinger identified unidentified alternative jobs and businesses as part of his claimed damages. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 299:1–300:3. | |
| 203. At deposition, Chazz Clevinger described his damages as including "untold damages." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 299:11–18. | |
| 204. At deposition, Chazz Clevinger acknowledged that his annual compensation ultimately reached approximately | |

| | |
|---|---|
| $300,000. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 315:2–5. | |
| 205. In verified interrogatory responses, Chazz Clevinger claimed deferred compensation and lost earnings from alternative career opportunities. Clevinger Apr. 2, 2025 Suppl. Interrog. Resps., Ex. 27 to Advocacy Holdings' Br., Resp. No. 20, at 49. | |
| 206. In verified interrogatory responses, Chazz Clevinger asserted that he "forwent higher-paying opportunities." Clevinger Apr. 2, 2025 Suppl. Interrog. Resps., Ex. 27 to Advocacy Holdings' Br., Resp. No. 20, at 50. | |
| 207. Chazz Clevinger asserted that he could have earned $1.5 million to $2 million in an alternative executive role. Clevinger Second Am. Suppl. Interrog. Resps., Ex. 10 to Advocacy Holdings' Br., at Resp. 20, p. 45. | |
| 208. Chazz Clevinger's $46,000 in contributions was paid to Advocacy Holdings rather than personally to John Koepke or Raymond Zenkich. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 349:11–350:9 | |
| 209. At deposition, Chazz Clevinger testified that he conferred benefits on Red Chalk and Advocacy Holdings through his work. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 352:13–353:2. | |
| 210. When asked to identify something Chazz Clevinger personally transferred to John Koepke or Raymond Zenkich, apart from work performed for the companies, Chazz Clevinger identified no labor, money, property, or service. He said he "provided a great deal of value." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 342:7–345:15. | |
| 211. Chazz Clevinger testified that John Koepke paid himself approximately $300,000 from PPP proceeds. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 344:7–22; 345:4–8. | |
| 212. The approximately $300,000 that Chazz Clevinger testified John Koepke paid himself came from government PPP proceeds rather than directly from Chazz Clevinger. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 345:4–8. | |
| 213. Chazz Clevinger's $11,000 payment was made under a written Subscription Agreement. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 214. Chazz Clevinger signed the Subscription Agreement in December 2020. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |

| | |
|---|---|
| 215. At deposition, Chazz Clevinger did not dispute his signature on the Subscription Agreement. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 337:11–338:1. | |
| 216. The Subscription Agreement reflected Chazz Clevinger's purchase of 55,000 Class B shares for $11,000. Advocacy Holdings Subscription Agreement and Payment Record, Ex. 5 to Advocacy Holdings' Br., at OCP0000287–88. | |
| 217. Raymond Zenkich testified that Chazz Clevinger received his ten-percent interest through a subscription agreement. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 231:4–8. | |
| 218. By the time of the later capital calls, Chazz Clevinger held 10 percent of Advocacy Holdings' equity. Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 193:15–24; 194:1–9, 21–25. | |
| 219. When Advocacy Holdings' business declined, all Advocacy Holdings shareholders were subjected to capital contributions. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 328:8–16. | |
| 220. Chazz Clevinger's contributions were made on a pro rata basis corresponding to his ownership. Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 193:15–24; 194:1–9. | |
| 221. Chazz Clevinger testified that his base salary when he left Advocacy Holdings was $180,000. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 189:8–14. | |
| 222. Chazz Clevinger testified that he "started at 15 percent commission." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 313:15–20. | |
| 223. Chazz Clevinger's $46,000 was paid to Advocacy Holdings, not Red Chalk. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 349:11–350:9. | |
| 224. Chazz Clevinger testified that the alleged $94,000 consisted of payments from Advocacy Holdings to Red Chalk. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 352:13–353:2. | |
| 225. Chazz Clevinger characterized the alleged $94,000 in payments from Advocacy Holdings to Red Chalk as "payments to Red Chalk . . . from Advocacy Holdings for services that Red Chalk did not, you know, render." Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 352:13–353:2. | |
| 226. John Koepke testified that Red Chalk was not an owner of Advocacy Holdings. Koepke Dep., Ex. 9 to Advocacy Holdings' Br., at 274:17–21. | |
| 227. Raymond Zenkich testified that Advocacy Holdings transferred nothing to Red Chalk Group. Zenkich Dep., Ex. 8 to Advocacy Holdings' Br., at 72:17–24. | |

