UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-----------------------------x

CHAZZ CLEVINGER, :

Plaintiff, :

v. : Case No.:

ADVOCACY HOLDINGS, INC., : 1:23-cv-1159-JMC

and :

RED CHALK GROUP, LLC, :

and :

JOHN KOEPKE, :

and :

RAYMOND ZENKICH, :

Defendants. :

-----------------------------x

ADVOCACY HOLDINGS, INC., :

Counter-Plaintiff, :

v. :

CHAZZ CLEVINGER, et al., :

Counter-Defendants. :

-----------------------------X

Video Deposition of CIVICLICK AND SUPERIOR
CAMPAIGN SOLUTIONS
By and through its Corporate Designee
CHAZZ CLEVINGER,
and in his individual capacity
Washington, DC
Thursday, December 11, 2025
10:26 a.m. EST

Job No.: 612263
Pages: 1 - 408
Stenographically reported by: Judith E. Bellinger, RPR, CRR, CSR-TX, CCR-WA, CCR-NM

Video deposition of CHAZZ CLEVINGER held at the offices of:

VEDDER PRICE, PC
1401 New York Avenue NW
Suite 500
Washington, DC 20005
202.312.3322

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF AND
COUNTER-DEFENDANTS:

KENNETH CHASE, ESQUIRE
CHASE LAW & ASSOCIATES, PA
1141 71st Street
Miami Beach, FL 33141
305.402.9800

ON BEHALF OF THE DEFENDANTS AND
COUNTER-PLAINTIFF:

ANAND RAMANA, ESQUIRE
VEDDER PRICE, P.C.
1401 New York Avenue NW
Suite 500
Washington, DC 20005
202.312.3320

ALSO PRESENT:

Jamie Ogihara

10:26:40 Chalk Group, John Koepke, and Raymond Zenkich.
10:26:43 MR. CHASE: Kenneth Chase, Chase Law
10:26:44 and Associates, representing Chazz Clevinger,
10:26:48 CiviClick, Incorporated, and
10:26:52 Superior Campaign Solutions, LLC.
10:26:55 THE VIDEOGRAPHER: The court reporter
10:26:56 today is Judy Bellinger, representing Planet
10:26:57 Depos.
10:26:58 The witness will now be sworn.
10:27:00 CHAZZ CLEVINGER,
10:27:00 being first duly sworn, was examined
10:27:00 and testified as follows:
10:27:00 EXAMINATION BY COUNSEL FOR THE DEFENDANTS AND
10:27:00 COUNTER-PLAINTIFF
10:27:09 BY MR. RAMANA:
10:27:10 Q Good morning, can you, please, state
10:27:12 your name for the record.
10:27:13 A Chazz Clevinger.
10:27:14 Q Okay. And do you understand that
10:27:16 you're here for your deposition individually, in
10:27:22 Case Number 1:23 CV 1176 and Case Number 1:23 CV
10:27:29 1159, consolidated in the United States District

10:48:16 prior to that date, but it just didn't have a bank
10:48:20 account, right?
10:48:21 A Yes. In very small quantities.
10:48:26 Q It was generating revenues in very
10:48:28 small quantities?
10:48:29 A Yeah, prior to June 2023, yes.
10:48:31 Q Okay.
10:48:33 A But, you know, there was a very brief
10:48:35 time period, just because I'm sure you're going to
10:48:37 have a subsequent question about this, there was a
10:48:40 very brief time period, from the day that
10:48:42 CiviClick first started, because we received no
10:48:44 revenue prior to, I think, January -- or excuse
10:48:47 me, February, be very, very clear about that,
10:48:50 February, I think it was February the, maybe 6th
10:48:54 or 7th, I think we sent out the very first
10:48:56 invoice. I can't recall the exact dates, but you
10:49:00 can check my invoices, that we supplied as part of
10:49:04 discovery, to see when the very first invoice date
10:49:07 was.
10:49:07 But I believe it would have been, yeah,
10:49:10 that February 6th or 7th. And so, there was a

brief time period, from February 6th or 7th of 2023, to June of 2023, where we received a handful of, you know, smaller payments that were CiviClick, you know, related. You know, most of the revenue that we received, again, as you probably know from the documents that you produced in the prior deposition to Mr. Tosto, using the Wayback Machine, that Superior Campaign Solutions has always focused on mass torts legal marketing; however, there was a brief period of time there, for several months, that some payments, you know, were received, you know, relative to, you know, to CiviClick, for just that period of time, from February the 6th or 7th through, like, the beginning of June of 2023.

Q But the CiviClick website and platform was operational as of, what, about March 1st, 2023?

A I don't know the exact date, but thereabouts, give or take, yeah.

Q And so, from that time, until June 2023, CiviClick, the CiviClick website and

11:28:12 you know, in the California market.
11:28:13 Q Okay. In the last five years, have you
11:28:15 ever owned any real property?
11:28:16 A No, sir.
11:28:17 Q Okay. Kind of an odd question, but
11:28:24 were you a running back in high school?
11:28:26 A A running back? I played football, you
11:28:30 know, in high school. I believe that I played
11:28:34 corner. I was a defensive corner and then, yeah,
11:28:36 I was a backup running back. I was not the
11:28:40 starter, yes.
11:28:41 Q So you were -- were you starter as a
11:28:43 corner or cornerback?
11:28:44 A I started sometimes. But, you know,
11:28:47 no, I was not the main starter.
11:28:49 Q Okay. So you started at cornerback and
11:28:53 you were backup running back?
11:28:55 A Yeah.
11:28:56 Q How many years did you play?
11:28:57 A One.
11:28:59 Q Varsity?
11:29:00 A Yes.

11:29:05 Q Did you play in college at all?
11:29:07 A No, no.
11:29:08 Q Do you play any sports now? Like, not
11:29:11 as you sit here at the table today --
11:29:12 A That's a strange question, yes, but,
11:29:14 no, not usually. Maybe some pickup sports from
11:29:19 time to time.
11:29:20 Q What pickup sports?
11:29:24 A Basketball, golf, you know, I don't
11:29:28 know.
11:29:29 Q No flag football?
11:29:30 A Flag football? Gosh, I know I played
11:29:35 some flag football in recent years, but, yeah, no,
11:29:39 not anytime recently, no.
11:29:41 MR. CHASE: Mr. Clevinger and I will
11:29:42 play you and Mr. Koepke in flag football or name
11:29:46 your sport. We'll be there with bells on.
11:29:51 A Sounds like a great way to settle this
11:29:53 dispute, Mr. Ramana. Why don't we play two-on-two
11:29:56 basketball? We'll do it next week.
11:29:58 MR. CHASE: Any sport.
11:30:02 Q Other than your lawyer, don't want to

11:30:04 know about your conversations with your lawyer,
11:30:05 have you spoken with anyone about this deposition
11:30:08 today?
11:30:10 A Not that I can recall, no.
11:30:12 Q Okay.
11:30:13 A I have a lot of conversations with Ken,
11:30:15 Ken is my --
11:30:17 Q Yeah, I don't want to know about your
11:30:18 conversations with Mr. Chase. I'm just talking
11:30:21 about anyone other than Mr. Chase?
11:30:23 A The only thing I've said to anyone
11:30:26 other than Mr. Chase is that I would be
11:30:27 participating in a deposition, you know, this
11:30:29 week, so that certain people that work, you know,
11:30:35 for CiviClick or that are clients of CiviClick
11:30:38 would know that I was unavailable today.
11:30:40 Q Okay. You left Advocacy Holdings on
11:30:47 February 1st, '23; is that right?
11:30:49 A That is correct.
11:30:50 Q Have you spoken, other than Mr. Koepke
11:30:51 and Mr. Zenkich, have you spoken with anyone at
11:30:55 Advocacy Holdings since that date?

11:36:10 bit early.
11:36:11 Do you want to just take five right
11:36:13 now? Is that all right?
11:36:14 MR. CHASE: Sure.
11:36:15 MR. RAMANA: Is that all right?
11:36:17 THE WITNESS: That's fine.
11:36:18 MR. RAMANA: Let's take a break.
11:36:20 THE VIDEOGRAPHER: We are going off the
11:36:21 record. The time on the video monitor is
11:36:24 11:36 a.m.
11:36:27 (Recess taken.)
11:49:39 THE VIDEOGRAPHER: We are back on the
11:49:40 record. The time is 11:49 a.m.
11:49:45 BY MR. RAMANA:
11:49:47 Q All right. Mr. Clevinger, did there
11:49:50 ever come a time that you worked for Red Chalk
11:49:59 Group?
11:50:00 A Well, yes, I was hired as a 1099,
11:50:04 independent contractor, for Red Chalk Group in
11:50:07 mid-November of 2016, and I continued in that role
11:50:12 until, you know, Mr. Koepke and Mr. Zenkich, after
11:50:17 years and years of encouragement from me, finally,

11:50:20 you know, spun out the OneClickPolitics business
11:50:23 into a separate entity, known as
11:50:26 Advocacy Holdings, which I believe Mr. Koepke
11:50:29 testified, you know, began in, you know, July of
11:50:35 2020.
11:50:36 I don't believe that he actually, you
11:50:37 know, started paying us, you know, as W-2s of
11:50:42 Advocacy Holdings until the following month,
11:50:45 August of 2020.
11:50:46 And then there was a very, very brief
11:50:48 interval of time, from January through July of
11:50:51 2020, where I was a W-2 of Red Chalk. So just to
11:50:54 be extra clear for you, Mr. Ramana, from
11:50:57 mid-November of 2016, through December 31st of
11:51:05 2019, I was a 1099 independent contractor with the
11:51:09 Red Chalk Group, which was a very confusing time,
11:51:14 you know, for me, because OneClickPolitics and
11:51:17 Red Chalk funds were being commingled.
11:51:20 My conversations with Mr. Koepke and,
11:51:23 you know, Mr. Zenkich, you know, from the
11:51:26 beginning, were about me getting 33%, you know,
11:51:29 equity. Then that conversation changed to

