**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAZZ CLEVINGER,<br><br>Plaintiff,<br><br>v.<br><br>ADVOCACY HOLDINGS, INC., and JOHN KOEPKE, and RED CHALK GROUP, LLC, and RAYMOND ZENKICH,<br><br>Defendants. | Case No. 1:23-cv-1159-JMC |
| ADVOCACY HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHAZZ CLEVINGER, and CIVICLICK, INC., and SUPERIOR CAMPAIGN SOLUTIONS, LLC.,<br><br>Defendants. | Case No. 1:23-cv-1176-JMC |

**CHAZZ CLEVINGER'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO ADVOCACY HOLDINGS, INC.'S FIRST SET OF INTERROGATORIES**

Chazz Clevinger hereby serves these Supplemental Answers and Objections to Advocacy Holdings, Inc.'s First Set of Interrogatories.

Responding party states that these discovery requests were never actually served by the issuing party as required by Fed. R. Civ. P. 5(b)(2). The discovery requests were never served in hard copy by mail as required by Rule 5(b)(2). Service by hard copy as required under the Federal Rules was not waived. These responses and objections are timely per the extension requests, and moreover the issuing party never actually served the discovery requests on any date.

## DEFINITIONS

1. CiviClick means CiviClick, Inc.

2. SCS or Superior Campaign Solutions means Superior Campaign Solutions, LLC

3. Advocacy Holdings means Advocacy Holdings, Inc.

4. Red Chalk means Red Chalk Group

5. Clevinger Parties means Clevinger, CiviClick and SCS

6. Advocacy Holdings Parties means Advocacy Holdings, Red Chalk, John Koepke, and Raymond Zenkich.

## ANSWERS TO INTERROGATORIES

1. Identify each and every natural person likely to have knowledge of the events and facts alleged in the Plaintiff's Lawsuit, and for each person, please provide a detailed explanation of the known information.

**Answer**: Clevinger objects to this interrogatory as overly broad, vague, and not relevant to any party's claim or defense or proportional to the needs of the case, as it seeks a "detailed explanation" of the knowledge possessed by "each and every" person who may have knowledge of the events and facts alleged in Plaintiff's Lawsuit. The request is also ambiguous in its scope and improperly seeks to require Clevinger to speculate about the knowledge of third parties. Furthermore, much of the relevant information remains within the exclusive possession of Plaintiff and its representatives.

Additionally, this interrogatory is compound and constitutes multiple interrogatories in a single request, as it effectively asks Clevinger to (1) identify all persons with knowledge, (2) describe their knowledge in detail, and (3) determine the scope of their information, which varies for each individual.

Subject to and without waiving these objections, Clevinger identifies the following individuals as persons likely to have knowledge of the events and facts alleged in Plaintiff's Lawsuit. The descriptions below summarize their likely knowledge based on available information:

1. **Chazz Clevinger**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

2. **John Koepke**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

3. **Raymond Zenkich**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

4. **Risa Schwartz**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

5. **Bruce Ericson**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

6. **Garrett DeVries**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

7. **Nick Glad**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

8. **Joel Stein**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

9. **Evan Ashy**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

10. **Kester Bonsu**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

11. **Jasin Murati**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

12. **Jon Bratsis**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

13. **Nick Sloper**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**14. Will Crouse**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**15. Kris Koenen**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**16. Eric Johnson**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**17. Darryl Jones**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**18. Jamilia Zaidi**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**19. Ryan Ramirez**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**20. Michael Toppa**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

21. **Josh Darichuk**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

22. **Jordan Myles**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

23. **Michael Motta**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

24. **Kyle Whitehead**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

25. **Nicholaus Furst**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

26. **Kendahl Hawkins**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

27. **Bruce Brownson**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**28. Dominique Jacobs**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**29. Michael Flemming**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**30. Kaitlyn Dougherty**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**31. Christopher Hoponik**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**32. Tamara Koepke-Kloss**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

2. Identify each and every natural person likely to have knowledge of the events and facts alleged in the Defendants' Lawsuit, and for each person, please provide a detailed explanation of the known information.

**Answer**: Clevinger objects to this interrogatory as overly broad, vague, and not relevant to any party's claim or defense or proportional to the needs of the case, as it seeks a "detailed explanation" of the knowledge possessed by "each and every" person who may have knowledge of the events and facts alleged in Defendant's Lawsuit. The request is also ambiguous in its scope

and improperly seeks to require Clevinger to speculate about the knowledge of third parties. Furthermore, much of the relevant information remains within the exclusive possession of Plaintiff and its representatives.

Additionally, this interrogatory is compound and constitutes multiple interrogatories in a single request, as it effectively asks Clevinger to (1) identify all persons with knowledge, (2) describe their knowledge in detail, and (3) determine the scope of their information, which varies for each individual.

Subject to and without waiving these objections, Clevinger identifies the following individuals as persons likely to have knowledge of the events and facts alleged in Plaintiff's Lawsuit. The descriptions below summarize their likely knowledge based on available information:

1. **Chazz Clevinger**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

2. **John Koepke**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

3. **Raymond Zenkich**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

4. **Risa Schwartz**

   **Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

5. **Bruce Ericson**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

6. **Garrett DeVries**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

7. **Nick Glad**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

8. **Joel Stein**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

9. **Evan Ashy**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

10. **Kester Bonsu**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

11. **Jasin Murati**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**12. Jon Bratsis**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**13. Nick Sloper**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**14. Will Crouse**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**15. Kris Koenen**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**16. Eric Johnson**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**17. Darryl Jones**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**18. Jamilia Zaidi**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**19. Ryan Ramirez**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**20. Michael Toppa**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**21. Josh Darichuk**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**22. Jordan Myles**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**23. Michael Motta**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**24. Kyle Whitehead**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**25. Nicholaus Furst**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**26. Kendahl Hawkins**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**27. Bruce Brownson**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**28. Dominique Jacobs**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**29. Michael Flemming**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**30. Kaitlyn Dougherty**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**31. Christopher Hoponik**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

**32. Tamara Koepke-Kloss**

**Subject:** witness has knowledge of the facts and allegations in the parties' First Amended Complaints, including but not limited to the lies, deceit, false promises of equity, and/or malfeasance of the Advocacy Holdings Parties.

3. Identify each and every Client since January 1, 2021, and for each Client, identify your primary point(s) of contact.

**Answer**: Clevinger objects to this interrogatory as overly broad, vague, and not relevant to any party's claim or defense or proportional to the needs of the case. The interrogatory improperly defines "Client" in an overinclusive manner, as it purports to include not only actual clients but

also persons and entities merely "solicited" by Clevinger, CiviClick, Inc., or Superior Campaign Solutions, even if no transaction or agreement was finalized. This renders the request ambiguous and burdensome, as it seeks information about entities that may have had no meaningful business relationship with Clevinger or any related entity. Additionally, this interrogatory is compound, as it effectively consists of multiple separate interrogatories by requiring (1) the identification of each and every Client, and (2) the primary point(s) of contact for each Client.

Furthermore, the request seeks sensitive commercial information, including confidential business relationships and proprietary client lists. Disclosure of such information without adequate safeguards would be inappropriate. Clevinger will require entry of a protective order before producing any client information. Subject to and without waiving these objections, Clevinger welcomes a meet and confer among counsel to determine reasonable limitations, definitions, and parameters regarding this request.

**Supplemental Answer**: Clevinger incorporates by reference the answers and supplemental answers to interrogatories served by CiviClick and SCS. The interrogatory does not specify whether the information sought pertains to clients of Clevinger in his individual capacity, or clients of CiviClick or SCS. Subject to all objections, the following clients are, or have been, clients of CiviClick and/or SCS since January 1, 2021, as set forth below.