| | |
|---|---|
| 228. Chazz Clevinger worked as a Red Chalk 1099 contractor between 2016 and 2019. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 84:10–85:14. | |
| 229. Chazz Clevinger was compensated for his work as a Red Chalk 1099 contractor between 2016 and 2019. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 84:10–85:14. | |
| 230. Clevinger became a W-2 employee of Red Chalk in January 2020 and remained on Red Chalk's payroll until Advocacy Holdings began paying him later that year. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 76:15–77:17. | |
| 231. On February 17, 2023, Arkansas Advanced Energy Association paid SCS $35,039.00 for 11,688 guaranteed emails from Arkansas residents to elected officials. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005583; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001499; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007547. | |
| 232. On February 24, 2023, Arkansas Advanced Energy Association paid SCS $9,975.00 for guaranteed emails from advocates to Arkansas state lawmakers. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005583; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001501. | |
| 233. On March 3, 2023, Arkansas Advanced Energy Association paid SCS $14,975.00 for guaranteed-response emails and 500 live-operator calls. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001508. | |
| 234. On March 6, 2023, Convention of States paid SCS $34,000.00 for paid advertising and 800 live-operator calls. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001498; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007555. | |
| 235. On March 9, 2023, Digital Restaurant Association paid SCS $20,000.00 for 1,000 live-operator calls for its Georgia campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001505; CiviClick/SCS Customer Emails | |

| | |
|---|---|
| and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007586. | |
| 236. On March 9, 2023, Digital Restaurant Association paid SCS $12,500.00 for paid media for its Georgia campaign and a webinar campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001500; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007548. | |
| 237. On March 10, 2023, Arkansas Advanced Energy Association paid SCS $9,975.00 for 500 live-operator calls. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001507; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007553. | |
| 238. On March 14, 2023, Amber Integrated paid SCS $19,000.00 for an annual CiviClick grassroots-advocacy software subscription and a guaranteed-response email program. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001493; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007543. | |
| 239. On March 28, 2023, Digital Restaurant Association paid SCS $5,500.00 for Aristotle data concerning Georgia restaurant owners, operators, and general managers. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005592; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001503; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007551. | |
| 240. On April 10, 2023, Digital Restaurant Association paid SCS $35,000.00 for a Winsight Restaurant Business email-list rental and guaranteed-click program. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001522; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007569. | |

| | |
|---|---|
| 241. On April 11, 2023, National Hookah Community Association paid SCS $7,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001509; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005087. | |
| 242. On April 20, 2023, The Herald Group paid SCS $4,000.00 for 200 live-operator calls for the Housing Options Campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001504; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007585. | |
| 243. On May 9, 2023, Asthma and Allergy Foundation of America paid SCS $20,000.00 for a two-year CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005605; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001527; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005508. | |
| 244. On March 15, 2024, National Hookah Community Association paid SCS $7,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005663; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007629. | |
| 245. On August 24, 2023, FreedomWorks paid CiviClick $17,820.00 for a two-year CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005359; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007594. | |
| 246. On November 28, 2023, Push Digital paid CiviClick $6,000.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005377; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007606. | |

| | |
|---|---|
| 247. On December 7, 2023, American Cancer Society paid CiviClick $10,000.00 for guaranteed-response email programs directed to federal and state legislative districts. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005387; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007608. | |
| 248. On December 11, 2023, Whitestone Strategic paid CiviClick $16,200.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005387; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007607. | |
| 249. On January 3, 2024, Students for Life Action paid CiviClick $18,000.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007605. | |
| 250. On January 16, 2024, Convention of States Action paid CiviClick $40,000.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007597. | |
| 251. On January 17, 2024, FreedomWorks paid CiviClick $17,820.00 for a two-year CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007610. | |
| 252. On February 21, 2024, American Conservative Union paid CiviClick $5,000.00 for an Idaho advocate-acquisition email campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007621. | |
| 253. On March 14, 2024, American Conservative Union paid CiviClick $12,125.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005409; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007617. | |
| 254. On April 22, 2024, National Association for Gun Rights paid CiviClick $3,000.00 for a Maine advocate-acquisition email campaign. Bank of America Records, Ex. 21 to | |