11:52:34 Mr. Koepke and his management, you know,
11:52:35 consulting clients. And Mr. Koepke continued to
11:52:38 refuse to offer me equity in the Red Chalk Group
11:52:43 while continuing to promise me all this equity in
11:52:45 Advocacy Holdings.
11:52:47 You know, I felt like I was being
11:52:49 promised, you know, my 72, you know, virgins after
11:52:53 being a good holy warrior. And it never
11:52:57 happens -- never happened. You know, after, you
11:52:59 know, remind of the story of the Bible, you know,
11:53:02 when, you know, Jacob labored seven years, you
11:53:06 know, for his uncle, only to be offered up not the
11:53:11 daughter that he wanted, you know, but the older
11:53:14 daughter. And so he had to start all over again,
11:53:18 labor another seven years for the true love, you
11:53:21 know, the daughter that he truly desired.
11:53:24 So, you know, Jacob's uncle got the
11:53:26 better end of that deal with 14 years of labor.
11:53:29 And Mr. Koepke and Mr. Zenkich got the better end
11:53:33 of the deal with me, where I labored and took a
11:53:36 company, you know, 50, a hundred thousand dollars
11:53:36 of revenue when I came in, after they had played

11:53:41 around with the business from 2008 to 2016, and
11:53:45 not gotten it anywhere in eight years of
11:53:47 existence, according to Mr. Koepke's testimony
11:53:50 yesterday, and I came in and saved the day, took
11:53:53 the company from 50,000, hundred thousand dollars,
11:53:56 whatever it was, whatever they testified to, to,
11:54:00 you know, 3 million, give or take, according to
11:54:02 their own testimonies over the last week, which is
11:54:07 a very significant endeavor. And I did it all
11:54:10 without, you know, any money.
11:54:11 You know, Mr. Koepke and Mr. Zenkich
11:54:13 testified all this money that they spent. And
11:54:16 they may have spent money between 2008 and 2016, I
11:54:19 don't know. But during my tenure there, the only
11:54:22 contributions they ever made to the company were
11:54:25 their capital contributions, which I also made.
11:54:27 They did not put in any money into the company,
11:54:30 like, other than that. It was my hard-earned
11:54:33 efforts, it was --
11:54:35 Q Mr. Clevinger, hold on.
11:54:37 MR. CHASE: Hold on.
11:54:38 Q The question was --

11:56:41 Chalk Group that was supposed to have been spun
11:56:44 off from Red Chalk many years ago.
11:56:47 And it took, what, 2017, 2018, 2019,
11:56:52 you know, and still I continued to be a W-2 of Red
11:56:56 Chalk Group for another eight months after that.
11:56:58 So it was almost four years. I think I didn't
11:57:01 finally --
11:57:01 Q I'm just trying to get the timeline
11:57:03 right here.
11:57:03 You were 1099 for Red Chalk from 2016
11:57:06 to December 1, 2019; is that correct?
11:57:09 MR. CHASE: Okay. Objection. Hold on,
11:57:10 hold on, hold on. Just objection. Excuse me.
11:57:12 Objection to the clarification of you're a 1099
11:57:15 for Red Chalk, as if that fully encapsulates what
11:57:19 the situation was. He has explained --
11:57:21 MR. RAMANA: No, I'm just asking him if
11:57:22 he's a 1099.
11:57:24 MR. CHASE: But he received 1099s from
11:57:25 Red Chalk. That is one dimension of the
11:57:27 experience that was occurring, whereby OCP was
11:57:31 supposed to have been spun, but it was --

11:57:33 MR. RAMANA: I got it.
11:57:34 MR. CHASE: -- still within Red Chalk.
11:57:35 MR. RAMANA: I'm just asking about his
11:57:37 contractor status. I got that there's all sorts
11:57:39 of facts that have to do with Red Chalk during
11:57:41 that time. I'm just asking him if he was a 1099
11:57:43 from November '16 to the end of December 2019,
11:57:46 right?
11:57:47 MR. CHASE: But he already said that.
11:57:48 A That is correct, Mr. Ramana.
11:57:49 Q Okay. And then, you became a W-2 for
11:57:52 Red Chalk in January 2020 to when?
11:57:56 A January 2020 to, it would have been,
11:58:00 July or August of that same year --
11:58:02 Q Okay.
11:58:02 A -- was when Mr. Koepke finally, I
11:58:06 believe, started paying me through the new
11:58:13 Advocacy Holdings entity, and then it was, yet,
11:58:16 another five months after that before my bogus B
11:58:20 shares were offered to me in December of, you
11:58:23 know, 2020.
11:58:24 Q Okay.

11:58:24 A Similar to the biblical story, where
11:58:27 Jacob was offered not the sister he worked for,
11:58:29 but the --
11:58:30 Q Not asking about the Bible. Not asking
11:58:32 about the Bible.
11:58:33 You started as -- were you a 1099 or
11:58:36 W-2 for Advocacy Holdings?
11:58:39 A I was a W-2.
11:58:40 Q Okay. And were you W-2 starting in
11:58:43 July/August 2020; is that right?
11:58:46 A Yes.
11:58:46 Q And you remained under that status
11:58:48 until -- W-2 status until February 1, 2023; is
11:58:52 that right?
11:58:53 A Yes.
11:58:54 Q That's it. That's literally all I was
11:58:56 trying to get at.
11:58:57 All right. And as of February 1, 2023,
11:58:59 you are not a 1099 or W-2 of either Red Chalk or
11:59:05 Advocacy Holdings, correct?
11:59:05 A Yes, sir.
11:59:06 Q Thank you. That's so easy.

11:59:07 All right. So when did you start at
11:59:13 CiviClick?
11:59:15 A We did not begin prospecting for
11:59:21 customers until, you know, February the 2nd, the
11:59:25 day following my departure from Advocacy Holdings.
11:59:31 Q All right. As you sit here today, are
11:59:35 you a 1099 or a W-2 for CiviClick?
11:59:39 A For CiviClick? Yeah --
11:59:44 Q Or something else?
11:59:44 A Yeah, I mean, I'm the owner of
11:59:46 CiviClick. You know, I own, you know, a hundred
11:59:49 percent of the company. We have no W-2 employees.
11:59:53 CiviClick only has 1099 contractors, and I am the
11:59:58 sole owner of CiviClick, Incorporated, a C
12:00:01 corporation.
12:00:02 Q Okay. So you, at all times during
12:00:06 CiviClick's existence, have been hundred percent
12:00:09 owner of CiviClick; is that right?
12:00:11 A That is correct.
12:00:11 Q Okay.
12:00:12 A As Mr. Tosto testified, you know, after
12:00:16 five years with the company, it's possible he may

12:00:18 get some shares. But as of today, and from
12:00:21 February, you know, the 2nd of, you know, 2023, to
12:00:26 this point in time, whatever time it is today, I
12:00:29 am a hundred percent, you know, owner of
12:00:32 CiviClick, Incorporated.
12:00:33 Q Okay. And --
12:00:35 A And there was one share class, all A
12:00:37 shares, and I own all 1 million A shares of
12:00:40 CiviClick.
12:00:45 Q CiviClick has authorized 1 million A
12:00:49 shares; is that right?
12:00:49 A Yes.
12:00:50 Q And all 1 million authorized A shares
12:00:54 are --
12:00:56 A Well --
12:00:57 Q Are issued to you, correct?
12:00:58 A Let me revise my testimony. I don't
12:01:00 recall what the shares were authorized or not,
12:01:03 that's a, you know, technical term. And so, I
12:01:06 can't speak with actual certainty as to whether
12:01:09 they were authorized, but a document was created,
12:01:14 you know, indicating the existence of 1 million A

12:03:33 enshrined in what I believe about, you know, the
12:03:36 inadequacy and the unfairness of nonrestrictive
12:03:40 covenants.
12:03:43 Q I think earlier I said I would refer to
12:03:47 Superior Campaign Solutions as SCS.
12:03:48 Can we use SCS instead of the mouthful?
12:03:52 A Yes, sir.
12:03:53 Q Are you a hundred percent owner of SCS?
12:03:54 A Yes, sir.
12:03:55 Q And have you been a hundred percent
12:03:56 owner of SCS since it was incorporated --
12:03:58 A Yes, sir.
12:03:59 Q -- or since it was organized?
12:04:00 A Yes, sir.
12:04:01 Q Okay. Are there any employees or 1099s
12:04:03 of SCS, currently?
12:04:06 A No. Not currently.
12:04:07 Q Have there ever been any employees or
12:04:10 1099s of SCS?
12:04:12 A There have never been any employees.
12:04:14 There have been a number of 1099s.
12:04:17 Q Okay. And when was the last time SCS

12:04:19 had a 1099?
12:04:21 A We had a 1099 from early this year, I
12:04:26 don't remember the exact date, I believe it was
12:04:27 March of this year, through September, perhaps,
12:04:34 October of this year. I don't remember the exact
12:04:36 date. But for the majority of this year, there
12:04:39 was a 1099 that worked for Superior Campaign
12:04:43 Solutions.
12:04:43 Q Was Chris Tosto ever a 1099 for SCS?
12:04:47 A Yes. I believe Mr. Tosto was paid, in
12:04:52 some capacity, as a 1099 for SCS for a brief
12:04:58 period of time.
12:04:59 Q Okay. I'm going to hand you a document
12:05:01 that has previously been marked as Tosto 9.
12:05:06 (Tosto Exhibit 9 previously marked for
12:05:06 identification and attached to the transcript.)
12:05:16 Q And this is -- these are four checks
12:05:19 written from the SCS bank account; is that right?
12:05:37 A Yes, Mr. Ramana, all four checks appear
12:05:40 to be written from the SCS bank account at Bank of
12:05:45 America.
12:05:45 Q Okay. And on all four checks, the

12:05:48 bottom right-hand corner, that's your signature,
12:05:53 right?
12:05:54 A Yes, sir, I can attest that my
12:05:56 signature appears to be on all four copies of
12:05:59 these checks.
12:06:00 Q Okay. Does anybody other than you have
12:06:06 the authority to write checks for Superior
12:06:10 Campaign Solutions?
12:06:10 A No, sir.
12:06:11 Q And that's always been the case,
12:06:13 correct?
12:06:13 A Yes, sir.
12:06:14 Q All right. Does anybody, other than
12:06:16 you, have the authority to write checks for
12:06:19 CiviClick?
12:06:20 A No, sir.
12:06:20 Q And that's always been the case since
12:06:22 the beginning of CiviClick, correct?
12:06:23 A Yes, sir.
12:06:24 Q Okay. If you look at the first one
12:06:26 here, it's for $1,500, dated September of '22.
12:06:30 Do you see that?