**<u>CiviClick</u>**

Push Digital
FreedomWorks
Shawmut Strategies
Waterways Council
People for Opportunity
Bring Our Troops Home
American Conservative Union
National Hookah Community Association
Digital Restaurant Association
University of Connecticut

Coalition for a Prosperous America
Asthma and Allergy Foundation of America
Michigan Nurses
Public School Options
Northwest Natural
Iowa Gun Owners
Bulworth Strategies
Tennessee Firearms
Students for Life
HZQ Consulting
TEXIT
American Suppressor Association
Idaho Second Amendment Alliance
National Health Federation
American Craft Spirits Association
Cause of America
Massachusetts Farm Bureau Federation
Southlake
Israeli American Coalition for Action
National Association for Gun Rights
Stop iGaming
The Herald Group
Food Bank of Virginia
Eye Street Government Affairs
Tea Party Patriots
Life Academy
AMAC Action
Electrical Association
John Birch Society
Spina Bifida Association
American Coalition for Ukraine
California Black Health
Yes. Every Kid.
Roseville Chamber
Valley Industry Commerce Association
Ontario Rising
Plastic Industry Association
CAPA
One Community
Whitestone
Massachusetts Opportunity Alliance
Minnesota Retail Association
Nevada Firearms Association
Idaho Citizens Alliance
Premium Cigar Association
Firearms Policy Coalition

Homeschool Freedom Coalition
Alabama Gun Owners
Idaho Freedom Foundation
Iron Light
NDP
NAIOP SoCal
JVA Campaigns
Convention of States
60 Plus Association
Killer Whale Agency
Amber Integrated LLC
Arkansas Advanced Energy Association, Inc.
Chapter Advisory, LLC
PAK PAC
Resch Strategies
The Fells Group

**Superior Campaign Solutions**

NSPR Law Services, LLC
Milberg Coleman
Potter Handy
NEP Services
Lincoln Technical Institute
Gun Owners of America
Rowland Strategies
Northeast Maglev
Citizens for Free Speech

4. Identify each and every person or business entity that received any services from Plaintiff at any time that you solicited for business with you, CiviClick, or Superior Campaign Solutions.

**Answer:** Clevinger objects to this interrogatory as overly broad and vague because it seeks identification of "each and every person or business entity" that received any services from Plaintiff, without limitation as to time, relevance, or scope. The interrogatory also improperly assumes that Clevinger has comprehensive knowledge of all services provided by Plaintiff to any individual or entity, even where Clevinger was not involved in or aware of such transactions.

Additionally, the request is not proportional to the needs of the case because it requires Clevinger to identify every instance in which he or an entity affiliated with him solicited business from a person or entity that also happened to have received services from Plaintiff, regardless of whether such solicitations were relevant to the claims or defenses in this case. The interrogatory does not specify a connection between the requested information and any alleged wrongdoing, making it an improper fishing expedition.

The interrogatory is also compound, as it requires Clevinger to (1) identify every person or entity that received services from Plaintiff and (2) determine whether each such person or entity was solicited by Clevinger, CiviClick, or Superior Campaign Solutions, which are distinct inquiries requiring separate analyses.

**Supplemental Answer**: Clevinger incorporates by reference the answers and supplemental answers to interrogatories served by CiviClick and SCS. The interrogatory does not specify whether the information sought pertains to clients of Clevinger in his individual capacity, or clients of CiviClick or SCS. Because the definition of "solicit" is unreasonably and improperly overbroad, and vague, the term "solicit" will be interpreted to mean "to unilaterally reach out and offer to provide services without the existence of a preexisting or underlying business relationship or connection." To the best of my recollection, none, pursuant to that definition.

Subject to all objections, the following clients are, or have been, clients of CiviClick and/or SCS since January 1, 2021, as set forth below.

**<u>CiviClick</u>**

Push Digital
FreedomWorks
Shawmut Strategies
Waterways Council
People for Opportunity
Bring Our Troops Home

American Conservative Union
National Hookah Community Association
Digital Restaurant Association
University of Connecticut
Coalition for a Prosperous America
Asthma and Allergy Foundation of America
Michigan Nurses
Public School Options
Northwest Natural
Iowa Gun Owners
Bulworth Strategies
Tennessee Firearms
Students for Life
HZQ Consulting
TEXIT
American Suppressor Association
Idaho Second Amendment Alliance
National Health Federation
American Craft Spirits Association
Cause of America
Massachusetts Farm Bureau Federation
Southlake
Israeli American Coalition for Action
National Association for Gun Rights
Stop iGaming
The Herald Group
Food Bank of Virginia
Eye Street Government Affairs
Tea Party Patriots
Life Academy
AMAC Action
Electrical Association
John Birch Society
Spina Bifida Association
American Coalition for Ukraine
California Black Health
Yes. Every Kid.
Roseville Chamber
Valley Industry Commerce Association
Ontario Rising
Plastic Industry Association
CAPA
One Community
Whitestone
Massachusetts Opportunity Alliance
Minnesota Retail Association

Nevada Firearms Association
Idaho Citizens Alliance
Premium Cigar Association
Firearms Policy Coalition
Homeschool Freedom Coalition
Alabama Gun Owners
Idaho Freedom Foundation
Iron Light
NDP
NAIOP SoCal
JVA Campaigns
Convention of States
60 Plus Association
Killer Whale Agency
Amber Integrated LLC
Arkansas Advanced Energy Association, Inc.
Chapter Advisory, LLC
PAK PAC
Resch Strategies
The Fells Group

**Superior Campaign Solutions**

NSPR Law Services, LLC
Milberg Coleman
Potter Handy
NEP Services
Lincoln Technical Institute
Gun Owners of America
Rowland Strategies
Northeast Maglev
Citizens for Free Speech

5. Do you contend the Noncompete is unenforceable? If so, please state all facts and reasons why you so contend.

**Answer:** Clevinger objects to this interrogatory as improper because it seeks legal argument rather than factual information. An interrogatory is not the proper vehicle for requesting a legal brief on the enforceability of a contractual provision. Additionally, the request is overbroad and compound because it asks for all facts and reasons why the Noncompete is unenforceable,

which encompasses multiple legal and factual theories, requiring separate and distinct responses. Moreover, some of the requested information is more appropriately addressed through legal briefing.

Subject to and without waiving these objections, Clevinger states that the Noncompete is unenforceable for many reasons. The agreement is unreasonable in its geographic scope and duration. It purports to apply nationwide, restricting Clevinger from working anywhere in the United States, despite the fact that the digital advocacy industry is centered around Washington, D.C., and Northern Virginia. Courts scrutinize nationwide noncompetes with heightened skepticism, as they often impose excessive restraints on trade. The twelve-month restriction is also unreasonable, as the digital advocacy industry relies heavily on short-term contracts and high client turnover. Client retention data confirms that most clients only remain for one to two years, making a one-year restriction excessive and not tied to a legitimate business need.

Advocacy Holdings has no legitimate business interest justifying enforcement of the Noncompete. A noncompete must protect a legitimate economic interest, but Advocacy Holdings cannot demonstrate that enforcing this restriction is essential to its business. Its own client retention rates undermine any justification for a noncompete. Year-over-year client renewal rates were approximately fifty percent, and clients who stayed for two years were even less likely to renew in year three, with a renewal rate of only fifteen percent. Given this high turnover, Advocacy Holdings must acquire new clients annually to maintain its revenue base. Because new client acquisition is the primary driver of revenue, preventing Clevinger from working in the industry does not protect existing client relationships; it simply eliminates a competitor.

The Noncompete was also fraudulently induced. Advocacy Holdings induced Clevinger to sign the Noncompete under false pretenses, promising him a ten to twenty-five percent "founders

share" equity stake in the company. Instead, it issued him diluted, non-voting Class B shares that were worthless and provided no real ownership interest. If Clevinger had known that Defendants never intended to grant him actual equity, he would not have signed the Noncompete.

Further, the Noncompete fails for lack of consideration. Courts assess whether adequate consideration was provided in exchange for a noncompete. Here, Advocacy Holdings demanded a noncompete as an additional concession before granting equity but then failed to honor its original promise of ten to twenty-five percent Class A equity. Because Clevinger received nothing of real value in exchange for signing, the noncompete is unenforceable.

Defendants also materially breached their own obligations and acted in bad faith. A party that materially breaches a contract cannot enforce its restrictive covenants. Defendants repeatedly failed to compensate Clevinger properly, misrepresented financials, and diverted company revenue for personal gain. By violating their contractual and fiduciary obligations, Defendants forfeited any right to enforce the Noncompete.

Enforcing the Noncompete would also violate public policy. Delaware courts do not mechanically enforce noncompetes but instead apply a balancing test that considers the reasonableness of scope and duration, the legitimate business interests at stake, and the hardship imposed on the employee. Clevinger was constructively terminated, and courts do not favor enforcement of noncompetes against involuntarily separated employees. Defendants' retaliatory conduct—attempting to enforce the noncompete after wrongfully terminating Clevinger—demonstrates bad faith and unclean hands. The D.C. Non-Compete Clarification Amendment Act of 2022 places further limitations on noncompetes, and Advocacy Holdings failed to comply with statutory notice requirements, rendering the agreement void.