| | |
|---|---|
| Advocacy Holdings' Br., at OCP0005417; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007641. | |
| 255. On May 30, 2024, National Association for Gun Rights paid CiviClick $15,000.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005423; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007640. | |
| 256. On July 19, 2024, Yes. Every Kid. paid CiviClick $14,600.00 for an annual CiviClick grassroots-advocacy software subscription and advocate-acquisition emails. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007646. | |
| 257. On November 7, 2024, The John Birch Society paid CiviClick $18,000.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007659. | |
| 258. On November 8, 2024, Yes. Every Kid. paid CiviClick $6,000.00 for the acquisition of 2,000 advocates and email addresses for a Tennessee activation campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007660. | |
| 259. On December 4, 2024, California Black Health Network paid CiviClick $2,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006518. | |
| 260. On December 18, 2024, Whitestone Strategic paid CiviClick $13,800.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007666. | |
| 261. On December 19, 2024, Tennessee Firearms Association paid CiviClick $25,000.00 for advocate acquisition and a CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, | |

| | |
|---|---|
| Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007667. | |
| 262. On December 27, 2024, Students for Life Action paid CiviClick $25,245.00 for an annual CiviClick grassroots-advocacy software subscription and an email-and-telephone advocacy campaign in South Carolina. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007662, 0007668. | |
| 263. On January 15, 2025, Spina Bifida Association paid CiviClick $7,425.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007672. | |
| 264. On January 17, 2025, Yes. Every Kid. paid CiviClick $10,000.00 for advocate-acquisition email campaigns in Idaho and Kansas. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007679. | |
| 265. On February 24, 2025, Bama Carry paid CiviClick $10,000.00 for Alabama advocate acquisition and a CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005478; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006837. | |
| 266. On March 19, 2025, Yes. Every Kid. paid CiviClick $15,000.00 for advocate-acquisition email campaigns in Indiana, Illinois, and Alaska. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007693. | |
| 267. On March 28, 2025, Coalition for a Prosperous America paid CiviClick $8,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007695. | |
| 268. On April 8, 2025, National Hookah Community Association paid CiviClick $7,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005493; | |

| | |
|---|---|
| CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007694. | |
| 269. On April 16, 2025, Bama Carry paid CiviClick $10,000.00 for Alabama advocate acquisition and a CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005493; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007689. | |
| 270. On May 9, 2025, Multistate Associates paid CiviClick $12,500.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012548. | |
| 271. On May 13, 2025, The Play Equity Fund paid CiviClick $7,425.00 for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012585. | |
| 272. On October 21, 2025, Herbalife paid CiviClick $24,500.00 for an annual CiviClick grassroots-advocacy software subscription and 100 hours of digital-advocacy consulting. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013493; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012618. | |
| 273. On February 8, 2023, SCS received $9,250.00 that corresponds by amount and timing to Digital Restaurant Association's invoice for a monthly strategy retainer, monthly advocacy-software license, and monthly Advocacy Action Center updates. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005583; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007583. | |
| 274. On February 27, 2023, SCS received an Intuit customer deposit of $5,000.00 that corresponds by unique amount and timing to Bring Our Troops Home's invoice for an eight-month CiviClick grassroots-advocacy software subscription and WV-51 voter-file mobile numbers and landlines. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005583; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001502; | |