12:06:31 A Yes, sir.
12:06:31 Q Do you recall what this payment was
12:06:33 for?
12:06:34 A Yes, sir. I hired, you know, Mr. Tosto
12:06:37 to consult for me. I know there was some
12:06:42 confusion, you know, in his deposition. So I'm
12:06:44 happy to take this opportunity to clarify.
12:06:47 So he was consulting for me in two
12:06:50 different capacities, one was specifically to
12:06:56 identify and to attend conferences and trade shows
12:07:00 for SCS. I believe he mentioned Mass Torts Made
12:07:05 Perfect. I think another one was called, like,
12:07:07 the American Association of Justice, and then
12:07:11 there was one, they always meet in Miami every
12:07:14 year, like, Trial Lawyers of America, maybe. I
12:07:16 could be wrong on that third one.
12:07:18 But the goal was -- is that, you know,
12:07:20 I had secured an opportunity, you know, to do mass
12:07:29 torts case acquisition on Camp Lejeune-related
12:07:34 cases for a trial firm and we wanted to get more
12:07:37 of this type of business. And so I had, you know,
12:07:41 Chris identify and attend some of those legal

conferences for me and to conduct research on those conferences, of which ones to attend.

And then, also, I had him advise me on LobbyLinx and what he had done with LobbyLinx. Very briefly, as I'm sure the Wayback Machine has told you, we very briefly had something called CiviRefer on our website, similar to Mr. Koepke's defunct businesses, like J Cupcakes and others that we learned about yesterday, I have, myself, had a couple of business ideas that never reached fruition, and CiviRefer is one of those ideas. Mr. Tosto consulted for me, you know, starting in late '22, you know, going into early '23, on, you know, some ideas around LobbyLinx and, you know, potentially, you know, creating a service similar to that, which, may I add, had nothing to do whatsoever with any service offered by Red Chalk Group or OneClickPolitics. And so, Mr. Tosto was advising me exclusively in those two capacities.

Q So CiviRefer, that was on the CiviClick website initially, was kind of the brainchild of your discussions about LobbyLinx with Mr. Tosto?

12:19:22 A One moment, Mr. Ramana. I will review
12:19:24 this --
12:19:25 MR. CHASE: Objection.
12:19:25 A -- and give you an answer momentarily.
12:20:12 Yes, Mr. Ramana, this appears to be a
12:20:15 recent copy, in printout version, of the CiviClick
12:20:20 website.
12:20:20 Q Okay. And the two solutions that are
12:20:22 being offered here are, like we talked about,
12:20:26 CiviClick and CiviBoost; is that right?
12:20:30 A That's correct, sir.
12:20:31 Q And CiviClick is the online platform
12:20:32 that customers can subscribe to, correct?
12:20:36 A Yes. It is a platform that customers
12:20:39 can subscribe to.
12:20:41 Q Okay. And can you describe what
12:20:49 CiviClick is?
12:20:51 A CiviClick is a software as a service
12:20:55 solution that was built on Bubble, which is a
12:21:01 no-code solution, as Mr. Zenkich was clearly aware
12:21:05 of from his testimony, you know, last week.
12:21:08 Let me take this opportunity to set the

12:35:05 Vagueness.
12:35:07 A Superior Campaign Solutions makes call,
12:35:09 Mr. Ramana.
12:35:09 Q Okay. So Superior Campaign Solutions
12:35:12 makes calls. I'm -- we'll get to -- well, let's
12:35:16 talk about that right now.
12:35:17 So, for instance, you did the
12:35:19 Camp Lejeune campaign, right?
12:35:21 MR. CHASE: Objection.
12:35:22 MR. RAMANA: What's the objection?
12:35:23 MR. CHASE: You're saying he did the
12:35:24 Lejeune --
12:35:27 Q SCS did the Camp Lejeune work, right?
12:35:30 A SCS did a project for a client to
12:35:34 secure Camp Lejeune cases. A project.
12:35:40 Q Okay. And when you say "secure
12:35:44 Camp Lejeune cases," what you mean is find
12:35:47 plaintiffs that could participate in litigation
12:35:49 that is brought by your client, right?
12:35:52 A That is correct.
12:35:55 Q Okay. And do you know how many
12:35:58 plaintiffs were eventually brought to that

12:36:01 client --
12:36:01 MR. CHASE: Objection.
12:36:02 Q -- because of SCS?
12:36:03 MR. CHASE: Objection. Relevance.
12:36:04 A I don't recall. That number may be on
12:36:08 one of the invoices that were provided in
12:36:09 discovery, but I don't recall, off the top of my
12:36:12 head, exactly how many cases it would have been.
12:36:14 Q And SCS would charge, like, per
12:36:16 plaintiff that it secured, basically?
12:36:18 MR. CHASE: Objection. Relevance.
12:36:19 A I believe so.
12:36:20 Q Yeah. Okay. And I'm just talking
12:36:24 about SCS right now. Would the client, which is a
12:36:27 law firm, right?
12:36:28 MR. CHASE: Objection.
12:36:30 A Yes. Let's be very clear. Because,
12:36:32 Mr. Ramana, you keep trying to confuse me by
12:36:36 pivoting between CiviClick and SCS. So let's just
12:36:40 be very clear so that the record is nice and
12:36:42 clean, for both you and myself, that CiviClick had
12:36:47 no involvement, you know, whatsoever, you know, in

12:36:51 any of the business that you're discussing.

12:36:56 SCS is the only entity that engaged in
12:36:59 the work related to mass torts, like, legal
12:37:04 marketing. So just to make that clear.

12:37:06 So answer your specific, you know,
12:37:08 question, yes, SCS, you know, provided services to
12:37:14 law firms to secure potential, right, because it
12:37:20 wouldn't be our choice whether somebody would be a
12:37:23 plaintiff, but potential, you know, plaintiffs for
12:37:25 litigation. You know, not being, you know,
12:37:28 lawyers, you know, we were unable to vet and to
12:37:34 determine the qualification of an individual to be
12:37:38 taken on, you know, as a client, you know, for a
12:37:41 firm. That would be the responsibility of a
12:37:44 partner and associate, you know, who had the
12:37:46 expertise and the knowledge to properly vet and
12:37:49 qualify the individual merits of someone's case.

12:37:54 So it was not, at any point in time,
12:37:57 SCS's responsibility to engage in, you know,
12:38:00 whether somebody would actually be a plaintiff.
12:38:03 We simply marketed, you know, the concept and the
12:38:07 idea, you know, of, maybe, you know, if, you know,

12:38:13 you lived in Camp Lejeune in particular time
12:38:18 periods, you know, we'll connect you to someone to
12:38:21 talk to, to determine if, like, you have a case.
12:38:24 But that would have been the extent of our work.
12:38:26 Q I'm not trying to confuse you between
12:38:28 SCS and CiviClick. I just want to talk about SCS
12:38:32 right now.
12:38:33 So when did SCS -- when did you start
12:38:35 SCS?
12:38:35 A I don't recall the exact date. I
12:38:38 believe, if my memory serves, according to all the
12:38:42 filings over the last couple years, that it may
12:38:45 have been incorporated or started in 2021. But I
12:38:51 don't believe I got my first real clients, you
12:38:55 know, for that -- I mean, there may have been one
12:38:59 or two things in, like, 2021, but we really didn't
12:39:02 start actively doing much with SCS until the fall
12:39:05 of '22, and that was when, you know, I hired
12:39:10 Mr. Tosto as a 1099 to start attending conferences
12:39:14 in an effort to try to secure more law firms as
12:39:18 clients.
12:39:18 Q Okay. Did -- at any time, has SCS

12:42:51 iteration, in the past, of the OneClickPolitics
12:42:57 platform.
12:42:57 Q Okay. And do you see, in the middle
12:43:01 there, it says the Assault Weapons Ban SCS
12:43:04 Acquisition?
12:43:06 A Yes, I see that.
12:43:06 Q Okay. Is this one of the examples of
12:43:10 what you just described on securing solutions, one
12:43:15 of SCS's services?
12:43:19 A No. I believe this is where the data
12:43:22 ultimately ended up after the fundraising campaign
12:43:26 that I did for Firearm Policy Coalition, which I'm
12:43:32 assuming, I have no knowledge, but I'm assuming
12:43:34 this is related to because the contract, I went
12:43:38 and looked it up, which was for, you know,
12:43:41 fundraising, you know, consulting and, you know,
12:43:44 identifying potential donor prospects. We ran
12:43:47 that campaign, and then Firearms Policy Coalition
12:43:53 wanted to be able to use that data after we ran
12:43:55 the fundraising campaign, to be able to try to
12:43:58 leverage those people for advocacy as well.
12:44:05 And of course being the, you know, CEO

12:44:07 of OneClickPolitics at the time, I was, like,
12:44:08 great, you know, it's a great way to be able to
12:44:11 get even more value out of what you're doing with
12:44:13 OneClick. So I believe that the data from the
12:44:17 donor campaign, that I ran for them, was
12:44:20 ultimately uploaded, in some form or fashion, into
12:44:24 OneClickPolitics, but that's the extent of, you
12:44:26 know, my knowledge of the matter.
12:44:29 Q Do you recall how much Firearms Policy
12:44:30 Coalition paid SCS?
12:44:35 A Yes, I do. Initially, I believe there
12:44:38 was early version of an agreement that stated
12:44:42 150,000. That amount was never paid. An amount
12:44:45 of $50,000 was paid for the donor campaign, you
12:44:50 know, kind of prospecting effort that we
12:44:54 conducted.
12:44:54 Q Okay.
12:44:55 A And let me state, for the record, that
12:44:56 at no point in time, you know, during my tenure at
12:44:59 OneClickPolitics, was donor prospecting or
12:45:04 fundraising, consulting, ever a service that was
12:45:07 offered by the Red Chalk Group, Advocacy Holdings,

12:45:10 or OneClickPolitics, so this was strictly a
12:45:13 noncompetitive service being offered.
12:45:26 Q I'm going to hand you another document.
12:45:28 We can mark this as 11, please.
12:45:40 (Clevinger Exhibit 11 marked for
12:45:40 identification and attached to the transcript.)
12:45:49 Q I just handed a copy of three checks.
12:45:53 Do you see that, Mr. Clevinger?
12:45:53 A Yes.
12:45:54 Q Is that your handwriting on these
12:45:56 checks?
12:45:56 A Oh, boy, I can't really tell. But
12:45:58 assuming since I'm the only person that has --
12:46:00 presumably, the only person I know of that has
12:46:04 access to these checks. I, you know, assume that,
12:46:07 you know, that it is.
12:46:08 Q Okay. And are these your signatures,
12:46:11 then?
12:46:14 A I can't -- I can't tell, but I presume
12:46:18 so.
12:46:23 Q Are these checks related to what you
12:46:25 just described as how Superior Campaign Solutions