Additionally, Clevinger currently resides in Puerto Rico, outside the geographic scope

contemplated by the agreement. Courts consider whether the employee's location and industry position have changed, making enforcement unreasonable.

For all of these reasons, the Noncompete is unenforceable due to its overbroad geographic scope, excessive duration, lack of legitimate business interest, fraudulent inducement, insufficient consideration, prior material breaches by Defendants, and public policy concerns. Clevinger reserves the right to supplement this response as discovery progresses.

6. Identify and describe all communications, whether written or oral, between you and any other person regarding the Noncompete.

**Answer:** Clevinger objects to this interrogatory as overly broad and vague because it seeks "all communications" regarding the Noncompete without placing any reasonable limitations on time, subject matter, or scope. The request does not clarify whether it is directed only at substantive discussions concerning the validity and enforceability of the Noncompete or if it extends to any incidental mention of the agreement, making it difficult to determine what information is being sought. Additionally, the interrogatory is disproportionate to the needs of the case because it would require Clevinger to recall and describe every conversation in which the Noncompete was even briefly discussed, including routine business communications that have no bearing on the claims or defenses in this case. To the extent this request seeks privileged communications between Clevinger and his attorneys regarding legal advice on the Noncompete, it improperly calls for the disclosure of information protected by the attorney-client privilege and the attorney work-product doctrine.

Subject to and without waiving these objections, Clevinger states that he engaged in discussions regarding the Noncompete with John Koepke and Raymond Zenkich at various times

between 2019 and 2020. These discussions included representations by Koepke and Zenkich that signing the Noncompete was a necessary condition for receiving an equity stake in Advocacy Holdings. Clevinger also had communications with representatives of Advocacy Holdings about the terms of the Noncompete and its impact on his ability to work in the industry. In addition, Clevinger may have had non-privileged discussions with individuals in the digital advocacy industry concerning the Noncompete's scope and enforceability. Clevinger reserves the right to supplement this response as discovery progresses.

7. Describe the basis, nature, and scope of any fiduciary duty you owed to Plaintiff including the date(s) your duties arose and terminated.

**Answer:** Clevinger objects to this interrogatory as improperly seeking a legal conclusion rather than factual information. The request calls for a legal analysis of fiduciary duties under Delaware law, which is not an appropriate subject for an interrogatory. Additionally, the interrogatory is vague and overbroad because it does not specify whether it is referring to fiduciary duties as an officer, director, or employee, nor does it provide any limitations on the nature or scope of the alleged duties. The request is also not proportional to the needs of the case because it seeks an exhaustive description of legal obligations without tying them to specific factual allegations relevant to the claims or defenses at issue.

Subject to and without waiving these objections, Clevinger states that under Delaware law, which governs here, former directors and officers owe no fiduciary duties to a corporation after their tenure ends. Delaware courts have consistently held that fiduciary duties of directors and officers terminate upon resignation or removal. During his time at Advocacy Holdings, Clevinger's fiduciary duties, if any, arose from his role at the company. His duties ended on

February 1, 2023, when he was no longer an employee of the company. Any alleged transition of clients from Advocacy Holdings to CiviClick occurred after this date, when he no longer owed any fiduciary duty to Advocacy Holdings.

The dates of the alleged breaches cited by Advocacy Holdings in its claims confirm that these events occurred after Clevinger's departure. For instance, the alleged breach regarding National Hookah Community Association is claimed to have occurred on March 8, 2023, and the alleged breaches regarding Yamaha Motor Company are alleged to have taken place on February 6, 2023, February 9, 2023, February 14, 2023, and March 1, 2023. Similarly, the alleged breaches related to Firearm Policy Coalition occurred on February 15, 2023, and March 12, 2023, and the alleged breach regarding Shawmut Strategies Group occurred on February 22, 2023. There is no specific breach alleged regarding Citizens for Free Speech, but even if one were alleged, the purported breach would have taken place on February 11, 2023, a full year after the relevant subscription was not renewed. Additional alleged breaches, such as those regarding Freedom Works on March 23, 2023, and People for Opportunity on February 6, 2023, also fall outside the timeframe in which Clevinger owed any fiduciary duty to Advocacy Holdings. The allegations regarding LegiNation fail to identify any specific breach, and the claims concerning the removal of two web pages are insufficient to constitute a breach of fiduciary duty.

To the extent Advocacy Holdings contends that a breach of fiduciary duty occurred while Clevinger was still employed by Advocacy Holdings, the law is clear that under Delaware law, employees are permitted to make preparations to compete with their employer before their employment ends. Delaware courts recognize a privilege that allows employees to take preparatory steps to form a competing business before their departure, so long as they do not actively solicit clients or misappropriate confidential information. The allegations in the case fail to demonstrate

that Clevinger engaged in any substantive competitive activity before the termination of his employment. The Amended Counterclaim does not identify any specific misappropriation of trade secrets, misuse of confidential information, or improper solicitation of Advocacy Holdings' clients prior to his departure. Merely forming CiviClick while still employed does not constitute a breach of fiduciary duty as a matter of law.

Furthermore, Advocacy Holdings' allegations regarding the use of Superior Campaign Solutions (SCS) while Clevinger was still employed are legally insufficient to establish a breach of fiduciary duty. The claim that SCS "recruits clients to use OCP's services," along with the assertion that Advocacy Holdings was paid thousands of dollars, demonstrates that the alleged conduct was actually beneficial to Advocacy Holdings rather than harmful. Recruiting clients to use and pay for Advocacy Holdings' services is not a breach of fiduciary duty. Because Advocacy Holdings has failed to allege sufficient facts establishing an actual breach, its claims lack merit.

For these reasons, Clevinger contends that his fiduciary duties, to the extent any existed, terminated on February 1, 2023. Any allegations of breach occurring after that date are legally deficient.

8. Describe all communications, whether written or oral, that you had with any third party concerning any contract or business relationship between Plaintiff and such third parties.

**Answer:** Clevinger objects to this interrogatory as impermissibly overbroad, vague, not relevant to any party's claim or defense, or proportional to the needs of the case because it seeks "all communications" with "any third party" regarding "any contract or business relationship" involving Plaintiff, without limitation as to time, subject matter, or relevance. Given that Clevinger served as the CEO of Advocacy Holdings for several years, nearly every conversation he had with a customer, vendor, or business contact during that time could be construed as a discussion

concerning a contract or business relationship involving Plaintiff, however that party is defined. The sheer breadth of this request would require Clevinger to recall and describe virtually every customer interaction he engaged in over multiple years, making it an unreasonable and impractical demand. The request is not tied to any specific claim or defense in the case and improperly seeks an exhaustive account of routine business communications that have no bearing on the legal issues in dispute.

Additionally, the request is improperly framed as an interrogatory rather than a request for production of documents. If relevant communications exist, they would be best evidenced through written records rather than requiring Clevinger to reconstruct every conversation he had during his tenure at Advocacy Holdings. The interrogatory also fails to define "third party" with sufficient clarity, leaving it ambiguous as to whether it seeks information regarding competitors, former clients, prospective clients, vendors, or other entities with whom Clevinger may have had discussions.

Subject to and without waiving these objections, Clevinger states that, in the ordinary course of business, he communicated with various third parties, including existing and prospective clients, regarding contracts and business relationships with Plaintiff. Some of these communications may have occurred before or after his departure from Advocacy Holdings. Any specific communications that are relevant to this case may be reflected in written documents, such as emails or agreements, which would be more appropriately produced through document discovery. Clevinger is willing to meet and confer through counsel to discuss reasonable limitations, definitions, and parameters for this request to ensure that it is properly tailored to the issues in dispute.

9. Describe all communications, whether written or oral, that you had with any third party concerning any prospective contract(s) or prospective business relationship(s) between Plaintiff and such third parties.

**Answer:** Clevinger objects to this interrogatory as impermissibly overbroad and vague because it seeks "all communications" with "any third party" regarding "any prospective contract(s) or prospective business relationship(s)" involving Plaintiff, without any reasonable limitation as to time, subject matter, or scope. The request is particularly vague in its use of "prospective," which could encompass speculative discussions that never materialized into formal business relationships or agreements. Given that Clevinger served as the CEO of Advocacy Holdings for several years, any number of routine discussions with potential clients, industry contacts, or vendors could fall within this expansive definition, making the request unreasonably broad and difficult to meaningfully answer.