| | |
|---|---|
| CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007550. | |
| 275. On February 28, 2023, SCS received an Intuit customer deposit of $12,000.00 that corresponds by unique amount and timing to Killer Whale Agency's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005583; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001491; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007541. | |
| 276. On March 6, 2023, SCS received an Intuit customer deposit of $14,500.00 that corresponds by unique amount and timing to JVA Campaigns' invoice for an annual CiviClick agency-account grassroots-advocacy software subscription and 1,000 guaranteed constituent emails to elected officials. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001492; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007542. | |
| 277. On March 9, 2023, SCS received $9,250.00 that corresponds to Digital Restaurant Association's invoice for a monthly strategy retainer, monthly advocacy-software license, and monthly Advocacy Action Center updates. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001489; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007552. | |
| 278. On March 20, 2023, SCS received $18,000.00 from Memoir Inc. that corresponds to Chapter Advisory's invoice for sales leads. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001510; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007558. | |
| 279. On March 24, 2023, SCS received an Intuit customer deposit of $11,500.00 that corresponds by unique amount and timing to Iron Light's invoice for an annual CiviClick grassroots-advocacy software subscription for Future 42 and | |

| | |
|---|---|
| Change Washington. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005591; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001514; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005166. | |
| 280. On April 6, 2023, SCS received $9,250.00 that corresponds to Digital Restaurant Association's invoice for a monthly strategy retainer, monthly advocacy-software license, and monthly Advocacy Action Center updates. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001515; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007563. | |
| 281. On April 10, 2023, SCS received $9,250.00 that corresponds to Digital Restaurant Association's invoice for a monthly strategy retainer, monthly advocacy-software license, and monthly Advocacy Action Center updates. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001524; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007571. | |
| 282. On April 19, 2023, SCS received an Intuit customer deposit of $8,500.00 that corresponds by unique amount and timing to Coalition for a Prosperous America's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005599; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001523; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007570. | |
| 283. On May 1, 2023, SCS received $10,000.00 from Push Advocacy that corresponds to Push Digital's invoice for 500 live-operator calls. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005605; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001525; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007572. | |
| 284. On May 2, 2023, SCS received an Intuit customer deposit of $7,000.00 that corresponds by unique amount and | |

| | |
|---|---|
| timing to The Fells Group's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005605; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001530; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005648; 0007388; 0007589. | |
| 285. On June 22, 2023, SCS received an Intuit customer deposit of $5,000.00 that corresponds by unique amount and timing to Digital Restaurant Association's invoice for 250 guaranteed-response phone-call units for calls to members of the Miami-Dade Board of County Commissioners. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005613; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001536; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007581. | |
| 286. On August 2, 2023, SCS received an Intuit customer deposit of $2,540.00 that corresponds by unique amount and timing to Iron Light's invoice for 127 live-operator calls. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005625; CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001488; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0005743; 0007590. | |
| 287. On November 21, 2023, CiviClick received an Intuit customer deposit of $15,000.00 that corresponds by unique amount and timing to Liberty Square's invoice for a CiviClick annual grassroots-advocacy software subscription for UConn. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005377; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007609. | |
| 288. On December 1, 2023, CiviClick received an Intuit customer deposit of $30,000.00 that corresponds by unique amount and timing to Midwestern Freedom's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005387; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007604. | |
| 289. On January 16, 2024, CiviClick received an Intuit customer deposit of $8,500.00 that corresponds by unique | |

| | |
|---|---|
| amount and timing to Greg Pruett's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007614. | |
| 290. On January 19, 2024, CiviClick received an Intuit customer deposit of $10,000.00 that corresponds by unique amount and timing to Push Digital's invoice for a guaranteed-response email program directed to South Carolina Senate districts. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007619. | |
| 291. On January 29, 2024, CiviClick received an Intuit customer deposit of $11,500.00 that corresponds by unique amount and timing to JVA Campaigns' invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007615. | |
| 292. On January 30, 2024, CiviClick received an Intuit customer deposit of $12,500.00 that corresponds by unique amount and timing to Killer Whale Agency's invoice for the first payment on a CiviClick annual grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005393; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007618. | |
| 293. On February 5, 2024, CiviClick received an Intuit customer deposit of $8,000.00 that corresponds by unique amount and timing to HZQ Consulting's invoice for a Brooklyn advocate-acquisition email campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007620. | |
| 294. On February 7, 2024, CiviClick received an Intuit customer deposit of $18,000.00 that corresponds by unique amount and timing to JVA Campaigns' invoice for 6,000 advocate-acquisition emails directed to twelve members of the U.S. House for the Auto Care Association. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to | |