12:46:30 would bring in customers for OneClickPolitics?
12:46:35 A As I mentioned, there was a very small
12:46:38 number, like I said, two or so, or three in 2021,
12:46:41 and two or three in 2022. But, yes, this would
12:46:46 have been examples of what I had described a few
12:46:53 minutes ago, where, you know, SCS, you know, was
12:46:56 providing a broader, noncompetitive range of
12:46:59 services, and, you know, in effort, obviously, to,
12:47:02 you know, help OneClickPolitics, as was my
12:47:06 fiduciary duty, I brought in business for OneClick
12:47:07 and secured, you know, funds as part of those
12:47:12 broader SCS services to pay for the
12:47:15 OneClickPolitics, you know, solution.
12:47:17 Q Why wouldn't you just have these
12:47:19 clients directly pay OneClickPolitics for the
12:47:23 grassroots, for the OneClickPolitics grassroots
12:47:26 software subscription?
12:47:28 A It was easier for them to make one
12:47:30 payment for everything and for me to simply pay,
12:47:33 you know, OneClick, is my recollection.
12:47:35 Q So on the first two, it just says
12:47:40 grassroots software, though, and not anything

12:47:42 beyond grassroots software, right?
12:47:43 A Well, that was the portion of what they
12:47:46 paid me that was being allocated for grassroots,
12:47:49 you know, software, you know, Mr. Ramana.
12:47:53 Q So if this is just the portion just for
12:47:54 the grassroots software subscription, why didn't
12:47:58 you just say, hey, client, pay OneClickPolitics
12:48:01 directly, $4,000 or $4,200?
12:48:05 A I mean, as I mentioned, Mr. Ramana, it
12:48:08 would have been in poor form to ask the client to
12:48:10 pay each individual vendor directly since, as I
12:48:13 mentioned to you, there were multiple other
12:48:16 offerings, you know, for, you know, other, you
12:48:19 know, companies, you know, solutions that were,
12:48:22 again, noncompetitive to OCP, like NationBuilder,
12:48:24 which is a CRM, that, you know, I advised clients
12:48:29 to use, who NationBuilder was a partner of
12:48:33 OneClickPolitics at the time.
12:48:34 And so, rather than asking the clients,
12:48:36 like, hey, you know, pay all these different
12:48:39 people individually, it was, you know, polite and
12:48:42 in better form for me to simply accept one payment

12:48:46 through SCS and then for me to take that burden
12:48:49 off of them and make the payments individually to
12:48:54 OCP and to others.
12:48:55 Q Okay. I'm going to hand you another
12:48:59 document.
12:48:59 MR. RAMANA: We can mark this as 12.
12:49:00 (Clevinger Exhibit 12 marked for
12:49:00 identification and attached to the transcript.)
12:49:15 Q All right. This appears to be your
12:49:19 LinkedIn profile, correct?
12:49:20 A Yes, it does.
12:49:21 Q If you go to the second page. It says
12:49:23 founder and CEO of CiviClick, February '23 to the
12:49:28 present, right?
12:49:28 A Yes, sir.
12:49:29 Q Okay. And then below that it says
12:49:32 founder and CEO of Superior Campaign Solutions,
12:49:33 February '23 to the present, right?
12:49:37 A Yes. That's correct.
12:49:38 Q Okay. If you move to the next page, it
12:49:42 says chief executive officer of OneClickPolitics,
12:49:44 from November '16 to February '23; is that right?

12:49:48 A Yes.
12:49:49 Q Okay. Moving to CiviClick. Is there
12:49:55 anything that is false in your CiviClick entry
12:50:05 here?
12:50:05 MR. CHASE: Objection.
12:50:09 A Oh, boy. Well, it seems like it's cut
12:50:11 off.
12:50:11 Q Right. Just from what you see?
12:50:13 MR. CHASE: Objection.
12:50:13 A So let me read what I see. Founder and
12:50:16 chief operating officer, CiviClick full-time,
12:50:18 February '23 to the present, Washington, DC,
12:50:23 hydrid. CiviClick is an AI-powered civic
12:50:27 technology platform launched in February of 2023
12:50:30 to change how public professionals leverage digit,
12:50:32 dot, dot, dot, assuming there's some more language
12:50:36 there. And then I see an image of me holding
12:50:38 trophies that I won for my excellence in campaign
12:50:44 management and my distinction as a thought leader.
12:50:47 And I see words that say Chazz Clevinger's
12:50:50 revolutionizing civic engagement in the digital
12:50:51 age, which was an article featured about me in USA

12:53:41 A Not to my knowledge.
12:53:44 Q Okay. So SCS and CiviClick are the first companies where you really are running the show; is that right?
12:53:53 MR. CHASE: Objection.
12:53:57 A That's maybe -- that's largely accurate, I would say. I mean, clearly I had a role, you know, of some importance at Advocacy Holdings. I'm not denying that. But I am denying that I was, you know, a traditional CEO because I had no power, I wasn't listed as an officer and director, but, you know, clearly I had a large amount of knowledge of the industry. And, you know, I had a number of management responsibilities. So I'm not saying that I had no role, you know, whatsoever, but, yes, to the extent that you are asking the question, you know, SCS and CiviClick are the first time that I have completely, you know, run my own show and been, you know, a, you know, an owner of more than, you know, 50 percent, you know, of something. Because my prior career consisted of roles in sales for

12:54:46 other companies and, you know, a -- being a 1099,
12:54:50 you know, for various political campaigns.
12:54:53 Q And if you turn the page to OCP. You
12:54:57 were there, it looks like, almost six and a half
12:55:00 years. And is it safe to say that the growth of
12:55:07 OCP is primarily attributable to you?
12:55:12 A Yes, it is.
12:55:12 Q Is it safe to say that the growth of
12:55:14 OCP is exclusively attributable to you?
12:55:20 A That's a big statement. I would not
12:55:23 say exclusively, but, you know, almost
12:55:28 exclusively. I think that there was one
12:55:30 individual mentioned briefly yesterday by
12:55:34 Mr. Chase named Evan Ashy. Mr. Koepke spoke at
12:55:39 length about how the, you know, in his opinion,
12:55:42 you know, the company's, you know, finances
12:55:45 dropped, you know, a bit from '21 to '22, and that
12:55:51 was because Mr. Ashy was really the only
12:55:54 salesperson of any merit that ever worked for
12:55:57 Raymond and John and myself at Advocacy Holdings.
12:56:01 Mr. Ashy produced over half a million dollars in
12:56:05 revenue and sales. And so, you know, he was the

12:56:08 only person, other than myself, that made any sort
12:56:10 of meaningful contribution.

12:56:15 We had, as Mr. Koepke testified the
12:56:17 other day, a number of different people who worked
12:56:20 for us in sales roles, you know, Andrew Tucker and
12:56:23 a whole bunch of other people. There must have
12:56:25 been, you know, a dozen or more people that were
12:56:28 hired to do sales role. But Evan Ashy was the
12:56:31 only one to ever produce more than one or two
12:56:31 sales.

12:56:35 And so, you know, his
12:56:36 500,000-dollar-plus contribution in sales, in
12:56:40 2021, was very important, very important to the
12:56:43 company, and to its revenues. And when he chose
12:56:46 to leave, to take a position elsewhere, that is,
12:56:51 you know, the main reason why, you know, sales
12:56:54 dropped. Because in 2021, both myself and Evan
12:56:57 were actively selling. And it made a huge
12:57:01 difference to have an extra, you know, 40,
12:57:03 $50,000, or whatever it was, on the books every
12:57:05 month coming in from Evan. And so when Evan left,
12:57:10 that is the number one reason why, you know, we

13:29:59 Q When was the last time a tax advising
13:30:02 service advised you on your extensions?
13:30:08 MR. CHASE: Objection.
13:30:09 A I can't speak to when the last time was
13:30:10 they advised me on my extensions other than just
13:30:13 helping me prepare the documentations needed for
13:30:16 production of discovery over the last week. But
13:30:19 the last time I had a substantive conversation
13:30:22 with either one of them was probably at some point
13:30:27 early this year, I made a rather large tax payment
13:30:32 for, I believe it was some money owed from when I
13:30:40 was a 1099 of Red Chalk in those previous years.
13:30:44 So we were going back to, you know, to pay off
13:30:47 some of those, you know, first.
13:30:54 Q Earlier I asked you about your check --
13:30:57 strike that.
13:30:58 Earlier I asked about check-writing
13:31:00 authority from CiviClick and SCS, and I believe
13:31:02 you said that you are the only person that has
13:31:05 ever had that check-writing authority for either
13:31:07 organization; is that correct?
13:31:09 A Yes. I believe that was my answer.

13:57:25 Mr. Zenkich. A company that was built on false
13:57:28 promises that those two gentlemen, you know, made
13:57:31 to me.
13:57:31 So, yes, after many years of being lied
13:57:32 to, after many years of it going from 33 percent
13:57:36 to 25 percent to 15 percent to 10 percent, to
13:57:39 5.5 percent of nonvoting B shares, I don't even
13:57:43 get to vote, you know, in the outcome of the
13:57:45 company that I help built [sic] and take from
13:57:48 $50,000, a hundred thousand dollars, to over
13:57:50 3 million.
13:57:51 Absolutely, I was incredibly like, you
13:57:54 know, upset about that. And, yes, the motivation
13:57:57 for, you know, wanting to start CiviClick, you
13:57:59 know, was derived, you know, largely because of
13:58:02 those false promises and those lies and the
13:58:05 fraudulent inducements, you know, that Mr. Koepke,
13:58:09 you know, made to me and never, you know, made
13:58:11 good on. And, you know, here in America, you know
13:58:14 I believe in free competition. I believe that
13:58:17 when somebody lies to you and screws you, you
13:58:19 should be able to get out of that situation.