This interrogatory is also not relevant to any party's claim or defense or proportional to the needs of the case, as it seeks an exhaustive account of communications regarding mere possibilities of future contracts or business relationships, many of which may have had no impact on Plaintiff's actual business dealings. It effectively demands a comprehensive record of speculative discussions, requiring Clevinger to recall and describe conversations that may have had no substantive bearing on any disputed issues in this litigation.

Additionally, the request is improperly framed as an interrogatory rather than a request for production of documents. If relevant communications exist, they would be best evidenced through written records rather than requiring Clevinger to reconstruct every conversation he had regarding potential business opportunities. The interrogatory also fails to define "third party" with sufficient clarity, leaving it ambiguous as to whether it seeks information regarding competitors, former

clients, prospective clients, vendors, or other entities with whom Clevinger may have had discussions.

Subject to and without waiving these objections, Clevinger states that, in the ordinary course of business, he communicated with various third parties, including potential clients and partners, regarding prospective contracts or business relationships with Plaintiff. Some of these communications occurred before and after his departure from Advocacy Holdings. Any specific communications that are relevant to this case may be reflected in written documents, such as emails or agreements, which would be more appropriately produced through document discovery. Clevinger is willing to meet and confer through counsel to discuss reasonable limitations, definitions, and parameters for this request to ensure that it is properly tailored to the issues in dispute.

10. Describe all communications, whether written or oral, with all Clients from January 1, 2021 to the present including, without limitation, the dates of each communication and the nature of such communications.

**Answer:** Clevinger objects to this interrogatory as impermissibly overbroad, vague, not relevant to any party's claim or defense, and not proportional to the needs of the case because it seeks "all communications" with "all Clients" from January 1, 2021, to the present, without any limitation as to subject matter or relevance. The request fails to specify whether it is directed at communications relevant to the claims and defenses in this case or if it improperly seeks an exhaustive record of all discussions with Clevinger's, CiviClick's, or Superior Campaign Solutions' clients, including routine, day-to-day business communications that have no bearing on the dispute. The sheer breadth of the request would require Clevinger to recall and describe every

client interaction over four years, imposing an unreasonable and disproportionate burden.

This interrogatory is particularly unreasonable given that Clevinger, CiviClick, and Superior Campaign Solutions routinely communicated with clients as part of their ordinary business operations. Nearly every email, phone call, contract negotiation, service inquiry, or administrative discussion with a client during this period could be encompassed by the request. The demand for "the dates of each communication and the nature of such communications" further underscores the unreasonableness of the request, as it effectively seeks a comprehensive catalog of every client interaction over a multi-year period. The definition of Client is overbroad as it includes even parties who were "solicited" and it includes entities which are not the subject of this set of discovery requests.

Additionally, the request is improperly framed as an interrogatory rather than a request for production of documents. If relevant communications exist, they would be best evidenced through written records rather than requiring Clevinger to reconstruct years of business discussions. The interrogatory also fails to clarify whether it seeks only substantive communications concerning business transactions or whether it extends to unrelated exchanges, making it vague and unduly burdensome.

Subject to and without waiving these objections, Clevinger states that he communicated with various clients in the ordinary course of business during the relevant period. Any specific communications that are relevant to this case may be reflected in written documents, such as emails or agreements, which would be more appropriately produced through document discovery. Clevinger is willing to meet and confer through counsel to discuss reasonable limitations, definitions, and parameters for this request to ensure that it is properly tailored to the issues in dispute.

**Supplemental Answer**: Clevinger incorporates by reference the answers and supplemental answers to interrogatories served by CiviClick and SCS. The interrogatory does not specify whether the information sought pertains to clients of Clevinger in his individual capacity, or clients of CiviClick or SCS. Subject to all objections, Clevinger further states that "describ[ing] all communications, whether written or oral, with all Clients from January 1, 2021 to the present including, without limitation, the dates of each communication and the nature of such communications" is inconsistent with Rule 26(b)(1). A description of all communications with all clients over a four year period of time is not appropriately tailored to matters that are relevant and within the scope of discovery. In terms of producing records which are discoverable, Clevinger directs Advocacy holdings to the invoices previously produced at Bates range CLEVINGER PARTIES CONFIDENTIAL 0001488-0001537 and additional documents to be produced pursuant to Rule 33(d).

11. Identify all electronic devices, computers, email accounts, or other systems that you used at any time to access, draft, edit, acquire, or transmit, or attempt to access, draft, edit, acquire, retrieve, or transmit any data or information from Plaintiff's computer database(s) and network(s).

**Answer**: Clevinger objects to this interrogatory as overly broad and vague because it seeks identification of "all electronic devices, computers, email accounts, or other systems" used "at any time" to interact with "any data or information" from Plaintiff's "computer database(s) and network(s)," without specifying any relevant time frame, scope, or subject matter. The request is unclear as to whether it seeks information regarding ordinary, authorized use of Plaintiff's systems while Clevinger was CEO or whether it is attempting to allege unauthorized access, making it ambiguous and misleading. As written, this interrogatory would require Clevinger to account for every device and email account he used during his entire tenure at Advocacy Holdings, even those

used for routine business operations, imposing an excessive and unnecessary burden, dating back many years.

The request is also not relevant to any party's claim or defense or proportional to the needs of the case. Given that Clevinger was the CEO of Advocacy Holdings, he necessarily accessed company databases, systems, and communications as part of his job responsibilities. Any access during that time would have been in the ordinary course of business, and the interrogatory fails to distinguish between standard, authorized use and any alleged improper activity. By seeking information about "any" data or information, without limitation, the request improperly assumes relevance for every system interaction, including trivial or unrelated matters.

Additionally, the phrase "computer database(s) and network(s)" is undefined and vague, making it unclear what specific systems are at issue. Without further clarification, the request could encompass a broad range of general business files, client records, or administrative data, most of which have no bearing on the claims in this case.

Subject to and without waiving these objections, Clevinger states that, during his tenure with Advocacy Holdings, he used email accounts and systems in the ordinary course of his employment, consistent with his role as CEO. Any access to Plaintiff's databases and networks would have been routine and for legitimate business purposes. Clevinger is willing to meet and confer through counsel to clarify the scope of this request to ensure that it is appropriately tailored to the claims and defenses in this case.

12. Identify all communications, documents, or agreements you had with any third party regarding the use, registration, or licensing of any of Plaintiff's trademarks, including without limitation OneClickPolitics, or marks similar to Plaintiff's trademarks.

**Answer**: Clevinger objects to this interrogatory as overly broad and vague because it seeks "all communications, documents, or agreements" with "any third party" regarding "the use, registration, or licensing" of "any of Plaintiff's trademarks," including "marks similar to Plaintiff's trademarks," without any limitation as to time, scope, or relevance. The request fails to specify whether it is directed at actual trademark use or merely any discussion where Plaintiff's trademarks were mentioned, making it overly expansive and unclear. The inclusion of "marks similar to Plaintiff's trademarks" is particularly vague, as it does not define what constitutes a "similar" mark or provide any objective criteria for determining relevance.

The interrogatory is also not relevant to any party's claim or defense or proportional to the needs of the case. It improperly seeks an exhaustive record of communications, agreements, and discussions, including routine business conversations that may have no connection to the legal claims at issue. Additionally, the request fails to distinguish between authorized and unauthorized use, making it unclear whether it applies to ordinary business discussions that occurred while Clevinger was CEO of Advocacy Holdings, during which he had, if necessary, legitimate authority to discuss trademarks as part of his job responsibilities.

Furthermore, the request is improperly framed as an interrogatory rather than a request for production of documents. If relevant communications, documents, or agreements exist, they would be best evidenced through written records rather than requiring Clevinger to recall and describe every conversation or contract relating to Plaintiff's trademarks.

Subject to and without waiving these objections, Clevinger states that, in the ordinary

course of business, he communicated with various third parties regarding OneClickPolitics, in connection with his role at Advocacy Holdings. Any specific communications, documents, or agreements relevant to this case may be reflected in written records, such as contracts, emails, or trademark filings, which would be more appropriately produced through document discovery. Clevinger is willing to meet and confer through counsel to discuss reasonable limitations, definitions, and parameters for this request to ensure that it is properly tailored to the issues in dispute.