| | |
|---|---|
| Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007624. | |
| 295. On February 9, 2024, CiviClick received an Intuit customer deposit of $11,702.50 that corresponds by unique amount and timing to Coalition for Community Solar's invoice for guaranteed-response email and telephone advocacy services for its Washington campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007622. | |
| 296. On March 11, 2024, CiviClick received an Intuit customer deposit of $2,500.00 that corresponds by unique amount and timing to Beacon Center's invoice for a Tennessee advocate-acquisition email campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005409; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007630. | |
| 297. On March 15, 2024, CiviClick received an Intuit customer deposit of $9,500.00 that corresponds by unique amount and timing to Shawmut Strategies Group's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005409; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007616. | |
| 298. On March 26, 2024, CiviClick received an Intuit customer deposit of $26,100.00 that corresponds by unique amount and timing to JVA Campaigns' invoice for 8,700 guaranteed-response messages to seventeen members of Congress for the Auto Care Association. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005409; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007634. | |
| 299. On April 3, 2024, CiviClick received an Intuit customer deposit of $10,000.00 that corresponds by unique amount and timing to Southlake Public Affairs' invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005417; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007639. | |
| 300. On April 12, 2024, CiviClick received an Intuit customer deposit of $8,500.00 that corresponds by unique amount and timing to Coalition for a Prosperous America's | |

| | |
|---|---|
| invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005417; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007636. | |
| 301. On April 18, 2024, CiviClick received an Intuit customer deposit of $15,000.00 that corresponds by unique amount and timing to Israeli-American Coalition's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005417; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007638. | |
| 302. On June 12, 2024, CiviClick received an Intuit customer deposit of $13,000.00 that corresponds by unique amount and timing to Drive Public Affairs' invoice for 6,500 guaranteed-response emails to lawmakers for the PA Leaders Action Fund campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005429; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007644. | |
| 303. On July 16, 2024, CiviClick received an Intuit customer deposit of $21,000.00 that corresponds by unique amount and timing to Riverfront Strategy's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007643. | |
| 304. On July 22, 2024, CiviClick received an Intuit customer deposit of $11,000.00 that corresponds by unique amount and timing to Shawmut Strategies Group's invoice for 5,500 guaranteed-response emails for a Low Carbon Fuel Standard campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007645. | |
| 305. On July 23, 2024, CiviClick received an Intuit customer deposit of $12,500.00 that corresponds by unique amount and timing to Killer Whale Agency's invoice for the second payment on a CiviClick grassroots-advocacy software subscription for People for Opportunity. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007648. | |

| | |
|---|---|
| 306. On August 5, 2024, CiviClick received an Intuit customer deposit of $112,000.00 that corresponds by a unique two-invoice combination to The Herald Group's invoices for 3,000 advocate-acquisition emails for the American Homes Campaign and 40,000 advocate-acquisition emails for the Commitment to Seniors Campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005441; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007650; 0007651. | |
| 307. On August 6, 2024, CiviClick received an Intuit customer deposit of $8,500.00 that corresponds by unique amount and timing to Federation of Virginia Food Banks' invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005441; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007653. | |
| 308. On October 15, 2024, CiviClick received an Intuit customer deposit of $6,000.00 that corresponds by unique amount and timing to Bulfinch's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005451; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006506. | |
| 309. On November 6, 2024, CiviClick received an Intuit customer deposit of $3,500.00 that corresponds by unique amount and timing to Roseville Chamber's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006515; 0006533. | |
| 310. On November 13, 2024, CiviClick received an Intuit customer deposit of $3,000.00 that corresponds by unique amount and timing to Valley Industry's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006549. | |
| 311. On November 15, 2024, CiviClick received an Intuit customer deposit of $15,000.00 that corresponds by unique amount and timing to AMAC Action's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of | |