13:58:22 You know, just like in a divorce. If
13:58:24 somebody cheats on you, you should be able to
13:58:26 leave. You should be able to leave them and, you
13:58:28 know, pursue, you know, another relationship and
13:58:31 be done with them. And I wanted to, you know, I
13:58:34 wanted to get out of the situation I was in
13:58:36 because I was trapped. I was trapped. I had been
13:58:38 lied to. You know, I had been given bogus, you
13:58:41 know, shares of equity. I had been misled with
13:58:45 false promises and, you know, yeah. So the idea
13:58:48 for, you know, for CiviClick was intended to be a
13:58:51 way for me to, you know, get out and free myself,
13:58:54 you know, from people that had lied to me for many
13:58:57 years.
13:58:57 Q When did you first begin to believe
13:59:00 that you were lied to?
13:59:03 A Certainly not, you know, initially.
13:59:06 You know, just like with any relationship that
13:59:09 breaks down, you know, Mr. Ramana, it's rarely all
13:59:14 at once, it's usually incrementally.
13:59:17 Q I'm asking when you first believed
13:59:18 that.

14:03:23 Mr. Koepke could never be bothered to come see me
14:03:27 or any of the employees of OneClickPolitics, like,
14:03:30 you know, during this time, you know, with the
14:03:32 two hours a week that he would put towards the
14:03:35 business. And me, having given my entire life,
14:03:37 you know, having suffered, like, health setbacks
14:03:40 because of the amount of effort and time and
14:03:43 energy that I put into the business, for me to be
14:03:46 betrayed like that, like, yeah. It was [sic]
14:03:48 incredibly, incredibly angry, after being lied to
14:03:52 and being given countless excuses, yes.
14:03:54 Incrementally, probably about the fifth or sixth
14:03:57 time, I started to believe they're probably lying
14:03:59 to me or they're probably trying to reposition
14:04:02 things to their benefit, instead of mine, and I
14:04:05 started to get skeptical.
14:04:07 But it wasn't until 2020, when I got
14:04:10 the subscription agreements, you know, that I was
14:04:12 like, all right, you know, I'm getting screwed.
14:04:15 This is not a, you know, this is not a question of
14:04:18 if I'm getting screwed, this is, wow, I cannot
14:04:21 believe how badly I'm getting screwed and what the

14:04:23 level of betrayal, you know, was. And so, yeah,
14:04:27 2020 was when I firmly, to answer your question,
14:04:31 without a doubt, 1000 percent knew that I was
14:04:34 being betrayed, I was being lied to, and I had
14:04:37 been fraudulently induced.
14:04:39 Q December of 2020?
14:04:40 A No, prior to that.
14:04:41 Q June?
14:04:42 A So would have been the summer of 2020.
14:04:45 Q June of 2020?
14:04:46 A Would have been when I first got that,
14:04:46 you know, subscription agreement that I knew that
14:04:48 I was being lied to and I had been fraudulently
14:04:50 induced.
14:04:51 Q Do you remember what month you first
14:04:52 got the subscription agreement?
14:04:54 A It would have been around that summer
14:04:54 sometime.
14:04:55 Q Like June 2020?
14:04:58 A Most likely. Whatever the document
14:04:59 says. I know that we've looked at that document a
14:05:03 number of times over the depositions in the last

14:09:07 four years, four years that I had given to my, you
14:09:11 know, given some of the best years of my life to
14:09:13 John and Raymond. And, you know, I had no idea,
14:09:15 you know, what to possibly do after being
14:09:18 betrayed. It was a horrible experience.
14:09:20 Q But it's clear that on June 27th, 2020,
14:09:23 you realized that they were only going to offer
14:09:25 you Class B shares; is that right?
14:09:29 MR. CHASE: Objection.
14:09:30 A I realized, yes, they had lied to me
14:09:33 and misled me and that, you know, they were
14:09:35 clearly betraying me and, you know, had made false
14:09:38 promises of equity and were giving me a teeny-tiny
14:09:44 fraction. Look, Mr. Ramana, we're not quibbling
14:09:46 about 30 percent versus 33 percent here. We're
14:09:49 talking about 33 percent versus 5.5 percent of the
14:09:52 company. Like, Mr. John -- Mr. John Koepke's
14:09:58 testimony about 10 percent is accurate only to the
14:10:00 extent that he is discussing B shares. You know,
14:10:03 they were, like, half a million B shares and half
14:10:05 a million A shares. You know, he gave himself and
14:10:09 Mr. Zenkich all of the A shares. You know, he

14:14:13 actually, I'm not sure if this is the actual
14:14:15 document. Because to my knowledge, I recall there
14:14:16 being an address line beneath the subscriber name,
14:14:22 which appears to have been scrubbed from this
14:14:24 document. But I do know that we've had problems,
14:14:28 in this discovery process, with scrubbing
14:14:30 metadata. So it seems that, you know, this
14:14:32 document may have been scrubbed, as well, of the
14:14:35 address, which I signed for under this
14:14:38 subscription.
14:14:39 Q Is that your signature on the second
14:14:40 page?
14:14:43 A Mr. Ramana, I'm not contesting whether
14:14:45 it's my signature. I'm contesting that the
14:14:48 address line beneath my signature has been
14:14:51 scrubbed from this document.
14:14:52 Q Okay. But this is the subscription
14:14:54 agreement, December 11th, 2020, that's signed by
14:14:58 you, that you are referring to?
14:14:59 MR. CHASE: Objection.
14:15:00 A I'm contesting, Mr. Ramana, for the
14:15:03 record, that this document has been modified.

14:40:49 MR. RAMANA: Noted.
14:40:50 MR. CHASE: I'm going to move to strike
14:40:52 that line of testimony as -- that line of
14:40:54 questioning as completely improper.
14:40:56 MR. RAMANA: Noted.
14:40:59 THE WITNESS: Mr. Ramana is very
14:41:00 unethical, so it's a continuation of his --
14:41:00 (Clevinger Exhibit 19 marked for
14:41:00 identification and attached to the transcript.)
14:41:02 MR. RAMANA: Can you mark this as 19,
14:41:03 please. Thanks.
14:41:24 Q You organized SCS in Delaware, correct?
14:41:30 A I believe so, yes.
14:41:31 Q All right. And is it safe to say that
14:41:33 you organized SCS in Delaware on or about
14:41:36 May 11th, 2021?
14:41:39 A I believe so. That's what the document
14:41:40 says.
14:41:41 Q All right. Any reason to believe that
14:41:42 that date is incorrect?
14:41:45 A No reason to believe it's incorrect.
14:41:47 Q All right. Have you reorganized SCS in

14:42:34 identification and attached to the transcript.)
14:42:34 MR. RAMANA: Can you mark this as 20,
14:42:36 please.
14:42:59 Q You incorporated CiviClick in Delaware
14:43:04 on or about July 21st, 2022; is that correct?
14:43:07 A If that's what the document says, yes.
14:43:09 But as I previously testified, there was not a
14:43:12 penny of revenue that CiviClick, you know,
14:43:15 received until its bank account opened in June of
14:43:21 2023.
14:43:22 Q Right. But CiviClick started providing
14:43:24 services before June of 2023, correct?
14:43:27 MR. CHASE: Objection.
14:43:28 A No. I mean, as I previously testified,
14:43:31 those, you know, services were provided very, very
14:43:35 briefly through SCS from, you know, February the
14:43:39 6th or thereabouts, you know, until June of 2023.
14:43:44 And CiviClick's first penny, first services,
14:43:49 whatever, if you will, were started in June of
14:43:52 '23.
14:43:53 Q Are you testifying that no customer
14:43:56 subscribed to the CiviClick platform until June of

15:02:03 conferences, that they white-label LegiNation now
15:02:07 and, you know, supposedly do it. But, you know,
15:02:10 they never provided that service.
15:02:13 So, clearly, with, you know, tracking
15:02:14 legislation, that was, you know, I would often
15:02:18 recommend people to go to BillTrack50 because they
15:02:21 were OCP's partner for CRM. I would recommend
15:02:24 NationBuilder for planning a Hill day. You know,
15:02:30 recommended a variety of vendors for that. For
15:02:32 voter contact lists, I recommended a variety of
15:02:35 different, you know, vendors. Only for launching
15:02:38 a grassroots campaign. That was the one thing out
15:02:41 of these four sentences that relates to OCP.
15:02:44 Q All right.
15:02:46 MR. RAMANA: If we can mark -- where
15:02:47 are we at, 21?
15:02:57 (Clevinger Exhibit 21 marked for
15:02:57 identification and attached to the transcript.)
15:03:17 Q Have you seen this document before?
15:03:21 A Yes, I have.
15:03:22 Q All right. If you go to the last page.
15:03:25 Is that your signature on the last

15:03:27 page?
15:03:34 A Yes, I believe it is. And I'll state,
15:03:36 for the record, that the address is 1204 G Street
15:03:39 Northeast, Washington, DC. Yet another of dozens
15:03:43 of documents that were produced proving my
15:03:46 residency in Washington, DC, at the time that you,
15:03:49 Mr. Ramana, signed a false Rule 65 certification
15:03:55 trying to claim Virginia residence for me, which
15:03:57 you clearly knew was not the case and chose to lie
15:04:00 about.
15:04:00 Q Is the date there, July 15th, 2020, or
15:04:04 July 15th, 2021?
15:04:07 A Looks like, to me, that that says
15:04:09 July 15th, 2021.
15:04:12 Q If you look at the front, on July 1st,
15:04:16 2020, this is the noncompete that you signed in
15:04:20 July of 2020, correct?
15:04:23 A I don't know that to be a fact. All
15:04:25 I've testified to, at this point, is that I've
15:04:28 seen this document and the address that, you know,
15:04:32 was here as my residence in DC, at that particular
15:04:37 point in time.

15:04:37 Q But you only signed one noncompete with
15:04:42 Advocacy Holdings, right?
15:04:43 A Yeah, there was only ever one document.
15:04:45 Q And you signed that in July of 2020,
15:04:47 correct?
15:04:47 A I don't know that to be the case, no.
15:04:50 I signed something at some point. But, like most
15:04:54 other contracts, you know, this one, you know,
15:04:58 requires fidelity. So just like a marriage
15:05:01 contract, you know, lack of fidelity is a reason
15:05:03 that, you know, one can, you know, seek divorce
15:05:05 and can invalidate and nullify a contract. And
15:05:10 Mr. Koepke's, Mr. Zenkich's fraudulent inducements
15:05:14 and false promises of equity, amongst various
15:05:17 other, you know, mendacious and false promises
15:05:18 that he made to me, such as making me officer and
15:05:25 director of the company, which their Delaware
15:05:26 filings show they never did, you know, invalidate
15:05:29 and nullify this on its face. In addition, you
15:05:33 know, geographic scope and many other reasons
15:05:36 invalidates, you know, this poorly written
15:05:39 agreement.