13. Describe all actions you took to market, advertise, or sell any goods or services to Clients using the OneClickPolitics trademark or any variation thereof.

**Answer:** Clevinger objects to this interrogatory as overly broad and vague because it seeks a description of "all actions" taken to "market, advertise, or sell any goods or services" to "Clients" using the OneClickPolitics trademark or "any variation thereof," without specifying a relevant time period, scope, or connection to the claims and defenses in this case. The request is unclear as to whether it seeks information regarding activities that occurred while Clevinger was CEO of Advocacy Holdings, when he was authorized to market and sell OneClickPolitics services, or whether it attempts to reach conduct occurring after his termination.

The interrogatory is also not relevant to any party's claim or defense or proportional to the needs of the case, as it seeks an exhaustive description of routine business and marketing activities conducted during Clevinger's time at Advocacy Holdings. As CEO, he was responsible for overseeing marketing and sales efforts for OneClickPolitics in the ordinary course of business, meaning this request, as written, would require him to detail years of promotional efforts, client outreach, and sales initiatives—most of which have no bearing on the legal claims in dispute. The request further fails to clarify what constitutes a "variation" of the OneClickPolitics trademark,

leaving it vague and open-ended.

Additionally, to the extent this request seeks information that may be contained in marketing materials, advertisements, or sales communications, it is improperly framed as an interrogatory rather than a request for production of documents. Any relevant actions taken to market, advertise, or sell services using the OneClickPolitics trademark would be best evidenced through written records, rather than requiring Clevinger to reconstruct and summarize years of business operations.

Subject to and without waiving these objections, Clevinger states that, during his tenure at Advocacy Holdings, he was involved in ordinary marketing, advertising, and sales efforts related to OneClickPolitics in his role as CEO. Any specific actions that are relevant to this case may be reflected in written materials, such as promotional documents, emails, or sales records, which would be more appropriately produced through document discovery. Clevinger is willing to meet and confer through counsel to discuss reasonable limitations, definitions, and parameters for this request to ensure that it is properly tailored to the issues in dispute.

**Supplemental Answer**: After Clevinger was constructively terminated from his employment with Advocacy Holdings on February 1, 2023, none.

14. Identify and describe all communications, whether written or oral, between you and any other person from February 1, 2023 to the present in which you purported, suggested, or implied that you were employed by Plaintiff.

**Answer:** Clevinger objects to this interrogatory as overly broad, vague, not relevant to any party's claim or defense, and not proportional to the needs of the case. The request seeks "all communications" with "any other person" over a period exceeding a year, without limitation as to

subject matter, scope, or relevance. It is unclear what standard is being applied to determine whether a statement "purported, suggested, or implied" that Clevinger was employed by Plaintiff, making the interrogatory highly subjective and speculative. A person's interpretation of a statement is inherently subjective and does not provide a clear, objective basis for determining whether a communication is responsive to this request.

Additionally, this interrogatory improperly assumes facts not in evidence by suggesting that Clevinger made statements implying he was employed by Plaintiff. The request also fails to specify whether it seeks only intentional representations or whether it seeks to encompass inadvertent references, third-party misunderstandings, or statements taken out of context. Requiring Clevinger to recall and describe every conversation over two years in which someone may have misunderstood his role imposes an unreasonable and disproportionate burden.

Further, to the extent this interrogatory seeks information contained in emails, messages, or other written records, it is improperly framed as an interrogatory rather than a request for production of documents. Any relevant communications, if they exist, would be best evidenced through written records rather than requiring Clevinger to recall and reconstruct conversations from memory.

Subject to and without waiving these objections, Clevinger states that he has not represented himself as being employed by Plaintiff since his departure on February 1, 2023. If any individuals mistakenly assumed that he remained with Plaintiff after that date, such assumptions were not the result of any affirmative statement or representation made by Clevinger.

15. Describe in detail the events that you allege constituted an assault against you,

including, without limitation, the date, time, location of the incident, and the witnesses present.

**Answer**: On January 17, 2023, Defendant Koepke assaulted Clevinger by threatening to beat him up and making a contemporaneous aggressive and threatening physical gesture with the intent of causing harmful and offensive contact and to create an imminent apprehension of such contact. In conjunction with these threats, Koepke physically lunged at Clevinger, intending either to make physical contact or, at a minimum, to place him in imminent apprehension of physical harm. These threats were not made in jest. Koepke explicitly stated, "We are going to beat up on Chazz" and "We may as well use a baseball bat on him," while making a physically threatening gesture.

Earlier that day, Koepke repeatedly berated Clevinger, mocking his personal life and eating habits. That evening, during a meeting at Advocacy Holdings/Red Chalk Group's office in Chicago, where Koepke, Zenkich, and Clevinger were discussing business matters, Koepke's aggression escalated. His verbal threats were accompanied by physical intimidation. He sat just a few feet from Clevinger, within striking distance, and lunged forward, causing Clevinger to experience immediate concern for his physical safety. The setup of the conference room further heightened the threat because Koepke partially blocked Clevinger's ability to exit, and Zenkich was in no position to intervene.

At that moment, Clevinger was placed in reasonable apprehension of imminent harmful and offensive contact. Koepke's behavior was particularly alarming given his known history of aggressive and violent conduct, including a prior contempt finding by an Illinois court, which described him as combative and lacking credibility. His threats were not idle. Clevinger feared that Koepke could have had a baseball bat on the premises and that the threat of violence could materialize at any time.

The situation deteriorated further on January 23, 2023. During an eight-minute phone call regarding an email Koepke had sent to an employee, Koepke erupted into a tirade, yelling and using profanity. When Clevinger attempted to de-escalate the situation by asking Koepke to stop yelling and cursing, Koepke called him "stupid" and blamed him for the company's struggles. When Clevinger pushed back, Koepke escalated the confrontation by threatening to fire him, stating, "Fuck you, go talk to your lawyer then."

Koepke's actions were intentional and went beyond mere workplace hostility. His behavior created an environment that was not only hostile but physically dangerous. Given his aggressive history, his explicit verbal threats, and his physical lunge, it was objectively reasonable for Clevinger to fear immediate physical harm. Koepke's conduct was serious, erratic, and threatening, and it continues to be offensive to any reasonable observer. As a direct result of this assault, Clevinger has suffered damages.

16. Describe in detail the alleged misrepresentations you refer to in Counts Eight and Ten of Defendant's Lawsuit, including the exact words of the statements, the dates, times, and places where they were made, and the people present or involved.

**Answer:** Clevinger objects to this interrogatory as overly broad and not proportional to the needs of the case to the extent it seeks "the exact words" of alleged misrepresentations, which may not be precisely recalled. The request also assumes that all details, including exact dates, times, and locations, are available or can be fully reconstructed. The interrogatory is unduly burdensome because it seeks an exhaustive recollection of statements spanning multiple years, many of which

occurred in informal settings or private conversations where precise documentation is not available.

Subject to and without waiving these objections, Clevinger states that the misrepresentations referenced in Counts Eight and Ten of his lawsuit involve false statements made by John Koepke and Raymond Zenkich regarding Clevinger's entitlement to equity in the company, his status as an officer and director, and the transfer of OneClickPolitics' assets into a new entity in which he was promised an ownership stake. These misrepresentations were made repeatedly between 2016 and 2023, including but not limited to the following instances:

- **October 12, 2016** – During an in-person meeting at Red Chalk's office in Chicago, Koepke and Zenkich told Clevinger, "You will be entitled to up to a quarter of equity in the business if you build this thing up."
- **August 19, 2018** – At a dinner meeting at Gibson's Bar & Steakhouse in Chicago, Koepke reiterated that Clevinger "would receive 'founders shares' that 'could not be diluted'" and that he would be made "an owner, director, and officer of the company."
- **December 20, 2018** – During another in-person meeting at Red Chalk's office, Koepke and Zenkich stated that Clevinger would receive "founders shares" of 10–25% of the company and be formally named an officer and director.
- **June 24, 2019** – During a telephone call, Koepke assured Clevinger, "We'll make good on your founders shares and we'll make you an officer and director of the company."
- **December 23, 2019** – At Red Chalk's office, Koepke acknowledged prior promises of equity but backtracked, stating that they might only be able to give Clevinger "10–15%" instead of the originally promised 25%.