| | |
|---|---|
| America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007656; 0006398; 0006416; 0006458; 0006461; 0006466. | |
| 312. On November 29, 2024, CiviClick received an Intuit customer deposit of $12,000.00 that corresponds by unique amount and timing to Grassroots Institute's invoice for an annual CiviClick grassroots-advocacy software subscription and custom coding for submission of testimony to elected officials. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005457; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007664; 0006623. | |
| 313. On December 3, 2024, CiviClick received an Intuit customer deposit of $9,500.00 that corresponds by unique amount and timing to Bring Our Troops Home's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006524; 0006527; 0006564; 0006618; 0006652; 0006774; 0006840; 0012090; 0012111; 0012594; 0012597. | |
| 314. On December 16, 2024, CiviClick received an Intuit customer deposit of $30,000.00 that corresponds by unique amount and timing to Midwestern Freedom's invoice for an annual CiviClick grassroots-advocacy software subscription for AFA and its affiliates. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007661. | |
| 315. On January 2, 2025, CiviClick received an Intuit customer deposit of $4,500.00 that corresponds by unique amount and timing to Minnesota Retail's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007670; 0006673; 0006681; 0007125; 0012127; 0012659. | |

| | |
|---|---|
| 316. On January 3, 2025, CiviClick received an Intuit customer deposit of $22,000.00 that corresponds by unique amount and timing to Riverfront Strategy's invoice for 11,000 advocate-acquisition emails for the AFPI Linda McMahon nomination campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007669. | |
| 317. On January 6, 2025, CiviClick received an Intuit customer deposit of $9,500.00 that corresponds by unique amount and timing to Shawmut Strategies Group's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007673; 0006687. | |
| 318. On January 15, 2025, CiviClick received an Intuit customer deposit of $20,000.00 that corresponds by unique amount and timing to Whittingham's invoice for campaign website development and an advocate-acquisition email campaign directed to identified targets. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005469; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012105. | |
| 319. On January 29, 2025, CiviClick received an Intuit customer deposit of $30,000.00 that corresponds by unique amount and timing to Riverfront Strategy's invoice for 20,000 advocate-acquisition emails for the Gabbard and RFK nomination campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005470; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007681. | |
| 320. On February 18, 2025, CiviClick received an Intuit customer deposit of $20,250.00 that corresponds by unique amount and timing to Firearms Policy's invoice for an enterprise CiviClick grassroots-advocacy software subscription and email-marketing credits. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005477; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007687; 0006807; 0006814; 0007127; 0007287; 0012628; 0012633. | |

| | |
|---|---|
| 321. On February 24, 2025, CiviClick received an Intuit customer deposit of $20,000.00 that corresponds by unique amount and timing to Texas Gun Rights' invoice for advocate-acquisition emails, patch-through phone calls, and related CiviClick services. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005478; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006826. | |
| 322. On March 3, 2025, CiviClick received an Intuit customer deposit of $15,000.00 that corresponds by unique amount and timing to Patient's Rising's invoice for 750 guaranteed-response telephone calls for a Tennessee Senate Commerce and Labor Committee campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012523. | |
| 323. On March 4, 2025, CiviClick received an Intuit customer deposit of $12,000.00 that corresponds by unique amount and timing to Liberty Square's invoice for an annual CiviClick grassroots-advocacy software subscription and advocate-acquisition emails for a UConn campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007692. | |
| 324. On March 10, 2025, CiviClick received an Intuit customer deposit of $9,000.00 that corresponds by unique amount and timing to Citizens Alliance's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007682; 0006786; 0006789. | |
| 325. On March 11, 2025, CiviClick received an Intuit customer deposit of $25,000.00 that corresponds by unique amount and timing to Drive Public Affairs' invoice for a CiviClick grassroots-advocacy software subscription for Scout Motors and guaranteed-response email services for the Scout Motors campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005485; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007674. | |
| 326. On April 18, 2025, CiviClick received an Intuit customer deposit of $12,000.00 that corresponds by unique amount and timing to Ohio Advocates' invoice for an annual | |