15:05:40 Q So you can't, as you sit here today --
15:05:43 well, strike that.
15:05:44 We all agree that it says July 15th,
15:05:46 correct?
15:05:48 A The last page it clears -- clearly
15:05:51 says, yes, 7/15. Which would be July 15th.
15:05:56 Q Okay. But as you sit here today, you
15:05:59 have no recollection of whether you signed this in
15:06:02 2020 or 2021; is that right?
15:06:03 MR. CHASE: Objection.
15:06:06 A All I'm willing to testify to is it
15:06:08 appears to have my signature. And next to my
15:06:10 signature, it says 7/15/2021, and then it says
15:06:14 printed name, Chazz Clevinger. Address, 1204 G
15:06:17 Street Northeast, Washington, DC 20002.
15:06:20 Q Okay. So it's your testimony that
15:06:21 this -- you're interpreting the year on this to be
15:06:26 2020 and not -- or 2021 and not 2020, where the
15:06:31 zero is kind of squished together?
15:06:33 MR. CHASE: Objection.
15:06:34 A Mr. Ramana, I can't say, with any
15:06:37 certainty, you know, when this document is signed.

15:06:39 I'm simply reading the last page. And, you know,
15:06:44 that looks like, you know, a 1 to me.
15:06:47 Q Okay. Did you intend to discharge all
15:06:52 of your obligations, under this agreement, when
15:06:54 you signed it?
15:06:55 MR. CHASE: Objection.
15:06:56 A No. I had no intention of discharging
15:07:00 my obligations when, you know, it was signed. You
15:07:03 know, it was, you know, only, you know, after, you
15:07:08 know, Mr. -- you know, Koepke made it clear that
15:07:15 he was going to continue to lie to me. The lies
15:07:17 were many. I have focused specifically on their
15:07:20 lies related to my equity because those were the
15:07:22 most personally damaging to me. But they lied to
15:07:24 me about raising money for the company, John
15:07:28 always refused to raise any money, which meant
15:07:30 that I always bore the burden of generating enough
15:07:35 revenue to cover all of our expenses, and that was
15:07:38 a very heavy weight to carry. Mr. Koepke and I
15:07:40 had many intense disagreements about, you know,
15:07:42 taking out loans for the business, raising money
15:07:45 so that I could -- we could actually hire a sales

15:08:33 going to re-ask the question. I think there may
15:08:35 have been a misunderstanding.
15:08:37 Q Not trying to trick you. Did you
15:08:38 intend to abide by the terms of this agreement
15:08:40 when you signed it?
15:08:42 A To the extent that I understood those
15:08:44 terms, like, yes. I mean, I had, you know, no
15:08:47 reason, when I signed it, you know, not to. It
15:08:50 was only, you know, through the increased lies
15:08:54 and, you know, the increased misconduct from
15:08:57 Mr. Koepke and Mr. Zenkich, you know, the many
15:09:00 different things that they did to lie to me and to
15:09:03 lie to others. And it was really interesting to
15:09:07 see Mr. Koepke lie in his deposition yesterday
15:09:10 about, you know, numerous employees, you know,
15:09:15 who, you know, threatened legal remedies for
15:09:20 discrimination, you know, against Mr. Koepke for
15:09:22 his actions.
15:09:23 So, you know, there's just been a
15:09:25 countless number of lies. But, no, at the time
15:09:28 that I signed this, you know, I had -- I signed
15:09:31 it, like, in good faith. You know, just like when

15:36:59 decisions were never made independent of them.
15:37:02 Q And that's the same for Darren Pyles?
15:37:05 A That is correct.
15:37:05 Q That's the same for Ms. Williams?
15:37:09 A That is correct.
15:37:10 Q And why didn't you fire Chris Tosto?
15:37:14 A My understanding is Mr. Tosto resigned.
15:37:17 And so, as you may well be aware, given that
15:37:19 you're an attorney, you know, Mr. Ramana, an
15:37:23 individual may resign, you know, without knowledge
15:37:25 of anyone else like, you know, in the company.
15:37:27 And Mr. Tosto, I don't believe, informed me, nor
15:37:32 was I copied on, like, you know, his resignation
15:37:35 letter, to my knowledge.
15:37:40 Q The other day Mr. Tosto testified that
15:37:44 you and he had conversations in January 2023 of an
15:37:51 opportunity that you would provide him.
15:37:55 Do you recall hearing that when you
15:37:56 were in that deposition?
15:37:58 A Yes. As Mr. Tosto testified, you know,
15:38:01 he approached me because I had not had any
15:38:04 conversations with anyone affiliated in any way

15:38:08 with OCP about my desire to leave. But Mr. Tosto
15:38:13 approached me, you know, in mid to late January, I
15:38:16 don't know the exact dates, you know, if you
15:38:20 really want to know, I can try to dig through my
15:38:24 phone records or something. But he approached me,
15:38:26 I believe it was a phone call, and said, you know,
15:38:28 Chazz, what's going on? You know, there's all
15:38:30 these people, like, you know, like, leaving and/or
15:38:32 being terminated. You know, is there some
15:38:34 company-wide purge? Do I need to worry about my
15:38:37 job? You know. You know, he really pressed me on
15:38:41 the matter and I informed him that, you know, I
15:38:44 would be leaving soon. And, you know, starting,
15:38:48 you know, a new venture.
15:38:49 And, you know, he asked me what that
15:38:51 was about and I told him that I was not at liberty
15:38:53 to say, you know, at this time. And then, you
15:38:57 know, he asked me, like, you know, if he could
15:38:59 come with me, you know. And I told him I would
15:39:02 have to think about it some because, you know, I
15:39:04 really didn't have, you know, money. You know, I
15:39:06 didn't have, you know, hardly anything to, you

15:40:23 Mr. Zenkich and Mr. Koepke, and certainly, you
15:40:24 know, had the desire to leave.
15:40:26 But, you know, the exact date of my
15:40:30 departure, you know, was -- wasn't decided until,
15:40:33 I think, the night before, on January, like, 31st,
15:40:38 I think was when I made the final designation. I
15:40:41 mean, I knew in general that I would be, like,
15:40:44 leaving, but I don't think I made the actual
15:40:46 decision to leave on February 1st until the night
15:40:49 before, if I recall correctly.
15:40:51 Q Do you know that you fired -- do you
15:40:52 know that Advocacy Holdings fired Darren Pyles on
15:40:55 January 31st, 2023?
15:40:57 A I don't recall when Mr. Pyles was, you
15:40:59 know, terminated. You know, I knew that it was
15:41:03 shortly before my departure, within like a week
15:41:06 beforehand. But if you say so, I'll take your
15:41:09 word for it.
15:41:14 MR. RAMANA: All right. Let's mark
15:41:15 this as -- what are we at? 22?
15:41:18 (Clevinger Exhibit 22 marked for
15:41:18 identification and attached to the transcript.)

15:44:32 freedom was my primary motivator and, you know --
15:44:37 and it was -- you know, nothing I had was worth
15:44:39 anything.
15:44:39 You know, OneClickPolitics had a poor
15:44:42 product. You know, they had poor leadership. And
15:44:47 I wanted no parts of them, whatsoever. All I
15:44:50 wanted was my freedom.
15:44:52 Q Okay. And so, you just wanted to walk
15:44:54 away, not worry about getting your money back,
15:44:57 just walk away; is that right?
15:44:58 A I wanted to be free.
15:45:00 Q All right. In your letter you
15:45:02 reference an incident on January 17th, 2023, at
15:45:05 approximately 8:30 p.m.
15:45:07 Do you see that?
15:45:08 A I do.
15:45:09 Q And this incident forms the basis for
15:45:12 your assault claim in your Complaint, correct?
15:45:16 A Yes, it does.
15:45:17 Q Can you tell me, in as much detail as
15:45:19 possible, how John Koepke assaulted you?
15:45:23 A Well, if you read this, I never claimed

15:45:27 that he actually physically laid a hand on me.
15:45:31 What happened is that in the heat of an intense
15:45:35 argument that was taking place between me and
15:45:38 Mr. Koepke -- and just to give some background
15:45:42 here. Earlier that day, in a conference room on
15:45:44 the bottom floor of the UBS building in Chicago,
15:45:48 Mr. Maclid had also been present, along with
15:45:50 myself and Mr. Koepke and Mr. Zenkich, where we
15:45:53 had just a broad discussion about, like, you know,
15:45:56 the future of the company. And then about midway
15:45:59 through the day, I don't remember exactly when,
15:46:01 maybe around, like, 3:00 or so, Mr. Maclid headed
15:46:04 back to the airport to go home to Minnesota. And
15:46:07 me and Mr. Koepke and Mr. Zenkich migrated up to,
15:46:10 I believe it's the 36th floor, where the Red Chalk
15:46:14 office is. Mr. Zenkich, you know, has an office
15:46:16 in the far left, Mr. Koepke the far right, and in
15:46:19 between is a conference room. In that conference
15:46:22 room we proceeded to, you know, have a very
15:46:25 lengthy and tense discussion, which led to a very
15:46:28 intense and inflammatory argument between myself
15:46:31 and Mr. Koepke, at which, you know, point in time,

15:51:05 Was it more than that?
15:51:07 A Could have been 12. Could have been
15:51:08 18.
15:51:08 Q Okay. Did he get up out of his seat?
15:51:11 A I can't recall whether he got up out of
15:51:13 his seat, you know, or not. I remember a lunge
15:51:15 and I remember the statements. I honestly can't
15:51:19 recall whether he was seated the entire time or
15:51:21 whether he got up out of his seat. You know,
15:51:24 that -- the trauma of the moment was what he said
15:51:28 and what he did.
15:51:29 Q Did he laugh at all before or after
15:51:31 lunging?
15:51:36 A No. Certainly, there was no laughter.
15:51:37 Q Did he laugh at all before or after
15:51:40 saying anything about a baseball bat, as you
15:51:42 testify?
15:51:43 A I do not recall any laughter associated
15:51:45 before, during, or after that statement.
15:51:48 Q Did you see any baseball bats in the
15:51:50 conference room?
15:51:51 A I did not see a baseball bat in the

15:51:54 conference room, no.
15:51:55 Q Did you see a baseball bat anywhere in
15:51:57 the Red Chalk offices?
15:52:00 A I can't testify one way or another to
15:52:02 that. There were a lot of things in John's
15:52:07 office. I don't know if you've ever been there,
15:52:08 but, you know, he's a bit of a hoarder. You know,
15:52:10 he keeps thousands and thousands of documents.
15:52:13 You know, he has a liquor cabinet, you know, he
15:52:17 has a couch, you know, he has diplomas up on the
15:52:19 wall.
15:52:20 I may or may not have seen a bat in his
15:52:23 office. He's a sports fan. But I can't, no, to
15:52:26 your -- to answer your question, I can't testify
15:52:29 that I specifically saw, like, a bat, like, in his
15:52:32 office or not. I may have, I may not have.
15:52:35 Q Did you think that he possibly could
15:52:39 physically assault you, like, right then and right
15:52:44 there or were you worried it was going to happen
15:52:47 sometime after that meeting?
15:52:50 A I wasn't sure, Mr. Ramana. I mean, you
15:52:52 know, his statement, you know, speaks for itself.