These statements were false when made. Defendants never intended to provide Clevinger

with the promised equity or officer status and instead used these misrepresentations to induce him to continue working under false pretenses. In addition to misrepresentations about equity and officer status, Defendants also made numerous false statements about the company's finances to deceive Clevinger, conceal revenue, and prevent him from asserting his ownership rights. These financial misrepresentations include, but are not limited to:

- **Failure to Disclose Financial Records (2017–2023)** – Throughout his tenure as CEO, Clevinger repeatedly requested access to the company's financial records, including bank statements, tax returns, balance sheets, income statements, and records of capital contributions and distributions. Koepke and Zenkich refused to provide these documents and instead misrepresented the company's financial position.
- **December 16, 2019 – Telephone Call** – During a discussion about company financials, Clevinger requested access to bank records and other financial documentation. Koepke refused, stating, "You're the CEO of OCP, not the Red Chalk Group. You have no right to request financial records." This statement was misleading because OneClickPolitics was being operated under Red Chalk, and as CEO, Clevinger should have had access to financial information.
- **Revenue Misrepresentation (2018–2023)** – Koepke and Zenkich repeatedly underreported revenue figures and withheld accurate financial data from Clevinger.
- **June 24, 2019 – Telephone Call** – In a discussion about securing additional working capital, Clevinger suggested raising a Series A investment or seeking a loan against receivables. Koepke dismissed the idea, saying, "Raising money is a tricky business, Chazz." When Clevinger insisted that the new company should be formed so that his equity could be in place before a capital raise, Koepke responded, "That seems fair and

reasonable, Chazz, we just have to spin this thing out first." In reality, Defendants never intended to structure the company in a way that honored Clevinger's ownership rights.

- **Concealment of Company Valuation (2020–2023)** – Despite Clevinger's role in growing the business, he was denied access to valuation data. Defendants misrepresented the company's financial health to prevent him from asserting his claims to equity and profit-sharing.

These financial misrepresentations were material because they directly influenced Clevinger's decisions to continue working for the company, defer compensation, and forgo other professional opportunities under the false belief that he was building equity in the business.

17. Explain in detail how you relied on the alleged misrepresentations, including all actions you took or refrained from taking based on the alleged misrepresentations.

**Answer:** Clevinger objects to this interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks exhaustive details regarding every action taken or refrained from taking based on the alleged misrepresentations over the course of years. The request also improperly demands precise recollection of all decisions, including actions and inactions, made over several years in reliance on misrepresentations, which is unreasonable and difficult to reconstruct.

Subject to and without waiving these objections, Clevinger states that he relied on the misrepresentations made by John Koepke and Raymond Zenkich in several significant ways that influenced his professional decisions, financial expectations, and continued involvement with Advocacy Holdings and Red Chalk. Specifically, Clevinger took or refrained from taking the following actions based on Defendants' false statements:

**1. Continued Employment and Business Development**

- **Accepted and Remained in Leadership Roles (2016–2023):**

  Clevinger joined Red Chalk Group in 2016 based on promises of a substantial equity stake in OneClickPolitics, contingent on growing the business. In reliance on repeated assurances that he would receive equity and be made an officer and director, Clevinger remained in the company for over six years, contributing to revenue growth from under $110,000 in 2016 to over $3 million annually by the time of his departure. He stayed despite never receiving the promised equity, believing it was forthcoming.

- **Invested Substantial Time and Effort Without Proper Compensation:**

  Clevinger refrained from seeking alternative employment or starting his own business, dedicating his efforts to expanding OneClickPolitics. He recruited clients, hired and trained employees, and led a platform redesign, all under the belief that he was building long-term ownership value.

**2. Deferred Compensation and Financial Sacrifices**

- **Accepted Below-Market Salary and Commission Structures:**

  Clevinger accepted a lower salary than industry standards, relying on the belief that his equity stake in the company would serve as compensation. Had he known that Defendants never intended to provide him with equity, he would have either negotiated a higher salary or pursued other career opportunities.

- **Did Not Demand Formal Profit-Sharing or Bonuses:**

  Clevinger refrained from negotiating a formal profit-sharing arrangement or additional bonuses because he was led to believe he would receive ownership in the company. Had he known the truth about Defendants' intentions, he would have insisted on a written

agreement securing his compensation rights.

**3. Did Not Pursue Competing Opportunities**

- **Declined Other Job Opportunities and Business Ventures:**

  Clevinger was approached with other career opportunities in the advocacy technology space but chose to remain with OneClickPolitics, trusting Defendants' assurances that he was building his own company. Had he known that Defendants had no intention of granting him equity, he would have pursued alternative opportunities.

- **Refrained from Negotiating an Exit Strategy Sooner:**

  Clevinger did not resign or demand a buyout when suspicions arose, believing Defendants would eventually honor their commitments. He refrained from legal action or challenging Defendants' misrepresentations until it became clear they had no intention of fulfilling their promises.

**4. Relied on False Financial Representations**

- **Operated Without Full Access to Financial Records:**

  Clevinger trusted Defendants' representations about the company's revenue, expenses, and profitability, believing that they were being truthful about the business's financial health. This reliance caused him to continue reinvesting his time and efforts, unaware that Defendants were concealing higher earnings and diverting funds through Red Chalk Group.

- **Did Not Challenge Misreported Revenues or Seek Formal Accounting:**

  Because he believed Defendants' revenue disclosures were accurate, Clevinger did not demand formal audits or financial transparency sooner. Had he known that Defendants were concealing earnings, he would have insisted on full financial disclosures and pursued

legal recourse earlier.

**5. Assisted in Business Expansion Based on False Promises**

- **Led Strategic Growth Initiatives Under the Belief He Had an Ownership Stake:**

  Clevinger led the redesign of OneClickPolitics' platform, believing he was developing an asset he partially owned. He invested in client acquisition, product development, and marketing under the assumption that his efforts were increasing the value of his future equity.

- **Did Not Secure Legal Protections for His Contributions:**

  Clevinger refrained from negotiating a formal founder's agreement or independent contractor agreement that would have protected his interests. Had he known Defendants' misrepresentations were false, he would have required a legally binding contract guaranteeing his ownership stake before contributing to the company's expansion.

Clevinger relied on Defendants' misrepresentations to his detriment in multiple ways, including staying with the company for years, deferring compensation, declining other opportunities, and contributing to the business under false pretenses. These misrepresentations directly influenced his career trajectory and financial decisions, causing him significant harm.

18. Describe all due diligence you performed to verify the accuracy of the alleged misrepresentations, including omissions and concealments, that you claim to have relied upon that forms the basis of any damages you claim to have sustained in this Case.

**Answer:** Clevinger objects to this interrogatory as overly broad and not proportional to the needs of the case because it seeks a comprehensive account of "all due diligence" performed over a multi-year period, without any limitation as to time, scope, or relevance. The request also

assumes that every misrepresentation, omission, or concealment could have been independently verified at the time it was made, which is unreasonable given that key financial and corporate records were intentionally withheld by Defendants. Additionally, the interrogatory is vague in its reference to "due diligence," failing to specify whether it seeks formal investigative steps or any general inquiries Clevinger may have made during his tenure.

Subject to and without waiving these objections, Clevinger states that he made reasonable efforts to verify the accuracy of Defendants' representations regarding his equity, officer status, and the financial condition of the company. His due diligence efforts included, but were not limited to, the following:

**1. Requests for Documentation and Financial Transparency**

- **Repeatedly Requested Access to Financial Records (2017–2023):**

  Throughout his tenure as CEO, Clevinger sought access to bank statements, tax returns, balance sheets, income statements, and records of capital contributions and distributions. Koepke and Zenkich refused to provide these documents and instead misrepresented the company's financial position.

- **December 16, 2019 – Telephone Call:**

  Clevinger directly requested financial documentation, including bank records, but was told by Koepke, "You're the CEO of OCP, not the Red Chalk Group. You have no right to request financial records." This was misleading, as OneClickPolitics was being operated under Red Chalk, and Clevinger should have had access to financial data.

- **Examined Partial Financial Data (2019–2022):**

  On limited occasions when financial documents were made available, Clevinger reviewed revenue reports and client invoices to assess the company's financial health. However, key

documents, such as tax filings and complete financial statements, were consistently withheld.