| | |
|---|---|
| CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005493; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007136. | |
| 327. On April 28, 2025, CiviClick received an Intuit customer deposit of $20,000.00 that corresponds by unique amount and timing to Asthma and Allergy Foundation of America's invoice for a two-year CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005494; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0006855; 0006882. | |
| 328. On May 9, 2025, CiviClick received an Intuit customer deposit of $10,000.00 that corresponds by unique amount and timing to Berman and Company's invoice for guaranteed-response emails for a Connecticut campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013463; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012582. | |
| 329. On August 6, 2025, CiviClick received an Intuit customer deposit of $12,000.00 that corresponds by unique amount and timing to Howl for Wildlife's invoice for an annual CiviClick grassroots-advocacy software subscription. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013481; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0012600. | |
| 330. On September 27, 2023, CiviClick received $50,000.00 from a bank entry identifying "COALITION F 7846" that corresponds by payer identity, amount, and timing to Coalition for a Prosperous America's invoice for 25,000 advocate-acquisition emails for the Americans for Safe Drugs Campaign. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005365; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007598. | |
| 331. On August 24, 2023, Digital Restaurant Association paid CiviClick $19,500.00 for work identified in the contemporaneous bank record as "Inv0098 Miami Canvassing 2." Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0098 was located in his production. | |

| | |
|---|---|
| Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005359. | |
| 332. On August 25, 2023, Digital Restaurant Association paid CiviClick $13,750.00 for work identified in the contemporaneous bank record as"INV0091 Miami GRP Phone." Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0091 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005359. | |
| 333. On September 6, 2023, Digital Restaurant Association paid CiviClick $12,000.00 for work identified in the contemporaneous bank record as"Inv0103 GRP Miami consumer email phone." Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0103 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005365. | |
| 334. On December 29, 2023, Digital Restaurant Association paid CiviClick $9,250.00 for Invoice No. 0158, as identified in the contemporaneous bank record. Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0158 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005387. | |
| 335. On February 2, 2024, Digital Restaurant Association paid CiviClick $12,441.29 for work identified in the contemporaneous bank record as"Inv0175 CA LA phone email campaign." Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0175 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403. | |
| 336. On February 8, 2024, Coalition for Community Solar paid CiviClick $7,500.00. Clevinger produced other invoices documenting advocacy services for Coalition for Community Solar, but no invoice corresponding to this $7,500 payment was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403. | |
| 337. On February 22, 2024, Center for Common Ground paid CiviClick $3,960.00. Center for Common Ground appears on OCP's customer list, and Clevinger produced other invoices documenting advocacy services for that customer, but no invoice corresponding to this $3,960 payment was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005403. | |

| | |
|---|---|
| 338. On April 9, 2024, Digital Restaurant Association paid CiviClick $9,250.00 for Invoice No. 0212, as identified in the contemporaneous bank record. Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0212 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005417. | |
| 339. On June 6, 2024, Digital Restaurant Association paid CiviClick $8,250.00 for Invoice No. 0236, as identified in the contemporaneous bank record. Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0236 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005429. | |
| 340. On July 2, 2024, Digital Restaurant Association paid CiviClick $7,711.28 for work identified in the contemporaneous bank record as"Inv235 SB1490 Senate Committees emails." Clevinger produced other invoices documenting advocacy services for Digital Restaurant Association, but no corresponding Invoice No. 0235 was located in his production. ank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435. | |
| 341. On July 2, 2024, Digital Restaurant Association paid CiviClick another $3,310.63 for Invoice No. 0245, which the bank record describes as "NRA FOD reimbursement." No corresponding Invoice No. 0245 was located in Clevinger's production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005435. | |
| 342. On January 27, 2025, 60 Plus Association paid CiviClick $15,000.00 for Invoice No. 0345, as expressly identified in the contemporaneous bank record. No corresponding Invoice No. 0345 was located among the invoices Clevinger produced. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005470. | |
| 343. On February 4, 2025, Georgians for Safe Anesthesia paid CiviClick $100,000.00 for Invoice No. 0354, as expressly identified in the contemporaneous bank record. No corresponding Invoice No. 0354 was located among the invoices Clevinger produced. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005477. | |
| 344. On April 1, 2025, Lifelong Learning paid CiviClick $36,000.00 for Invoice No. 0362, as expressly identified in the contemporaneous bank record. No corresponding Invoice No. 0362 was located among the invoices Clevinger produced. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005493. | |