16:03:48 more than me, but I can't tell you exactly how
16:03:50 much I weigh -- well, I can tell you how much I
16:03:52 weigh, but I can't tell you exactly how much
16:03:55 Mr. Koepke, you know, weighs.
16:03:55 Q I'm talking about in January of 2023,
16:03:58 not right now.
16:03:59 A In January of 2023. Mr. Koepke weighed
16:04:02 more than me in January of 2023.
16:04:03 Q Okay. After -- and so how much longer
16:04:10 did the conversation go in the conference room
16:04:15 after this incident?
16:04:19 A It didn't carry on for too terribly
16:04:21 much longer because I think John recognized that I
16:04:25 was visually uncomfortable and upset. And so, it
16:04:30 went on for at least another 30 minutes, maybe an
16:04:33 hour. I can't recall the exact specificity in the
16:04:36 conference room. And then Raymond excused
16:04:39 himself, I think, and either went to his office or
16:04:42 something, and John and I had a drink. Mr. Koepke
16:04:45 was clearly trying to put me at ease after seeing
16:04:48 that I was uncomfortable.
16:04:49 And so, I mean, I will state for the

16:04:51 record, he did try to make an effort to, you know,
16:04:55 show some good will to me after, you know, he saw
16:04:58 that I was scared. And that, you know, I was
16:05:02 visually uncomfortable by the threats of bodily
16:05:05 harm that he made to me.
16:05:07 Q And you and he walked to the elevator
16:05:11 together when he left, correct?
16:05:14 A I recall, yes. Since I testified
16:05:17 Mr. Koepke and I went to his office and he offered
16:05:19 me alcohol. And, you know, we had -- you know, we
16:05:23 had some bourbon in his office.
16:05:27 Q So after this, you went to Mr. Koepke's
16:05:29 office and you had a glass of bourbon, correct?
16:05:34 A Yes. Mr. Koepke offered me a glass of
16:05:37 bourbon. And, you know, and I -- and stated that,
16:05:39 you know, he wanted me to feel comfortable. And,
16:05:43 you know, no hard feelings.
16:05:45 Q Okay.
16:05:46 A Were the words that he used. And, you
16:05:48 know, I just -- I don't believe I said anything in
16:05:51 response. I just remember taking a sip of bourbon
16:05:54 and letting John talk. And then, you know, as

16:05:57 memory serves, after the drink in his office, we
16:06:01 did leave the building and took his Jeep to
16:06:04 Gibsons for steak in Chicago and he dropped me off
16:06:09 at the hotel by the airport.
16:06:12 Q Okay. Did you have a nice dinner?
16:06:15 A Define "nice."
16:06:16 Q Was it a pleasant, civil dinner?
16:06:18 MR. CHASE: Objection.
16:06:19 A It was civil. I don't know that it was
16:06:21 pleasant. I mean, I let Mr. Koepke kind of talk.
16:06:24 I didn't really say much. I was still
16:06:27 uncomfortable and tired and I just wanted to get
16:06:28 out of his presence and get out of Chicago.
16:06:30 But did we have any conflict at dinner,
16:06:33 if that's what you're looking for, no, we didn't.
16:06:38 Q Okay. Prior to this incident --
16:06:43 alleged incident, had Mr. Koepke ever assaulted
16:06:49 you before?
16:06:51 A Mr. Koepke had never physically
16:06:54 assaulted me, no. But verbal assault, yes, many
16:06:57 times.
16:06:59 MR. CHASE: Just a quick, two-minute

Q All right. You have a number of fraud claims in your Complaint. I want to talk a little about that.

We've talked a lot about it, but I want to make sure I understand it.

You are maintaining that one or more of the defendants falsely represented to you the types and quantity of shares in Advocacy Holdings you would be getting, correct?

A That is correct.

Q Okay. And you are contending that the number, the type and quantity of shares, that they were promising you were material in your decision to sign the noncompete, correct?

A They were hugely material. Like, in my desire to leave the company, I don't -- you know, I'm not making any statements, one way or another, as to, you know, like, how they affected, you know, any thinking related to the noncompete.

Q Okay. How were you, if at all, monetarily damaged by the fraud?

MR. CHASE: Objection.

16:22:46 A In an enormous way, like, Mr. Ramana,
16:22:48 because they robbed me of opportunities. I'm sure
16:22:52 you may be -- being an educated man yourself, you
16:22:55 may be aware of an economic term referred to as
16:22:57 opportunity costs. Opportunity costs is a concept
16:23:02 whereby an individual or a business may make a
16:23:06 variety of different decisions to go one path in
16:23:09 life or another path in life. And opportunity
16:23:12 cost is the cost of making one decision versus
16:23:15 another.
16:23:15 And the opportunity cost of me making
16:23:17 the decision to work for the OneClickPolitics
16:23:23 business unit at Red Chalk and then work for
16:23:26 Advocacy Holdings for six years of my life caused
16:23:29 me lost wages, lost educational opportunities, and
16:23:35 untold damages in terms of, you know, general, you
16:23:39 know, business and life opportunities that I may
16:23:42 otherwise have had.
16:23:45 I mentioned some of these in my earlier
16:23:47 testimony. I had the opportunity to attend
16:23:49 Michigan Law School. You know, I had, you know,
16:23:52 opportunity to pursue, you know, other businesses

16:23:56 and other job opportunities. I could have stayed
16:23:59 at, you know, Phone2Action. You know, I could
16:24:03 have done other businesses.
16:24:04 And so, the damages are actually, you
16:24:06 know, quite extreme, in terms of being robbed of
16:24:10 six years of my life and all of the effort and
16:24:13 time and energy, you know, the trauma of John
16:24:18 yelling at me, you know, the weight gain, you
16:24:22 know, that I experienced, you know, through, you
16:24:24 know, just constantly pushing myself getting very
16:24:28 little sleep.
16:24:29 And, Mr. Ramana, I doubt you've ever
16:24:31 been in a position in your life, you know, where
16:24:34 you had to generate revenue not only to be able to
16:24:37 make a living for yourself, but, like, other
16:24:39 people on a constant, you know, basis, you know,
16:24:41 in a small company. You know, you've had the good
16:24:46 fortune of working at a Vault 50 firm, you know,
16:24:50 where you're compensated, you know, handsomely as
16:24:53 a shareholder, along with many shareholders before
16:24:57 you, you know, who, you know, supply you with an
16:24:59 endless bevy of resources to, you know, assault,

16:35:25 real, as he stated on the record yesterday. You
16:35:28 know, in which all businesses, you know, suffered,
16:35:32 you know, a great deal of difficult times. And
16:35:34 so, you know, revenue actually increased, I
16:35:38 believe, about 10 percent in 2020, which is
16:35:40 ironic, because I had to work about 20 times
16:35:44 harder just to keep it at that level during 2020.
16:35:47 And then thankfully, due to Mr. Ashy,
16:35:50 we were able to shoot revenue up significantly in
16:35:54 2021. And, yeah, I think that by the time I left,
16:35:58 you know, I can't, you know, you'd have to, you
16:36:01 know, ask Mr. Koepke for my W-2, but I believe
16:36:05 between base salary, which my base salary when I
16:36:08 left, I think, was $180,000, and I think with base
16:36:12 salary plus commissions, which, by the way, for
16:36:15 the record, Mr. Koepke reduced over the years. I
16:36:17 started at 15 percent commission and Mr. Koepke
16:36:21 unilaterally, you know, with no consent, no
16:36:25 discussion with me, made the decision to reduce,
16:36:28 you know, my commission amount to 10 percent.
16:36:31 And when you're talking about the
16:36:33 enormous sums of money that I was bringing in, you

discussion with me.

Q But by the time you left your compensation, your annual compensation was about $300,000 at Advocacy Holdings?

A That's correct.

Q Okay.

A I thought we were still on the discussion about damages.

Q So you said lost opportunity costs. Can you specifically identify, other than Michigan law school, any opportunity -- any opportunities that you lost as a result of the representations that you've identified, or misinterpretations that you've identified?

A Well, as I've already mentioned, you know, Mr. Ramana, I generated over $10 million of revenue for OCP. So that, at a minimum, you know, is calculated, like, in our damages. You know, plus whatever unknown quantities of revenue I may have generated at a different company, in the same industry or a different industry, using, you know, my sales skills, which Mr. Koepke and Mr. Zenkich

16:41:28 contract, and Mr. Zenkich and Mr. Koepke lacked
16:41:35 fidelity in the most gross manner possible.
16:41:38 Q Are you alleging that you were
16:41:40 fraudulently induced into signing the noncompete?
16:41:43 A I am absolutely, you know, saying that
16:41:46 I was fraudulently induced to sign the noncompete.
16:41:49 I am testifying that I was fraudulently induced to
16:41:52 take the business opportunity with Mr. Koepke and
16:41:54 Mr. Zenkich. I'm stating, for the record, that I
16:41:56 was fraudulently, you know, induced, you know, to
16:42:01 accept the role with them to lead the OCP business
16:42:04 unit within Red Chalk, on the basis that they
16:42:07 would help raise money for the venture, that they
16:42:09 would spin out the OCP business unit from Red
16:42:13 Chalk Group within a year, and that they would be
16:42:16 giving me 33.3 percent, which equal partnership,
16:42:20 with John and Raymond owning the other 66 percent
16:42:24 of the company. None of those things came to
16:42:28 fruition. And they didn't not come to fruition by
16:42:30 a slight margin, Mr. Ramana. They didn't come to
16:42:33 fruition at all.
16:42:35 You know, Mr. Zenkich and Mr., you

17:00:05 of your fraudulent inducement, you're just saying
17:00:08 that they've concealed the same representations
17:00:11 that you talked about; is that right?
17:00:13 MR. CHASE: Objection. This statement
17:00:14 incorporates the pleading by reference and all
17:00:16 discovery responses.
17:00:18 A For your benefit, since you believe I'm
17:00:20 taking too long to answer things, I'm going to
17:00:22 incorporate, as referenced, my previous testimony
17:00:24 in this deposition on that matter.
17:00:26 Q I just want to make sure the
17:00:27 concealment claims aren't any different than the
17:00:30 other fraud claims, other than instead of
17:00:31 affirmatively representing, you're saying that
17:00:34 certain defendants concealed certain facts from
17:00:37 you, correct?
17:00:38 MR. CHASE: Objection.
17:00:38 A They concealed many material facts,
17:00:40 Mr. Ramana, and I have been very clear about what
17:00:43 those facts are.
17:00:44 Q Same facts that we talked about before?
17:00:46 MR. CHASE: Objection.