**2. Efforts to Confirm Equity Promises**

- **Sought Clarification from Koepke and Zenkich (2016–2023):**

  Clevinger repeatedly questioned Koepke and Zenkich about the timeline for receiving his promised equity, asking for written confirmation of his ownership stake. Each time, he was assured that the equity would be formalized once the business structure was finalized.

- **June 24, 2019 – Telephone Call:**

  Clevinger insisted that his equity be confirmed before any capital raise or restructuring. Koepke responded, "That seems fair and reasonable, Chazz, we just have to spin this thing out first." This was another false assurance designed to keep Clevinger engaged without granting him ownership.

- **Reviewed Internal Company Records:**

  Clevinger periodically reviewed internal communications and agreements related to the company's structure but was never provided formal documentation supporting his equity stake.

**3. Legal and Industry Research**

- **Consulted with Colleagues and Industry Contacts:**

  Throughout his time at Advocacy Holdings, Clevinger sought informal input from other professionals in the advocacy and technology space regarding standard compensation and equity agreements. These discussions reinforced his understanding that his arrangement was atypical and that he should have been provided formal documentation.

- **Reviewed Public Filings and Business Registrations:**

Clevinger checked corporate records and public filings related to OneClickPolitics and Red Chalk Group but did not find documentation reflecting his ownership stake.

- **Examined Precedents for Equity Grants:**

  Based on discussions with other professionals and industry research, Clevinger confirmed that executives in comparable roles typically receive formalized equity grants, further indicating that Defendants were not acting in good faith.

**4. Internal Financial Analysis and Revenue Assessment**

- **Monitored Client Revenue and Business Growth:**

  While unable to access full financial records, Clevinger tracked revenue growth and compared it with the company's reported financial condition. He identified discrepancies suggesting that Defendants were concealing revenue and underreporting earnings.

- **Assessed Cash Flow Constraints and Investment Decisions:**

  Despite Koepke's claims that the company lacked sufficient funds, Clevinger observed that capital was being allocated in ways inconsistent with Defendants' representations, further raising suspicions about the company's financial health.

**5. Attempted to Secure Formal Recognition of His Ownership**

- **Proposed Equity Agreements (2020–2022):**

  On multiple occasions, Clevinger requested a formal agreement documenting his equity stake, but Koepke and Zenkich continually postponed or dismissed these requests.

- **Requested Written Confirmation of His Role (2021–2023):**

  In an effort to solidify his officer and director status, Clevinger requested written confirmation of his leadership role and equity in the company. These requests were ignored.

19. Describe in detail all facts supporting the allegations you make in paragraphs 518 of Defendant's Lawsuit.

**Answer:** Clevinger objects to this interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case, as it seeks "all facts" supporting allegations in Paragraph 518 without reasonable limitation. Further, to the extent the interrogatory seeks an exhaustive and detailed factual account, including specific monetary calculations, some of the information is within the exclusive control of Defendants, as they concealed financial records and misrepresented key transactions. Subject to and without waiving these objections, Clevinger responds as follows. Paragraph 518 of Clevinger's Amended Complaint alleges that he was financially harmed due to Defendants' misconduct, including:

(1) failure to compensate him fairly,

(2) withholding promised Class A stock ownership in Advocacy Holdings,

(3) forcing him to contribute $46,000 to a defunct enterprise, and

(4) Defendants' self-dealing and misappropriation of company funds.

**1. Failure to Provide Promised Compensation and Equity**

- Koepke and Zenkich Promised Equity But Never Delivered:
  - Defendants repeatedly assured Clevinger that he would receive Class A stock ownership in Advocacy Holdings in recognition of his role in leading the company.
  - Despite these promises, they failed to formalize or provide him with any enforceable equity interest.
- Defendants Diverted Profits While Claiming Insolvency:
  - Despite Clevinger's leadership driving revenue growth to over $10 million, Defendants refused to fairly compensate him.

    - They used misleading financial reports to justify withholding payments, while secretly transferring company funds to themselves.
    - Koepke and Zenkich initially promised him 25% equity in the company, which was later reduced to 10%, then 5.5%, and ultimately to valueless Class B shares.

2. Forced Financial Contributions Under False Pretenses

- Misrepresentation of Financial Need:
    - In 2019 and 2020, Koepke and Zenkich misrepresented the company's financial condition, claiming it required capital contributions to sustain operations.
    - Relying on these statements, Clevinger personally contributed $46,000, believing he was investing in the company's long-term success.
- Defendants Concealed Financial Transactions and Profited Personally:
    - Despite repeated requests, Defendants never provided financial records or a clear accounting of where his contributions were allocated.
    - Koepke misrepresented company revenue while personally benefiting from undisclosed financial transfers.

**3. Self-Dealing and Improper Fund Transfers**

- Unauthorized Payments to Red Chalk Group:
    - Defendants engaged in insider dealings, including the wrongful payment of at least $94,000 to Red Chalk Group for services it did not render.
    - These payments were made while Defendants falsely claimed the company was struggling financially.
- Diverting Advocacy Holdings Funds for Personal Gain:
    - Financial records indicate that Defendants directed company revenue into

undisclosed personal accounts and related entities rather than reinvesting in the business.

- Clevinger testified that Koepke repeatedly refused to provide financial statements, preventing him from verifying whether profits were fairly allocated.

**4. Advocacy Holdings' Unstable Finances and Induced Reliance**

- Testimony on Koepke's Mismanagement:
  - Koepke routinely failed to pay vendors and contractors on time, forcing him to personally step in to prevent lawsuits.
  - This mismanagement directly contributed to the company's financial instability, placing an undue burden on Clevinger.

Clevinger was financially harmed as a direct result of Defendants' misconduct, including false promises of equity, forced financial contributions under fraudulent pretenses, and wrongful diversion of company funds. He was deprived of the compensation he earned, forced to contribute capital without return, and excluded from the financial benefits Defendants unlawfully retained.

20. Describe the damages alleged in Defendant's Lawsuit, broken down by each of your remaining claims, and how you calculated each amount.

**Answer:** Clevinger objects to this interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case, as it seeks an exhaustive breakdown of damages calculations at this stage of litigation. The full extent of damages is still being developed through discovery, including financial records that are in Defendants' exclusive possession. Additionally, some categories of damages, such as lost business opportunities and reputational harm, do not lend themselves to precise calculation at this time.

Subject to and without waiving these objections, Clevinger provides the following preliminary breakdown of damages, which remains subject to refinement as discovery progresses:

**1. Breach of Contract (Failure to Grant Equity)**

Damages Claimed:

- Fair market value of the promised Class A stock in Advocacy Holdings
- Lost profits and distributions that would have been earned as an equity owner
- Compensatory damages for economic loss due to Defendants' failure to grant equity
- Calculation Basis:
- Defendants repeatedly promised Clevinger 25% equity in Advocacy Holdings, which was later reduced to 10%, then 5.5% in valueless Class B shares.
- The company's revenue exceeded $10 million, with significant profit margins concealed from Clevinger.
- A 10% ownership stake would have entitled him to distributions in excess of $1 million, assuming a reasonable profit margin.
- Additional damages may include diminution in equity value due to Defendants' mismanagement.

Preliminary Estimate: $1.5 – $2 million (subject to financial disclosures).

**2. Fraudulent Inducement (Equity & Compensation Misrepresentations)**

Damages Claimed:

- Value of deferred compensation based on reliance on false promises
- Lost earnings from alternative career opportunities
- Compensatory damages for reliance losses

- Calculation Basis:
- Clevinger was induced to remain with the company for over six years based on false promises of equity.
- He forwent higher-paying opportunities in reliance on Defendants' misrepresentations.
- His industry peers in similar roles earned $450,000 - $600,000 annually in salary and bonuses.
- Had he left earlier and taken another executive role, he could have earned $1.5 - $2 million in salary over five years.

Preliminary Estimate: $1.5 – $2 million (subject to further financial analysis).

**3. Unjust Enrichment (Forced Financial Contributions)**

Damages Claimed:

- Reimbursement of the $46,000 personally contributed to sustain the company
- Interest and penalties for lost investment opportunities
- Calculation Basis:
- Clevinger personally contributed $46,000 at Defendants' request, under the false pretense that the company was financially struggling.
- These funds were misappropriated by Defendants for personal benefit rather than business operations.
- Interest and lost investment gains are estimated at 10% per year, totaling approximately $55,000 as of 2024.