| | |
|---|---|
| 345. On July 29, 2025, Sports Fans Coalition paid CiviClick $9,900.00. Sports Fans Coalition appears on OCP's customer list, which tracks software and advocate-acquisition revenue, but no invoice corresponding to this payment was located among the invoices Clevinger produced. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013475. | |
| 346. On October 9, 2025, MultiState Associates paid CiviClick $5,000.00, with the bank record referencing"REF*0499." MultiState appears on OCP's customer list, and Clevinger produced other advocacy-service invoices for MultiState, but no invoice corresponding to this payment was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013493. | |
| 347. On October 17, 2025, The John Birch Society paid CiviClick $18,000.00. The John Birch Society appears on OCP's customer list, and Clevinger produced other invoices documenting CiviClick's advocacy work for it, but no invoice corresponding to this $18,000 payment was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013493. | |
| 348. On November 6, 2025, 60 Plus Association paid CiviClick $102,000.00 for Invoice No. 0483, as expressly identified in the contemporaneous bank record. No corresponding Invoice No. 0483 was located among the invoices Clevinger produced. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013449. | |
| 349. On November 14, 2025, Whitestone Strategic paid CiviClick $20,000.00 for Invoice No. 0538, as expressly identified in the contemporaneous bank record. Whitestone appears on OCP's customer list, and Clevinger produced other advocacy-service invoices for Whitestone, but no corresponding Invoice No. 0538 was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013449. | |
| 350. On November 19, 2025, Students for Life Action paid CiviClick $17,820.00. Students for Life appears on OCP's customer list, and Clevinger produced other invoices documenting CiviClick's advocacy services for Students for Life, but no invoice corresponding to this payment was located in his production. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0013449. | |
| 351. SCS provided client-acquisition services in connection with Camp Lejeune claims by marketing to potential claimants and connecting responsive individuals with law firms. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 120:13– | |

| | |
|---|---|
| 123:22; SCS/Milberg Camp Lejeune Emails, Ex. 26 to Advocacy Holdings' Br., at OCP0013170–71. | |
| 352. The Camp Lejeune work consisted of client-acquisition and marketing services, including marketing to potential Camp Lejeune claimants and connecting responsive individuals with law firms. Clevinger Dep., Ex. 2 to Advocacy Holdings' Br., at 120:13–123:22; SCS/Milberg Camp Lejeune Emails, Ex. 26 to Advocacy Holdings' Br., at OCP0013170–71. | |
| 353. During 2022 and 2023, Advocacy Holdings provided client-acquisition and marketing services, including services designed to identify and recruit advocates or other responsive individuals for customer campaigns. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 13. | |
| 354. Advocacy Holdings had personnel, technology, and experience available to perform client-acquisition and marketing work of the type SCS performed in connection with Camp Lejeune claims. Koepke Decl., Ex. 12 to Advocacy Holdings Parties' Br., ¶ 14. | |
| 355. On November 10, 2022, SCS received $50,000 from Milberg Coleman in connection with Camp Lejeune case-acquisition work. Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005559; SCS/Milberg Camp Lejeune Emails, Ex. 26 to Advocacy Holdings' Br., at OCP0013170–71. | |
| 356. On January 11, 2023, SCS received $500,000 from NSPR Law Services, with the wire identifying the payment as "CAMP LEJUENE." Bank of America Records, Ex. 21 to Advocacy Holdings' Br., at OCP0005575. | |
| 357. In June 2023, CiviClick invoiced Paul Napoli/NSPR for 250 case retainers at $2,000 each and reflects "Paid in Full." CiviClick and SCS Invoices, Ex. 22 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0001537; CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007582. | |
| 358. In September 2023, CiviClick invoiced NSPR Law Services $500,000 for 250 "Camp Lejeune Case Retainers" at $2,000 per retainer, and the invoice reflects that it was paid in full. CiviClick/SCS Customer Emails and Invoices, Ex. 23 to Advocacy Holdings' Br., at CLEVINGER PARTIES CONFIDENTIAL 0007599 | |