17:00:46 A Same facts.
17:00:47 Q Okay. That's it. All right. You have
17:00:52 some unjust enrichment claims. Well, strike that.
17:00:58 Let me go back to fraud real quick.
17:01:03 How has Red Chalk misrepresented
17:01:07 anything to you or concealed anything from you?
17:01:10 A I've already mentioned it. When I
17:01:12 first met with John Koepke and Raymond in 2016, in
17:01:16 Chicago, after Raymond had called me out of the
17:01:19 blue, never heard of this guy ever before, and
17:01:21 begged me to come to Chicago to talk with him and,
17:01:25 you know, John about their, you know, their
17:01:28 enterprise, which was going nowhere at the time,
17:01:30 you know, it was a scary thing. Like, I mean, OCP
17:01:36 had barely better than vaporware at the time, and,
17:01:40 you know, they had, you know, 20 or 30 clients and
17:01:42 50 to a hundred grand revenue. That's not exactly
17:01:45 an enticing opportunity.
17:01:47 You know, I had a good job at
17:01:49 Phone2Action. Phone2Action had just closed a
17:01:52 series A of $5 million, was well-funded, led by a
17:01:56 great CEO, Jeb Ory, you know, who had gone to, you

MR. CHASE: Objection to the extent that it's about asking about a pleading incorporated by reference.

A Can you be more specific? I'm not sure that I understand what you mean by a benefit conferred to Mr. Koepke that's --

Q Okay. So, clearly, you conferred benefits on Red Chalk and Advocacy Holdings through your work with both of those organizations, correct?

A Yes. I conferred a great deal of value.

Q All right. Now I'm asking about Mr. Zenkich and Mr. Koepke personally. Outside of your work for Red Chalk or advocacy groups, what have you given them that they have kept from you without compensating you?

MR. CHASE: Objection. To the extent that you're asking about the allegations in the claim. The allegations in the claim are incorporated by reference.

Are you asking him to recite them or go

17:05:27 beyond them?
17:05:29 MR. RAMANA: Yeah. I'm asking him to
17:05:30 give me his testimony on that. I understand that
17:05:34 you've got your complaint here and your
17:05:35 allegations are there.
17:05:36 MR. CHASE: Okay. But that's the
17:05:38 complainant's.
17:05:38 MR. RAMANA: I just want to know what
17:05:39 he's done for John or Raymond, personally, for
17:05:41 which he believes he should receive some
17:05:44 compensation.
17:05:44 MR. CHASE: Other than what's stated in
17:05:45 the Complaint?
17:05:46 MR. RAMANA: Sure.
17:05:47 MR. CHASE: Okay. So beyond what's in
17:05:48 the Complaint is your question?
17:05:49 MR. RAMANA: If it's in the Complaint
17:05:50 or outside the Complaint, I want all of them.
17:05:53 MR. CHASE: Well, objection.
17:05:53 Everything that's in the Complaint is incorporated
17:05:55 by reference.
17:05:56 MR. RAMANA: Sure.

17:05:56 Q Go ahead.
17:05:57 A All right. I'm a bit confused. I
17:05:58 mean, are we talking about the unjust enrichment
17:06:03 claim?
17:06:03 Q Yes.
17:06:03 A So the extent that I understand the
17:06:05 question, and I may not fully grasp it, but to the
17:06:08 extent I understand it, the basis of our unjust
17:06:10 enrichment claim is that during the time when I
17:06:13 was working for Red Chalk, you know, in 2020, you
17:06:18 know, Mr. Koepke, you know, sought PPP loan money,
17:06:23 you know, from the governments, you know, in the
17:06:24 amount of almost $800,000. He gave half a million
17:06:28 dollars of that money to Leah Christofolitus
17:06:29 (phonetic), unjustly enriched himself to the tune
17:06:34 of $300,000. You know, in his application, you
17:06:36 know, to the government, and also in his testimony
17:06:39 that he gave two years ago in open court, in front
17:06:43 of Jia Cobb, you know, in the preliminary
17:06:45 injunction hearing, he testified, you know, that,
17:06:48 you know, that money in the PPP loan was sought
17:06:52 for payroll to pay Advocacy Holdings and Red Chalk

17:06:55 employees.
17:06:56 I don't know if you bothered to read
17:06:58 the transcript, Mr. Ramana, of your own clients,
17:07:01 you know, but that's literally what he testified
17:07:02 to. And so, our claim is that Mr. Koepke unjustly
17:07:06 enriched himself by paying himself, personally,
17:07:09 $300,000 in money that was received, you know,
17:07:13 from the government. And if we're speaking
17:07:16 candidly here, you know, he fraudulently induced
17:07:19 the government as well, you know, by telling the
17:07:20 government that that money was going to be spent
17:07:23 on payroll, you know, and, instead, unjustly
17:07:25 enriching himself and Leah Christofolitus with
17:07:29 those funds, rather than using them to pay, you
17:07:31 know, Advocacy Holdings and Red Chalk employees.
17:07:35 Q What does any of that have to do with
17:07:36 you?
17:07:37 A It has to do with me because I was, you
17:07:39 know, employed by the Red Chalk Group at the time,
17:07:42 you know, of this application. And the only
17:07:44 reason that I was not already, you know, an equity
17:07:48 and shareholder is because of Mr. Koepke's lies,

17:10:20 MR. CHASE: Objection.
17:10:21 A I believe my representation is that John Koepke and Leah Christofolitus were unjustly enriched.
17:10:28 Q Okay.
17:10:28 A I don't believe that I made, you know, other specific representations. But, you know, I incorporate, and as referenced, the entire Complaint's, you know, here in front of me. And the document speaks for itself.
17:10:39 Q Well, let's talk about that too.
17:10:42 So in your Complaint, in all of your unjust enrichment claims, you talk about how one or more of the defendants were unjustly enriched by your contributions to Advocacy Holdings in the amount of --
17:10:57 A Yes.
17:10:57 Q -- $46,000. All right?
17:11:00 Do you see that?
17:11:01 A Yes. And that $46,000 would include, you know, my capital contributions and the money I paid for the shares --

17:11:11 Q Right.
17:11:11 A -- you know, that I had. So that was
17:11:13 just one of the unjustment -- unjust enrichment
17:11:17 claims, among others.
17:11:18 Q So the $46,000 is equal to your $11,000
17:11:22 that you bought your shares for, plus all of your
17:11:25 other capital contributions into
17:11:27 Advocacy Holdings, correct?
17:11:29 A I believe that's what it was for. But,
17:11:30 again, this is two years ago, Mr. Ramana --
17:11:33 Q Thank you.
17:11:33 A -- so I incorporate, as referenced --
17:11:35 Q See how easy this is?
17:11:37 MR. CHASE: Hold on. You're
17:11:37 interrupting him.
17:11:38 A I incorporate --
17:11:40 THE WITNESS: I'm sorry. Did you get
17:11:40 that?
17:11:40 A I incorporate, as reference, this
17:11:42 entire document.
17:11:44 Q Yeah. I don't know what that means,
17:11:45 but fine.

17:12:37 to be certain, I don't want to speculate further.
17:12:40 But these were payments that Mr. Koepke made to
17:12:42 himself that were inappropriate and
17:12:45 misappropriating funds.
17:12:47 Q Well, this says at least $94,000 in
17:12:49 payments to Red Chalk, not to Mr. Koepke.
17:12:52 A What page are we on?
17:12:54 Q We can start at 77. So paragraph 513.
17:12:59 It's the last sentence. Says "This includes but
17:13:05 is not limited to the wrongful payment of at least
17:13:08 $94,000 to Red Chalk for services which Red Chalk
17:13:12 did not render."
17:13:13 So I'm asking about that. Who made the
17:13:17 payment, the $94,000 payment to Red Chalk?
17:14:15 A Again, this was over two years ago.
17:14:16 But if memory serves, you know, these were
17:14:19 payments to Red Chalk, you know, from
17:14:23 Advocacy Holdings for services that Red Chalk did
17:14:28 not, you know, render. And so, thereby,
17:14:29 Mr. Koepke and Mr. Zenkich were unjustly, you
17:14:33 know, enriched because Advocacy Holdings made
17:14:35 payments of $94,000 to the Red Chalk Group for

17:14:38 services, you know, that Mr. Koepke nor
17:14:42 Mr. Zenkich ever provided.
17:14:44 Q Okay. All right. I've got some big
17:14:50 ones here. This one has been previously marked as
17:14:57 Tosto No. 6.
17:15:04 MR. CHASE: Do we want to mark the
17:15:05 Complaint or no?
17:15:06 MR. RAMANA: No.
17:15:07 MR. CHASE: You just don't want to mark
17:15:08 it?
17:15:09 MR. RAMANA: No. Not an exhibit.
17:15:11 MR. CHASE: Don't want to mark it as an
17:15:12 exhibit?
17:15:12 MR. RAMANA: No.
17:15:13 MR. CHASE: How will the court reporter
17:15:15 reference it, then?
17:15:16 MR. RAMANA: Maybe she doesn't need to.
17:15:18 I'm pretty good at taking depositions. I'm good.
17:15:21 MR. CHASE: You're doing a great job,
17:15:22 but my question is just about marking the exhibit.
17:15:26 MR. RAMANA: It's not an exhibit. I'm
17:15:27 just referring to a document.

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, JUDITH E. BELLINGER, RPR, CRR, CSR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 19th day of December, 2025.

My Commission Expires: January 1, 2027

____________________________

NOTARY PUBLIC IN AND FOR

THE DISTRICT OF COLUMBIA