Preliminary Estimate: $55,000 - $60,000.

**4. Breach of Fiduciary Duty & Self-Dealing**

Damages Claimed:

- Lost profits due to Defendants' financial mismanagement
- Losses from Defendants' diversion of company funds
- Punitive damages for willful misconduct
- Calculation Basis:
- Evidence suggests that Defendants wrongfully transferred at least $94,000 to Red Chalk Group for services never rendered.
- Defendants diverted additional company revenue to undisclosed personal accounts.
- Clevinger, as CEO, was prevented from accessing financial records that would have revealed the full extent of the self-dealing.
- Punitive damages may be warranted due to the deliberate concealment of financial transactions.

Preliminary Estimate: $250,000 - $500,000, plus punitive damages (amount TBD).

**5. Tortious Interference with Business Relations**

Damages Claimed:

- Lost business opportunities due to Defendants' conduct
- Reputational harm in the industry
- Lost revenue from clients and partners misled by Defendants
- Calculation Basis:
- Defendants spread false statements about Clevinger to clients, damaging his professional reputation.

- Clevinger lost multiple business opportunities due to Defendants' actions, including potential partnerships valued at $500,000+.
- Lost goodwill with clients directly impacted his ability to generate new business.

Preliminary Estimate: $500,000 – $750,000.

Total Estimated Damages (Preliminary)

| Claim | Estimated Damages |
|---|---|
| Breach of Contract | $1.5M - $2M |
| Fraudulent Inducement | $1.5M - $2M |
| Unjust Enrichment | $55K - $60K |
| Breach of Fiduciary Duty | $250K - $500K |
| Tortious Interference | $500K - $750K |
| Total (excluding punitive damages) | $3.8M – $5.3M |

These figures are preliminary and subject to revision as necessary.

21. Describe in detail all facts that support your contention that Plaintiff, John Koepke, Raymond Zenkich, and Red Chalk Group were unjustly enriched as you allege in Defendant's Lawsuit, and include in your answer how much you believe each was unjustly enriched.

**Answer:** Clevinger objects to this interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case, as it seeks an exhaustive factual breakdown without reasonable limitation and it is actually multiple separate interrogatories all rolled into one. Additionally, the full extent of unjust enrichment is still being developed through discovery, as many financial records remain in the exclusive control of Plaintiff, John Koepke, Raymond

Zenkich, and Red Chalk Group.

Subject to and without waiving these objections, Clevinger provides the following response:

**1. Unjust Enrichment of Plaintiff, John Koepke, Raymond Zenkich, and Red Chalk Group**

Clevinger contends that Plaintiff, John Koepke, Raymond Zenkich, and Red Chalk Group were unjustly enriched by retaining financial and business benefits that rightfully belonged to Clevinger, including equity, compensation, and business opportunities. The unjust enrichment arose from:

- Denying Clevinger his promised ownership interest in Advocacy Holdings while retaining full control over profits and distributions.
- Forcing Clevinger to contribute $46,000 under false pretenses while concealing the company's true financial condition.
- Diverting company funds for personal benefit rather than reinvesting them into the business or compensating Clevinger fairly.
- Misappropriating revenue and misrepresenting the financial position of the company, preventing Clevinger from making informed financial decisions.

**2. Specific Acts of Unjust Enrichment**

- A. Retention of Clevinger's Earned Equity
- Koepke and Zenkich repeatedly promised Clevinger Class A stock ownership in Advocacy Holdings, which they never delivered.
- Instead of granting the agreed equity, Defendants structured the company to ensure they retained 100% control while blocking Clevinger from any financial upside.

- The estimated value of the equity Clevinger was promised exceeds $1.5 – $2 million based on the company's revenue growth and profit margins.
- This directly benefited Koepke, Zenkich, and Red Chalk Group, who pocketed 100% of the ownership stake that should have been partially allocated to Clevinger.

Estimated Unjust Enrichment (Equity Retention): $1.5 – $2 million (primarily benefitting Koepke and Zenkich).

- B. Misappropriated Revenue & Diversion of Funds
- Defendants directed at least $94,000 in payments to Red Chalk Group for services never rendered.
- Defendants transferred company funds to undisclosed personal accounts, depriving the business of operational capital.
- Financial records indicate that Defendants concealed revenue growth from Clevinger while ensuring they received disproportionate financial benefits.
- Koepke and Zenkich personally benefited from these diverted funds while preventing Clevinger from accessing financial statements.

Estimated Unjust Enrichment (Misappropriated Revenue): $250,000 – $500,000 (primarily benefitting Red Chalk Group, Koepke, and Zenkich).

- C. Forced Financial Contribution by Clevinger
- Clevinger was coerced into contributing $46,000 under false pretenses, believing the funds were necessary for business survival.
- In reality, Defendants were misrepresenting the company’s financial condition while personally enriching themselves.
- These funds were not used for legitimate business expenses but instead absorbed into

Defendants' accounts.

- This benefited Koepke, Zenkich, and Red Chalk Group at Clevinger's direct financial expense.

Estimated Unjust Enrichment (Forced Contribution): $55,000 – $60,000 (with interest, primarily benefitting Koepke and Zenkich).

- D. Withholding Compensation & Business Opportunities
- Clevinger was promised a fair salary and profit-sharing agreement, which was never honored.
- Defendants intentionally underpaid Clevinger while increasing their own financial benefits.
- Clevinger relied on false promises of equity and compensation and thus did not pursue other career opportunities that could have resulted in higher earnings.
- Industry-standard compensation for Clevinger's role would have been $250,000 – $400,000 annually in salary and bonuses.
- The lost earnings due to Defendants' deception are estimated at $1.5 – $2 million over multiple years.

Estimated Unjust Enrichment (Withheld Compensation): $1.5 – $2 million (primarily benefitting Koepke and Zenkich).

**3. Total Estimated Unjust Enrichment Per Defendant**

| Beneficiary | Basis of Unjust Enrichment | Estimated Amount |
|---|---|---|
| John Koepke | Retained Clevinger's equity, misappropriated funds, | $1.5 – $2.5 |

| Beneficiary | Basis of Unjust Enrichment | Estimated Amount |
|---|---|---|
| | withheld compensation | million |
| Raymond Zenkich | Retained Clevinger's equity, misappropriated funds, withheld compensation | $1.5 – $2.5 million |
| Red Chalk Group | Fraudulent payments and misallocated funds | $250,000 – $500,000 |
| Plaintiff (Advocacy Holdings) | Benefited from underpaying Clevinger and using his contributions | $55,000 – $60,000 |
| Total | Overall unjust enrichment across all defendants | $3.8 – $5.5 million |

Clevinger contends that Plaintiff, John Koepke, Raymond Zenkich, and Red Chalk Group were unjustly enriched by at least $3.8 – $5.5 million, primarily through the retention of his promised equity, misappropriation of company funds, forced financial contributions, and the withholding of fair compensation.

22. Identify each and every person who is not a party to either the Plaintiff's Lawsuit or the Defendant's Lawsuit who was present during any conversation about these cases you had with Kenneth Chase, Esq., regardless of whether that conversation was in person or via telephone, and for each person provide his/her contact information.

**Answer:** Clevinger objects to this interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case. The request is vague as to scope and improperly seeks

privileged or protected information, including communications between Clevinger and his legal counsel. To the extent this interrogatory seeks the identities of third parties who may have been present during privileged communications, it improperly intrudes on the attorney-client privilege and attorney work-product doctrine.

Subject to and without waiving these objections, Clevinger states that, to the best of his knowledge, no non-party individuals were present during communications about the cases between himself and his counsel.

**VERIFICATION**

I have read the preceding interrogatory answers, which are true and correct. I declare that the foregoing is true and correct.

Dated: 4/2/2025

By: DocuSigned by: Chazz Clevinger
23EF38FC6B8D402...
Chazz Clevinger

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By: *__/s/ Kenneth E. Chase__*

Kenneth E. Chase
D.C. Bar No. 985629
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Counsel for Chazz Clevinger, CiviClick, Inc., and Superior Campaign Solutions, LLC*

## CERTIFICATE OF SERVICE

I, Kenneth E. Chase, hereby certify that I served the foregoing via email to issuing party's counsel via email on April 2, 2025.

By: *__/s/ Kenneth E. Chase__*
Kenneth E. Chase